# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE

| | |
|---|---|
| CAPTAIN TODD DORRIS, and ) | |
| DETECTIVE MICHAEL CANDLER, ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | **Jury Demand** |
| ) | |
| KIM KELLEY, ) | |
| PHILLIP JOSEPH DRAKE, ) | |
| DIGITAL DEFENDERS UNITED ) | |
| INCORPORATED, ) | |
| GROW ONLINE, LLC, ) | |
| UNITING AMERICA, INC., and ) | |
| DOES 1-25 ) | |
|     Defendants. ) | |

---

## COMPLAINT

---

Table of Contents

*INTRODUCTION*.................................................................................................................*3*

*PARTIES*.........................................................................................................................*5*

*JURISDICTION AND VENUE*..............................................................................................*7*

*ALLEGATIONS OF FACT*..................................................................................................*10*

    **Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership**..........10

    **Plaintiffs Begin Working for a New Administration Under Chief Bryan Morris**.............17

    **Assistant Chief Shawn Taylor's Creation of a Joint Task Force to Combat Corruption.**19

    **The Millersville Undercover Pedophile Sting.** ...................................................................28

    **Defendant Kim Kelley's Disruptions, False Alarms, and False Claim That Suspect "Got Away."** ........................................................................................................................34

    **Suspect Henry Dean Jordan Solicits the Decoy Profile Operated by Capt. Dorris**..........36

    **Kim Kelley Demands $35,000 from Craig Sawyer to "Purchase Trafficked Children."** .39

    **Kim Kelley Remains in Nashville After the Pedophile Sting Ends.**....................................40

    **The TBI Operation Plan Shows Investigation Was Requested on May 22, 2024.**.............42

**Millersville's Request for a Prosecutor Pro Tem and Investigative Grand Jury is Declined.** ................................................................................................................44

**Capt. Todd Dorris Testifies at The Preliminary Hearing on May 28, 2024.**.....................45

**Det. Candler Attempts to Obtain a Judicial Subpoena for Public Records.**......................56

**Defendants Drake and Kelley Release Video of Michael Candler to Reveal His Identity.** ................................................................................................................65

**Defendant Kim Kelley and Phil Drake's Intentional Sabotage of the Millersville Pedophile Sting in Furtherance of Their Racketeering Influenced Corrupt Organization.** ................................................................................................................66

**Phil Drake Publicly Claims To Have Created the "Q Anon" Conspiracy As Part of His Work as Contractor for CIA, FBI, and OIG.** ................................................74

**Phil Drake and Kim Kelley's "Child-Purchasing" and "Survivor Center" Fraud Scheme.** ................................................................................................................77

**Defendant Phil Drake Admits Involvement In Interstate and Transnational Racketeering Scheme, Willfully Violating Rights of Americans, and Engaging in Acts of Terrorism.**...78

**Defendants Phil Drake and Kim Kelley's "Survivor Center" Is An Instrument of Fraud Racketeering**................................................................................................83

**The Defendants' Manipulation of Recordings Taken at the Millersville Pedophile Sting – May 17 to May 19, 2024** ................................................................96

*CAUSES OF ACTION* ................................................................................................110

*COUNT I: DEFAMATION – TENNESSEE LAW* ................................................................110

*COUNT II: FALSE LIGHT – TENNESSEE LAW* ................................................................116

*COUNT III: DEFAMATION BY IMPLICATION OR INNUENDO – TENNESSEE LAW.*117

*COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE BUSINESS RELATIONSHIPS – TENNESSEE LAW* ................................121

*COUNT V: MISAPPROPRIATION OF LIKENESS – TENNESSEE LAW* ........................122

*COUNT VI: MISAPPROPRIATION OF A TRADE SECRET – TENNESSEE LAW* ..........123

*COUNT VII: CONSPIRACY – TENNESSEE LAW* ................................................................125

*COUNT VIII: MISAPPROPRIATION OF TRADE SECRETS - (18 U.S.C. § 1832)*............125

*COUNT IX – VIOLATIONS OF RACKETEERING INFLUENCED CORRUPT ORGANIZATION ACT (18 U.S.C. §§ 1961–1968)*................................................................127

*COUNT X – CONSPIRACY IN VIOLATION OF RICO ACT (18 U.S.C. § 1962(d))*............132

*PRAYER FOR RELIEF*................................................................................................135

Plaintiffs, Todd Dorris, and Michael Candler, for their cause of action against the Defendants Kim Kelley, Digital Defenders United, Incorporated, Grow Online, LLC, Phillip Joseph Drake, Uniting America, Inc., and Does 1-25, state and allege as follows:

## INTRODUCTION

1. This action is brought by Plaintiffs, Captain Todd Dorris and Detective Michael Candler, both highly respected and veteran police officers currently employed by the Millersville Police Department, seeking redress for the harms inflicted upon them by the tortious and unlawful acts and omissions of Defendants Kim Kelley, Phillip Joseph Drake, and their "Affiliated Organizations," which include Digital Defenders United Incorporated, Grow Online, LLC, and Uniting Americas, Inc. The Defendants utilized instrumentalities of interstate commerce, including traveling to Millersville, Tennessee, where they engaged in a coordinated smear campaign aimed at intentionally interfering with law enforcement operations and discrediting the Plaintiffs' professional reputations. Utilizing interstate commerce facilities, the Defendants promoted, managed, and facilitated their unlawful activities, including the solicitation of funds for their Affiliated Organizations, which are fronts for illegal racketeering. Under the guise of assisting in a legitimate child trafficking sting operation conducted between May 17, 2024, and May 20, 2024, Defendant Kelley, with the premeditated assistance of Phillip Joseph Drake and their Affiliated Organizations, conspired to engage in unlawful racketeering activities, including promoting facilitating the  promotion of their unlawful activities. These activities encompassed carrying on a business of unlawful child trafficking, obstruction of justice, interference with law enforcement operations and Plaintiffs' employment, generating false accusations to trigger criminal investigations of Plaintiffs, and the deliberate dissemination of false information

designed to undermine legitimate law enforcement efforts and destroy the careers and lives of two law enforcement officers who are dedicated to protecting the public and upholding the law.

2. As identified herein, the Defendants' acts and omissions are predicate acts under the Racketeer Influenced and Corrupt Organizations Act (RICO) as defined in § 1961 and § 1952, and involve fraudulent schemes and the use of interstate commerce facilities to further their unlawful objectives. The Defendants intended their smear campaign and false narrative to generate online traffic to their monetized social media accounts and to promoted themselves, their businesses, and to solicit donations from unsuspecting viewers. As a result of the Defendants' coordinated efforts, Plaintiffs have suffered financial and monetary losses, losses to their business and property interests, damage to their professional reputations, emotional distress, and other compensable injuries. Plaintiffs seek compensatory and punitive damages for the Defendants' RICO violations, including but not limited to lost wages, damage to their business and property interests, reputational harm, emotional suffering, and costs incurred due to the Defendants' unlawful conduct, as well as damages under applicable state laws for defamation, tortious interference, and the Plaintiffs' other state and federal claims.

3. The Defendants' tortious and unlawful acts and omissions, motivated by personal, political, and unlawful agendas, have resulted in widespread harm to the Plaintiffs. The Defendants' acts have also proximately caused the release of a serial child rapist, the obstruction and dismissal of numerous criminal cases that were being investigated by Capt. Dorris and Det. Candler, whose exemplary records and careers have been targeted by a smear campaign

driven by Defendants' fraudulent intent and actions to promote their own unlawful enterprise.

4. This action seeks to hold the Defendants accountable for defamation, tortious interference with a business relationships, corporate espionage and theft of trade secrets, and civil claims for the Defendants engaging in acts made unlawful as Racketeering Influenced Corrupt Organizations by manipulating the public narrative to further their racketeering organizations by obstruct justice, intentional interference with legitimate law enforcement operations, engaging in numerous acts of unlawful child trafficking, generating false accusations to trigger criminal investigations, the purpose of which was to destroy the careers and lives of two law enforcement officers who are dedicated to protecting the public and upholding the law.

## PARTIES

5. Plaintiff Todd Dorris is a citizen and resident of Robertson County, Tennessee. He is a police officer certified by the Tennessee Peace Officer Standards and Training ("POST"). He currently holds the rank of Captain and is also a Detective at the City of Millersville, Tennessee Police Department.

6. Plaintiff Michael Candler is a citizen and resident of Montgomery County, Tennessee. He is a POST-certified police officer and a Detective employed at the City of Millersville, Tennessee Police Department.

7. The Defendant Kim Kelley aka "Kimberly Promise Kelley," is a citizen and resident of Austin, Texas. Kelley is a director of Digital Defenders United Incorporated, and a co-Founder and Spokesperson for Defendant Uniting America Inc. She may be served at 2203 Red Fox Road, Austin, Texas 78734.

8. Defendant Phillip Joseph Drake is a citizen and resident of South Carolina, and he may be served at 125 Huskey Court, Spartanburg, South Carolina. Drake ran an unsuccessful campaign as Democrat and became an independent candidate for President of the United States in 2024. In November of 2024, Defendant Drake was arrested by U.S. Marshalls and is currently being housed without bond in the Hidalgo County jail at 711 El Cibolo Road, Edinburg, Texas 78541 Texas for multiple charges of fraud and cattle theft between $35,000 and $150,000 for each charge.

9. The Defendant Digital Defenders United Incorporated is a not-for-profit organized under the laws of the State of Alabama with its principal place of business located at 17350 State Highway 249, Suite 220, Houston Texas, 77064-1132. Defendant Digital Defenders United, Incorporated may be served through its registered agent, Republic Registered Agent, LLC, whose address is 181 W Valley Ave Suite 245, Birmingham, Alabama 35209. Defendant Digital Defenders United, Incorporated is owned and controlled by Defendant Kim Kelley and it is a coconspirator and instrumentality of the racketeering and illegal activities identified herein.

10. Defendant Uniting America, Inc. a/k/a "Uniting Americas Inc." is a purported non-profit co-founded by Defendant Kim Kelley that is owned and operated by Phillip Drake with its principal place of business located at 125 Huskey Court, Spartanburg, South Carolina. Although it was granted nonprofit status on November 15, 2023, there have been no 990s filed with the IRS, and its website https://unitingamericainc.org was deactivated on December 5, 2024. Uniting America, Inc. is, in fact, a front for money laundering, human trafficking, and funding for the additional acts of racketeering identified herein.

11. Defendant Grow Online, LLC is a limited liability company with its principal place of business located at 1806 Sandy Lake Drive, Friendswood, Texas 7754. Defendant Grow Online, LLC is owned in whole or in part by Defendant Kim Kelley and it is a coconspirator and instrumentality of the racketeering and illicit activities identified herein. Defendant Grow Online is engaged in the illicit business activities of Defendants Phil Drake, and Uniting America, Inc.. Defendant Grow Online, LLC has received over $200,000 in illicit funds from Defendants Phil Drake and Uniting America, Inc, in furtherance of the unlawful racketeering scheme alleged herein.

12. Defendant Uniting America, Incorporated is a not-for-profit owned and operated by Defendant Phillip Drake. Its principal place of business is 125 Huskey Court, Spartanburg, South Carolina, 29203. It is an instrumentality of the fraud, racketeering and illicit activities

13. Does 1-25 are the John and Jane Doe Defendants and co-conspirators of the principal defendants named herein who are therefore liable for the acts, omissions, and predicate acts of the principal named Defendants. Discovery will be necessary to identify Doe Defendants 1-25.

14. As stated herein, Defendants Uniting America, Incorporated, Grow Online, LLC, Phillip Drake, and Digital Defenders United, Inc. will collectively be referred to as the "Affiliated Entities."

**JURISDICTION AND VENUE**

15. This Court has subject-matter jurisdiction because the Plaintiffs' claims are brought pursuant to 18 U.S.C. § 1961 et seq., and federal questions are therefore presented under

28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1667.

16. In the alternative, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between the plaintiffs and the defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

17. This Court has jurisdiction over this action pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), codified at 18 U.S.C. §§ 1961–1968. RICO is a federal law designed to combat organized crime by allowing prosecution and civil penalties for acts performed as part of an ongoing criminal organization. Federal questions are therefore presented under 28 U.S.C. § 1331.

18. As alleged herein, this Court has RICO jurisdiction over the Defendants because they have engaged in a pattern of racketeering activity, which includes committing at least two "predicate offenses" within a ten-year period. Defendants have engaged in a series of unlawful acts that constitute predicate offenses under RICO, both in Millersville, Sumner County, Tennessee, in May 2024, and elsewhere in the United States over the preceding ten years. These predicate acts include, but are not limited to:

    a. Human Trafficking and Involuntary Servitude: Violations of 18 U.S.C. §§ 1584, 1589, 1590, and 1591, involving the purchase, sale, and exploitation of individuals through force and coercion.

    b. Financial Crimes and Extortion: Violations of 18 U.S.C. §§ 1951, 1952, 1960, and 1343, encompassing extortion, money laundering, and wire fraud aimed at financing and perpetuating the Defendants' illicit activities.

c. Sexual Exploitation of Children: Violations of 18 U.S.C. §§ 2251–2260 and 2421–2424, involving the procurement and transportation of minors who have been trafficked for unlawful sexual purposes.

d. Economic Espionage and Theft of Trade Secrets: Violation of 18 U.S.C. § 1832, involving the unauthorized recording and dissemination of sensitive information to harm law enforcement efforts and gain illicit advantages.

e. Interference with Law Enforcement Operations: Violations of 18 U.S.C. §§ 1324, 1327, and other related statutes, involving the obstruction of legitimate law enforcement investigations and the manipulation of legal processes to facilitate criminal enterprises.

f. Murder-for-Hire and International Terrorism: Violations of 18 U.S.C. § 1958, which prohibits murder-for-hire schemes, and 18 U.S.C. §§ 2331(1) and 1959, which address international terrorism and violent crimes in aid of racketeering activity. Specifically, based on Phil Drake's admissions, the Defendants engaged in separating children from their parents at the U.S.–Mexico Border, participating in the murder of those parents, and smuggling satchels of money back into the United States to bribe officials. These actions constitute a clear "murder-for-hire" scheme and "international terrorism," directly violating the aforementioned statutes.

g. Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises: Violations of 18 U.S.C. § 1952, which prohibits the use of interstate or foreign commerce facilities to further racketeering activities. The Defendants traveled across state lines and utilized interstate mail and commerce facilities with the intent

to distribute the proceeds of unlawful activities, commit crimes of violence to further these activities, and facilitate the promotion and management of their criminal enterprises.

19. The Defendants' coordinated and continuous illegal activities demonstrate the Defendants' involvement in an organized scheme to exploit and undermine both individuals and law enforcement efforts. By committing these predicate acts, the Defendants have subjected themselves to RICO jurisdiction in this Court to redress the extensive harm caused by the Defendants' criminal conduct.

20. Venue is in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district. Venue is also proper in this district under 18 U.S.C. § 1965(a), as Defendants Kim Kelley, Phil Drake, individuals and as representatives of their Affiliated Organizations, Grow Online, LLC, Digital Defenders United, Inc., and Uniting Americas, Inc. Incorporated, travelled to the Middle District of Tennessee, in furtherance of schemes made unlawful and as part of Racketeering-Influenced Corrupt Organizations.

**ALLEGATIONS OF FACT**

*Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership.*

21. Historically, Millersville's proximity to the Kentucky border and major highways made it a hub for illegal trafficking. Many of the "old-timers" around the City might regale about stories of moonshiners using the City as a distribution hub, and how certain now-closed businesses had been used as fronts for money-laundering. The City of Millersville was incorporated in 1981. Through years of incompetence, corruption, and mismanagement, the City's financial resources have been stressed to the limits. Incompetent management

lead to the failure of the City to apply for grants for funds sorely needed. Poor leadership resulted in such a high number of lawsuits from 2022-2023 that it caused the City to lose its insurance with Public Entity Partners, the main insurer of municipalities in Tennessee.

22. In January 2024, the City of Millersville saw key leadership changes. Commissioner Alisa Huling won a special election over former Mayor Tim Lassiter, ending a 2–2 deadlock on the Board of Commissioners—split between Commissioners Cristina Templet and David Gregory versus Mayor Tommy Long and Vice Mayor Milton Dorris. These changes lead to immediate retaliation from Cristina Templet and David Gregory and resulted in their year-long campaign to obstruct and interfere with municipal operations. Although it is beyond the scope of this Complaint to detail every change, a brief background is necessary for context.

23. On January 23, 2024, the Board voted 3–2 to remove City Manager Scott Avery, who had previously been fired from another city manager post and faced multiple controversies during his year in office. As an at-will employee, Avery's termination was expected, and in the days leading up to the vote, Avery deleted around 30,000 emails and texts, forwarded city emails to his personal account, and removed several boxes of documents from City Hall, which was captured on CCTV.

24. Mayor Long and Vice Mayor Dorris opposed various corrupt practices that had been occurring in the City, including the use of Millersville as a hub for hiring "reserve officers" so they could obtain police commission cards and direct traffic for a private security company, Solaren Risk Management. Their opposition angered Commissioners Templet, who was friends with the owner and the police chief at the time, and Commissioner

Gregory, who was found later to have possessed one of the illegal police commission cards that had been issued in his name.

25. Mayor Long had first ran for commissioner in 2020 to fill a two year, unexpired term. He ran again in November of 2022 for a four year term, receiving 46% of the votes and becoming the City's next Mayor. In December of 2022, he heard a rumor that Cristina Templet did not live in the City of Millersville when she ran for City Commissioner, which is illegal. T.C.A. § 2-2-122 states that a person's residence is the "place in which the person's habitation is fixed, and to which, whenever the person is absent, the person has a definite intention to return[.]" The property claimed as a Millersville residence by Templet was 7711 Ruby Lane in Millersville. Templet had used this address to illegally register to vote in 2018, and she had also used the address on her "Candidate Nominating Petition" filed on August 14, 2020. In fact, there was no habitation on the Templet's Millersville property at all until February-March of 2021. Thus, it was clear that Templet had illegally registered to vote under T.C.A. § 2-19-107, and made false entries on official registration and election documents under T.C.A. § 2-19-109, both of which are Class D felonies.

26. On November 16, 2021, Cristina Templet voted to approve a land purchase agreement with the City of Millersville selling a property to StaPro Investments, LLC, a company owned by Templet's husband in which she had an undisclosed, personal financial interest, in violation of Section 2-187 and 2-189 of the Millersville Code of ordinances, T.C.A. § 6-54-107, T.C.A. § 12-4-101, and the official misconduct statute, T.C.A. § 39-16-402. Templet did not even submit a "Personal Interest Disclosure Form" disclosing her interests in the dozen or so shell companies she and her husband owned until September 21, 2023.

27. The Templets then took action to conceal their involvement in various projects in the City, including Winston Templet using fictitious names like "Jones Property Town Homes" or having former City Manager Scott Avery list only the tax and parcel numbers in City meeting agendas instead of listing the address and the owner/developer information.

28. After Mayor Long removed Winston Templet from the Planning Commission due to a conflict of interest with him voting to approve projects where he and his wife held an undisclosed, material interest, the Templets retaliated by forming another shell company they named "FU Tommy Long, LLC," spray-painting the name on a dumpster and moving it around town until they eventually parked it next to Mayor Long's home.

   a. See https://www.wsmv.com/2023/09/06/husband-political-rival-millersville-mayor-tommy-long-registers-company-with-state-named-fu-tommy-long-llc/ (Sept. 6, 2023).

   b. Winston Templet discussing the vendetta on one of his many YouTube Videos:



29. Before January 2024, the City faced longstanding problems, including an alleged quid pro quo scheme with Solaren Risk Management—a security firm owned by Jack Byrd III. Uncertified officers received Police Commission Cards, allowing them to direct traffic and

work lucrative downtown Nashville security gigs, despite lacking the required Tennessee POST certification. Media outlets ran multiple stories alleging unlicensed guards and impersonation of police officers.

    a. https://www.tennessean.com/story/news/2017/08/10/nashville-metro-council-candidate-runs-office-while-fighting-extortion-charges-giles-county/548537001/ (Aug. 10, 2017);

    b. https://www.wsmv.com/2023/05/04/security-company-insiders-imposter-police-officers-all-worked-same-business/ (May 3, 2023);

    c. https://www.newschannel5.com/news/newschannel-5-investigates/security-company-vows-to-make-changes-following-allegations-of-hiring-unlicensed-guards (May 26, 2023);

    d. https://www.wsmv.com/2024/07/02/state-issues-62-violations-against-company-accused-allowing-imposter-cops-nashville-streets/ (July 2, 2024);

    e. https://tennesseeconservativenews.com/davidson-county-sheriffs-office-investigating-fake-cops-in-nashville/ (Sept. 23, 2024);

    f. https://www.newschannel5.com/news/newschannel-5-investigates/sheriff-suspends-four-deputies-for-wearing-misleading-police-patch-while-working-off-duty-private-security (Oct. 11, 2024);

30. Former Chief Dustin Carr was often in the news, with allegations of an illegal quid pro quo for the sale or barter of police commission cards for up to $5,000 a piece. At least one eyewitness claimed in an online podcast to have seen that Carr had a drawer that was filled with bundles of cash that vastly exceeded his police chief salary. Carr abruptly resigned on December 12, 2022 shortly before photos he had taken of himself brandishing his penis at City Hall while in his police uniform emerged online.

    a. https://www.wsmv.com/2023/07/07/recorded-phone-call-former-police-chief-raises-questions-quid-pro-quo-commission-card/ (July 7, 2023);

    b. https://www.newschannel5.com/news/newschannel-5-investigates/millersville-police-chief-named-in-bullying-lawsuit-resigns (Dec. 12, 2022).

    c. https://mainstreetmediatn.com/articles/news-robertsoncountyconnection/millersville-police-chief-abruptly-resigns-before-emergence-of-indecent-photograph-2/ (Dec. 27, 2022).

31. Throughout 2023, the City of Millersville faced ongoing issues. Former Assistant Police Chief Glenn Alred—lacking a current P.O.S.T. certification—served full-time when he

could only lawfully be employed as a "part-time reserve officer," violating P.O.S.T. rules and subjecting the City to potential criminal sanctions. He and Interim Police Chief Melvin Brown resigned in July 2023, sparking additional media coverage of their actions:

    a.  https://www.newschannel5.com/news/newschannel-5-investigates/millersville-cop-under-investigation-amid-questions-about-his-state-certification (Mar 9, 2023);

    b.  https://www.wsmv.com/2023/09/26/internal-investigation-former-assistant-chief-violated-deadly-force-restriction-policy/ (Sept. 25, 2023).

    c.  https://www.newschannel5.com/news/newschannel-5-investigates/state-investigators-confirm-timesheet-issues-for-now-former-millersville-assistant-police-chief (Aug. 18, 2023).

32. In November 2023, then–City Manager Scott Avery hired Robert "Uno" Richman from Texas as Millersville's new police chief, despite Richman's lack of a college degree and a controversial record as Associate Commissioner for Child Protective Investigations in Texas, which included allegations (reported by the Texas Tribune) of mishandling sex trafficking and abuse reports at a foster care facility resulting in the Governor of Texas demanding that Richman step down from office.

    a.  https://www.texastribune.org/2022/08/12/texas-child-abuse-agency-rich-richman/ (Aug. 12, 2022).

33. Around January 26, 2024, Interim City Manager Tina Tobin terminated Richman after he presented a roster listing former City Manager Scott Avery as a "reserve officer." Records online also revealed that Richman faced harassment and criminal trespass charges in Texas for conduct presumed to have occurred before he had relocated to Tennessee:



34. Before the January–February 2024 personnel changes in Millersville, the City had only one

detective with under a year of experience, and he had been "*Giglio*-impaired"[1] by the

---

[1] See *Giglio v. U.S.,* 405 U.S. 150 (1972), a case in which the prosecution failed to disclose a promise of immunity to a state's witness. In Tennessee law enforcement circles, a "*Giglio*-impairment" refers to a prosecutor's duty to provide exculpatory evidence that impeaches the testimony and credibility of the police officer, and is part of the *Brady v. Maryland,* 373 U.S. 83 (1963) line of cases. If the exculpatory evidence is that the officer had lied to prosecutors, for

Robertson County DA for lying about involvement in a traffic stop of a meth trafficker, Savannah Hill. A *Giglio*-impaired officer is when prosecutors refuse to call a witness due to documented untruthfulness, often leading to case dismissals. Former Assistant Chief Glen Alred—friend and associate of ex–Chief Dustin Carr—was also *Giglio*-impaired by the same DA for lying about his role in that same traffic stop.  A copy of the letter is attached hereto as **Exhibit A.**

***Plaintiffs Begin Working for a New Administration Under Chief Bryan Morris.***

35. In February 2024, Interim City Manager Tina Tobin hired Bryan Morris as Millersville's new Chief of Police. Morris, a former chief in a neighboring town with a college degree and private-sector business management experience, discovered the prior administration had overstated its full-time officer count. He immediately hired certified, experienced officers to resolve the City's longstanding problems with uncertified officers. Chief Morris also ended the City's controversial reserve/auxiliary officer program, prioritizing policing within the City of Millersville, instead of using Millersville's police resources to enrich security companies in Downtown Nashville.

36. Before the 2024 leadership shift, a local trailer park saw an alarming rate of one to two dead bodies appearing weekly from what appeared to be drug overdoses, earning it the grim nickname "the body park" among Millersville officials.  Prior administrations had either ignored the problem or failed to competently address it.  Under the leadership and experience of Chief Morris, however, dead bodies suddenly stopped surfacing in Millersville almost overnight.

---

example, it could result in a refusal to prosecute the officer's cases.  In that regard, a *Giglio*-impairment amounts to a "scarlet letter" for law enforcement officers.

37. Det. Michael Candler began working at the City of Millersville in the Spring of 2024. He was recruited by Chief Morris to work undercover narcotics investigations in Millersville, which has been plagued by illegal narcotics trafficking, human trafficking, and unusually high overdose deaths over the past several years. When Det. Candler arrived in Millersville, he brought with him 20 years of security and police experience. During that time, he had been involved in a multitude of police roles, from K9 officer to patrol officer, from S.W.A.T. team member to advanced investigation, and he would now be Millersville's first undercover detective. His training and experience includes, among other things, tactical S.W.A.T. team training, advanced drug and narcotics investigations, advanced narcotics training including human trafficking training, K9 and drug interdiction operations, and Open-Source Intelligence Training conducted by the FBI. He has private security contractor experience, training as a maritime security specialist, and has attended and graduated from the elite executive protection school, Executive Security International ("ESI"), in Grand Junction, Colorado. His security assignments have included being an OpFor (Opposition Force) or "red-team" tactician, tasked with engaging in simulated guerilla warfare operations against members of various branches of the United States Special Forces, including Navy SEALs, as well as foreign components of U.S. allies such as the British SAS, the purpose of which was to train them for combat operations overseas.

38. Capt. Todd Dorris has over 31 years of experience in law enforcement with over 20 years of that experience as a P.O.S.T. certified police officer. In March of 2024, he was recruited by Millersville Police Chief Bryan Morris as a detective, and he has since been promoted to Captain. Capt. Dorris has prior training in child abuse investigations, recognition of characteristics of child sex abuses, and tactical firearms training. Prior to being recruited

to work at Millersville, he had been with the Greenbriar Police Department for 14 years, where he had also been promoted to the rank of Captain. He has prior experience in K9 handling, and was a K9 patrol officer with the Montgomery County Sheriff's Office, where he had been employed previously for 9 years.

***Assistant Chief Shawn Taylor's Creation of a Joint Task Force to Combat Corruption.***

39. Det. Candler and Capt. Dorris worked directly under Assistant Chief Shawn Taylor and Chief Bryan Morris. Asst. Chief Taylor's background included prior work and experience that enabled him to assist with the overhaul and modernization of the MPD. Asst. Chief Taylor began using his knowledge, skills, and training to help the department gain access to advanced investigative tools. With regard to the investigations occurring within the City, Taylor was involved in the research and gathering of intelligence from databases and law enforcement database portals, which he provided to Det. Candler and Capt. Dorris, who were independently handling the investigative work for the cases that followed.

40. On February 28, 2024, Assistant Chief of Police Shawn Taylor emailed federal FinCEN representatives requesting assistance in obtaining access for the Millersville Police Department. FinCEN provided contact information for Tennessee representatives of the TBI. Assistant Chief Taylor subsequently emailed Brooklyn Nash and Aja Brechtel of the Tennessee Bureau of Investigation (TBI), stating that he had been brought in to Millersville to correct various issues, including uncovering financial issues within the city that required access to FinCEN data to develop. Taylor proposed a phone call to discuss his request and "put together a game plan." The call was scheduled for the following day.

41. On or around February 29, 2024, the TBI spoke with Taylor and provided him with re-dissemination guidelines and guidelines on the use of Suspicious Activity Reports (SARs)

by law enforcement. These documents highlighted that SARs information could be used as a part of <u>any</u> criminal investigation, and should be treated as a "confidential informant" that the officer could use to locate other credible information. The documents stated that re-dissemination of SARs documents should typically only be to other officials, federal, state or local, but that the primary rule was that the primary rule is that the subject of FinCEN data should never be informed that a Suspicious Activity Report was filed against them by a financial institution.

42. Assistant Chief Taylor had identified numerous inconsistencies in the City of Millersville's files and paperwork, including missing documents and files pertaining to employee background checks and employment records.

43. On March 2, 2024, Assistant Chief Taylor requested a report of all background checks for queries made by Millersville between January 1, 2022, and January 26, 2024 from the Sumner County Emergency Communications Center (ECC). This request included information about pre-employment and employment-related queries, including the names and dates of requested background checks, as well as records of whether criminal findings were returned as part of these queries. The reports Taylor received further substantiated evidence that the City of Millersville had been conducting improper background checks of various individuals.

44. On March 6, 2024, Chief Bryan Morris and Assistant Chief Shawn Taylor met with officials and attorneys from the Tennessee Department of Commerce and Insurance (TDCI), the Tennessee P.O.S.T. Commission, and representatives of other state agencies to address several issues, including Millersville's prior practice of printing illegal police commission cards for uncertified officers, the lack of training records for almost all of the

auxiliary/reserve officers from Millersville who had been working for Solaren Risk Management, and missing municipal files, including personnel files for former MPD officers.

45. On March 7, 2024, Assistant Chief Taylor followed up with TDCI and Regulatory Board officials via email, expressing gratitude for their assistance and offering to provide them with intelligence reports on some of the topics and individuals discussed during their meeting.

46. On March 7, 2024, Taylor requested additional criminal case numbers from the ECC, through the Computer-Aided Dispatch (CAD) system. Although TBI documents would later claim that Taylor had not filed incident reports or citizen complaints in CAD when requesting criminal case numbers, nothing about the practice is unlawful. First, entering information into CAD is at each officer's discretion, and no law requires it to obtain a criminal case number. Criminal case numbers are also not required for a criminal investigation. The CAD system is used to track the status of units, record incident details, and to generally ensure that resources are dispatched quickly and accurately. Second, the MPD intentionally avoided placing details in CAD since that system can be accessed by officials and the public—potentially alerting suspects that they are under investigation. In Millersville, preserving operational security ("OPSEC") demanded that no such information be published in CAD.

47. On March 8, 2024, Asst. Chief Taylor emailed TBI Agent Katie Chestnut, identifying himself and stating that he and Chief Morris had recently been hired and that he had been tasked to fix the issues that had plagued the Millersville Police Department, including his discovery of numerous issues and security breaches uncovered while auditing the records

and systems utilized by former members of the Millersville Police Department. Asst. Chief Taylor requested to schedule a time to speak with Agent Chestnut to speak about the issues that he and the MPD had identified. Agent Chestnut is the Support Supervisor for Criminal Justice Information Services (CJIS) and Tennessee Information Exchange System (TIES) for the TBI. CJIS is a division within the FBI responsible for managing and disseminating critical criminal justice information to federal, state, local, and international law enforcement agencies to ensure they have accurate and timely information necessary for effective policing, investigations, and maintaining public safety. CJIS allows for data management of from the National Crime Information Center (NCIC), and other databases and serves as the backbone of information sharing in the criminal justice community. TIES is a secure, statewide network designed to facilitate seamless information sharing among law enforcement agencies within Tennessee and with federal entities. TIES tailors the CJIS databases to sharing at the statewide level, providing Tennessee law enforcement agencies with a platform for collaboration and efficient access to essential information.

48. On March 11, 2024, Assistant Commissioner Alex Martin of the Tennessee Division of Regulatory Boards emailed Asst. Chief Taylor, thanking him for the time that he and Chief Morris had taken out of their schedules to meet and brief Commissioner Martin and Chief Legal Counsel Jesse Gentry. Martin thanked Taylor for his willingness to share documents and other information that would aid them in their pursuit of a resolution of their cases, and stated that he and Gentry would be happy to come to Millersville to review any additional material. Commissioner Martin informed Taylor that he was looking forward to staying in touch.

49. On March 11, 2024, Assistant Chief Shawn Taylor of the City of Millersville Police Department emailed the Tennessee Integrated Criminal Justice Portal (ICJP) Administrator to report a potential misuse and security breach involving the Criminal Justice Portal (CJP) by former employees of the City of Millersville. Assistant Chief Taylor stated that he had received a report from a local District Attorney outlining an event where the Criminal Justice Portal was allegedly misused. Acting on this report, Assistant Chief Taylor requested the City of Millersville's Administrator of the Criminal Justice Portal to perform an offline search of individuals named in the District Attorney's letter, as well as other individuals of concern. The findings returned by the City's Administrator conflicted with the information provided by the District Attorney. Assistant Chief Taylor sought further assistance and clarification from the ICJP Administrator and requested a phone conversation to discuss the matter, offering availability on Friday of that week.

50. On March 12, 2024, Asst. Chief Taylor contacted the ICJP administrator regarding alleged misuse of the portal by former Millersville employees. The administrator included his manager, Christine Estes, and Business Analyst Gina Brawley, and they scheduled a TEAMS call to discuss Taylor's concerns. Taylor informed the ICJP administrator that he wanted to investigate the matter to a conclusion and take action, if necessary.

51. On March 14, 2024, the ICJP administrator informed Taylor that the Millersville Police Department currently lacked proper authorization to access the Criminal Justice Portal due to previous issues with Millersville employing uncertified officers. During subsequent correspondence, the ICJP clarified procedures and provided relevant user agreements so that MPD could be .

52. On March 15, 2024, Assistant Chief Taylor met with various officials with the Tennessee Administrative Office of the Courts (AOC) to discuss his findings regarding portal misuse. He proposed forming a Task Force to address public corruption and shared investigative findings with the AOC.

53. On March 15, 2024, Taylor emailed Christine Estes at the AOC, stating:

Mrs. Estes,

I hope you are well. I am following up on the meeting we had by TEAMS on 03/15/2024. As stated in the meeting, We have opened a criminal investigation into several former Millersville employees, regarding possible misuse of Criminal Justice Portal as well as several other possible criminal acts. We are diligently auditing files, records, evidence and will begin conducting interviews in the near future. Your assistance in auditing and providing me the findings on the reports I have requested will be extremely helpful in identifying issues. I will provide you ALL the findings as we identify them.

Warm regards,
Shawn Taylor
Assistant Chief of Police

54. Between March 15 and March 19, 2024, Asst. Chief Taylor continued to coordinate with the AOC regarding their TNCRIM Audit Request, inquiring as to whether there were possible criminal infractions for unlawful access of the ICJ Portal by uncertified officers employed by the prior administration.

55. On March 20, 2024, TBI Intelligence Analyst Brooklyn Nash emailed Asst. Chief Taylor, to follow up and see if he had submitted a FinCen request, a response indicating that the TBI was eager to assist Taylor during the investigation. Taylor responded the following day, stating that he had not yet submitted the first FinCen request, but that he was working on one but making sure that it was on point when he sent it. He then indicated that he should have his first request submitted by Friday.

56. On March 26, 2024, Assistant Chief Taylor emailed the AOC with an update on the investigation previously discussed in a TEAMS meeting. He believed he had enough probable cause to seek a search warrant for one suspect and intended to continue investigating all involved until he was ready to request warrants for all. Taylor also noted that he was in contact with the Tennessee Department of Commerce and Insurance, which was conducting its own parallel investigation. He proposed forming a multi-agency task force—including the AOC—to combine gathered evidence and welcomed any input the AOC could offer.

57. On April 2, 2024, Charisse Bonwell from the AOC replied to Taylor's request for her agency to join his Task Force, confirming their willingness to assist. **She copied TBI's Joshua Schwartz and several other state officials on her response to Taylor, stating, "We will assist you in any way that we can. Please let me know what you need in that endeavor."**

58. At no point during the creation of this Task Force did any state or federal official indicate that Taylor's actions were even remotely improper. Instead, emails demonstrate that they praised his competence, diligence, and adherence to protocol. Official records show Taylor was conducting investigations with assigned case numbers, uncovering extensive criminal activity in Millersville with ties extending across the United States.

59. On April 2, 2024, Millersville's former Chief of Police, Dustin Carr, was apprehended during a what appeared to be a theft sting operation in Goodlettsville. Authorities discovered over $100,000 in stolen goods in Carr's possession, while driving a Solaren Risk Management vehicle, and the report indicates that he was alleged to have been selling the stolen goods on Facebook. This incident originated in 2023 and documented in CAD

as Case No. 23-35167. The report also references Case No. 24-12894, and states that Carr represented himself "as an officer." Despite the severity of these allegations, Carr was neither charged nor prosecuted for theft or impersonation. This lack of action and selective enforcement of the laws further raises doubts and concerns about the credibility and motives behind the allegations of "official misconduct" against Shawn Taylor for investigating criminal activity, as well as the allegations of "perjury" based on statements from the Defendants in the case at bar.

60. On April 3, 2024, Chief Bryan Morris forwarded Taylor an email from the Blue Lightning Operation Center (BLOC), an ICE division focused on combatting human trafficking and commercial sexual exploitation. It included a sample BLOC access request letter from federal HSI/ICE officials for other MPD officers to use, as Taylor already had BLOC access since 2009 and served as an official HIDTA (High Intensity Drug Trafficking Area) Agent.

61. On April 4, 2024, Taylor updated the TDCI on his ongoing investigation into a former Millersville PD officer who had illegal used the Criminal Justice Portal to conduct background checks on individuals for personal reasons unrelated to anything concerning the City of Millersville. Taylor requested copies of the relevant files, and continued working with TDCI on these issues.

62. On April 4, 2024, Gen. Ray Whitley closed his investigation of Commissioner Cristina Templet, claiming that there was no evidence of criminal activity "that would warrant prosecution."

63. On April 5, 2024, sent additional information to TDCI about more individuals of interest to the joint investigation.

64. On April 23, 2024, Asst. Chief Taylor announced "Operation Clean Sweep," the initiative targeting corruption and misconduct. That evening, former Mayor Tim Lassiter was arrested on charges of criminal simulation for his involvement in document fraud completed in furtherance the unapproved build-out of the sleeping quarters for Millersville's Fire Hall, which was ironically not build according to Fire Code and which therefore could never be used for its intended purpose, costing taxpayers over $100,000 in wasted funds. The charges of tampering with governmental records and criminal simulation where based on allegations that Lassiter had issued himself building permits he was not authorized to grant. Despite commissioners warning him not to do so, the renovation project for the fire department was completed anyway. Lassiter was also possibly involved in building out the city's almost unusable evidence room in a similar manner.

65. On April 24, 2024, Channel 5 News quoted Gen. Ray Whitley's frustration about not being consulted before the MPD arrested former mayor Lassiter on two counts of document fraud. Whitley claimed that he found the situation "very strange," and indicated that he was unsure of whether his office would prosecute the case, despite not having reviewed any of the evidence. Commissioner Cristina Templet, speaking outside the jail with Lassiter's family, called the arrest a personal vendetta by mayor Tommy Long. Templet said she believed Lassiter was an "amazing human being" who was somehow wrongly treated by the city. The story noted how Lassiter had stepped down as mayor in 2022, following a lawsuit by two former Millersville Police officers who claimed they were bullied out of their jobs and faced racial discrimination.

66. Between May 3-7, 2024, the TBI emailed Asst. Chief Taylor multiple positive results of SARs reports and Cash Transaction Reports (CTRs) of various individuals and corporations who were being investigated. These positive FinCEN results indicated that the flagged transactions were deemed suspicious by independent federal authorities, signaling potential money laundering and other financial crimes that warranted further scrutiny.

***The Millersville Undercover Pedophile Sting.***

67. From May 17-19, 2024, the City of Millersville Police Department conducted an undercover child solicitation sting with the assistance and guidance of Veterans for Child Rescue ("V4CR"), a non-profit organization comprised of military professionals, military veterans, former and current law enforcement officers, and child abuse and trafficking survivors that, in addition to raising awareness about child trafficking, provides advice and live assistance to law enforcement agencies conducting pedophile stings across the United States. V4CR provided what amounted to live training to Millersville officers in how to prepare for and run an undercover pedophile sting, which differs from the more common types of undercover stings, such as narcotics and prostitution stings.

68. On May 16, 2024, in advance of the sting, all V4CR volunteers and the Millersville Police Officers participating in the Operation met at Assistant Chief of Police Shawn Taylor's house, where the law regarding exploitation of minors and the rules of the Operation were explained.

69. The primary law applicable to the sting is T.C.A. § 39-13-528, which sets forth the elements of the offense of solicitation of a minor:

(a) It is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet services, directly or through

another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age, or **solicits a law enforcement officer posing as a minor, and whom the person making the solicitation reasonably believes to be less than eighteen (18) years of age**, to engage in conduct that, if completed, would constitute a violation by the soliciting adult of one (1) or more of the following offenses:
(1) Rape of a child, pursuant to § 39-13-522;
(2) Aggravated rape, pursuant to § 39-13-502;
(3) Rape, pursuant to § 39-13-503;
(4) Aggravated sexual battery, pursuant to § 39-13-504;
(5) Sexual battery by an authority figure, pursuant to § 39-13-527;
(6) Sexual battery, pursuant to § 39-13-505;
(7) Statutory rape, pursuant to § 39-13-506;
(8) Especially aggravated sexual exploitation of a minor, pursuant to § 39-17-1005;
(9) Sexual activity involving a minor, pursuant to § 39-13-529;
(10) Trafficking for commercial sex acts, pursuant to § 39-13-309;
(11) Patronizing prostitution, pursuant to § 39-13-514;
(12) Promoting prostitution, pursuant to § 39-13-515; or
(13) Aggravated sexual exploitation of a minor, pursuant to § 39-17-1004.

(emphasis added).

70. Thus, the statute prohibits soliciting a law enforcement officer posing as a minor if the suspect making the solicitation reasonably believes the person was less than eighteen years of age.

71. Before the sting began, Capt. Dorris met with Robertson County Assistant District Attorney Jason White, who insisted that police officers conduct the text messaging with suspects during the solicitation. Adult conversations with a minor, alone, are not illegal; however, soliciting sexual activity is. Under T.C.A. § 39-13-522, "rape of a child" involves unlawful sexual penetration when the victim is between 8 and 12 years old—so any solicitation of sexual activity with someone in that age range constitutes unlawful solicitation of a minor.

72. No Tennessee case specifically requires an officer to be the one "typing" text messages during a sting operation. Nevertheless, at the Robertson County DA's request, the

Millersville Police Department instructed all V4CR volunteers that MPD Detectives were required to handle all solicitation-related texting.

73. Capt. Dorris and Asst. Chief Taylor instructed V4CR volunteers that only detectives could handle solicitation texts. V4CR Volunteer Tim Brown reiterated these instructions during the three-day event. Volunteers could initially "chat" with subjects to see how they reacted once the decoy profiles revealed they were 12 years of age. If conversations turned "raunchy" or veered into solicitation, volunteers were instructed to bring the phone to detectives to review and handle the solicitation.

74. Other instructions and rules were given to V4CR volunteers, including the rule that nobody was allowed to take any Ops Phone from the kitchen area of the VRBO, which is where Capt. Dorris and Det. Candler were seated next to V4CR's Tim Brown. It was abundantly clear to every volunteer that all of the solicitations had to be handled by Millersville detectives and needed to take place on phones purchased by the Millersville Police Department.

75. Prior to the Operation, Gen. White stated that it was OK for the V4CR volunteers to assist setting up the phones used in the Operation, and had stated that the MPD officers needed to wait until V4CR got into Millersville to set up the decoy profiles. Although Kim Kelley would later complain during a podcast interview that "nothing had been set up" when she arrived in Millersville as part of her disparagement of Plaintiffs and the Millersville PD, this was because Gen. White wanted the profiles to be set up in Millersville when the V4CR volunteers were present, and not prior to their arrival.

76. On Thursday, May 16, 2024, all V4CR volunteers and MPD officers participating in the sting met at Assistant Chief Shawn Taylor's house to go through the details of the operation, including the following:

a.  The requirements of Tennessee law for prosecuting the unlawful solicitation of a law enforcement officer posing as a minor;

b.  The district attorney's preference that the MPD officers do the actual texting or messaging with the suspects during the part of any conversation that involved the actual solicitation or solicitations from the suspects;

c.  No personal cell phones could be used for any part of the Operation or any solicitation;

d.  The V4CR volunteers were not to handle any solicitation because it could not be prosecuted;

e.  V4CR volunteers who were monitoring one of the Ops Phones were to bring could only filter through profiles that had reached out to the decoy profile, and they were only permitted to "chat" with subjects for the limited purpose of gauging whether they were still interested in chatting after the decoy profile indicated that their real age was under 13;

f.  There was to be no recording or photographing of the Operation or participants with any cell phones, most notably because Det. Michael Candler was hired to be the City's undercover narcotics officer;

77. All volunteers, including Defendant Kim Kelley, were briefed on Tennessee's solicitation law and told that only Millersville detectives could handle actual solicitations. In the event that a suspect spontaneously solicited a volunteer while they were "chatting," the phone

was to be handed to a detective so they could attempt seek a second or third provable solicitation. All volunteers were aware that any solicitations not handled by a law enforcement officer would not be presented for prosecution.

78. Kim Kelley knew that Det. Candler was an undercover narcotics detective who was not to be photographed and who had taken measures to ensure that his identity would not be revealed in any picture or video. When Det. Michael Candler first introduced himself to Kim Kelley, he stated that he was the narcotics detective, and that he had been hired to work undercover narcotics operations in the City. Furthermore, one of the first rules communicated to Defendant Kim Kelley and the other volunteers was that no photos or videos of the Operation were to be taken by any of the Volunteers and most especially Det. Candler because his identity could not be disclosed. Candler also wore plain clothes and drove an unmarked, undercover vehicle.

79. On Thursday, May 16, 2024, the Millersville Police Department purchased six (6) generic Android smart phones from Walmart to be used in the Operation, referred to as the "Ops Phones." Det. Candler unboxed each phone that evening to complete the initial activation of each phone by connecting the cell phone to the carrier's network. As he unboxed each phone, he numbered each phone and box with a black permanent marker, writing the phone number on the box, and placing each box in a separate evidence bag that followed each phone. That evening, he charged the phones at the Police Department.

80. A VRBO in Millersville was rented from May 17 to May 20, 2024, and used as the "Chatter house" for detectives and volunteers. Before the operation, Det. Dorris consulted DA Jason White, who confirmed volunteers could help set up phones but that only detectives could handle solicitation. Volunteers ("chatters") screened messages to weed out innocuous

chats, but once a conversation turned to solicitation, detectives were required to take over to ensure legal compliance.

81. On the Morning of Friday, May 17, 2024, with the assistance of V4CR volunteer Tim Brown, Capt. Dorris and Det. Candler set up the social media accounts and decoy profiles on the phones used during the Operation. Each decoy profile had a data sheet that accompanied the Ops Phone, setting forth the fictitious names and other "personal" information used for the decoy accounts.

82. As part of the training provided by V4CR during the Operation, Tim Brown assisted the detectives with organizing and setting up each decoy profile, while explaining how he generates the names, which AI programs he uses for modifying pictures, and his methodology for setting up profiles on the App they would be using during the sting, which was called MocoSpace.

83. Detectives Dorris and Candler, with Tim Brown's help, created the MocoSpace profile on Ops Phone #3 that attracted an individual with the username, "honeylover1034," later identified as Henry Dean Jordan of Nashville.

84. Det. Dorris selected the AI-altered decoy photo from a batch of several options provided by V4CR volunteers. Tim Brown had generated the photos from AI using real photos that Kim Kelley and Aspen Sawyer had taken inside the VRBO. These interior photos served as the base or starting point for the AI program to alter and make them appear to be 12 year old girls. None of the volunteers ever suggested that Dorris use the specific image that he selected for Ops Phone #3. Similar AI-altered photos of Kim Kelley and Aspen Sawyer were sent to Det. Candler.

85. Once the decoy profile photos were uploaded to the MocoSpace profiles on the morning of Friday May 17, 2024, the profiles started receiving dozens of immediate views and communications from men, and some women. Videos taken that morning show Det. Candler and Capt. Dorris both texting and messaging various subjects and suspects.

86. Detectives Dorris and Candler were stationed primarily in the kitchen of the Chatter House—its central hub—handling texts and messages on their Ops Phones. Tim Brown sat beside them to monitor the volunteers, who began filtering chats or "chatting" with subjects to anticipate which were likely to become suspects, with the expectation that phones would be handed off to one of the detectives if the conversation was turning toward a solicitation.

87. During the Operation, Tim Brown had to repeat the rules several times to Kim Kelley, who seemed to be having difficulty following the rules. Nobody was to take the Ops Phones outside of the room. Nobody was to be texting on personal phones while the Operation was taking place. Chatters could sift through conversations with subjects to see which of them were still interested in communicating after the decoy profile revealed they were actually underage. In fact, Defendant Kelley did not have difficulty following the rules, but instead intended to violate the rules as part of her and Phil Drake's plan to sabotage the MPD sting and exploit the subsequent coverage to promote themselves and their businesses.

**Defendant Kim Kelley's Disruptions, False Alarms, and False Claim That Suspect "Got Away."**

88. Assistant Chief Shawn Taylor and Chief Bryan Morris were both part of the "takedown team," stationed at a location separate from the Chatter House. Around 5:00 p.m. on Friday, May 17, 2024, Taylor was in an unmarked vehicle near the interstate conducting surveillance, searching for the suspects that Kim Kelley claimed were coming.

89. While Taylor and others were conducting surveillance in unmarked vehicles, Kim Kelley periodically shouted to Detective Candler, "I got one coming in!" and insisted the "suspects" were "15 minutes away." Each time, Detective Candler relayed this information to the takedown team via radio, forcing the rest of the team to prepare for interception and scan for the suspects. When Detective Candler asked Kelley if there had been a solicitation, Kelley said no. It did not make sense for individuals to be arriving if there had been no solicitation, and Kelley was aware that solicitations had to be handled by the Detectives. Concerned by these discrepancies, Candler went over to see what Kelley was doing on her phone but he did not observe any conversations with individuals claiming to be en route to the Chatter House. At some point during the operation, Kim Kelley's bizarre behavior caused Det. Candler to question Kim Kelley's motives, and he told Tim Brown that he believed Kim Kelley was secretly recording them.

90. Kelley's continued misinformation not only created a chaotic atmosphere at the Chatter House but also led Assistant Chief Taylor to temporarily call off the operation that evening. Although the MPD did not realize at that time that Kim Kelley had conspired with Defendant Phil Drake to sabotage the undercover sting, her duplicity became apparent when she told news outlets about detectives letting a suspect "get away," even though none of those "suspects" actually existed. Stated differently, she "cried wolf" and falsely reported that suspects were approaching, so that she and Phil Drake could later mock the MPD by claiming these imaginary suspects "got away."

91. Drake later made the implausible claim that MPD officers could not locate the arrested suspect, Henry Dean Jordan, but he was able to "ping" the suspect's cell phone and located him "within 3 seconds." These dubious assertions underscore Kelley and Drake's

consistent dishonesty and their willingness to disseminate any information, regardless of its credibility, to advance the Defendants' agenda. If Kelley and Drake were communicating in real-time and Drake genuinely possessed the ability to "ping" a suspect's cell phone, why did they not "ping" the locations of all the suspects Kelley falsely reported as arriving "in 15 minutes"? Furthermore, if their "pinging" capability were authentic, why would Kelley and Drake knowingly allow these suspects to escape justice? Their reckless and unfounded claims not only undermine their credibility but also highlight their deliberate efforts to mislead the public and obstruct legitimate law enforcement operations.

92. In subsequent media interviews, Defendants Kim Kelley and Phil Drake falsely claimed that a suspect escaped because an MPD vehicle lacked a siren on the vehicle. Both Kelley and Drake used this pretext to disparage Plaintiffs and make the MPD appear incompetent. Drake and Kelley had apparently rehearsed the same story, as both of them mocked the purported lack of a siren and stated that officers should have hung their heads out the window and "made siren sounds with their mouths."  While the Defendants' statements were intended to impugn the reputations of the Plaintiffs and their department, they nonetheless revealed Drake and Kelley's profound ignorance of basic police procedure— blue lights are used to stop vehicles, while sirens merely alert surrounding motorists that an emergency vehicle is approaching.

***Suspect Henry Dean Jordan Solicits the Decoy Profile Operated by Capt. Dorris.***

93. A few hours later, suspect Henry Dean Jordan (profile "honeylover1034") contacted the decoy profile on Ops Phone #3, and officers noted that other MocoSpace users were claiming to have knowledge that Jordan was a child predator, which comments are visible in one of the photographs taken by the detectives:



94. Kim Kelley claims she "identified" Jordan's profile. In fact, Tim Brown and Michael Candler saw the profile and comments, and this was the reason why Candler snapped the above picture and then handed the phone to Capt. Dorris. It was reasonable to believe that Jordan was likely to solicit the decoy profile and Capt. Dorris retained possession of that phone, Ops Phone #3. Thereafter, Tim Brown observed Dorris typing messages to Jordan in both the MocoSpace App, and the subsequent text messages with Jordan where the solicitations occurred.

95. Capt. Dorris and Det. Candler continued working with Ops Phone #3 and other Ops Phones, periodically placing the phone down on the table. Shortly after the solicitations

were obtained from Jordan, Defendant Kim Kelley grabbed Ops Phone #3 and attempted to walk to another room with it. Det. Candler yelled for Kelley to come back and set the phone down. Shortly thereafter, Kim Kelley made a second attempt to take Ops Phone #3 away from the detectives to another location. Although the Plaintiffs thought it was strange that Kelley kept trying to walk away with the phone, they were unaware at the time that Kelley was trying to actively sabotage the sting. Upon information and belief, her intent was to take contemporaneous photographs of Capt. Dorris's text thread with Henry Dean Jordan on her personal phone to fabricate evidence to support her false that she had handled the solicitation with Jordan.

96. During Capt. Dorris's communications, Henry Dean Jordan was informed that the individual he believed he was speaking to was a child about to turn thirteen (13) years old. Despite this, Mr. Jordan made explicit statements regarding his intentions to engage in various unlawful sexual acts, and coordinated plans to travel by bicycle to a designated meeting location in Millersville at the Bethel Road Shell Station near I-65 North Exit 104.

97. After Jordan failed to arrive at the Shell Station at the agreed upon time that evening, MPD officers located and detained Mr. Jordan pedaling his bicycle up the shoulder of I-65 North near mile marker 103. Jordan was taken to the Millersville Police Department, and Capt. Dorris left the Chatter House to handle the paperwork.

98. Although Jordan was never questioned by MPD detectives, he told Capt. Dorris, "I never touched that girl" while he was being processed at the Millersville Police Department. Capt. Dorris then prepared documentation regarding the incident, and Jordan was subsequently transferred to the Robertson County Jail and taken before a judicial commissioner around 2:25 am on May 18, 2024, where his arrest warrant was signed.

99. That same evening, Henry Dean Jordan voluntarily spoke to a documentary film crew that accompanied the V4CR volunteers, where Jordan voluntarily confessed to the crime of soliciting a minor. Contrary to the false statements later made by Kim Kelley that this was improper or would "jeopardize" the prosecution, it is well-established under Tennessee law that statements voluntarily made by a suspect to a third-party that is not a law enforcement officer are generally admissible against the defendant at trial. See, e.g., *State v. Sanders,* 452 S.W.3d 300 (Tenn. 2014); *State v. March,* 395 S.W.3d 738 (Tenn. Crim. App. 2011).

100. At the end of each day, all of the Ops Phones were gathered and secured. After the evidence from Ops Phone #3 was downloaded, the phone was brought back to the Chatter House. Upon information and belief, Ops Phone #3 was returned to the Chatter House on Sunday, May 19, 2024. It is possible that Kim Kelley had access to Ops Phone #3 at this point. Plaintiffs do not know what purported "evidence" she has that she texted Henry Dean Jordan and handled the solicitation. None of the videos or recordings that are publicly available online show her actually texting Henry Dean Jordan. None of those videos have time stamps or dates. All of the videos are edited, isolated clips that cut off conversations mid-way, raising serious questions about what they actually show.

*Kim Kelley Demands $35,000 from Craig Sawyer to "Purchase Trafficked Children."*

101. On the evening of Saturday, May 18, 2024, Kim Kelley openly demanded that Craig Sawyer, CEO of V4CR, provide her with $35,000 to purchase trafficked children as a means of "rescuing" them from traffickers. Det. Candler overheard Kelley's demand for payment, but was unaware at the time that Kim Kelley and Phil Drake were soliciting payments to purchase trafficked children from child traffickers as part of their business model to "combat" child trafficking. At some point prior to the Millersville Operation,

Kim Kelley and Phil Drake developed the opinion that intercepting pedophiles as part of a child solicitation/child exploitation sting was somehow not an effective way to prevent pedophiles from victimizing children, or that intercepting pedophiles on the "demand side" of child trafficking was not as effective as direct action against child traffickers on the "supply side" of an illegal child trafficking ring. Regardless of whatever distinction Kelley and Drake had conjured in their minds, Sawyer refused to pay the $35,000 and Kim Kelley became upset. She stormed outside the rental house, once again taking an Ops Phone with her that required Det. Candler and another V4CR Volunteer to go outside and retrieve the phone from her.

***Kim Kelley Remains in Nashville After the Pedophile Sting Ends.***

102.    Kim Kelley had the means and motive to fabricate evidence, and on the evening of May 19, 2024, she was given the opportunity to do so. V4CR had rented a VRBO for the Millersville Operation from Friday May 17, 2024 to Monday, May 20, 2024. When the pedophile sting ended on the evening of May 19, 2024, Kim Kelley stayed by herself overnight at the VRBO. Thus, she had an entire evening to herself inside the VRBO to record videos of herself and fabricate evidence that made it appear she was openly chatting with suspects on one of the Millersville Op Phones during the sting.

103.    Shawn Taylor returned on Monday, May 20, 2024 to retrieve some radios that had been left inside the rental. When he arrived, there were two vehicles on the property, the sedan that Kim Kelley was driving and a four-door truck. When Taylor entered the house, he announced his presence and saw Kim Kelley hurry to her bedroom and shut the door. Upon information and belief, Defendant Kelly was hiding Defendant Drake in her bedroom at the VRBO.

104.     After the Millersville Operation had concluded, Kim Kelley stated that she was staying in Nashville for a few extra days.  Upon information and belief, during this time she met with additional co-conspirators in the days that followed to further prepare and orchestrate the smear campaign used to damage the Plaintiffs.

***Local Reporter Begins Politically-Motivated Attack Campaign Against Shawn Taylor and Other Millersville Officials.***

105.     On May 18, 2024, local reporter Phil Williams of Channel 5 released a teaser video about a story he would be running about Asst. Chief Taylor on Monday, May 20, 2024. The purpose of the article was to discredit Taylor over statements made during various podcast 18 months to over two years before he became Assistant Chief in Millersville. Williams claimed that Taylor was a "QAnon conspiracy theorist" and "had appeared on podcasts associated with the widely discredited QAnon conspiracy theories." The article intentionally omits the dates of these podcast videos, ostensibly to create the illusion that the content on the podcast was recent and that it was therefore a matter of public concern. Phil Williams falsely claimed that he "discovered" Shawn Taylor as part of his earlier investigation of a former Franklin, Tennessee official named Gabrielle Hanson, when in fact Taylor had met both Phil Williams and Channel 5 reporter Levi Ismail in March of 2023, during which time Taylor provided both with a binder of documents and a USB drive containing even more files.  The article also quoted only part of what Taylor said in one of the dated podcasts to make it appear that he was currently "looking into"  U.S. Senator Marsha Blackburn, which was false.  In fact, the video was from years ago and Taylor was referring to publicly-available bank records filed as part of Blackburn's campaign disclosures.  Without any evidence, Phil Williams speculated that Taylor must have been

abusing a law enforcement database because Taylor had called Williams by a different last name.

106.     On May 22, 2024, Williams ran another story about Millersville Commissioner Templet and Gregory demanding an inquisition into the hiring of Shawn Taylor. Millersville Commissioners have no authority to either conduct an inquisition during a City Meeting and have no authority to make or influence any hiring decisions, which authority is solely that of the City Manager under Millersville's charter.   Williams speculated again that Taylor used a government database to investigate Williams.  However, it is easy for law enforcement agencies to conduct an audit of a police officer's queries made in government databases, and there has never been any evidence that Taylor queried Phil Williams.  Phil Williams is nowhere mentioned in any of the available information from the TBI, such as their search warrants, which do not mention Phil Williams at all.   Despite Williams' lack of evidence, he continued running attack pieces against Taylor and other Millersville officials every other day, and even published different stories twice a day as part of an unprecedented campaign.

***The TBI Operation Plan Shows Investigation Was Requested on May 22, 2024.***

107.     According to a TBI Operation Plan found at Shawn Taylor's house after the "raid" had concluded, on May 22, 2024, District Attorney Ray Whitley requested that the TBI conduct an investigation into allegations against Shawn Taylor for "improper use of law enforcement intelligence data, falsifying government records, and official misconduct." Discovery will be needed to determine if the investigation was triggered by the allegations from the Phil Williams stories.

108.	The Operation Plan shockingly claimed that Taylor was alleged to have been improperly utilizing government databases, when in fact he was the one that had created the very Task Force that was investigating improper utilization of the ICJ portal and other matters.	Moreover, Taylor's Task Force had been formed with the knowledge and inclusion of multiple TBI officials and the actual Administrator of the Integrated Criminal Justice Portal.	The TBI's Operation Plan states, "It is believed [Taylor] has improperly utilized law enforcement intelligence data to include the State of Tennessee Integrated Criminal Justice Portal, Financial Crimes Enforcement Network, and the National Crime Information Center."

109.	The allegation that Taylor "improperly utilized" FinCEN data is difficult to understand or believe.	Taylor accessed this data through the proper channels by requesting it via the TBI's web portal and justifying its use for legitimate criminal investigations. In Tennessee, the TBI acts as an intermediary to FinCEN, ensuring that only authorized officers with valid reasons are provided FinCEN information. Therefore, it's unclear how Taylor could have misused data that was provided to him through the correct procedures. The suggestion of official misconduct is as questionable as if a bank allowed a customer to withdraw money from their own account, and then turned around and accused the customer of robbing the bank.

110.	By statute, municipal police officers have extremely broad authority to investigate and prevent crimes.	Under T.C.A. § 6-21-602, municipal police are authorized to protect residents from *all* criminal acts, and to prevent the commission of crime, and violations of law and of the city ordinances.	Thus, it is difficult to understand how a police officer investigating suspected criminal activity can be charged with official misconduct and

"exceeding his authority" when he was both doing what the law requires of municipal police, and he possessed documents that the TBI had approved and provided.

***Millersville's Request for a Prosecutor Pro Tem and Investigative Grand Jury is Declined.***

111.    In an effort to ensure that the Millersville investigations remained unbiased, Taylor had also proposed notifying the Tennessee Attorney General to request a prosecutor *pro tem* and convene an investigative grand jury. Taylor had briefed the Attorney General and Reporter on several occasions with regard to the criminal activity he was investigating, and an official request had been sent by the City of Millersville in mid-April, 2024. However, on May 23, 2024, after the negative press, the Attorney General "respectfully declined" to do so, claiming that he was constrained by statute requiring the local district attorney's consent to appoint a prosecutor *pro tem*, which the Attorney General believed was unlikely to occur.

112.    Not coincidentally, a prosecutor *pro tem* and an investigative grand jury were convened as part of a different TBI investigation occurring in Chattanooga based on allegations identical to those against Millersville Commissioner Cristina Templet. According to the TBI press release:

> At the request of District Attorney General Pro Tem D. Michael Dunavant, TBI agents began investigating the residency of Celeste Murphy (DOB [REDACTED]) in April. Dunavant was appointed by the Court to serve as District Attorney General Pro Tem upon the recusal of 11th Judicial District Attorney General Coty Wamp. During the investigation, agents determined Murphy knowingly entered false information on several government documents related to establishing residency in Chattanooga, though swearing to their truth in signing the documents.

> On Tuesday, the Hamilton County Grand Jury returned a 17-count indictment, charging Murphy with one count of Illegal Voter Registration, one count of False Entries on Official Registration or Election Documents, three counts of False Entries in Governmental Records, three counts of Forgery, three counts of Perjury, and six counts of Official Misconduct. This morning, Murphy surrendered to agents

at the Hamilton County Jail, where authorities booked her and subsequently released her after Murphy posted an aggregate $19,000 bond.

*Capt. Todd Dorris Testifies at The Preliminary Hearing on May 28, 2024.*

113.	On the morning of May 28, 2024, Capt. Todd Dorris testified at the preliminary hearing in State of Tennessee v. Henry Dean Jordan. Jordan was the only suspect arrested during the sting. Assistant DA Jason White did not prepare Capt. Dorris in advance of his testimony, but Dorris brought copies of some pictures of the text messages where he was posing as a minor and Jordan had made the solicitation.

114.	Assistant DA Jason White directed the examination of Capt. Dorris. He testified that he was an investigator at the Millersville PD, and that they had started an investigation into internet crimes against children. He testified that the investigations began with them setting up the phones they had purchased from Walmart, and that they had created some accounts and a profile on MocoSpace, where Capt. Dorris had to set the decoy profile age to 18 at the time, because that was the minimum allowable age on the App. Capt. Dorris testified that he had been doing the typing in the App.

115.	Capt. Dorris testified that after they received hits on the app, they would try to move over to straight text messaging from phone to phone, to get off the app so they could tell the individuals that they were 12 years old. Capt. Dorris was then asked about the contact from the phone number belonging to Henry Dean Jordan. Dorris testified that they researched the phone number through some databases to determine the name associated with it, and the name Henry Jordan came back.

116.	Capt. Dorris testified that they were communicating via text from that point on, which started out with basic communication, and then letting Jordan know that he was only 12 years old, turning 13 next week. Jordan then began making explicit comments in the

text messages and solicited oral sex from the decoy profile whom he believed was a 12 year old girl that was actually Capt. Dorris.

117.     Capt. Dorris testified that arrangements were made for Jordan to come to a Shell Station in Millersville, and that Jordan stated he would be traveling there via a bicycle.

118.     Capt. Dorris testified that it was taking a very long time for Jordan to arrive, so officers were sent out to locate Jordan on the interstate, and they located him on the interstate coming up the ridge by mile marker 104, confirmed his identity, and brought him into custody.

119.     Capt. Dorris testified that he served the warrants on Jordan, and informed him of the charges, at which point Jordan stated, "I never touched that girl." At that point, Dorris informed Jordan that he was the one posing as the underage girl that Jordan had been soliciting. Jordan did not deny sending the text messages to the decoy profile.

120.     Gen. White then asked Capt. Dorris to go through the pictures of the text message chain that he had with Mr. Jordan, and Capt. Dorris read through the parts of the text message chain that he started, and various parts of the text thread that he had typed out and sent to Jordan. Gen. White then confirmed the part of the text messages where Jordan had solicited oral sex, and the seven pages of text thread was made "State's Exhibit 1."

121.     On cross-examination by Jordan's defense attorney, Capt. Dorris testified that the operation started on May 17, 2024 around 3:00pm and went until about 3:00 in the morning. Capt. Dorris testified that Det. Candler was also responding to the text messages with Jordan, and that he had assistance from Veterans for Child Rescue. Capt. Dorris testified that V4CR chatters provided him with advice during his texts with Jordan,

including how to talk like a 12-year-old, and that they were with him, in person, while the text messages were being sent.

122.     Capt. Dorris testified that Jordan was not the only individual contacted during the sting.  He was asked, generally, about how the MocoSpace App worked, and Capt. Dorris testified that it was a social app like Facebook Messenger, and was not a dating app.

123.     Capt. Dorris testified about how users had to set up an account stating they were 18 years old, otherwise they would be immediately kicked out of the app.  Capt. Dorris stated that Mocospace monitored the profile and the messages.  He testified that he had, at some point, identified himself as underage in the app, and that they had used different account names for each profile.

124.     Capt. Dorris testified that they had used AI to generate the photo for the profile used on the decoy profile.  He testified that he had chosen the AI photo, and that it was not suggested by V4CR.  Capt. Dorris was never asked if more than one AI photo had been generated.  Nor was Dorris asked any questions about the process of how the AI programs generated the profile pictures, which involved uploading photos of Kim Kelley and Aspen Sawyer (or any other female) into the AI program where the photo was altered by the algorithm to appear as though the subjects were 12 years old.

125.     Capt. Dorris, who had been handed back a copy of the text messages with Henry Dean Jordan, was asked if V4CR had sent any of the messages, and he truthfully testified that they had not.  He testified that he did not send any additional pictures through the Mocospace App.

126.     Capt. Dorris testified that he was not sure whether he or Henry Dean Jordan had provided their phone numbers through the Mocospace App, but that Jordan would have

been the first to send a text message. Dorris testified that there some pictures were sent via text message, but that he did not recall whether Jordan had sent pictures to the decoy phone. Dorris testified that he saw the profile picture of the individuals on the other side of the message.

127.     Capt. Dorris testified that Jordan had indicated he was in Nashville, and that most of the communications with him would have likely occurred in Davidson County, but that he did not take part in the arrest on the Interstate, which could have been in Sumner or Robertson County.

128.     Capt. Dorris testified that there was no way to know who was truly communicating on the other side of the Mocospace app, and that, thereafter, some communications happened by text message, but that, aside from their investigation, there was no way to tell who was sending the text messages on the other end.

129.     Capt. Dorris was asked if there was any video in real time of him communicating through the Mocospace App, and he said there was no video involving Henry Dean Jordan. He was then asked questions about who might have been on the arresting team, whether he knew if Jordan was mirandized or asked any questions, and some other questions about who secured Jordan's phone and logged it into evidence.

130.     On re-direct, Gen. White asked Dorris more details about V4CR's advisory role and the type of advice that V4CR had given, and he testified that they had given advice on what to look for, how to set up the profile, what questions to ask, and how to answer in order to sound like a 12-year old.

131.     Capt. Dorris still had State's Exhibit One in his hands at this point in his testimony, which consisted of seven pages of his text messages with Jordan. Dorris was asked if he

and Candler had done "all the typing and the all the data entry," and Capt. Dorris replied, Yes, sir." In making this statement, Dorris was not stating that he and Candler handled every one of the six Ops Phones. He was still testifying solely about the conversations with Henry Dean Jordan and the Exhibit that was in his hands. The crinkling of paper from Capt. Dorris's hands grasping Exhibit One can actually be heard on the audio recording of the preliminary hearing. Although it is easy to manipulate a narrative with a short, edited clip of testimony taken out of context, the full, unedited recording demonstrates that Dorris was testifying about his text messages with Henry Dean Jordan during the solicitation, and those present in the courtroom knew that Dorris was testifying about those messages because he was holding them in his hands while speaking.

132.    Capt. Dorris was then asked to clarify whether he started conversations by reaching out to individuals or waited for them to question him, and Dorris testified that he waited until they questioned him. Dorris acknowledged that he waited for Jordan to make first contact with the decoy profile, and that they did not "target" anybody. Dorris acknowledged that the address for the decoy profile was in Robertson County, which meant that Jordan had solicited sexual acts with a minor that were going to occur in Robertson County.

133.    Capt. Dorris concluded his testimony by confirming that he never tried to question Henry Dean Jordan when he was in police custody, and that Jordan made the statement ("I never touched that girl") after Dorris informed him about the charges.

*After Kim Kelley Questioned by V4CR, She Uploads Video of Herself Claiming She Texted*
*Suspect, and Locks V4CR Out of Their Social Media Accounts.*

134.    Craig Sawyer was notified that Kim Kelley and Phil Drake had attempted to bribe one of the V4CR members to commit corporate espionage against V4CR.   After learning about this subterfuge, Sawyer invited Kim Kelley to participate in a Zoom call with him and some other managers.  The call took place at 10:00 am PST on the morning of May 28, 2024 and lasted approximately two hours.

135.    During the call, Mr. Sawyer asked Ms. Kelley, "Kim, we want to understand from your perspective, why are you investigating V4CR?"  Sawyer stated that they were a non-profit and their records were open.  He informed her that her business partner, Phil Drake, is a criminal and Sawyer questioned why she and Drake were working together to try and disrupt the important work that V4CR was doing under the guise of some "investigation."

136.    During the Zoom call, Kim Kelley was acting in a bizarre manner and was hyper-focused on minute distinctions in order to avoid answering questions.  For example, if she was asked about harmful statements she had made on Thursday, she would immediately accuse the person of lying, saying the statements happened on Wednesday and that the person was therefore a "liar."

137.    During the Zoom Call on the morning of May 28, 2024, Kim Kelley acted in a bizarre manner, and began hyper-focusing on trivial details and disputing definitions of words instead of providing direct answers about her actions related to the corporate espionage that she and Phil Drake were attempting against V4CR.  An example of the type of quibbling would be responding to an accusation that she had made harmful statements on Thursday, to which she would counter with the accusation that the person was lying

because the statement was made on a Wednesday, while dodging the call of the question as to *why* she had made the statements. At other times, she would quibble with the definition of a word when asked a question, responding with non-answers such as, "well, that depends on how you define _____." Her deliberate evasion and emphasis on minutiae prevented a clear understanding of her involvement and actions with Phil Drake, but at that point she knew that her and Drake's "investigation" had been exposed.

138.    Kim Kelley had been handling the social media for V4CR and had access to all of their social media accounts. Shortly after the Zoom Call, Kim Kelley uploaded a video of herself to V4CR's YouTube channel, claiming that she was the one who had texted the suspect that was arrested during the Millersville sting. In the video Kim Kelley made of herself, she suspiciously emphasizes with unnecessary details that she alone had done all the texting and chatting with suspect Henry Dean Jordan. She suspiciously emphasized that law enforcement essentially had nothing to do with the sting, except for arresting the suspect.

139.    Kim Kelley's disinformation tactics were aimed at derailing the Millersville pedophile sting and manipulating public perception. She falsely emphasized her unilateral role in texting with the suspect, despite multiple witnesses contradicting her claims. Kim Kelley was fully aware that only law enforcement was authorized to handle solicitations with suspects under Tennessee law, and the video she took of herself and uploaded was designed to make a public video containing information that she knew would not only obstruct the Millersville sting, but would also contradict any truthful testimony from Capt. Dorris that he had handled the messages involving Henry Dean Jordan's solicitations.

140. After uploading the video to V4CR's YouTube channel, Kim Kelley locked V4CR out of their social media accounts and changed the 2-factor authorization to a phone number controlled by her, making it impossible for V4CR to either take down the misleading information, access their accounts, or recover them. Because they lacked access to the account, Kim Kelley's video remained on V4CR's YouTube account. Kelley then provided the link to the video of herself to local reporter Phil Williams as "evidence" that she had done all the texting with Henry Dean Jordan, which conveniently contradicted the testimony that Det. Dorris had given earlier that morning.

141. On the evening of May 28, 2024, Craig Sawyer emailed Kim Kelley, stating:

Hi Kim,

After a 2-hour discussion with you, trying to gain understanding of why you have been working with a known criminal and facilitating his bizarre attempt to "investigate" our org, even though our books are open public record, we were unable to get that honesty, or sincerity.

Instead of addressing our observations of your words and actions, you accused us of making accusations and fought us on every minute aspect of your behavior, even when we have video evidence of your behavior. Even with your painful betrayal, we were inclined to try to reach you and get you to see you've been led into a very precarious situation with many red flags on the legal front.

One day, you will see we were telling you the truth and were trying to save you from whatever you're headed into. But at the end of the day, you've chosen your own behavior. That is your prerogative. We each must choose our path. You have chosen yours, which is now obviously hostile to ours. We have an important org to run and a difficult mission to conduct.

Due to your refusal to address our concerns, You are no longer trusted by our team. Your contract services here will no longer be needed, even though we all genuinely celebrated your contributions while you were here.

We do ask that you cooperate with our people as we make some adjustments to our online services for turnover, in good faith.

We will have nothing negative to say about you and genuinely wish you well. In addition, we will continue to aggressively defend our org & mission from defamation by all comers where needed.

Go be well. I pray that you continue to grow, learn, heal and thrive.

142.     On the morning of Wednesday, May 29, 2024, Kim Kelley responded to Sawyer
and denied the accusations made against her, asserting that she had dedicated two hours
during the Zoom call to addressing the concerns and false allegations, even though she
never presented any evidence to support her claims. Kelley maintained that her contract
could be terminated with a 30-day written notice and outlined options for either continuing
her team's work until June 28, 2024, or halting all activities, including publishing content
and managing orders, with final payment due the week following the termination date.  She
stated she would help "streamline an easy turnover process" of and that this would take
place over the course of the next 30 days. However, Kelley's denials were later proven false
through her own subsequent interviews and statements from Phil Drake, who confirmed
that Kelley was deliberately sabotaging the Millersville sting operation under the guise of
conducting an unsanctioned "investigation" of their competitor, V4CR.  As Drake stated
in his interview with Heartland Journal Podcast, Kim Kelley went in to "take those bastards
out."

143.     Additionally, Kelley was found to be untruthful regarding the 30-day cancellation
clause in the V4CR contract; when requested to provide a signed copy of the contract
containing this clause, she failed to produce it within the email chain, further discrediting
her claims and demonstrating intentional fabrication of evidence to mislead and manipulate
the situation.  She nonetheless asked if V4CR had any reason to not fulfill their side of the
agreement, despite not producing a signed copy of it.

144. On May 30, 2024, Craig Sawyer wrote to Kim Kelley, characterizing her hostile

actions to lock V4CR out of their social media accounts and withhold their property as

"attempted extortion":

"Hi Kim,

Under normal circumstances, no, there would be no reason we would ever withhold any compensation. However, under a hostile attack from an outside entity attempting to hold our property hostage, or to actively bring harm to our mission for children, we reserve the right to handle the situation as our legal team advises. Since I trust you're not attempting to hold our property hostage in such an attempted extortion scenario, I trust that's not even an issue we need to further discuss.

So, as you turn over our property (social media accounts) in good faith, as agreed, we will all be free to continue the separation process amicably.

**Craig "Sawman" Sawyer**
**Founder, Veterans For Child Rescue"**

145. Despite the fact that Sawyer never acknowledged the validity of the 30-day clause,

Kim Kelley disingenuously replied to him, stating that she was going to still demand final

payment 30 days out:

"1. Ok, great. Since there's no hostile attack or attempt to hold your property hostage on my end 😂 I'm going to confirm that you're agreeing to honor the termination process and the final payment will be due the week after June 28.
If any of that is incorrect, please clarify in your next email.

2. My expense invoice was approved and processed by Forrest :D thank you!

3. Following up on this important question, since I have still not received a response:
**Would you like Grow Online to continue our regular work until June 28th, or would you like us to halt further work and go ahead and send the final invoice, and complete a smooth turnover process?**
Please advise so we have a clear, written agreement on our next steps to wrap up this contract.

THANKS

Kim Kelley"

146.     In fact, no expense invoice had been approved by V4CR, and Kim Kelley charged several thousand dollars to a V4CR credit card without permission.   Moreover, V4CR remained locked out of their social media accounts for many months and, upon information and belief, have still not recovered access to several of them as of the time of filing this lawsuit.

***Plaintiffs' Investigations Reveal a Nexus of Corruption, Voter Fraud, Mortgage Fraud, and Money Laundering.***

147.     Det. Candler continued working on other investigations after the pedophile sting. As part of these investigations, he submitted numerous Open Records Requests to Sumner County Government.

148.     In June of 2024, Det. Candler submitted a Public Records Act request for numerous individuals including several individuals who were Commissioners at the time.   The purpose of the request was to obtain records that Candler already knew existed, but that had been produced as part of a complaint in a different administrative proceeding.   Thus, Candler was merely trying to authenticate documents he already had in his possession. Some of the records included emails and requests for other documents from the Sumner County Election Commission.

149.     On June 12, 2024, Det. Candler attended a training conducted by the FBI about open-source intelligence.  During breaks in the training, Candler discussed the issues that were occurring in Millersville, and the FBI agents stated they believed there was clear evidence of public corruption and that they would send an analyst down to discuss the case with him.

150.    On June 18, 2024, Det. Candler emailed the FBI to connect with an agent in Nashville, and ultimately set up a meeting with them on June 25, 2024.

***Det. Candler Attempts to Obtain a Judicial Subpoena for Public Records.***

151.    Concerned that his Public Records requests might be arbitrarily denied or that he might be provided incomplete information, on June 18, 2024, Det. Candler dropped off an application for a judicial subpoena to Judge Joe Thompson's judicial assistant. She emailed him back stating that she needed additional information. Det. Candler responded, and sent the Judicial Subpoena via email.

152.    On June 20, 2024, Detective Candler returned to Sumner County Circuit Court, and met Judge Joe Thompson again. Instead of meeting Judge Thompson in chambers, the Sheriffs' deputy directed Candler to the courtroom, stating that Judge Thompson was waiting on him in the courtroom.

153.    Upon entering the courtroom, Judge Thompson initiated the official recording of the session by pressing the record button, signaling the start of the proceedings. He addressed Detective Candler directly, stating for him to come up, and that his subpoena needed a "clear and concise nexus." Candler responded by specifying his request for emails and other public records. Judge Thompson reviewed the subpoena, highlighting specific sections and making annotations directly on the document.

154.    As the discussion progressed, Judge Thompson identified the individuals listed in the subpoena, stating, "I know these people. They are on the Sumner County Election Commission. And these three are lawyers." He claimed that the records would be protected by "attorney-client privilege," asserting, "You know these are lawyers. This is protected

by attorney-client privilege." Detective Candler clarified, "No sir, I'm not requesting that information; these are public records."

155.　　The courtroom tension heightened when Judge Thompson inquired about Candler's sources, asking, "Who is your confidential source? Who is the complainant?" Candler referenced a Bureau of Ethics Complaint filed by a Millersville resident against a Commissioner. In response to further probing from the Court, Candler stated that Shawn Taylor had provided him with some information for him to either use or discard. Of course, Shawn Taylor's role as Asst. Chief of Police was to assist the detectives with any technical research and computerized intelligence gathering for anything that might be relevant or related to the cases being investigated by the City's detectives, but Taylor was otherwise uninvolved and let the detectives conduct their investigations how they saw fit.

156.　　Judge Thompson expressed concern over the direction of the investigation, stating, "Your bosses are putting you in a predicament. You shouldn't be investigating this. It should be handled by a third party" In response, Candler stated that he had reached out to a third-party—the FBI. However, Judge Thompson stated that the FBI "did not have jurisdiction."

157.　　Judge Thompson dismissed the legitimacy of the subpoena. The judge reiterated his claims that Candler had been put in a predicament by his superiors and concluded the session by denying the subpoena. Notably, instead of returning the subpoena, Judge Thompson retained it, made additional annotations, and informed Candler, "You're not allowed to talk about this."

158.　　Subsequent actions raised serious concerns about Judge Thompson's impartiality. Detective Candler wrote a statement to document what occurred on the same day, but was

later seized by the TBI on September 4, 2024, along with all three copies of the statement and the laptop upon which it was typed. Additionally, the City of Millersville's request for the hearing's recording has been denied, pending further proceedings. Analysis of the TBI's Operation Plan "notes," inadvertently left behind after search warrants signed by Judge Thompson were executed, revealed references to "attempted subpoenas" as part of alleged "official misconduct"—claims that appear unfounded.

159.    Further suspicions arose when it was discovered that Judge Thompson retained the "attempted subpoena" and provided it, along with the hearing's recording, to the TBI. This action suggests a breach of judicial neutrality, especially considering Judge Thompson's role in authorizing search warrants for both Millersville City Hall and Shawn Taylor's residence. The confluence of these actions by Judge Thompson raises questions about the validity of the search warrants because a Judge that acts as an investigator that provides evidence to the prosecution cannot be considered a "neutral and detached magistrate" under well-established Fourth Amendment Jurisprudence.   These actions further cast doubt on the integrity of the legal proceedings and the motivations behind the TBI's subsequent actions in Millersville.

160.    On June 25, 2024, Det. Candler and Det. Dorris met with FBI special agents, bringing binders with evidence of their criminal investigations.  They discussed the cases, but did not hear back from the FBI before the TBI "raid" took place.  The TBI seized all of the folders that Detectives Candler and Dorris had taken to the FBI.

161.    On July 12, 2024, Det. Candler obtained a search warrant for Henry Dean Jordan's phone. During the search of the phone photographs were taken of the suspect's ID/Handle from the main phone log. Candler confirmed that the ID, WhatsApp, and MocoSpace

messages all matched the items Id/handles/and apps as show on the law enforcement phone on 05/17/24 during the communication and arrest of the suspect. Detective Candler matched the messages and phone logs from Henry Dean Jordan's phone to the phone used by law enforcement on the night of 05/17/24. The logs showed matches on MocoSpace, Phone Logs and text messages. All electronic and documents from the phone were saved to a thumb drive for evidence and placed in the Millersville Evidence section by Det. Candler for storage and safe keeping.

***Local Journalist Releases Secret Recordings Taken by Kim Kelley Who Claims They Prove Det. Dorris Committed Perjury.***

162.     On July 15, 2024, Phil Williams published a teaser on Twitter claiming that "disturbing recordings from inside child predator sting shows police, MAGA operatives ignoring laws." In the video, Williams simultaneously attacked military veterans and the Christian faith, referring to volunteers as "MAGA operatives" and "prayer warriors."

163.     On July 16, 2024, the Phil Williams story aired, making numerous false claims that "laws were ignored" by Millersville police.

164.     On July 19, 2024, Phil Williams posted another teaser on Twitter, stating "Did a Millersville, TN police officer commit PERJURY with his testimony about a child-predator sting? The explosive new story – with evidence – airs Monday on @NC5 at 6!"

165.     On July 22, 2024, Phil Williams released a story claiming that Detective Dorris had committed perjury, and on July 23, 2024, the TBI informed Williams that they were opening an investigation based of the purported perjury.

166.    All of the "evidence" posted in the Channel 5 came from short clips of the alleged secret recordings taken by Kim Kelley, which Defendant Phil Drake claims to have provided to Phil Williams.

167.    Of the 8 minutes and 20 seconds of the video broadcast associated with the Channel 5 Article titled, "Did Millersville detective commit perjury about child-predator investigation? Here's the evidence," there was only one minute and twenty seconds of video that actually showed Kim Kelley's "secret recordings" of the Millersville undercover sting, none of which actually showed Kim Kelley texting or messaging suspect Henry Dean Jordan. The article and broadcast quote Kelley at length, and it therefore appears that the gravamen of the purported "evidence" of perjury is, once again, Kim Kelley's words backed up with little more than fabricated evidence, selective editing, and visual disinformation.

168.    Three of the seconds-long video clips were sweeping panorama shots taken by Kelley of various people inside Shawn Taylor's barn, where the initial briefing took place on or about May 16, 2024. These shots obviously do not support Kelley's claims, but instead only serve to identify the persons who were present at the sting.

169.    There was one seven second video clip of Kim Kelley asking Todd Dorris, "I need to know what you'll need, so I can work up to that." Dorris responds to Kim Kelley with, "You know, as much as you can," but the audio of his full response is cut off. What can be heard is that Dorris states, "You know, as much as you can, *but the DA said that*…" – and at that point, Phil Williams' voiceover drowns out the rest of what Det. Dorris was saying, which was that "the DA said that" law enforcement had to do the typing for all of the actual solicitations. Det. Dorris repeated this instruction numerous times during the

Millersville sting, which Defendants Kelley and Drake knew but failed to show in the clips they provided to the media.

170. Although Kim Kelley claims this video is proof of her "doing all the work" in order to contradict Det. Dorris's testimony, everybody present knew that she was actually referring to what he needed her to do to "work up to the solicitation," which was part of the assistance the V4CR volunteers were allowed to provide, by filtering through suspects and to determine whether people had no interest in communicating with the decoy profile when they revealed that their age was 12 to 13 years old. Although the seven-second clip shows Kelley asking Det. Dorris what he needed for the "work up," and him

171. Another four second clip of the "secret recordings" shows Kim Kelley's hand on the grey phone, ostensibly to suggest she was typing something in a message. A subsequent eight second clip shows a recording of what appears to be the same grey phone, but the bottom of that phone appears to lack the text from a removable sticker that was left on the back of the Ops Phones as follows:



172.    Two angles of the bottom of the grey phone used by Kelley in her "secret recording" do not appear to have the above text, which should still be visible through at least part of the bottom of the phone:





173.     The video showed another eight second clip with a grey phone in Kim Kelley's hand, where she is heard on recording claiming that a suspect got away because a vehicle "had no siren."



174.    Remarkably, the phone shown in the video appears a lighter shade of grey and does not appear to have any of the Ops Phones numbers written on the back, which should be located in the open space near where the "2" and the "1" are written on Ops Phone #2 and #1, as seen in the image below:



175.    Ops Phone #3 was used for the Henry Dean Jordan solicitation, so the phone should have a "3" in the location where the "1" and "2" are located on the above phones.

***Defendants Drake and Kelley Release Video of Michael Candler to Reveal His Identity.***

176.    There was a seven second clip that showed Det. Michael Candler talking to Kim Kelley about Henry Dean Jordan pedaling his bicycle up I-65. The video clip of Candler serves no real purpose but to reveal Candler's identity, as his statement about Jordan pedaling up the side of I-65 had no value and provided nothing relevant to any of the claims that Det. Dorris had purportedly "perjured" himself.

177.    Thus, none of the video clips provided by Kelley and Drake to Channel 5 during that broadcast actual show Kim Kelley texting Henry Dean Jordan, which underscores that Kelley's false and defamatory communications provided the basis for the claim.

*Defendant Kim Kelley and Phil Drake's Intentional Sabotage of the Millersville Pedophile Sting in Furtherance of Their Racketeering Influenced Corrupt Organization.*

178.     Unbeknownst to V4CR or the City of Millersville, Defendant Kim Kelley had been sent into Millersville as an "undercover" agent provocateur and saboteur at the direction of Defendant Phillip Drake.   These Defendants had the shared goal of disrupting the Millersville undercover sting operation to, in their words, simultaneously "take out" their perceived competitor, V4CR, and the members of the Millersville Police Department working with them.  The Defendants and their co-conspirators, by fabricating evidence and coordinating a smear campaign, attacked and disparaged the Plaintiffs with false and negative statements for the purpose of advancing their own unlawful agendas and promoting their unlawful racketeering enterprise.  The Defendants' campaign also caused the unlawful release of Det. Candler's identity, thereby rendering it impossible for him to work as an undercover narcotics officer, and tortiously interfering with his employment.

179.     As set forth herein, Defendant Kim Kelley has been engaged in various racketeering enterprises with Defendant Phillip Drake, including through her companies Defendants Digital Defenders United, Inc. and Grow Online, LLC, and Drake's purported "non-profit" corporation, Uniting America Incorporated.

180.     Kim Kelley, an admitted former member of a "sex cult."  Kelley was interviewed in Episode 236 of the Heartland Journal Podcast on August 5, 2024,[2] and she emphasized that she was "raised by gaslighters and narcissists."[3] Kim Kelley's admission that she was

---

[2] See, e.g., https://rumble.com/v59v3gd-heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24.html;     https://podcasts.apple.com/us/podcast/heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24/id1650288595?i=1000664415208
[3] "Gaslighting" originates from the 1938 stage play *Gas Light,* later adopted into the 1944 film, in which a husband systematically manipulates his wife's environment, most notably by dimming

raised by narcissists and "gaslighters" demonstrates her familiarity with their manipulative tactics and further demonstrates that she understands, and has the propensity to utilize, gaslighting and narcissistic strategies—such as distorting facts, sowing confusion, and controlling narratives—to gather and selectively edit evidence for blackmail, to fabricate false evidence, and to orchestrate smear campaigns—which is exactly what she did as part of her and Drake's campaign to "destroy" Capt. Dorris, Det. Candler, and others.

181.     V4CR attempted to disrupt child trafficking operations by posing as minors in states where that is allowed, and assisting law enforcement with posing as minors in states like Tennessee.   V4CR's goal was to catch and arrest pedophiles who sought to have sex with persons they believed were minor children.   Kim Kelley apparently disagreed with the manner in which V4CR was operating, stating that she "had concerns about the lack of effectiveness on the "combatting" side of their operations," as she stated in an online post on July 3, 2024.   She claimed that she had been terminated after raising concerns about V4CR's affiliation with something she referred to as "the Moonies cult."

182.     According to statements published by the Defendants online, including in podcasts and videos streamed over the Internet and elsewhere in the channels and streams of interstate commerce, Defendant Kelley and Defendant Drake had been planning to "investigate" and eliminate V4CR for some time and that they had planned to sabotage Millersville for nearly a month in advance.   What the Defendants refer to as an

---

the gas lamps, to make her question her own perceptions and sanity.  As used herein, a "gaslighter" is someone who employs psychological manipulation and deception to make another person doubt their own reality or sanity, while a "narcissist" is an individual who displays extreme self-centeredness, lacks empathy, and exploits others for personal gain.

"investigation" is actually just corporate espionage and unfair trade practices, both of which are illegal under state and federal law.

183.     Kim Kelley was interviewed in Episode 236 of the Heartland Journal Podcast on August 5, 2024,[4] and provided the following statement to host Steve Abramowicz, who read the disclaimer at the beginning of the podcast:

*All recordings of V4CR in the Millersville's Police Department conducted by Kim Kelly were authorized by Uniting America Incorporated, Phil Drake.  Uniting America Incorporated led the entire investigation with Kim Kelly serving solely as an employee of Uniting America Incorporated.*

184.     Kim Kelley 's above disclaimer, published by the Heartland Journal about her working for Phil Drake and Uniting America Incorporated as part of an "investigation," contradicts her own statements in the podcast.  For example, one of her pretexts or justifications for making recordings was that she had a "gut instinct that they were trying to either frame me or just do some shady things that I had been observing and calling attention to."  Thus, according to Kim Kelley, she needed to have evidence just in case "they," at some future point, tried to "frame her" for some unknown act.  Kim Kelley does not identify the exact origin of her paranoia or explain who "they"  are and what she was going to be "framed" for.  At another point during her interview, she claims that she released her recordings because she saw that "people" were "trying to gaslight and deceive her" and had put her at "significant risk," but she offers no more details other than to say that when she got to Millersville, the phones had not been set up.

---

[4] See, e.g., https://rumble.com/v59v3gd-heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24.html;    https://podcasts.apple.com/us/podcast/heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24/id1650288595?i=1000664415208

185.     V4CR attempted to disrupt child trafficking operations by posing as minors in states where that is allowed, and assisting law enforcement with posing as minors in states like Tennessee.   V4CR's goal was to catch and arrest pedophiles who sought to have sex with persons they believed were minor children.  Kim Kelley apparently disagreed with the manner in which V4CR was operating, stating that she "had concerns about the lack of effectiveness on the "combatting" side of their operations," as she stated in an online post on July 3, 2024.  Although her justifications for her interference change every time she discusses them, she claimed at one point that she had been terminated after raising concerns about V4CR's affiliation with something she referred to as "the Moonies cult."  She also claimed that she had given V4CR "many opportunities to do what's right" and that they "made their decisions."

186.     Kim Kelley has a remarkable talent for weaving a web of vague terminology and evasive rhetoric, making it difficult to discern her true intentions or accusations. She frequently relies on pronouns like "they" and "them," deliberately obscuring who she is referring to and what specific issues she is addressing. This penchant for ambiguity allows her to construct straw men, deploy red herrings, and engage in circular logic, effectively derailing meaningful conversations and evading responsibility for anything she does. Much like her boyfriend Phil Drake, the self-proclaimed creator of the QAnon conspiracy, Kelley thrives on misdirection and confusion and their collaborative efforts resemble a modern-day QAnon playbook.

187.     For instance, Kim Kelley fixates on attacking V4CR by alleging vague "ties" to "The Moonies Cult," conveniently ignoring that the current members of the Unification Church have rebranded and distanced themselves from the old practices.   Information

available online shows that the Moonie children who currently operate the church have no ties to the old practices of their parents, revealing that Kelley's attack is based on information that is both outdated and irrelevant. Her strategy of targeting irrelevant or exaggerated threats supports her false narrative while diverting attention from the real issues at hand.

188.     Additionally, Kelley's grandiose claims that she provided V4CR with "many opportunities to do what's right" and that they "made their decisions" are nothing more than circular statements designed to evade accountability. Her love for vague assertions and misleading statements is no surprise, given her association with Drake, whose own conspiratorial antics mirror the cryptic and unfocused tactics Kelley employs.

189.     Regardless of her shifting and ambiguous statements, it is clear that Kim Kelley openly promoted Uniting America Inc. and solicited donations from viewers as part of her and Phil Drake's smear campaign.  For example, she provided the following statement on behalf of Uniting America Inc. to be used in the description of Episode 236:

"Joining us is Kim Kelley spokesperson for Uniting America Inc. a frontline movement actively assisting the homeless, advocating for social justice, and combating child trafficking in the USA. But we can't do it alone. We need your help to address these critical issues, make lasting impact, and make a world of difference in our communities. Kim requested she be given an opportunity to share her side of the story as it relates to our Millersville episode with Police Chief Bryan Morris so we did so and here it is. To find out more go tohttps://unitingamericainc.org/"

190.     Defendant Kelley made another incredible claim that at some time before she talked to Phil Williams, she had been accused of "obstructing justice" purportedly by making phone calls to some unidentified person to have them "rip up" the warrants.  Kelley then makes another incredible claim that, only when some unidentified person "framed" her for the warrants not going through at Millersville, that she decided to do an interview with Phil

Williams.  Although she claimed that she was going to force "the truth to come out," no part of the Phil Williams interview discusses the purported conspiracy to "frame" Kim Kelley.

191.    In the Heartland Journal Podcast, Kim Kelley states that there were four "chatters," but she fails to disclose that there were six phones.   She also claims to have been the one who identified suspect Henry Dean Jordan, claiming that the detective was with her and she showed him the phone.  She stated that the "chatters" were the ones "posing as minors," but fails to include the full truth, which is that chatters were only allowed to filter through communications to ascertain whether the subjects were still interested in talking to the underage profile or not.  She failed to state that none of the Volunteers were authorized to handle the solicitations from the suspects.

192.    In another isolated clip provided by Kelley to Channel 5, she played a clip of Asst. Chief Taylor stating that the detectives needed to be in the room with the chatters at all times, without playing the rest of the recording and without clarifying that this rule was independent of the rule regarding law enforcement officers handling the solicitation.  These are two separate rules, and Kim Kelley combined partial playback manipulation of a different rule to fabricate evidence that when she got to Millersville that "the Rules had changed."  In fact, the rules at the Millersville Op never changed, and none of the publicly available videos taken by Kim Kelley prove otherwise, except by selective editing and partial playback manipulation.  One rule was that the detectives had to always be present with the chatters.  The next rule was that the detectives had to handle the solicitation because that is what Tennessee law required.  Rule #1 and Rule #2 make sense because a detective needed to be present so that if a solicitation was about to happen, the phone could

be handed to them immediately. Another rule was that volunteer chatters could only handle preliminary communications with suspects to "work up" through preliminary chit chat to see if the conversation was going to steer toward a solicitation that needed to be handled by the detectives.

193.     In another one of the edited video clips Kim Kelley provided to Phil Williams, she asks Det. Dorris how much "work up" he needed for her to handle, and he states, "Well, as much as you can."  Kim Kelley then falsely characterized this isolated clip of the recording as evidence that she was handling all the solicitations and that the Plaintiffs were never involved in any communication with any suspect at all.  In fact, the "work up" was nothing more than Det. Dorris telling her the pre-existing rule, which was that they could "chat" with subjects but that the Robertson County DA was absolutely clear that detectives had to handle the solicitation with the suspect.

194.     According to Phillip Drake in an August, 19 2024 interview on episode 240 of the Heartland Journal Podcast, he and Kim Kelley had conspired to sabotage the Millersville/V4CR sting and had agreed in advance that she would travel to Millersville with the express goal "to take those bastards down," referring to both V4CR and the Millersville Police Department.  Defendant Kelley and Defendant Drake intended to sabotage the Millersville pedophile sting and then exploit the subsequent media coverage generated from the fallout to accomplish this goal.

195.     In one of the "secret recordings" made by Kim Kelley and sent to Phil Williams, Kim Kelley speaks with Asst. Chief Taylor, who correctly informs her that under Tennessee law, the detectives had to handle the solicitations and that the volunteers needed to tell the detectives what to type.  Taylor then asks Kim Kelley, "When it comes to setting

up the account, what's got to be done to set up the account?" After an awkward pause, Kim Kelley offered the following shill or non-sequitur, "That's what I want to understand are the parameters. The parameters. That's what – I'm being counseled against this, not only against this being effective. But I'm being counseled against doing this." In the recording, a male voice is heard laughing. Upon information and belief, the laughter was from Phil Drake, who admitted in a subsequent podcast that he was listening to the phone call and that it was somehow funny that Taylor was asking Kelley for her advice on how to set up a profile on the phone, which Kelley was unable to answer.

196. Defendant Kim Kelley stated in the recording that she was "being counseled against doing" the Op and was counseled against the "effectiveness" of a pedophile sting, which she would later state was, in her opinion, not the same as investigating "child trafficking." Philosophical differences aside, the full recording shows only that Shawn Taylor informed Kim Kelley truthfully about the requirements of an undercover law enforcement officer handling the solicitation aspect of the conversation.

197. Prior to the Millersville undercover sting commencing on or about May 17, 2024, volunteers had been expressly warned by Millersville officials about the risk of media coverage and that the Op needed to be run with a heightened duty of care for that reason. Kim Kelley was also specifically aware that Phil Williams at Channel 5 News would be running stories on Shawn Taylor.

198. Kim Kelley had participated in two prior operations with V4CR over the prior year. Drake admitted during his Heartland Journal Podcast interview that he had seen Defendant Kelley online and had recruited and groomed her to work for him. Drake admitted during the Heartland Journal Podcast that he had targeted Kelley because she was already working

with V4CR and had inside access to their operations, which would make it easier for him to commit corporate espionage against them. Their relationship goes back at least a year, and the two have been romantically involved.

199.      Drake stated in his interview that he was a "federal contractor" for 15 years, and that he did "horrendous things" to civilians as part of his work along the U.S. – Mexico border and as part of his purported "counter-corruption" job duties for one of several three letter agencies, including the FBI, OIG, and the CIA. Although Drake claims that he only uses the CIA for when he needs to kidnap (in his terms "rescue") children that are trafficked internationally. Violence is a routine part of Drake's racketeering enterprises. As Drake candidly stated to host Steve Abramowicz during Drake's interview on the Heartland Journal Podcast, when any individuals get in his way or his organization's way, "we take them out, too, as you well know."

200.      In early 2024, Drake and Kelley had attempted to bribe and/or solicit a V4CR volunteer to commit corporate espionage against V4CR. Although the V4CR volunteer declined to commit corporate espionage, the Defendants' attempt to commit the offense and/or solicitation of another to commit the offense constitutes a violation of 18 U.S.C. § 1832, and is therefore a predicate racketeering offense for purposes of 18 U.S.C. § 1961 et seq.

***Phil Drake Publicly Claims To Have Created the "Q Anon" Conspiracy As Part of His Work as Contractor for CIA, FBI, and OIG.***

201.      It is the peak of irony that Phil Williams baselessly branded Shawn Taylor a "QAnon conspiracy theorist," yet he relied on statements and evidence from Kim Kelley and her co-conspirator Phil Drake as his star witness and source of information. Phil Drake

openly claimed in online videos to be the *actual* creator of QAnon, supposedly as part of his top-secret work as a "federal contractor" working for the FBI, CIA, OIG, and various other unidentified "three-letter agencies." By using an unreliable witness and her self-professed QAnon–founding accomplice to smear the Plaintiffs for doing their job, Phil Williams has actually advanced the very "Q conspiracy" narrative he purports to condemn.

202.     On January 2, 2024, Phil Drake uploaded a YouTube interview he did with Craig Sawyer, another favorite target of Phil Williams, during which time Drake made additional, shocking claims.   According to Drake, contractors were needed to be a "third party" that could accomplish illegal tasks that the agencies themselves could not carry out.   He claims that his job was to assist the "FBI, OIG, or CIA" by breaking into homes, documenting evidence, and then being treated as an "undercover informant," in order to somehow provide these agencies the stolen information so they could then obtain a search warrant to seize the evidence.

203.     During the podcast with Craig Sawyer, Drake claims that his "entire career doing this was [sic] revolved around violating the rights of the American people," and that he was "not going to sugarcoat it."   Drake claims that he received "orders" from the CIA. "You make the people in the community trust you," claimed Drake, "and then you manipulate situations so you can follow out your orders."

204.     Drake claims to have received direct orders from "the administration," to create "QAnon."   He claims that he started working on "QAnon" in mid-2016.   To accomplish the creation of "Q" - Drake claims that he and unidentified members of his team of "contractors" were provided an English translation of Adolf Hitler's "Mein Kampf" as part

of the creation of "QAnon." According to Drake, his "QAnon" development was accomplished to target members of "the Christian faith."



205.    Drake claims that he and his team used "Cambridge Analytics" to create QAnon. He reiterated that his mission was to "target Christians" and "target their faith" to make sure that there was a "living savior" in office.

206.    Phillip Drake ran in the 2024 United States Presidential Race, first as a Democrat, and then as an independent candidate. In fact, his purported campaign was and is a front for illegal transmissions of money, money laundering, and racketeering enterprises owned and operated by Drake and Defendant Kelley, with over $200,000 being paid to Defendant Kim Kelley for "online marketing" services, when in fact the money was paid as part of these Defendants' unlawful scheme to purchase, traffic, and conceal children on a farm owned and operated by the Defendants, in violation of dozens of federal laws.

***Phil Drake and Kim Kelley's "Child-Purchasing" and "Survivor Center" Fraud Scheme.***

207.     Phil Drake and Kim Kelley had a shared "vision" of an enterprise to purchase children being illegally trafficked in the United States and then conceal them from society at an undisclosed farm operating as a purported "survivor center."  According to admissions by Drake during his interview on the Heartland Journal Podcast, to obtain these children, some of which are as young as ten (10) months old, he and his "team" will either use force to kidnap children from child traffickers, or he will "bribe government officials" involved in the illegal trafficking scheme, and then transport them to a compound owned and operated by him and Kim Kelley.

208.     Drake claims that he and Kim Kelley have built a "Survivor Center" to house the child trafficking victims he has rescued.  His stated reason for having this compound of children is "because you can't trust the government to house the children."

209.     Of course, being on the "buy side" of a child trafficking scheme is just as illegal as being on the "buy side" of a drug trafficking scheme.  Regardless of whether an individual wants to purchase a kilo of cocaine "to get it off the streets," they can still be arrested and charged for possession of the drugs as if they intended to use them personally.   Similarly, whatever lofty intentions were shared by Drake and Kelley as part of their "child purchasing" scheme or "kidnapping trafficked children from the traffickers" scheme, their conduct is just as illegal as if they had kidnapped these child victims by prying them from their parents' arms.

210.     Phil Drake openly admitted during his interview with Craig Sawyer that the funds he used to fund both his presidential campaign and the purported "Survivor Center" came from the illicit funds he made doing "horrible things" along the U.S. – Mexico border.

Drake made the following statements approximately 1 hour and 24 minutes in the online interview with Mr. Sawyer:

*Listen, my motivations have completely changed. Like the nonprofit up to this point where we're doing the Survivor Center and all that stuff. It's been funded completely out of pocket. Now I'm running out of money, but it's been completely out of pocket. The campaign completely out of pocket because. Listen, I did a lot of horrible things to make that money, right? It wasn't good money, even though there's not much of it left. I knew I had to. I knew that I had to do something good with that money or dispose of it. So I'm doing good with that money. And I have a unique set of skills now. I can use those skills for the good instead of for the bad. And that's why we run operations. Me and my team, we just go in and we get the kids. You know, we do a lot of investigating of child sex cults. I know you know a great deal about that, Craig. Ugly.*

211.      Phil Drake has admitted that his 2024 Presidential Campaign was funded in whole or in part with the illicit funds he obtained as part of the Defendants' scheme of mass murder of migrants on the border, and their subsequent trafficking of the children that Drake separated from their parents. Thus, all funds received by Drake, including all funds transferred to or from Drake and Kelley's shell corporation, Uniting Americas, Inc., which holds funds known to be derived from criminal offenses and holds said funds for purpose of tax evasion, and therefore constitutes an illegal "money transmitting business" in violation of 18 U.S.C. § 1960. The Defendants, individually and in collaboration with Defendant Uniting America, Inc., participate in and solicit participation in a human trafficking payment network used to move funds in furtherance of human trafficking operations in violation of 18 U.S.C. § 1960.

**Defendant Phil Drake Admits Involvement In Interstate and Transnational Racketeering Scheme, Willfully Violating Rights of Americans, and Engaging in Acts of Terrorism.**

212.      On numerous occasions, Phil Drake has publicly boasted not only about openly bribing government officials and expressing his continued willingness to do so, but also engaging in heinous acts of mass murder of migrant families along the U.S. Border with

Mexico. Drake has claimed that he was working as a "federal contractor" for both the CIA and Mexican drug cartels, and that he would intercept immigrants travelling to the U.S. Border from Mexico. Drake claims that he, with the assistance of other "federal contractors," separated children from their parents and then engaged in the systematic murder of the parents of over 5,000 child immigrants. Drake has claimed on numerous times that he knows where "all the mass graves" of the murdered victims are located, and that it is somewhere along the U.S. border with Mexico in Texas.

213.     Drake has openly admitted to trafficking children as part of his purported campaign of mass murder and violence. Drake claims that after separating migrant children from their parents and killing their adult parents, he was given "satchels full of money" from the drug cartels and ordered to transport these illegal payments across the border and state lines to officials in Washington D.C. as part of the Defendants' unlawful racketeering enterprise. Drake claims that he had been involved in this enterprise "under the past four U.S. Presidents," indicating that his pattern of racketeering has gone back at least two decades.

214.     Phil Drake's admissions of separating children from their parents at the U.S. – Mexico Border, participating in the murder of those parents, and then smuggling satchels of money back into the United States to bribe officials—constitutes a clear "murder-for-hire" scheme that is unlawful under 18 U.S.C. § 1958, which prohibits using interstate or foreign commerce facilities for the intentional commission of murder in exchange for anything of pecuniary value. Drakes admissions also serve as a "predicate act" under the Racketeer Influenced and Corrupt Organizations Act, rendering anyone involved in the scheme jointly and severally liable for it. Specifically, 18 U.S.C. § 1958 identifies the use of interstate commerce (through travel, mail, or other means) with the intent to commit

murder-for-hire as a federal offense; under civil RICO, such conduct demonstrates a pattern of racketeering activity that gives rise to liability for those who knowingly participate in, conspire to commit, or benefit from the scheme.

215. Defendant Drake's admissions of mass murder at the U.S.-Mexico border also constitute "international terrorism" in violation of 18 U.S.C. § 2331(1). First, his activities involved violent acts and serious threats to human life, which would be criminal under state or federal law if committed within the territorial jurisdiction of the United States. Second, these acts were inherently designed to intimidate or coerce a civilian population or government, satisfying 18 U.S.C. § 2331(1)(B). Finally, Drake's actions transcended national boundaries by allegedly occurring in Mexico and continuing into the United States, fulfilling the requirements of 18 U.S.C. § 2331(1)(C). Accordingly, Drake is guilty of international terrorism, and these offenses constitute separate predicate acts for purposes of the Plaintiffs' Civil RICO claims brought under 18 U.S.C. §§ 1961–1968.

216. Drake's admissions also implicate 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering activity. Specifically, Section 1959 penalizes individuals who commit or conspire to commit murder, kidnapping, and other violent offenses either for something of pecuniary value from a racketeering enterprise or to maintain or increase their position in such an enterprise. Here, Drake admits to committing mass murder on the U.S.–Mexico border, and then kidnapped the children and smuggled funds into the United States to bribe public officials—conduct that is the epitome of violent crimes done in furtherance of a racketeering scheme. Consequently, Drake's actions violate 18 U.S.C. § 1959 and constitute yet another multitude of predicate acts for purposes of Plaintiffs' Civil RICO claims under 18 U.S.C. §§ 1961–1968.

217.	Accepting Phil Drake's admissions as true, his direct involvement in the systematic murder of 5,000 to 10,000 civilians would also constitute crimes against humanity under international law and would rank him among such notorious persons as Serbian war criminal Ratko Mladić, who was criminally responsible for the July 1995 Srebrenica massacre in which over 7,000 Bosnians were systematically murdered.

218.	Phil Drake has told witnesses that he has videos on his cell phone showing him and his "team" stacking dead bodies into mass graves somewhere along the U.S. – Mexico border.  Discovery is needed to verify these claims.

219.	In Episode 240 of the Heartland Journal Podcast, Drake claimed that he and his Affiliated Organizations are responsible for the "rescue" of 1,384 children in the eight months from January 2024 and his interview in August of 2024.  Drake stated that he does not film his "rescues," because the child traffickers that he steals these children from view his actions as "stealing their product," which Drake claims justifies hiding these children from society on the purported farm owned and operated by him and Defendant Kelley.

220.	Under 18 U.S.C. § 1201, kidnapping is broadly defined as the unlawful abduction or confinement of a person, regardless of the perpetrator's claimed motive. In Defendant Drake and Kim Kelley's "business model," forcibly taking children from their parents or traffickers—without lawful authority—and holding them at a concealed location purportedly to "rescue" them still constitutes "abduction" and "holding" for an unlawful purpose. The statute does not require proof of a demand for ransom or reward; the phrase "or otherwise" covers any unlawful holding of a victim against their will or without proper legal justification. Consequently, even if Drake and Kelley subjectively view their actions as noble or protective, the act of removing children from their rightful custodians and

hiding them away at a "Survivor Center"—absent a valid legal order—constitutes kidnapping under federal law and also constitute at least 1,384 additional predicate acts occurring in 2024 for purposes of Plaintiffs' Civil RICO claims under 18 U.S.C. §§ 1961–1968.

221. Defendants Drake and Kim Kelley have knowingly used their Affiliated Organizations as unlicensed money transmitting businesses in violation of 18 U.S.C. § 1960 by funneling illicit proceeds from their murder/kidnapping/trafficking/fraud scheme into Drake's presidential campaign and then, in turn, transferring those funds to themselves under the guise of the expenditures being "campaign expenses." Further, they have misused their 501(c)(3) entities—Uniting America Inc. and Digital Defenders United—to facilitate these transactions without obtaining the required state licensing or federal registration as a money transmitting business under 31 U.S.C. § 5330. By operating without the appropriate license(s) and using instrumentalities of interstate commerce to move illicit funds, Defendants have violated 18 U.S.C. § 1960.

222. In addition, Defendants Drake and Kelley have engaged in the unlawful laundering of monetary instruments in violation of 18 U.S.C. § 1956, as they knew the funds derived from their murder/kidnapping/trafficking operation were proceeds of unlawful activity, yet they conducted financial transactions with the intent to promote further illegal conduct and to evade reporting requirements. Specifically, by moving money from the presidential campaign and through nonprofit accounts to pay themselves, Defendants concealed or disguised the nature, source, ownership, and control of these criminal proceeds. This conduct constitutes money laundering in violation of 18 U.S.C. § 1956(a)(1) and (a)(2), as

the transactions involved interstate commerce, were designed in part to avoid taxation and required disclosures, and clearly promoted continued unlawful activity.

223.     Defendants Kelley also exploited their 501(c)(3) nonprofits—Uniting America Inc. and Digital Defenders United—as conduits for funneling illicit funds while claiming the protection of charitable status. This misrepresentation to federal and state authorities further underscores their intent to conceal the origins and beneficiaries of the money. As a result, these nonprofits acted as fronts for illegal financial transactions, intensifying Defendants' violations of both 18 U.S.C. § 1960 and 18 U.S.C. § 1956, and contributing to a broader pattern of racketeering activity under 18 U.S.C. §§ 1961–1968.

*Defendants Phil Drake and Kim Kelley's "Survivor Center" Is An Instrument of Fraud Racketeering.*

224.     Defendant Drake and Defendant Kelley, Co-founders of Uniting America Inc., created and utilized Uniting America Inc. to not only promote and facilitate their unlawful racketeering enterprise, but have also used the instrumentalities of interstate commerce to fraudulently obtain donations and funds to build a "Survivor Center" that does not actually exist.  At bottom, Drake and Kelley are scam artists who travel across interstate lines to perpetrate their many frauds.

225.     Although the Defendants took down their websites "UnitingAmericaInc.org" and "GrowOnline.Com" in December and August of 2024, respectively, the Defendants had utilized those websites to advance their racketeering activities and fraudulently obtain donations.

226.     To advance their racketeering activities, Defendants Drake and Kelley claimed to own 80,000 acres of property "in the Carolinas," where they had built their Survivor Center

and were actively harboring "child trafficking survivors." The following screenshot is from the Facebook page of Uniting America Inc.:



227. The Defendants published the following information about their business plan and the purported "Survivor Center" on their website "UnitingAmericaInc.Org":

# 1. Human/Child Trafficking:

We actively spearhead counter-trafficking and rescue operations across the USA to combat child trafficking and exploitation. Collaborating with specialized agencies, we identify and dismantle trafficking networks, safely recover victims, and connect them with essential rehabilitation and support services. Our comprehensive approach targets both the prevention of such heinous crimes and the holistic recovery of survivors.

**Learn More**

## Join the Movement For Positive Action!

By contributing your time, resources, or donations, you directly impact the lives of those in need and contribute to the positive transformation of our society. Every small action contributes to lasting change.

Join the #UnitingAmerica Movement and become an agent of change. Together, we will take action, uplift our communities, and create a brighter future for all.

**A Sanctuary of Hope: Uniting America's Center for Child Trafficking Survivors**

Imagine surviving the unimaginable, facing each day with the heavy burden of unfathomable mental and physical trauma.

Children trapped in the harrowing realm of trafficking require more than sympathy. Beyond rescue, they need a sanctuary where they can rediscover hope, heal from their trauma, and envision a future where they are free and empowered.

**Donate & Make A Difference**

228.     The scope of the Defendants' fraudulent scheme varies.   On Facebook, they claimed to own 80,000 acres "in the serene Carolinas," but on their website, they claimed to own "85 acres in the peaceful Carolinas":



## Our Vision: A Self-Sustainable Haven

At Uniting America, we're rising to address this challenge. Over 85 acres in the peaceful Carolinas will soon be transformed into a beacon of hope and healing.

Our Survivor Center and Safe Home Community promises:
- **Safety & Security:** High-security measures, from on-site security teams to advanced tech, ensuring every child is truly safe.

> **- Healing & Therapy:** Spaces dedicated to trauma-informed core, led by specialists in various therapy and rehabilitation modalities.
> **- Reconnection with Nature:** Our community will thrive sustainably, complete with its farm, animals, and gardens, offering therapeutic engagements with nature, and solar panels ensuring green energy.
> **- Education & Growth:** Holistic growth opportunities, from education to skill-building, preparing them for brighter tomorrows.

229.     According to videos on the Defendants' Facebook page, they have travelled to various places throughout the United States to promote their illicit business and seek donations from those they can scam into believing that the "Survivor Center" has been built.  Through creative editing of videos and recordings, the Defendants have taken clips of videos from various places and edited them together to create the illusion that they own and operate a resort-like "Survivor Center" complete with what they refer to as a "regenerative farm," where purported child trafficking survivors live and work as part of some collective commune.   Drake and Kelley have uploaded videos of themselves with various children, claiming that these children were currently being housed at their "Survivor Center."  It is not clear if these children are, in fact, trafficked children or if they are just more "props" that the Defendants have used to create the illusion that they are operating a legitimate business.

230.     In videos the Defendants have posted to their Facebook page "Uniting America Inc," Kim Kelley announces herself as the "co-founder" of Uniting America Inc. and claims that the Defendants own "100 acres" that houses their Survivor Center and their "regenerative farm" and they claim in these videos "right now, we have a regenerative farm

and we have cabins that can house 15 to 17 children each." The Defendants show videos of children working on this "regenerative farm" and other videos of children playing with dogs, which the Defendants represent are trafficked children who have been rescued and are currently living at this compound.

231.     Defendants Drake and Kelley, and those acting in concert with them have admitted to harboring and conspiring to harbor children at their so-called "Survivor Center," which they claim is surrounded by armed guards. Drake has claimed that these children are then isolated and concealed from the public and lawful authorities until they will reach adulthood. Drake has stated his intent that these children remain under his control at the "Survivor Center," working on the "regenerative farm" that is attached or part of the same property. The Defendants' actions constitute the knowing recruitment, harboring, or obtaining of persons for labor or services under conditions that effectively prevent them from exercising their rights or seeking help from law enforcement—thus violating 18 U.S.C. § 1590. By removing any possibility of discovery by authorities, voluntary departure, or lawful guardianship, Drake and Kelley's plan violates the statutory prohibitions against peonage, slavery, involuntary servitude, or forced labor and constitute independent predicate acts of racketeering activity under 18 U.S.C. §§ 1961–1968.

232.     Moreover, Defendant Drake and Kelley's scheme to house these children in a compound surrounded by armed guards and compel them to work at the "Survivor Center" inherently envisions him benefiting—financially or otherwise—from their unpaid or forced labor. Under 18 U.S.C. § 1593A, any individual who knowingly profits from a venture involving trafficking or forced labor, knowing or acting in reckless disregard of the venture's illegal nature, is subject to the same penalties as a direct participant. Here,

Defendant Drake's continued public statements reveal an intent for him and the other Defendants and Defendant Organizations to profit from coerced labor, thereby demonstrating that he benefited (and plans to benefit) from his ongoing, criminal trafficking scheme.

233.     At bottom, Defendants Drake and Kelley are also simply utilizing their fraudulent enterprises to scam people into donations and receipt of money based on their misrepresentations.  For example, Drake uploaded a video on YouTube claiming it showed him building one of the "cabins" for trafficked children at the Defendants' Survivor Center:



234.     Although it is not clear where the staged videos of the two "tiny homes" being delivered were taken, Google Earth images show that both of these structures are now in

the back yard of Phillip Drake's dilapidated residence in South Carolina, as shown at the end of the dirt driveway in the right side of the following photo:



235.    Defendants Drake and Kim Kelley also utilized their fraudulent racketeering enterprises to scam individuals into donating money for purported "disaster relief efforts." Drake and Kelley used the federally-declared Maui fire disaster in 2023 to divert donations to his and Defendant Kelley's illicit enterprises.   In furtherance of this scheme, Defendants Drake and Kelley uploaded videos to YouTube falsely claiming that they were sending in a "team" to assist with the disaster relief, which was false.

236.    The following is a screenshot of the Defendants' YouTube video:



237.     The Defendants also linked back to their website for Uniting America, Inc., thus

using the instrumentalities of interstate, in order to obtain fraudulently induced donations

provided to them for purposes of assisting with the disaster in Maui:

**UNITING AMERICA: STEPPING UP TO FILL IN THE GAPS**

In these unprecedented times, we're committed to locating the lost, supporting the survivors, defending residents' rights, and initiating community rebuilds.

**Our Recon Team**
Despite the risks, our dedicated team is heading to Maui in an effort to render aid, investigate further losses, and champion the spirit of Aloha.

**Your Role in Their Resilience**
Your generosity can be the beacon of hope Maui desperately needs.

We guarantee:
💯 **Direct Impact**: Every penny of your donation directly fuels the Maui Disaster Relief effort

🐾 **Transparent Updates** We promise raw, unfiltered updates from the heart of the action, revealing the truths some might wish to conceal.

Join hands with us. Together, let's empower Maui to rise from the ashes.

Donate Now

238.    The Defendants disaster relief fraud not only violates 18 U.S.C. § 1040, it also constitutes yet another predicate act for purposes of Civil RICO, 18 U.S.C. § 1961 et seq. Drake and Kelley have violated 18 U.S.C. § 1040 by knowingly making materially false and fraudulent statements concerning the solicitation and use of donations purportedly designated for "Maui disaster relief" efforts. Specifically, under § 1040(a)(2), they falsified representations by assuring donors that their contributions would be allocated to emergency relief initiatives related to the Maui disaster, which qualifies as a benefit authorized under a major disaster declaration pursuant to the Robert T. Stafford Disaster Relief and

Emergency Assistance Act (42 U.S.C. § 5170). Their deceptive actions involve interstate commerce, as the donations were solicited and transmitted across state lines, thereby meeting the circumstances described in § 1040(b)(1). By concealing the true intent and misuse of the donated funds, Drake and Kelley engaged in fraud connected to major disaster benefits, warranting prosecution and penalties as stipulated under. 18 U.S.C. § 1040.

239.     Defendants Drake and Kim Kelley, along with their respective business entities and co-conspirators, have willfully combined and conspired to commit multiple federal offenses, including—but not limited to—money laundering, illegal money transmitting, kidnapping, forced labor, and tax evasion. By funneling illicit proceeds through purported nonprofit entities, concealing children at Drake's so-called "Survivor Center," and moving funds in and out of Drake's presidential campaign, Defendants engaged in a series of overt acts designed to further their collective criminal objectives. In so doing, they intended not only to defraud the United States government but also to obstruct law enforcement operations in Millersville, all in violation of 18 U.S.C. § 371.

240.     As part of their conspiracy, Defendants intentionally interfered with the undercover pedophile sting conducted by the Millersville Police Department, disparaging Plaintiffs and their participation in the operation as part of their promotion of their own unlawful racketeering ventures, Uniting America Inc. and Digital Defenders United. This interference included disseminating false and misleading information, orchestrating public attacks on Plaintiffs and law enforcement personnel, and coordinating a media narrative aimed at discrediting the sting's legitimacy and the Plaintiffs actions during the sting. By undermining a legitimate law enforcement operation, Defendants sought to advance their

racketeering enterprise by promoting it as superior to the methods used during the V4CR/Millersville pedophile sting.

241.    The above-described conduct also constitutes predicate acts under the Racketeer Influenced and Corrupt Organizations Act. Defendants' repeated violations of federal statutes—ranging from money laundering (18 U.S.C. § 1956) to unlicensed money transmitting (18 U.S.C. § 1960) to the conspiracy offenses described in 18 U.S.C. § 371—demonstrate a pattern of racketeering activity. By coordinating efforts to interfere with an active pedophile sting and simultaneously diverting criminal proceeds into their personal coffers and nonprofit organizations, Defendants acted as a cohesive "enterprise," seeking both financial gain and insulation from law enforcement. Their unlawful conspiracy, carried out through multiple related criminal acts, thus falls squarely within Civil RICO's purview, and each Defendant is jointly and severally liable for the damages caused by this pattern of racketeering activity.

242.    During his August interview on the Heartland Journal Podcast, Drake claimed that he had travelled across state lines into Tennessee "the other day" to assist "a young lady who has been abused quite a bit," claiming that "law enforcement" would not do anything about it. Whatever illicit act Drake accomplished during this August trip to Tennessee, it constitutes another predicate act of extending the Defendants' racketeering enterprises into Middle Tennessee.

243.    Drake claims, and Plaintiffs therefore aver, that Drake provided the "secret recordings" taken by his agent, employee, business partner, and co-conspirator Kim Kelley during the undercover pedophile sting in Millersville to two media outlets that he mentioned in his Heartland Journal Podcast interview. Drake has admitted that he was the

first person to contact Phil Williams at Channel 5, whom Drake claimed was eager and willing to publish the stories about Capt. Dorris and Det. Candler.

244.     Drake, a multiple felon, has prior convictions and has pled guilty to many crimes of dishonesty.  According to public records, Drake has over three dozen criminal filings against him from South Carolina and Texas, including multiple infamous crimes of dishonesty:

   a.  Two charges in South Carolina for Cruelty to Animals dated August 27, 2013.

   b.  Convictions in South Carolina for felony fraud/theft charges for "Breach of Trust with Fraudulent Intent for over $2,000" on November 2, 2012;

   c.  A guilty plea to the felony charge in South Carolina for the fraud/theft crime of "Larceny/Failure to Return Rented Objects, Fraud, Misappropriation," on February 24, 2012;

   d.  A guilty plea to a 2011 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses under $2,000" ;

   e.  A guilty plea to a 2012 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses under $2,000" ;

   f.  A guilty plea to a 2012 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses Valued $10,000";

   g.  A guilty plea to a 2012 felony charge in South Carolina for theft crime of "Exploitation/Exploitation of a Vulnerable Adult," on February 24, 2012;

   h.  A pending felony charges from 2010 in South Carolina for Theft of Livestock valued at $5,000 or more

i.   Indictments from 2009 for Breach of Trust with Fraudulent Intent, valued at $5,000 or more.

j.   Five guilty verdicts in 2006 for writing fraudulent checks valued at $500 or less;

245.   In November of 2024, Defendant Drake was arrested by U.S. Marshalls and is currently being held in the Hidalgo County jail in Texas, so he can stand trial for a half dozen felony charges of Theft of Cattle/Horses/Livestock and Theft of Property valued between $30,000 and $150,000.   Hidalgo Texas and Hidalgo County in the Rio Grande Valley sit directly on the U.S. – Mexico border, which is a geographic hotspot widely known to be a corridor frequently used in furtherance of cross-border smuggling and human trafficking.  Thus, Drake's allegations of kidnapping, trafficking and murder along the U.S. Border should be investigated by federal agents, as he had the means, motive and opportunity to have engaged in the heinous acts he has claimed to committing along the U.S.-Mexico border.

***The Defendants' Manipulation of Recordings Taken at the Millersville Pedophile Sting – May 17 to May 19, 2024***

246.   Although Plaintiffs currently lack critical evidence due to the TBI's raid and seizure of evidence from the Millersville police department and will require discovery to ascertain what Kim Kelley's "secret recordings" actually show and when they were taken, there is available evidence that demonstrates that Kim Kelley fabricated evidence that she was texting Henry Dean Jordan as part of her and Drake's mission to sabotage the Millersville Police Department and V4CR.

247.   In anticipation of the Millersville sting, Kim Kelley claimed that Craig Sawyer at V4CR asked her to purchase five (5) "burner phones" in early May, 2024, and she claims

that she began setting up profiles and texting pedophiles herself from a state outside of Tennessee. Kelley claims that the purpose of this operation was to "get a head start on things" in Millersville prior to the Operation. Thus, when Kim Kelley arrived in Millersville, she had at least six phones available to make it appear that she was handling solicitations with suspects when in fact she was not.

248.     Kim Kelley and Phil Drake falsely portrayed Asst. Chief Taylor as being the individual who requested this "head start," as part of their concerted effort to fabricate evidence that the Millersville pedophile sting was being conducted contrary to the requirements of Tennessee law. In fact, shortly before the Millersville Operation, Kim Kelley called Taylor and stated that she had talked with "local law enforcement" or the "TBI" and they had advised that she was not allowed to conduct the operation in the manner that V4CR had requested her to do, i.e., by handling solicitations. Taylor confirmed that law enforcement officers had to be the ones posing as minors during the solicitation, and he informed her that the MPD was going to conduct the Op in the manner requested by the Robertson County DA.

249.     After the sting had concluded on the evening of Sunday, May 19, 2024, a film crew of V4CR volunteers filmed Kim Kelley showing Millersville Officers Tiffany VanSciver and Matt Singleton several phones she claims she had been using to pose as a minor as part of an impromptu "on camera interview."

250.     In the video, Kim Kelley states to Officer Singleton and Officer VanSciver that she had been receiving texts and messages from various "perps" or "pervs" over the past three days, but hands them her personal iPhone, which is pink in color and has a wallet attached to it, as seen in the following picture:



251.     Kim Kelley's pink iPhone contained several videos of another phone that somewhat resemble the Androids used by Millersville officers, but there are distinctions.  Although Kim Kelley claims that the videos and evidence on her iPhone was from working "full-time over the past three days," the videos all appear to have been filmed on the morning of Friday, May 17, 2024, around the time that the Millersville detectives were still setting up the decoy profiles on each of the six Ops Phones.  Thus, it appears that Defendant Kelley was providing false information to Singleton and VanSciver, most likely to fabricate evidence that she had been texting with suspects entirely on her own throughout the duration of the Op.

252.     The entire MocoSpace Chats in the iPhone video are visible in the high-definition V4CR video of Kim Kelley's iPhone, but none of those chats showed any conversations with Henry Dean Jordan.  An excerpt of the multiple screens shows that the profile names can be seen in the V4CR video:



253.     All of the chat history seen in the video on Kim Kelley's phone actually shows videos taken only on the morning of Friday, May 17, 2024, shortly after or during the time when the phones profiles were being set up.     However, Kim Kelley told Officers VanSciver and Singleton that the videos on her pink iPhone represented "the entire inbox" of what she had accumulated on her phone over the past three days.

254.     Defendant Drake claimed to have provided the secret recordings made by Kim Kelley to Phil Williams at News Channel 5. Although she falsely represented that the video showed her chatting with Henry Dean Jordan, nothing shown in the video clip identified the person whom Kim Kelley was texting or messaging.

255.     Defendant Drake admitted in his Heartland Journal Podcast interview that he was constantly texting Kim Kelley during the sting. Based on Drake's admissions, it is reasonable to assume, and Plaintiffs therefore aver that the "secret recordings" taken by Kim Kelley are actually of her texting Phil Drake, who was admittedly participating in the efforts to sabotage and obstruct the Millersville pedophile sting.

256.     Although it is not possible to determine who Kim Kelley was texting in the short excerpt of the staged "secret videos" that Kim Kelley provided to Channel 5, it does not appear to have involved any of the Millersville Ops Phones.

257.     Kim Kelley handed the phone to Officer Singleton and Officer VanSciver, and explained that she had used the same AI-augmented photo of herself to make herself look like a child under the age of 12. This particular photo shows the AI generated photo of Kelley outdoors, whereas the profile pictures used during the sting were all taken indoors. This same AI-augmented photo was one of several that Kim Kelley sent in a batch of potential decoy profile photos to Det. Candler, which included some interior photos as well. Thus, the circumstances demonstrate that it would be remarkably easy for Kim Kelley to fabricate evidence that she was texting the suspects, as any pictures or video of the profile she set up prior to the Millersville sting on one of the "burner phones" she admitted to purchasing would closely-resemble any profile made by Det. Dorris or Det. Candler.

Plaintiffs therefore aver that some or all of the evidence that Kim Kelley provided to a local reporter and the TBI was not only selectively edited, but also falsified by Kelley and Drake.

258.    In the May 19, 2024 V4CR video of Kelley interacting with Millersville officers, two additional phones are seen by Kim Kelley's feet, neither of which appears to be one of the Millersville Ops Phones.  Based on Kelley's repeated claims that she had been asked by V4CR to purchase phones in advance of the sting, it is reasonable to assume and Plaintiffs therefore aver that one or more of the phones that Kelley displayed in her "secret recordings" were actually one of the five generic smart phones that purchased on her own in early May of 2024.  Kim Kelley never submitted invoices for reimbursement for these five "burner" phones she purchased, and Plaintiffs therefore aver that, if they were in fact purchased by Kelley, it was for Kelley and Drake's own malicious purpose to fabricate evidence and intentionally sabotage the Millersville/V4CR sting.

259.    Kim Kelley and the other volunteers had been instructed on what Tennessee law requires for unlawful solicitation of a minor, and all volunteers were aware that only the Detectives could handle the solicitations, and that only the "Ops Phones" purchased by Detective Candler were to be used for solicitations.   Thus, to the extent that Kim Kelley chatted or texted with suspect Henry Dean Jordan, it not only must have occurred on a separate profile she created on a different phone, but she knew it was against the express instructions provided by the Millersville Police Department, did not take place on a Millersville Op Phone, and most likely did not even take place during the Millersville Operation.   Kim Kelley has admitted she began texting with suspects two weeks prior to the Operation commencing and Henry Dean Jordan's profile indicates it has been active

since October 22, 2017.  Moreover, as alleged in more detail below, she was the last person staying at the Chatter House on May 20, 2024 to fabricate additional evidence.

260.     On May 28, 2024, Phil Williams released the Covenant School Shooting Story, falsely claiming that Shawn Taylor denied that the shooting had ever occurred.  The Covenant School Shooting occurred on March 27, 2023, at 9:22 am.  Shawn Taylor's house was also shot up earlier that same morning between 5:00 am and 5:20 am, and the TBI had been called out to investigate the shooting.  Evidence showed that a 9mm weapon had been used.  TBI agents had to leave Shawn Taylor's house to respond to the scene of the Covenant School Shooting.  It was later revealed that the shooter, Audrey Hale, used a 9mm carbine as part of her arsenal at the Covenant School.  In the story, Shawn Taylor was criticized over comments he made on a podcast in which he stated that the bodycam videos that had been released by MNPD looked like a "Training Op."  Contrary to the media report, Taylor never once stated that the Covenant School shooting did not occur.  Nor did Taylor deny that students and teachers were killed by Hale or that MNPD had shot Hale.

261.     On August 20, 2024, Assistant DA Jason White called Det. Dorris and stated that they were not going to prosecute the case against Henry Dean Jordan for solicitation of a minor "at this time."  Gen. White told Det. Dorris to "keep the evidence on Henry Dean Jordan in the event we decide to prosecute again."

262.     On August 23, 2024, Asst. Chief Taylor asked Capt. Dorris to email Sumner County DA Ray Whitley to see if he would be willing to come to Millersville and review the evidence that the detectives had been accumulating in the larger "white-collar type of case"

they had been working, and he even offered to buy Whitley and Assistant DA Thomas Dean lunch for taking their time:

"General Whitley,

I need your help. I was wondering if you would be able to come to the Millersville PD to look at a case I am working. It is a white-collar type of case that leads into the possibility of official misconduct, money laundering and fraud, so I put ADA Dean on the email as well. I have multiple binders, things drawn out on a white board and items posted on the wall. I believe I have enough for prosecution or at least to present to the Grand Jury, but I am not 100% sure.

With your knowledge and experience in these matters being greater than mine, plus it would be your office prosecuting, I was hoping you could take some time and come see if I am in the ballpark.

It shouldn't take too long, and if we do it around lunch time, we would feed you for taking the time. I know you have a very busy schedule.

 Captain Todd Dorris
Millersville Police Department


263.       On August 23, 2024, Assistant DA Thomas Dean responded to Capt. Dorris as follows:

"Capt. Dorris,

Thanks for reaching out. Sorry to be responding late - it's been a busy day. We will get back with you.

Have a good weekend.

Thomas Dean


***The TBI Conducts Suspicious Show of Force in Millersville to Forcibly Seize Evidence The MPD Had Voluntarily Offered.***

264.       The district attorney, who has the statutory authority in Tennessee to initiate and supervise TBI investigations in their county, was explicitly invited by the Millersville

Police Department to review the evidence they had been accumulating, which included an offer to buy the DA lunch to facilitate this collaboration. Instead of accepting the offer and cooperating transparently, the DA opted to have the TBI conduct a highly publicized raid twelve days later, forcibly taking the very files the MPD had prepared and intended to voluntarily provide. This orchestrated show of force was a coordinated publicity stunt, evidenced by the Channel 5 camera crew's presence in the immediate wake of the TBI's arrival. The sealed search warrants imply that Channel 5 had prior contact with the TBI, as they were not publicly available on any Circuit Court Docket.

265.     The raids took place at 10:00 AM on September 4, 2024, with the TBI executing two search warrants at Millersville City Hall and one at Assistant Chief Taylor's residence.

266.     Two warrants were issued in Sumner County, and one says "Sumner County" but was apparently signed by a Robertson County Judge.  The search warrant on Asst. Chief Shawn Taylor's house says "Robertson County" but was signed by Sumner County Judge Joe Thompson.  The Official Misconduct search warrant was also signed by Judge Joe Thompson, and targeted Asst. Chief Shawn Taylor.

267.     The Aggravated Perjury and Official Oppression search warrant targeted Det. Todd Dorris with regard to the pedophile sting.  The signature of the judge is difficult to read, but appears to belong to William R. "Bill" Goodman from the 19th judicial district in Robertson County. The allegations of perjury and the search warrant were based entirely on the false allegations from Kim Kelley and Phil Drake who claimed that Capt. Todd Dorris had committed perjury.

268.     The search warrants were obtained and signed on September 3, 2024, with the search warrant for Shawn Taylor's home and Millersville City Hall being signed by Judge

Joe Thompson, despite the fact that he had acted as a witness or investigator when he provided evidence of the "attempted subpoenas" and the recording of Det. Michael Candler to the TBI, who have admitted that they possess the recording and considered it as part of their investigation.

269.     Video at City Hall taken by witnesses present on the morning of September 4, 2024 shows that the TBI brought their press spokesperson on the raid at City Hall, and she is seen leading Channel 5 in the parking lot to take video of files being taken out of vehicles. Several witnesses saw the Channel 5 News vehicle enter the City Hall property very shortly after the TBI pulled up and blocked both of the Millersville staff parking lots, thus constituting a "custodial" stop by making it impossible for any officers or employees to leave.   Given the fact that the Search Warrants were filed "under seal" and could not be obtained publicly, it was obvious that somebody within the TBI or the Sumner County Circuit Court had tipped off Channel 5 and warned them the search warrants had been signed the day before and the "TBI raid" would be taking place the following morning.  In light of the fact that the Millersville PD had been working to get the TBI involved in a Task Force and to also provide evidence directly to Gen. Ray Whitley, who essentially controls when the TBI is involved in investigations in Sumner County, the "raid" objectively appeared to be both a publicity stunt and an intimidation tactic.

270.     The following is a photograph of Channel 5 camera man Brian Staples, seen wearing a blue shirt, with the TBI's Senior Public Information Officer, Susan Niland, seen in the right of the following photo appears to be taking pictures or video of Channel 5 peering into vehicles and filming evidence as it is being collected from vehicles that are actively being searched:



271.     Video from Channel 5's broadcast shows that they were allowed to actually look inside the trunks of vehicles for closeups of the items that were being seized, while they were being seized.  None of the other news agencies that showed up an hour later were given such preferential treatment.



272.  The TBI's decision to involve a media liaison and facilitate the presence of Channel 5 News during the execution of the search warrants is highly irregular. Traditionally, law enforcement agencies conduct such operations discreetly to preserve the integrity of investigations and protect the rights of individuals involved. Executing search warrants discreetly is essential to uphold the constitutional rights of individuals, maintain the integrity of criminal investigations, and preserve the fairness of the judicial process. Turning a search into a public spectacle can lead to significant legal consequences, including the suppression of evidence, civil liability, disciplinary actions against law enforcement, and jeopardizing the prosecution's case.

273.  According to a copy of the TBI's Operation Plan that had been left behind at Shawn Taylor's home:

"On May 22, 2024, Gen. Ray Whitley requested the TBI conduct an investigation into allegations against Shawn Taylor for improper use of law enforcement intelligence data, falsifying government records, and official misconduct. Taylor is the current Assistant Chief of the Millerville [sic] Police Department (MPD). Taylor has been known to request case numbers in order to initiate criminal investigations without claims or incident reports

being previously filed. It is believed he has improperly utilized law enforcement intelligence data to include the State of Tennessee Integrated Criminal Justice Portal, Financial Crimes Enforcement Network, and the National Crime Information Center. Several interviews have been conducted and information gathered about the initiation of such investigations and the possible motives involved.

The mission will be to execute a search warrant on Taylor's residence in an effort to locate documents and digital evidence to support the allegations of official misconduct. This mission will include a physical search of [Taylor's residence located at REDACTED].

A search warrant for the Millersville Police Department will be executed simultaneously to the search warrant execution for Taylor's residence."

274.     Thus, it appears that Taylor's residence was the primary target. The TBI was aware that Taylor had a sophisticated computer system that contained confidential client files from when he worked as a law enforcement consultant and OSINT researcher for private law firms. Thus, whatever the TBI seized from Taylor's computer, it is all protected under attorney-client privilege.

275.     The TBI was specifically aware of this computer because Taylor had previously filed a complaint against a TBI agent who was investigating the shooting of Taylor's house in the early morning hours of March 27, 2023, the same day as the Covenant School Shooting. The complaint alleged that the Agent had gone into the secured barn next to Taylor's house where the computer system in question was located, even though Taylor had told the TBI that nobody was to go in there unattended because of the highly confidential files located in the area. Shawn Taylor's house had been shot multiple times with a firearm chambered in 9mm while he and his family were asleep. In fact, the TBI had to stop investigating the shooting of Taylor's house to go to the Covenant School after Audrey Hale opened fire on students and teachers. One of Hale's weapons was also a 9mm. The same TBI agent who was the subject of Taylor's complaint participated in the execution of the search warrants at Millersville City Hall on September 4, 2024.

276.     The documents left behind by the TBI include handwritten notes bearing the title,

"Briefing 9/3/2024" reveal the following information:

"NA-82A-312 – Official Misconduct – Rielly
NA-26A-17 – Perjury – McGowan

Bryan Morris – Chief
Shawn Taylor – Asst. Chief
Todd Dorris – Capt/Detective
Michael Candler – Detective

FINCIN Reports – City Commissioners
Portal, Criminal History's, Attempted Subpoenas

Dorris – Agg. Perjury – Prelim – Child Predator Sting
Veterans for Child Rescue" – Group who helped on sting – several days
Henry Jordan – one arrest

Millersville PD
Shawn Taylor – Residence
[ADDRESS REDACTED]
TCA – 39-17-402 – Official Misconduct
[…]"

277.     Although the TBI claims it was searching for evidence related to queries that Taylor

ran through "State of Tennessee Integrated Criminal Justice Portal, Financial Crimes

Enforcement Network, and the National Crime Information Center," this information can

be easily located by the TBI without the need for a search warrant.  For example, the TBI

knew that Taylor had already obtained information from the Integrated Criminal Justice

Portal because they were copied on the email from the Administrator of the ICJ Portal who

had included them in the Task Force Taylor was creating.  A simple "offline audit" of

Taylor's username would show everything he ever ran.     Moreover, there's no question

that the TBI knew exactly what Taylor had received from FinCEN, since they were the

ones who provided the information to Taylor.  The question then becomes whether the TBI

has the authority and capability to conduct offline audits of access to the National Crime Information Center.

278.     According to Tennessee regulations, specifically Tenn. Comp. R. & Regs. 1395-1-1-.03, the TBI maintains the Control Terminal Agency (CTA) for the state, which is approved by the FBI/NCIC for control of the Tennessee Information Enforcement System (TIES) network. This network allows full access to make entries into NCIC and TCIC files, indicating that the TBI is the main contact for such access.

279.     Thus, it appears there was no reason at all for the TBI search Taylor's residence or City Hall for the documents they could find via an offline audit. That means that the only remaining search warrant for Det. Dorris's alleged "perjury" was based entirely on the false allegations and fabricated evidence that Defendants Kim Kelley and Phil Drake and their Affiliated Organizations had

## CAUSES OF ACTION

## COUNT I: DEFAMATION – TENNESSEE LAW

280.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

281.     At the time Defendants published false and defamatory statements of and concerning Plaintiffs to a media outlet, on podcasts, and across various media, there was no particular public controversy regarding Plaintiffs. The pedophile sting operation involved law-enforcement activity, not a matter of public concern about Plaintiffs individually.

282.     Defendants, chiefly Kim Kelley (with the assistance of Phil Drake), published numerous false and defamatory statements concerning Plaintiffs' role in the Millersville

pedophile sting. Kelley falsely claimed that volunteers were allowed to solicit suspects without any law enforcement supervision—despite overwhelming evidence that Detectives Dorris and Candler were present, personally handling the core "solicitation" phases. Kelley also misrepresented Detective Dorris's preliminary-hearing testimony, despite knowledge that Dorris's testimony concerned a single suspect (Henry Dean Jordan) and that his testimony was with regard to only the text messages with Jordan that had been labelled as "Exhibit 1" during the preliminary hearing.

283.    Defendants Kelley and Drake were aware that the prosecutor and lawyer questioning Det. Dorris during the preliminary hearing had asked specific questions about Henry Dean Jordan, as well as "general" questions about what had transpired during the sting, and they intentionally misrepresented Det. Dorris's answers via partial playback manipulation to create the illusion that Dorris had committed perjury.

284.    Defendants Kelley and Drake intentionally mischaracterized Det. Dorris as testifying that he and Candler "did everything" during the sting, which Dorris never stated during his testimony at the preliminary hearing.  In fact, Det. Dorris testified only about a single suspect and his testimony was with regard to a single exhibit consisting of the text messages Dorris had with suspect Henry Dean Jordan.  Det. Dorris testified truthfully that he had, in fact, sent messages to suspect Henry Dean Jordan in the MocoSpace App and in subsequent text messages with Jordan off the App.

285.    Defendants Kelley and Drake failed to disclose that Detective Dorris's sworn statements were limited to one defendant, and that he never testified to "doing all the work" with every suspect on every one of the six (6) chatter phones used during the sting.

286.     By creating "secret videos" that only showed Kelley typing on a phone and the back of that phone, Kelley and Drake created a false impression that Dorris's testimony was false, when in fact their "secret recordings" do not actually show her texting with Henry Dean Jordan.

287.     Defendant Kim Kelley falsely published statements that (1) Detective Dorris did not set up the decoy account, (2) did not choose the profile photo, (3) never communicated with Jordan on the App, and (4) "never" sent any text messages to Jordan.  Video evidence from the morning of May 17, 2024 shows both Plaintiffs using Ops Phones to communicate in the MocoSpace App and send text messages outside the App in real time.   Timestamped photos taken by Det. Candler of the texts with Henry Dean Jordan show Det. Candler's hand holding the Ops phone and the photos are contemporaneous with the times Jordan exchanged the messages.

288.     Defendants Phil Drake and Kim Kelley falsely published statements to others, including to the TBI, that the videos of Det. Candler and Det. Dorris were "staged" to cover up that they had not done any texting during the sting.   However, the allegation is implausible because the videos were taken at the beginning of the sting, not at the end of the sting.   Thus, there was nothing to "cover up" at the time the videos were taken. Moreover, the detectives were seen in the videos sending actual messages and receiving advice from volunteers on what to say, which demonstrates that they were not acting or pretending as part of some "staged" video.  The videos prove that Det. Dorris's testimony was true.   Moreover, the "secret recording" that Kim Kelley published to others and claimed was proof of "staging," was actually a video where she speaks off camera to a member of a documentary film crew that either V4CR or another volunteer had brought.

There were at least two different volunteers filming during the sting. Because everyone had been instructed to not take any video or pictures of Det. Candler, these crews had to be careful where they set up their cameras to frame their shots.

289.     Defendants Kim Kelley and Phil Drake also fabricated or manipulated "evidence" that they provided to Phil Williams at Channel 5 and others to create the illusion that Kelley was involved in the messaging and texting with Henry Dean Jordan, when in fact none of the excerpts of the videos shown on the Channel 5 broadcasts actually show who Kim Kelley is texting. At most, the excerpts just show the back of a phone that does not appear to be an Ops Phone. Defendant Drake later admitted in Episode 240 of the Heartland Journal Podcast that he was texting Kim Kelley during the undercover sting.

290.     Defendant Drake and Defendant Kelley published false and defamatory statements of and concerning Plaintiffs that they "had been told by prosecutors that the sting would only be legal if sworn law enforcement officers were the ones doing all the work." In fact, the MPD and Plaintiffs were specifically informed, and they instructed Kim Kelley, that prosecutors required that the detectives handle *the solicitation*, which is exactly what Tennessee law requires.

291.     Moreover, the Defendants knew or should have known that Henry Dean Jordan was not only never questioned by the Plaintiffs, but also that he never declined to be questioned. The Defendants also knew that the Plaintiffs never "handed over" Jordan to a documentary crew. Yet, the Defendants falsely stated that after Jordan first "refused to be questioned" that the Plaintiffs then handed him over to a documentary film crew to be interrogated against his will. In fact, the Plaintiffs had Jordan's text messages, did not need to question him, and had no intention of questioning him. Jordan voluntarily told Det. Dorris, "I never

touched that girl." Jordan later voluntarily engaged with a camera crew that had been brought in by V4CR or another volunteer. The Defendants' false allegations and intentional omissions of fact were calculated to paint Detectives Dorris and Candler as incompetent, unethical, and guilty of criminal misconduct.

292. Defendants published additional statements about Plaintiffs to the media, in podcasts, on other social media platforms, and to numerous other persons, with knowledge or reckless disregard for the falsity of the statements, or at least with negligence in failing to verify the truth of those statements. Specifically the Defendants made additional false and defamatory statements of and concerning Plaintiffs:

  a. That the Plaintiffs engaged in a scheme to intentionally circumvent Tennessee law during the undercover sting;

  b. That the Plaintiff's intentionally violated the civil rights and constitutional rights of suspect Henry Dean Jordan;

  c. That the Plaintiffs never actually conducted the solicitation with Henry Dean Jordan, among other misrepresentations;

  d. That the Plaintiffs staged or fabricated evidence, operated "illegally," and sought to conceal their wrongdoing, all of which were false;

293. The Defendants' false and defamatory statements portray Plaintiffs as immoral or disrespectful individuals, and include falsely accusing Detective Dorris of the crimes of perjury and aggravating perjury and falsely accusing Detective Candler of willfully participating in an illegal sting, intentionally circumventing Tennessee law, and violating the civil rights of a suspect who was, in fact, a serial child rapist.

294.     Defendants made these false and defamatory statements as part of a coordinated and planned smear campaign designed to undermine Plaintiffs' credibility, harm their standing in law enforcement, and simultaneously bolster Defendants' own unlawful and fraudulent racketeering schemes.

295.     Defendants deliberately and extensively published their statements to the widest possible audience—through mainstream media, social media, and podcasts—ensuring maximum reputational harm.

296.     The Defendants' statements were false, and Defendants either knew they were false or acted with reckless disregard for the truth. At a minimum, Defendants failed to conduct a reasonable investigation into the truth of their claims despite having access to evidence including recordings of Det. Dorris's testimony, videos, and time-stamped communications, contradicting their allegations.

297.     As a direct and proximate result of Defendants' defamatory statements, Plaintiffs have suffered and continue to suffer harm to their reputations in the law enforcement community and among the public.  Plaintiffs have endured personal humiliation, mental anguish, and emotional distress.  Plaintiffs have been forced to expend time and resources defending against these false charges.  Plaintiffs have also lost promotion opportunities, professional relationships, and Det. Candler has experienced the loss of the ability to pursue his role as an undercover narcotics officer.

298.     Because the Defendants' false allegations were part of video broadcast, were posted on the internet, and published in social media posts, etc., the defamatory matter constitutes libel under Tennessee law.

299.     To the extent the Defendants communicated the false and defamatory statements identified herein to others either verbally or orally, the Defendants are liable for slander under Tennessee law.

## COUNT II: FALSE LIGHT – TENNESSEE LAW

300.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

301.     The Defendants' statements and accusations were widely disseminated—via interviews, media reports, podcasts, and social media—and placed Plaintiffs before the public in a false light that would be highly offensive to a reasonable person.

302.     The Defendants' false statements included the accusations that Plaintiff Todd Dorris perjured himself in official court proceedings, and that Plaintiff Michael Candler willfully participated in a scheme to violate a suspect's rights and Tennessee law during the Millersville sting.  The additional false statements include allegations that Det. Dorris perjured himself in official court proceedings, and that both Plaintiffs violated a suspects rights and intentionally circumvented Tennessee law during the Millersville sting.

303.     The Defendants falsely accused the Detectives of staging or manipulating videos of themselves chatting and texting with suspects as part of a scheme to deceive the public, prosecutors, and the court.

304.     The Defendants falsely stated that the officers needed a "siren" to arrest a suspect and that a suspect got away because of the lack of siren, which was stated to impugn the Plaintiffs' reputations and professionalism.  Blue lights are used to stop a vehicle, but there never was an opportunity to stop a suspect because Kim Kelley was falsely telling officers that "suspects" were on the way or approaching Millersville in order to fabricate the

Defendants' false narrative and impugn the professionalism of Plaintiffs and their department.

305.     Defendants had actual knowledge or acted with reckless disregard for the falsity of their statements, given that the Defendants possessed or had access to clear evidence of Plaintiffs' legitimate law enforcement actions.

306.     They intentionally omitted exculpatory facts, including the facts that Plaintiffs carefully followed Tennessee law regarding soliciting suspects and instructed Defendant Kim Kelley and all volunteers on the same.

307.     The accusations described herein inherently impugn Plaintiffs' moral character and integrity as law enforcement officers, causing severe offense, embarrassment, and emotional distress. By sensationalizing these falsehoods, Defendants inflicted significant reputational and emotional harm.

308.     As a direct result of Defendants' false light invasion of privacy, Plaintiffs have suffered mental anguish, humiliation, emotional distress, and tangible harm to their professional standing.

**COUNT III: DEFAMATION BY IMPLICATION OR INNUENDO – TENNESSEE LAW**

309.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

310.     The Defendants published statements that omitted facts and distorted critical facts, thereby implying false narratives about Plaintiffs, their conduct, and their motives. In particular, the Defendants omitted and distorted facts to create the false impression that Detective Dorris committed perjury and implied that Detective Candler knowingly engaged in illegal civil rights abuses during the sting.

311.    In addition, the Defendants provided partial or manipulated playbacks of recordings to create a defamatory impression that would not have had the same defamatory meaning if the evidence had been presented to audiences in full.

312.    The Defendants deliberately withheld or obscured material facts to distort the truth and create a false impression, including but not limited to the following facts:

a.    That Defendants Phil Drake and Kim Kelley expressly intended to sabotage the Millersville pedophile sting because of some philosophical difference the Defendants had with V4CR about the best ways to combat child trafficking;

b.    That Defendants Phil Drake and Kim Kelley agreed that Kelley would go to Millersville with the express intent of "taking out" Millersville police officers and members of V4CR;

c.    That Defendants Phil Drake and Kim Kelley intended their sabotage of the Millersville sting to generate media attention for their own purported child-rescue operation;

d.    Defendants Phil Drake and Kim Kelley failed to disclose that volunteers had specifically been instructed on the MPD's internal protocols and state law requiring law enforcement officers to handle the "solicitation" portion of the communications with suspects;

e.    That if Defendant Kelley did handle a solicitation with any suspect, it was an express violation of the rules that had been instructed to Kelley and other Volunteers by Asst. Chief Taylor, Capt. Dorris, and others;

f.    That Kim Kelley was aware that if she did handle a solicitation, that the Plaintiffs would not prosecute the case;

g. That if Kim Kelley did provide a "secret recording" of the back of a cell phone and herself purporting to send text messages and handle a solicitation, that it did not actually involve messages with Henry Dean Jordan and was against the rules;

h. That Kim Kelley was aware that Tim Brown discovered Henry Dean Jordan's profile and saw the warnings from others regarding Jordan, and that Brown immediately took the phone to Capt. Dorris who then personally managed the solicitation;

i. That Defendants Phil Drake and Kim Kelley knew the legitimate process by which Plaintiffs participated in the sting, including the fact that all Volunteers and Kim Kelley had been instructed on the requirements needed for a prosecution for the unlawful solicitation of a minor;

j. Defendant Kelley's omission that that Asst. Chief Taylor and Capt. Dorris had both informed her and others that only sworn law enforcement officers could handle the core solicitation from suspects;

k. Defendant Kelly's failure to clarify that volunteers like herself were merely to act as "chatters" with potential suspects until the decoy profile confirmed they were underage and the suspects were aware that they were speaking to a minor, at which point the phones were supposed to be handed over to the detectives to handle the solicitation;

l. Defendants Phil Drake and Kim Kelley knew that no Millersville police officer ever instructed Kim Kelley or any other Volunteer to handle a solicitation of any suspect but failed to disclose these facts;

313.     To the extent that Defendants Phil Drake and Kim Kelley have additional secret recording, they concealed the actual videos, photos, and time-stamped text messages showing the Plaintiffs themselves texting suspects and closely supervising volunteers;

314.     By omitting these critical pieces of context, Defendants created a highly misleading narrative—portraying Plaintiffs as careless, unethical law enforcers trying to entrap suspects or violate their rights. In reality, the sting was conducted under lawful protocols. Kelley's and Drake's deliberate concealment of facts that would have exonerated Plaintiffs is proof of their malicious intent and reckless disregard for the truth.

315.     The Defendants published false implications by omitting critical facts of and concerning the Plaintiffs to the public at large, including mainstream media viewers, social media followers, and podcast audiences.

316.     Because the omitted information, taken together, would have dispelled the false impression that Detectives Dorris and Candler acted illegally, dishonestly, or corruptly, the Defendants are liable for defamation by implication or innuendo.

317.     By selectively releasing or distorting the evidence, Defendants manufactured innuendo that Plaintiffs were unlawfully circumventing Tennessee law and violating the rights of a suspect, thus impugning their professional ethics and lawfulness. In addition, the Defendants' selective release and distortion of evidence created an innuendo that Plaintiff Dorris had committed perjury.

318.     As a direct and proximate cause of the Defendants' unlawful acts and omissions, Plaintiffs suffered reputational harm, emotional distress, and potential lost career opportunities as a direct and proximate result of the defamatory innuendo.

## COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE BUSINESS RELATIONSHIPS – TENNESSEE LAW

319.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

320.    Plaintiff Detective Candler had an existing business relationship with the City of Millersville as an undercover narcotics officer, plus prospective relationships with state/federal task forces and specialized undercover programs.

321.    Plaintiff Detective Dorris also had an ongoing business relationship with the City of Millersville and prospective advancement opportunities in law enforcement.

322.    The Defendants knew of Plaintiffs' roles and future prospects because of prior discussions and direct interactions with Plaintiffs and their colleagues.

323.    The Defendants employed improper means, including defamation, misrepresentations, dissemination of confidential information, and other unethical conduct to undermine Plaintiffs' employment and prospective opportunities, including releasing secret recordings of Detective Candler, disclosing his undercover status, and publicly shaming Plaintiffs.

324.    The Defendants acted with malice when they undertook these actions with the specific intent to cause harm to Plaintiffs' relationships or at least with reckless disregard, knowing their conduct would result in the breach or termination of Plaintiffs' present or future business relationships.

325.    As a direct and proximate result of the Defendants' tortious interferences, Detective Candler can no longer serve effectively as an undercover narcotics officer and his opportunities for specialized drug enforcement and potential task force assignments have

been lost. In addition, both Plaintiffs have been deprived of valuable professional goodwill, ongoing investigations, and access to specialized training and access to drug enforcement funds for overtime, court appearances, equipment, and similar expenses paid out of the drug fund for drug enforcement activities. In addition, Plaintiffs have suffered emotional distress, reputational harm, and financial losses.

## COUNT V: MISAPPROPRIATION OF LIKENESS – TENNESSEE LAW
## (T.C.A. § 47-25-1105 et seq.)

326.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

327.     Under Tennessee law, Plaintiff Michael Candler has a property interest in his name, photograph, and likeness, including his status and identity as an undercover narcotics officer.

328.     The Defendants knowingly used, published, and infringed upon Candler's likeness by taking and releasing secret recordings of him without his consent and in violation of the express rules and prohibition against filming or recording Det. Candler because he was the City's undercover narcotics detective.    releasing secret recordings and images of him without consent.

329.     The Defendants knowingly used, published, and infringed upon Candler's likeness for their own commercial advantage, including fundraising, soliciting donations, or drawing publicity to their purported 501(c)(3) "child rescue" programs and Drake's presidential campaign.

330.     The Defendants publicized or used these secret recordings "as an item of commerce," for advertising and fundraising aimed at promoting their own businesses, in direct violation of T.C.A. § 47-25-1105.

331.     Det. Candler suffered loss of privacy, reputational harm, and diminished capacity to maintain secrecy in future undercover operations.

332.     As a direct and proximate result of the Defendants' unlawful acts and omissions, the Defendants profited from such unauthorized use by attracting attention, donations, and intangible benefits.  Det. Candler is therefore entitled to recover actual damages plus any profits attributable to the Defendants unauthorized use of his likeness, including any and all donations and fees obtained by the Defendants during their smear campaign, along with other statutory remedies available under T.C.A. § 47-25-1106.

## COUNT VI: MISAPPROPRIATION OF A TRADE SECRET – TENNESSEE LAW
## (T.C.A. § 47-25-1701 et seq.)

333.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

334.     Under T.C.A. § 47-25-1702, Detective Candler's identity and likeness as an undercover narcotics officer constitute a "trade secret" because his identity and likeness derive independent economic value from not being generally known to the public or other criminals who can exploit it.

335.     Det. Candler made reasonable efforts to maintain the secrecy of his identity and likeness, as is standard procedure for undercover law enforcement personnel.  Defendant Kim Kelley was aware that Det. Candler was the undercover narcotics officer for the City of Millersville, and he wore plain clothes and drove an unmarked, undercover vehicle.

Defendant Kim Kelley and other volunteers were specifically instructed to not photograph or film anyone or anything during the sting operation, but most specifically Defendant Kelley and other volunteers were told that Det. Candler could not be filmed or photographed under any circumstances because he was an undercover narcotics officer. This is the reason why Det. Candler was not included in the group photo that said "Team Mongoose."

336.    The Defendants used improper means—unauthorized filming, misrepresentations, and unlawful disclosure—to obtain and publish Det. Candler's identity despite knowing it was protected and confidential information.

337.    The Defendants disclosed or used Det. Candler's trade-secret identity without consent, violating T.C.A. § 47-25-1702(2)(B). They knew or had reason to know this information was subject to confidentiality for law enforcement purposes.

338.    As a direct and proximate result of the Defendants' conduct, Det. Candler has suffered an immediate and irreversible loss of the undercover advantage, destroying the economic value of Candler's secret identity. In addition, Detective Candler lost professional opportunities, including specialized undercover assignments, as well as the associated benefits of specialized and advanced training, overtime, additional pay for working with a drug task force, and access to specialized drug funds that can only be spent on the City's drug enforcement program.

339.    Det. Candler is entitled to damages for his actual losses and for Defendants' unjust enrichment under T.C.A. § 47-25-1704.

340.    Because the Defendants' shared malicious intent in exposing Det. Candler's identity for personal gain and to sabotage the Millersville sting, Det. Candler is entitled to

an award of punitive or exemplary damages against the Defendants under T.C.A. § 47-25-1704(b).

## COUNT VII: CONSPIRACY – TENNESSEE LAW

341.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

342.    The Defendants formed a common design or agreement among themselves, including with Does 1-25, to commit unlawful acts, or to commit lawful acts by unlawful means, including but not limited to:

   a.  Defamation, false light, and disparagement of Plaintiffs;

   b.  Intentional interference with Plaintiffs' business relationships; and

   c.  Misappropriation of trade secrets and Det. Candler's likeness.

343.    The Defendants engaged in multiple overt acts in furtherance of their unlawful conspiracy, including coordinating a smear campaign, releasing secret recordings, and publishing and posting false accusations, which acts included engaging in overt acts with Does 1-25 and which acts directly caused injury to Plaintiffs.

344.    As a direct and proximate result of the Defendants' unlawful conspiracy, including the named Defendants conspiring with Does 1-25, Plaintiffs have been damaged in their reputations, prospective business and employment relationships, and have suffered economic loss, emotional harm, and the destruction of Candler's trade-secret identity.

## FEDERAL CLAIMS

## COUNT VIII: MISAPPROPRIATION OF TRADE SECRETS - (18 U.S.C. § 1832)

345.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

346.     Detective Candler's identity/likeness as an undercover narcotics officer was used in undercover law enforcement narcotics operations involving the investigation, detection, and interception of illegal drugs that, by definition, flow through the instrumentalities of interstate commerce.  Det. Candler's identity/likeness is used in law enforcement operations that are interstate by nature, giving his undercover identity/likeness economic value from not being generally known, which constitutes a "trade secret" under 18 U.S.C. § 1839(3).

347.     Det. Candler spent much time and resources creating his undercover identity, including obtaining a fictitious driver's license or "cover license" from the Tennessee Department of Safety and Homeland Security to shield his real identity during undercover operations.  Det. Candler obtained documentation to support his undercover status so the State could issue valid credentials under an alias.

348.     Det. Candler also drove an undercover vehicle with a license plate officially registered under a fictitious name, which Defendant Kim Kelley took video or photographs of and provided to the media, the TBI, and others, including the other named Defendants and Does 1-25.

349.     The Defendants acted with intent to convert this trade secret to their own use or benefit, and they knew or should have known their acts would injure Det. Candler, who is the rightful owner of his undercover identity.

350.     The Defendants, without authorization and contrary to express rules prohibiting the same, photographed, recorded, transmitted, and publicized Candler's identity, violating 18 U.S.C. § 1832(a)(1)–(3). The Defendants' knowledge of Candler's undercover status

underscores their improper means and motives in obtaining and disclosing protected information to harm Candler while promoting their own illicit businesses for personal gain.

351.     The Defendants' theft and misappropriation has rendered Det. Candler's identity useless for future undercover investigations, depriving him of significant economic and law enforcement value, and causing reputational and professional harm. Det. Candler also seek any additional civil remedies (e.g., disgorgement, injunctive relief) available under federal law.

352.     As a direct and proximate result of the Defendants' theft and misappropriation of a trade secret, the Defendants are liable to Det. Candler for an award of compensatory damages, exemplary or punitive damages, attorneys fees, and all other relief permitted under 18 U.S.C. § 1836(b) and related federal statutes.

## COUNT IX – VIOLATIONS OF RACKETEERING INFLUENCED CORRUPT ORGANIZATION ACT (18 U.S.C. §§ 1961–1968)

353.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

354.     Defendants Kim Kelley and Phil Drake, along with their affiliated and co-owned business entities (including but not limited to Uniting America Inc., Grow Online, LLC, and Digital Defenders United), as well as various unnamed Doe Defendants (1–25), have formed an association-in-fact constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  This enterprise exists separate and apart from the predicate acts in which it engages and operates under a common purpose of raising illicit funds and public attention for Defendants' so-called "child rescue" activities, which included the alleged buying, kidnapping, or stealing of children from traffickers by force, as well as harboring them at

a "Survivor Center" surrounded by armed guards and concealing them from society until they reached adulthood, and plans to coerce them into labor at the "Survivor Center." Defendants also use this enterprise to solicit and launder donations through their 501(c)(3) organizations and Defendant Drake's political campaign, diverting money to themselves and evading regulatory oversight and proper taxation.

355.    The Defendants are engaged in interstate commerce, and the Defendants' enterprise activities affect interstate commerce because:

    a.    Defendants used online platforms, interstate travel, and out-of-state bank accounts to solicit donations and fees, and to move money across interstate lines;

    b.    Defendants traveled or caused travel to Millersville, Tennessee, from other jurisdictions for the purpose of sabotaging a police sting and disparaging Tennessee-based law enforcement officers to promote their illicit businesses; and

    c.    Defendants engaged in promotion of their business, including solicitation and demands of funds for illegal "child buying," child trafficking, and forced-labor operations that necessarily involve crossing state or national borders.

356.    Over the relevant period, Defendants have committed multiple predicate acts as defined under 18 U.S.C. § 1961(1), forming a continuous pattern of racketeering activity that poses a threat of continued criminal conduct. These predicate acts include, but are not limited to:

    a.    The Defendants' violations of 18 U.S.C. § 1590 by Trafficking for Forced Labor or Involuntary Servitude, via the Defendants' scheme to "rescue" or buy children, conceal them at a "Survivor Center," and use them for labor at the compound, which constitutes trafficking under federal law;

b. The Defendants' violations of 18 U.S.C. § 1593A by Benefitting Financially from Peonage or Slavery, including knowingly profiting from their kidnapping, concealment and forced labor scheme, including soliciting donations from the public under false pretenses;

c. The Defendants' violations of 18 U.S.C. § 1960 for operating an Unlicensed Money Transmitting Business, including moving funds derived from illegal activities (including murder, kidnapping, forced labor, bribery of public officials) through the Defendants' nonprofit accounts, business accounts, and Defendant Drake's presidential campaign accounts without the requisite state or federal money-transmitting license;

d. The Defendants' violations of 18 U.S.C. § 1956 (Money Laundering), including the Defendants knowingly conducting financial transactions with proceeds from specified unlawful activities—such as kidnapping, trafficking, murder-for-hire, or forced labor—intending to promote further illegal conduct and to evade tax laws and financial reporting laws;

e. The Defendant Drake's violations of 18 U.S.C. § 1958, Murder-for-Hire, due to Drake's public admissions to engaging in the systematic murder of the parents of migrant children and other "heinous acts" along the U.S.–Mexico border and transporting money to bribe officials, as part of a murder-for-hire scheme involving interstate facilities and foreign travel;

f. The Defendants' violations of 18 U.S.C. § 1201, for Kidnapping children from their parents or traffickers by use of force or deception, harboring them without lawful

authority, concealing them from the public and authorities, and transporting them across state lines;

g.  The Defendants' Misappropriation of Trade Secrets under 18 U.S.C. § 1832 for wrongfully disclosing and using the protected identity or "likeness" of Plaintiff Detective Candler—an undercover officer—to advance their illicit enterprise, knowing that Candler's identity was kept secret for law enforcement operations;

h.  The Defendants' Defamation, False Light, and Related State-Law Torts as Predicate Acts that are an integral part of RICO through wire fraud, including the Defendants' employment of misrepresentations, false statements, and public smear campaigns to obtain money or property in the form of donations or other funds to obtain a professional advantage.

357.    In furtherance of their enterprise, Defendants conspired to sabotage the Millersville Police Department's undercover pedophile sting in May 2024 and thereafter by traveling to Millersville, infiltrating and influencing volunteers and officers, fabricating evidence, and launching a widespread media campaign to defame Detective Dorris and Detective Candler.  The Defendants intentionally published false claims about Plaintiffs, including that they planned on intentionally circumventing Tennessee law regarding the unlawful solicitation of a minor, as well as intentionally deceiving prosecutors and the court, and the false allegations manipulation of evidence to suggest that Plaintiff Dorris committed perjury. By disparaging Plaintiffs and the conduct of the sting, Defendants enhanced and intended to enhance their own public profiles, draw attention to their 501(c)(3) "child rescue" schemes, and thereafter solicited additional donations and monies that were then

laundered or funneled into their personal accounts, business accounts, and Drake's presidential campaign.

358.    Throughout all RICO-related counts, Plaintiffs claim actual and compensatory damages for lost employment, out-of-pocket costs, diminished professional opportunities, trade secret misappropriation, and reputational harm, as well as treble damages under 18 U.S.C. § 1964(c), attorneys' fees, and other relief deemed just.

359.    Plaintiffs have suffered concrete financial loss and injury to their business or property interests as a direct and proximate result of Defendants' racketeering conduct.

360.    Plaintiffs' damages include, but are not limited to:

    a.  Loss of Employment/Professional Opportunities. Plaintiff Candler's loss of ability to continue working undercover, including as part of a Task Force, was destroyed once Defendants publicly disclosed his identity; Plaintiff Dorris has similarly endured reputational harm, jeopardizing career advancement.

    b.  Misappropriation of Trade Secrets. Det. Candler's identity/likeness, which is both a property right and property interest, has independent economic value in undercover narcotics operations but was disclosed, destroying its secrecy and utility, thereby diminishing its actual and potential value.

    c.  Reputational Harm and Out-of-Pocket Expenses. Both Plaintiffs have lost money, including legal expenses, elimination of overtime and specialized pay, forfeit of access to valuable training paid through drug-enforcement funds, and have endured diminished goodwill, damaging their professional standing in law enforcement.

361.    The Plaintiffs have incurred losses to their property and tangible business interests recoverable under the RICO Act.

362.     Defendants' ongoing criminal scheme—centered on discrediting a legitimate law enforcement operation to exploit media coverage as free advertising and to promote their businesses and solicit donations for financial gain—proximately caused Plaintiffs' injuries. But for Defendants' smear campaign, misappropriation of Candler's undercover identity, and interference with Plaintiffs' employment relationships, Plaintiffs would not have suffered the aforementioned losses.

363.     As a direct and proximate result of the Defendants' unlawful racketeering enterprises, Plaintiffs are entitled to an award of compensatory damages for the harm to their business, property, and reputations, as well as treble damages under 18 U.S.C. § 1964(c).   Plaintiffs are also entitled to the costs of this suit, an award of reasonable attorneys' fees, and all other relief authorized by RICO and deemed just and proper by this Court.

**COUNT X – CONSPIRACY IN VIOLATION OF RICO ACT (18 U.S.C. § 1962(d))**

364.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

365.     Defendants Kim Kelley, Phillip Drake, and their Affiliated Organizations, as well as Defendant Does 1-25 have agreed to participate in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity. They also agreed to carry out the unlawful scheme with the specific intent to harm Plaintiffs' business and property interests as part of advancing their illegal fundraising, money-laundering, child-harboring, and forced-labor operations.

366.     Each Defendant knew of and voluntarily joined in the conspiracy's objectives—namely, sabotaging the Millersville pedophile sting, defaming Plaintiffs, and channeling

the resulting notoriety and donations into Defendants' own coffers. Defendants acted in concert with each other and with unidentified Doe Defendants (1–25), each of whom knowingly engaged in at least two or more predicate acts, as alleged in Count IX and incorporated by reference.

367.    As a direct and proximate result of the Civil RICO conspiracy, Plaintiffs suffered injury to their business and property, including lost wages, loss of prospective employment, damage to professional goodwill, misappropriation of trade secrets, and other pecuniary losses described more fully above.

368.    Plaintiffs respectfully reserve the right to amend their pleadings to add such federal causes of action as may be warranted based on ongoing discovery and developments in this case.

## DAMAGES

369.    Plaintiffs bring this suit for all damages recoverable under Tennessee and federal law.

370.    Plaintiffs seek an award of punitive damages against the Defendants, jointly and severally, for the Defendants intentional, reckless, malicious and fraudulent conduct in an amount sufficient to punish the Defendants wrongful conduct and to deter the Defendants and others from similar misconduct in the future.

371.    Plaintiffs have experienced and will continue to experience damages to their persons, business interests, and property interest, including, but not limited to the following:

   a.  Lost wages,

   b.  Out-of-pocket expenses,

c. Damage to the professional reputations,

d. Loss of career opportunities and future career opportunities

e. Loss of case productivity effecting performance evaluations, promotions, and continued employment in specialized roles;

f. Exclusion from professional circles;

g. Inability to work in specialized roles;

h. Loss of standing in the law enforcement community;

i. Loss of professional standing and the economic value of professional standing;

j. Loss of earnings potential in current and future employment;

k. Loss of cases and investigative files, which is a unique form of intellectual and professional property in the field of law enforcement;

l. Increased likelihood of early retirement or termination due to the false allegations and subsequent fallout, directly impacting the benefits accruing through continued employment, including benefits, accrued leave, and retirement contributions;

m. Loss of professional equipment and resources, including access to investigative tools necessary for fulfilling their roles, further diminishing their property interests in their assigned work;

n. Devaluation of professional credentials, which carry value in employment or consulting opportunities, due to the false allegations of the Defendants

o. Damages for mental anguish and emotional distress;

p. Damages for loss of goodwill and public trust;

q. Damages for professional isolation leading to financial and career setbacks; and

r. Increased legal and financial burdens, including legal costs for representation.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray:

1. That process issue, requiring the Defendants to answer in the time prescribed by law;

2. That Plaintiffs be awarded a judgment and all damages, including actual and compensatory damages, for invasion of privacy, as well as any further relief the Court deems equitable and just;

3. That Plaintiffs be awarded a judgment and all damages recoverable under Tennessee law for the Defendants' defamation of Plaintiffs, including but not limited to actual damages for injury to reputation, mental anguish, and other relief the Court deems proper;

4. That Plaintiffs be awarded a judgment and all damages recoverable under Tennessee law for the Defendants' defamation by implication or innuendo, including actual, compensatory, and other appropriate damages plus any additional relief the Court finds just and proper;

5. That this Court enter a judgment for misappropriation of Plaintiff Michael Candler's likeness for all applicable damages, including actual damages, disgorgement of profits and "donations" obtained by the Defendants, and any further relief available under T.C.A. § 47-25-1101 et seq.;

6. That Plaintiff Michael Candler be awarded a judgment all damages recoverable under Tennessee law for the Defendants' misappropriation of trade secrets, including but not limited to actual damages, unjust enrichment, a reasonable royalty, exemplary damages, plus a reasonable attorneys' fees under T.C.A. § 47-25-1705;

7. That this Court enter judgment against Defendants, holding them jointly and severally liable for their roles in conspiring to conduct the RICO enterprise through a pattern of racketeering activity;

8. Treble damages, attorneys' fees, costs, and all other relief authorized by virtue of the Defendants' violations of the Racketeering Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961–1968;

9. That Plaintiffs be awarded a judgment from and against the Defendants for actual and compensatory damages in an amount in accordance with the proof.

10. That this Court enter an award of punitive damages against the Defendants in an amount sufficient to deter others from like conduct in the future, in an amount of ten million dollars for each Plaintiff, or a greater amount if proven at trial;

11. That this Court enter judgment against Defendants, jointly and severally, for damages (including treble damages), attorneys' fees, costs, and any such other relief as the Court deems fair and equitable;

12. That Plaintiffs be awarded their court costs and discretionary costs in this matter; and

13. For such other, general relief to which the Plaintiffs are entitled.

**Plaintiff demands a trial by jury for all issues so triable.**

Respectfully submitted,


 */s/ Bryant Kroll*
Bryant Kroll (#33394)
The Law Office of Bryant Kroll
P.O. Box 219,
Pegram, TN 37143
Bryant@BryantKroll.com
Office: (615) 994-1837

*Attorney for Plaintiffs*