# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE

| | | |
|---|---|---|
| CAPTAIN TODD DORRIS, and | ) | |
| DETECTIVE MICHAEL CANDLER, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:25-cv-00052 |
| | ) | |
| KIM KELLEY, | ) | CRENSHAW/NEWBERN |
| PHILLIP JOSEPH DRAKE, | ) | |
| DIGITAL DEFENDERS UNITED | ) | Jury Demand |
| INCORPORATED, | ) | |
| GROW ONLINE, LLC, | ) | |
| UNITING AMERICA, INC., | ) | |
| PHIL WILLIAMS | ) | |
| LEVI ISMAIL | ) | |
| SCRIPPS MEDIA, INC., | ) | |
| PARTICLE MEDIA, INC. d/b/a NEWSBREAK, | ) | |
| JESSE POWELL, in his individual capacity, | ) | |
| DUSTIN DARNALL, in his individual capacity, | ) | |
| DAVID GREGORY, in his individual capacity, | ) | |
| CARLA MCCAIN, in her individual capacity, | ) | |
| CRISTINA TEMPLET a/k/a CRISTINA | ) | |
| ROSADO, in her individual capacity, | ) | |
| THE CITY OF MILLERSVILLE, TENNESSEE | ) | |
| and | ) | |
| DOES 1-25 | ) | |
|     Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

## Table of Contents

*INTRODUCTION*....................................................................................................................5

*PARTIES*..............................................................................................................................7

*JURISDICTION AND VENUE*................................................................................................12

*ALLEGATIONS OF FACT*.....................................................................................................15

    **Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership**..........15

    **Plaintiffs Begin Working for a New Administration Under Chief Bryan Morris**.............21

Assistant Chief Shawn Taylor's Creation of a Joint Task Force to Combat Corruption.23

May 17-19, 2024: The Millersville Undercover Pedophile Sting.........................................32

Defendant Kim Kelley's Disruptions, False Alarms, and False Claim That Suspect "Got Away." ....................................................................................................................................39

Suspect Henry Dean Jordan Solicits the Decoy Profile Operated by Capt. Dorris...........41

Kim Kelley Demands $35,000 from Craig Sawyer to "Purchase Trafficked Children." .45

Kim Kelley Remains in Nashville After the Pedophile Sting Ends.....................................46

The TBI Operation Plan Claims Investigation Was Requested on May 22, 2024.............50

Millersville's Request for a Prosecutor Pro Tem and Investigative Grand Jury is Declined. ...........................................................................................................................52

Capt. Todd Dorris Testifies at The Preliminary Hearing on May 28, 2024.......................53

Det. Candler Attempts to Obtain a Judicial Subpoena for Public Records.......................64

Defamatory Article Published July 22, 2024 – "Did Millersville detective commit perjury about child-predator investigation?  Here's the evidence." ................................................85

The Defendants Release and Publish Video of Michael Candler to Reveal His Identity..95

The Defendants Intentional Sabotage of the Millersville Pedophile Sting in Furtherance of Their Racketeering Influenced Corrupt Organization....................................................96

Defendants Defamatory July 23 2024 Publication – "TBI opens investigation of Millersville child-predator sting amid questions of possible perjury." .............................97

The Defendants July 29 2024 Defamatory Publication – "TBI expands investigation … looking into misuse of government data." ..........................................................................100

The Defendants August 5 2024 Defamatory Article – "The stories that Millersville conspiracy cop tells about himself, his employment history, his threats."......................102

The Defendants' August 12 2024 Defamatory Publication – "TBI limits Millersville's access to sensitive law-enforcement data, chief says in podcast interview."...................102

August 26, 2024 – "QANON COMES TO MAIN STREET: Millersville cops team up with so-called pedophile hunter who blames 'satanic cult masquerading as Jews'" ......105

The TBI Conducts Suspicious Show of Force in Millersville to Forcibly Seize The Evidence That The MPD Had Voluntarily Offered. ..........................................................107

The Defendants September 4, 2024 Defamatory Publication – "TBI agents raid Millersville Police Department, home of town's 'conspiracy cop'"................................117

The Defendants September 16, 2024 Defamatory Publication – "When QAnon Comes to Main Street: Investigating the Millersville Police Department and its 'conspiracy cop'" ........................................................................................................................................120

The Defendants' Defamatory Publication on October 7, 2024 - titled "Election denier says his group gained access to U.S. banking data" ..........................................................122

2

**The Defendants Defamatory October 22, 2024 Publication Titled "GOP Lawmakers threaten 'political fallout' for TBI's Millersville investigation."** .......................................122

**Phil Williams Publishes Dustin Darnall and Jesse Powell's Defamatory Letter of October 24, 2024** .......................................124

**Millersville's Knowing and Intentional Violations of its Insurance Agreements.** ...........128

**The Defendants' December 9, 2024 Publication titled "Shawn Taylor resigns from Millersville Police Department amid criminal probe"** .......................................130

**Phil Williams and The NewsChannel 5 Defendants' December 18, 2024 Quid Pro Quo Media Kickback** .......................................131

**Phil Williams and the NewsChannel 5 Defendants Continued Campaign of Disinformation and Support of Kim Kelley and her Affiliated Organizations as Quid Pro Quo Media Kickback via January 14, 2025 Article.** .......................................131

**The Defendants' Shared Goals of Interfering with the Millersville Child Predator Sting and Plaintiffs Employment.** .......................................137

**Phil Drake Publicly Claims To Have Created the "Q Anon" Conspiracy As Part of His Work as Contractor for CIA, FBI, and OIG.** .......................................146

**Phil Drake and Kim Kelley's "Child-Purchasing" and "Survivor Center" Fraud Scheme.** .......................................149

**Defendant Phil Drake Admits Involvement In Interstate and Transnational Racketeering Scheme, Willfully Violating Rights of Americans, and Engaging in Acts of Terrorism.** .......150

**Defendants Phil Drake and Kim Kelley's "Survivor Center" Is An Instrument of Fraud Racketeering** .......................................155

**The Defendants' Manipulation of Recordings Taken at the Millersville Pedophile Sting – May 17 to May 19, 2024** .......................................169

**Capt. Dorris is Constructively Discharged** .......................................175

*CAUSES OF ACTION* .......................................177

*COUNT I: DEFAMATION – TENNESSEE LAW* .......................................177

**Defamation by Kim Kelley and Phil Drake** .......................................177

**Defamation by Phil Williams, Levi Ismail, the NewsChannel 5 Defendants and NewsBreak** .......................................181

*COUNT II: FALSE LIGHT – TENNESSEE LAW* .......................................188

**False Light Invasion of Privacy by Kim Kelley and Phil Drake** .......................................188

**False Light Invasion of Privacy by Phil Williams and the NewsChannel 5 Defendants.** .189

*COUNT III: DEFAMATION BY IMPLICATION OR INNUENDO – TENNESSEE LAW.* 190

**Defamation by Implication or Innuendo by Kim Kelley and Phil Drake** .......................................190

**Defamation by Implication or Innuendo by Phil Williams, Levi Ismail, and the NewsChannel 5 Defendants** .......................................194

3

***COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS, AT-WILL EMPLOYMENT, AND PROSPECTIVE BUSINESS RELATIONSHIPS – TENNESSEE LAW*** ........................................................................................................*196*

**Tortious Interference by Defendants Kim Kelley and Phil Drake.** ...................................196

**Tortious Interference by Phil Williams and the NewsChannel 5 Defendants.** ................197

***COUNT V: MISAPPROPRIATION OF LIKENESS – TENNESSEE LAW*** .........................*199*

***COUNT VI: MISAPPROPRIATION OF A TRADE SECRET – TENNESSEE LAW*** .........*201*

***COUNT VII: CONSPIRACY – TENNESSEE LAW*** ................................................................*204*

***COUNT VIII: MISAPPROPRIATION OF TRADE SECRETS - (18 U.S.C. § 1832)*** ............*204*

***COUNT IX – VIOLATIONS OF RACKETEERING INFLUENCED CORRUPT ORGANIZATION ACT (18 U.S.C. §§ 1961–1968)*** ........................................................*207*

***COUNT X – CONSPIRACY IN VIOLATION OF RICO ACT (18 U.S.C. § 1962(d))*** ............*216*

***COUNT XI: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT RETALIATION BASED ON FALSE POLITICAL ATTRIBUTION.*** .................................................................*217*

***COUNT XII:  MUNICIPAL LIABILITY UNDER MONELL – 42 U.S.C. § 1983*** .................*223*

***PRAYER FOR RELIEF*** ...........................................................................................................*227*

Plaintiffs, Todd Dorris, and Michael Candler, for their cause of action against the Defendants Kim Kelley, Digital Defenders United, Incorporated, Grow Online, LLC, Phillip Joseph Drake, Uniting America, Inc., Phil Williams, Levi Ismail, Scripps Media Inc., Particle Media, Inc. d/b/a Newsbreak, Jesse Powell in his individual capacity, Dustin Darnall in his individual capacity, David Gregory in his individual capacity, Carla McCain in her individual capacity, Cristina Templet in her individual capacity, the City of Millersville, Tennessee, and Does 1-25, state and allege as follows:

## INTRODUCTION

1. This action is brought by Plaintiffs, Captain Todd Dorris and Detective Michael Candler, both highly respected and veteran police officers currently employed by the Millersville Police Department, seeking redress for the harms inflicted upon them by the tortious and unlawful acts and omissions of Defendants Kim Kelley, Phillip Joseph Drake, and their "Affiliated Organizations," which include Digital Defenders United Incorporated, Grow Online, LLC, and Uniting Americas, Inc. The Defendants utilized instrumentalities of interstate commerce, including traveling to Millersville, Tennessee, where they engaged in a coordinated smear campaign aimed at intentionally interfering with law enforcement operations and discrediting the Plaintiffs' professional reputations. Utilizing interstate commerce facilities, the Defendants promoted, managed, and facilitated their unlawful activities, including the solicitation of funds for their Affiliated Organizations, which are fronts for illegal racketeering. Under the guise of assisting in a legitimate child trafficking sting operation conducted between May 17, 2024, and May 20, 2024, Defendant Kelley, with the premeditated assistance of Phillip Joseph Drake and their Affiliated Organizations, conspired to engage in unlawful racketeering activities, including promoting facilitating

the promotion of their unlawful activities. These activities encompassed carrying on a business of unlawful child trafficking, obstruction of justice, interference with law enforcement operations and Plaintiffs' employment, generating false accusations to trigger criminal investigations of Plaintiffs, and the deliberate dissemination of false information designed to undermine legitimate law enforcement efforts and destroy the careers and lives of two law enforcement officers who are dedicated to protecting the public and upholding the law.

2. As identified herein, the Defendants' acts and omissions are predicate acts under the Racketeer Influenced and Corrupt Organizations Act (RICO) as defined in § 1961 and § 1952, and involve fraudulent schemes and the use of interstate commerce facilities to further their unlawful objectives. The Defendants intended their smear campaign and false narrative to generate online traffic to their monetized social media accounts and to promoted themselves, their businesses, and to solicit donations from unsuspecting viewers. As a result of the Defendants' coordinated efforts, Plaintiffs have suffered financial and monetary losses, losses to their business and property interests, damage to their professional reputations, emotional distress, and other compensable injuries. Plaintiffs seek compensatory and punitive damages for the Defendants' RICO violations, including but not limited to lost wages, damage to their business and property interests, reputational harm, emotional suffering, and costs incurred due to the Defendants' unlawful conduct, as well as damages under applicable state laws for defamation, tortious interference, and the Plaintiffs' other state and federal claims.

3. The Defendants' tortious and unlawful acts and omissions, motivated by personal, political, and unlawful agendas, have resulted in widespread harm to the Plaintiffs. The Defendants'

acts have also proximately caused the release of a serial child rapist, the obstruction and dismissal of numerous criminal cases that were being investigated by Capt. Dorris and Det. Candler, whose exemplary records and careers have been targeted by a smear campaign driven by Defendants' fraudulent intent and actions to promote their own unlawful enterprise.

4. This action seeks to hold the Defendants accountable for defamation, tortious interference with a business relationships, corporate espionage and theft of trade secrets, and civil claims for the Defendants engaging in acts made unlawful as Racketeering Influenced Corrupt Organizations by manipulating the public narrative to further their racketeering organizations by obstruct justice, intentional interference with legitimate law enforcement operations, engaging in numerous acts of unlawful child trafficking, generating false accusations to trigger criminal investigations, the purpose of which was to destroy the careers and lives of two law enforcement officers who are dedicated to protecting the public and upholding the law.

## PARTIES

5. Plaintiff Todd Dorris is a citizen and resident of Robertson County, Tennessee. He is a police officer certified by the Tennessee Peace Officer Standards and Training ("POST"). He currently holds the rank of Captain and is also a Detective at the City of Millersville, Tennessee Police Department.

6. Plaintiff Michael Candler is a citizen and resident of Montgomery County, Tennessee. He is a POST-certified police officer and a Detective employed at the City of Millersville, Tennessee Police Department.

7. The Defendant Kim Kelley aka "Kimberly Promise Kelley," is a citizen and resident of Austin, Texas. Kelley is a director of Digital Defenders United Incorporated, and a co-Founder and Spokesperson for Defendant Uniting America Inc. She may be served at 2203 Red Fox Road, Austin, Texas 78734.

8. Defendant Phillip Joseph Drake is a citizen and resident of South Carolina, and he may be served at 125 Huskey Court, Spartanburg, South Carolina. Drake ran an unsuccessful campaign as Democrat and became an independent candidate for President of the United States in 2024. In November of 2024, Defendant Drake was arrested by U.S. Marshalls and is currently being housed without bond in the Hidalgo County jail at 711 El Cibolo Road, Edinburg, Texas 78541 Texas for multiple charges of fraud and cattle theft between $35,000 and $150,000 for each charge.

9. The Defendant Digital Defenders United Incorporated is a not-for-profit organized under the laws of the State of Alabama with its principal place of business located at 17350 State Highway 249, Suite 220, Houston Texas, 77064-1132. Defendant Digital Defenders United, Incorporated may be served through its registered agent, Republic Registered Agent, LLC, whose address is 181 W Valley Ave Suite 245, Birmingham, Alabama 35209. Defendant Digital Defenders United, Incorporated is owned and controlled by Defendant Kim Kelley and it is a coconspirator and instrumentality of the racketeering and illegal activities identified herein.

10. Defendant Uniting America, Inc. a/k/a "Uniting Americas Inc." is a purported non-profit co-founded by Defendant Kim Kelley that is owned and operated by Phillip Drake with its principal place of business located at 125 Huskey Court, Spartanburg, South Carolina. Although it was granted nonprofit status on November 15, 2023, there have been no 990s

filed with the IRS, and its website https://unitingamericainc.org was deactivated on December 5, 2024. Uniting America, Inc. is, in fact, a front for money laundering, human trafficking, and funding for the additional acts of racketeering identified herein.

11. Defendant Grow Online, LLC is a limited liability company with its principal place of business located at 1806 Sandy Lake Drive, Friendswood, Texas 7754. Defendant Grow Online, LLC is owned in whole or in part by Defendant Kim Kelley and it is a coconspirator and instrumentality of the racketeering and illicit activities identified herein. Defendant Grow Online is engaged in the illicit business activities of Defendants Phil Drake, and Uniting America, Inc.. Defendant Grow Online, LLC has received over $200,000 in illicit funds from Defendants Phil Drake and Uniting America, Inc, in furtherance of the unlawful racketeering scheme alleged herein.

12. As stated herein, Defendants Uniting America, Incorporated, Grow Online, LLC, and Digital Defenders United, Inc. may collectively be referred to as the "Affiliated Entities" of Defendants Kim Kelley and Phil Drake.

13. Defendant Phil Williams is a reporter for NewsChannel 5 and an employee of Scripps Media, Inc., whose tortious, illegal, and defamatory acts were committed within the scope of his employment and in furtherance of Scripps Media, Inc.'s business. He is a citizen and resident of Williamson County, Tennessee. Defendant Williams used his Channel 5 branded social media and his own "PhilNvestigates" social media profiles to promote, post, and republish the defamatory articles alleged herein, which is done with the knowledge, approval, and at the direction of Defendant Scripps Media, Inc.

14. Defendant Scripps Media, Inc., doing business as NewsChannel 5, is a Delaware company duly authorized to do business in Tennessee. Scripps Media, Inc. owns and operates

NewsChannel 5 (WTVF) in Nashville, Tennessee, located at 474 James Robertson Parkway, Nashville, Tennessee 37219. WTVF is a CBS affiliate. Scripps Media, Inc. may be served through its registered agent, Corporation Service Company located at 2908 Poston Ave, Nashville, TN 37203.

15. Defendant Levi Ismail is a reporter for NewsChannel 5 and an employee of Scripps Media, Inc. He is a citizen and resident of Davidson County, Tennessee. In addition to posting and publishing from his NewsChannel 5 credentials, he also posts on social media using various handles such as "NashvilleNews" and "@LeviIsmailTV" among others, where he posted and reposted each and every one of the false and defamatory articles identified herein.

16. Collectively, Defendants Scripps Media, Inc., Phil Williams, and Levi Ismail may be referred to herein as "The NewsChannel 5 Defendants."

17. Defendant Particle Media, Inc. d/b/a NewsBreak is a Delaware corporation headquartered in Mountain View, California, which operates a digital news aggregation platform that publishes, republishes, and disseminates news content to users across the United States, including within the Middle District of Tennessee. NewsBreak has widely distributed and republished defamatory articles originally created and disseminated by the other Defendants named herein, and has thereby caused reputational and professional harm to the Plaintiffs in this jurisdiction. Defendant Particle Media, Inc. maintains its principal place of business at 855 Maude Avenue, Mountain View, California 94043. Its registered agent for service of process is Corporation Service Company d/b/a CSC – Lawyers Incorporating Service, located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

18. Defendant Jesse Wayne Powell is sued in his individual capacity, including for acts occurring before he was elected as a Commissioner for the City of Millersville. He is a resident of Millersville, Tennessee and may be served at 1098 Langbrae Drive, Goodlettsville, Tennessee, 37072.

19. Defendant Dustin Darnall is sued in his individual capacity, including for acts occurring before he was elected as a Commissioner for the City of Millersville, Tennessee. He is a resident of Millersville, Tennessee and may be served at 137 Brookview Circle, Goodlettsville, TN 37072.

20. Defendant Carla McCain is sued in her individual capacity, including for acts occurring before she was appointed to fill a vacancy as a Commissioner for the City of Millersville, Tennessee. She is a resident of Millersville, Tennessee and may be served at 112 Longview Drive, Goodlettsville, TN 37072.

21. Defendant David Gregory is sued in his individual capacity for unlawful acts occurring outside the scope of his official duties as a Commissioner for the City of Millersville, Tennessee. He is a resident of Millersville and may be served at 1069 Ridgecrest Drive, Goodlettsville, TN 37072.

22. Defendant Cristina Rosado a/k/a Cristina Templet is sued in her individual capacity for unlawful acts occurring outside the scope of her official duties as a Commissioner for the City of Millersville, Tennessee. She is a resident of Millersville, Tennessee and may be served at 7605 Darby Road, Goodlettsville, TN 37072.

23. Defendant City of Millersville is a municipal corporation organized under the laws of the State of Tennessee, located in Robertson and Sumner Counties, and is a "person" within the meaning of 42 U.S.C. § 1983. The City is responsible for the actions, policies, customs,

and practices of its elected officials, appointed administrators, and law enforcement personnel. At all relevant times, the City of Millersville acted through its agents and final policymakers, including members of its Board of Commissioners, City Manager, and Chief of Police, and is liable for constitutional violations under the doctrine established in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City may be served with process through its City Attorney or City Recorder at 1246 Louisville Highway, Millersville, Tennessee 37072.

24. Does 1-25 are the John and Jane Doe Defendants and co-conspirators of the principal defendants named herein who are therefore liable for the acts, omissions, and predicate acts of the principal named Defendants. Discovery will be necessary to identify Doe Defendants 1-25.

## JURISDICTION AND VENUE

25. This Court has subject-matter jurisdiction because the Plaintiffs' claims are brought pursuant to 18 U.S.C. § 1961 et seq. and 42 U.S.C. § 1983, and federal questions are therefore presented under 28 U.S.C. § 1331.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1667.

26. This Court has jurisdiction over this action pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), codified at 18 U.S.C. §§ 1961–1968. RICO is a federal law designed to combat organized crime by allowing prosecution and civil penalties for acts performed as part of an ongoing criminal organization.  Federal questions are therefore presented under 28 U.S.C. § 1331.

27. As alleged herein, this Court has RICO jurisdiction over the Defendants because they have engaged in a pattern of racketeering activity, which includes committing at least two

"predicate offenses" within a ten-year period. Defendants have engaged in a series of unlawful acts that constitute predicate offenses under RICO, both in Millersville, Sumner County, Tennessee, in May 2024, and elsewhere in the United States over the preceding ten years. These predicate acts include, but are not limited to:

a. Human Trafficking and Involuntary Servitude: Violations of 18 U.S.C. §§ 1584, 1589, 1590, and 1591, involving the purchase, sale, and exploitation of individuals through force and coercion.

b. Financial Crimes and Extortion: Violations of 18 U.S.C. §§ 1951, 1952, 1960, and 1343, encompassing extortion, money laundering, and wire fraud aimed at financing and perpetuating the Defendants' illicit activities.

c. Sexual Exploitation of Children: Violations of 18 U.S.C. §§ 2251–2260 and 2421–2424, involving the procurement and transportation of minors who have been trafficked for unlawful sexual purposes.

d. Economic Espionage and Theft of Trade Secrets: Violation of 18 U.S.C. § 1832, involving the unauthorized recording and dissemination of sensitive information to harm law enforcement efforts and gain illicit advantages.

e. Interference with Law Enforcement Operations: Violations of 18 U.S.C. §§ 1324, 1327, and other related statutes, involving the obstruction of legitimate law enforcement investigations and the manipulation of legal processes to facilitate criminal enterprises.

f. Murder-for-Hire and International Terrorism: Violations of 18 U.S.C. § 1958, which prohibits murder-for-hire schemes, and 18 U.S.C. §§ 2331(1) and 1959, which address international terrorism and violent crimes in aid of racketeering

activity. Specifically, based on Phil Drake's admissions, the Defendants engaged in separating children from their parents at the U.S.–Mexico Border, participating in the murder of those parents, and smuggling satchels of money back into the United States to bribe officials. These actions constitute a clear "murder-for-hire" scheme and "international terrorism," directly violating the aforementioned statutes.

g. Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises: Violations of 18 U.S.C. § 1952, which prohibits the use of interstate or foreign commerce facilities to further racketeering activities. The Defendants traveled across state lines and utilized interstate mail and commerce facilities with the intent to distribute the proceeds of unlawful activities, commit crimes of violence to further these activities, and facilitate the promotion and management of their criminal enterprises.

28. The Defendants' coordinated and continuous illegal activities demonstrate the Defendants' involvement in an organized scheme to exploit and undermine both individuals and law enforcement efforts. By committing these predicate acts, the Defendants have subjected themselves to RICO jurisdiction in this Court to redress the extensive harm caused by the Defendants' criminal conduct.

29. Venue is in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district. Venue is also proper in this district under 18 U.S.C. § 1965(a), as Defendants Kim Kelley, Phil Drake, individuals and as representatives of their Affiliated Organizations, Grow Online, LLC, Digital Defenders United, Inc., and Uniting Americas, Inc.

Incorporated, travelled to the Middle District of Tennessee, in furtherance of schemes made unlawful and as part of Racketeering-Influenced Corrupt Organizations.

## ALLEGATIONS OF FACT

*Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership.*

30. Historically, Millersville's proximity to the Kentucky border and major highways made it a hub for illegal trafficking. Many of the "old-timers" around the City might regale about stories of moonshiners using the City as a distribution hub, and how certain now-closed businesses had been used as fronts for money-laundering. The City of Millersville was incorporated in 1981. Through years of incompetence, corruption, and mismanagement, the City's financial resources have been stressed to the limits. Incompetent management lead to the failure of the City to apply for grants for funds sorely needed. Poor leadership resulted in such a high number of lawsuits from 2022-2023 that it caused the City to lose its insurance with Public Entity Partners, the main insurer of municipalities in Tennessee.

31. In January 2024, the City of Millersville saw key leadership changes. Commissioner Alisa Huling won a special election over former Mayor Tim Lassiter, ending a 2–2 deadlock on the Board of Commissioners—split between Commissioners Cristina Templet and David Gregory versus Mayor Tommy Long and Vice Mayor Milton Dorris. These changes lead to immediate retaliation from Cristina Templet and David Gregory and resulted in their year-long campaign to obstruct and interfere with municipal operations. Although it is beyond the scope of this Complaint to detail every change, a brief background is necessary for context.

32. On January 23, 2024, the Board voted 3–2 to remove City Manager Scott Avery, who had previously been fired from another city manager post and faced multiple controversies

during his year in office. As an at-will employee, Avery's termination was expected, and in the days leading up to the vote, Avery deleted around 30,000 emails and texts, forwarded city emails to his personal account, and removed several boxes of documents from City Hall, which was captured on CCTV.

33. Mayor Long and Vice Mayor Dorris opposed various corrupt practices that had been occurring in the City, including the use of Millersville as a hub for hiring "reserve officers" so they could obtain police commission cards and direct traffic for a private security company, Solaren Risk Management. Their opposition angered Commissioners Templet, who was friends with the owner and the police chief at the time, and Commissioner Gregory, who was found later to have possessed one of the illegal police commission cards that had been issued in his name.

34. Mayor Long had first ran for commissioner in 2020 to fill a two year, unexpired term. He ran again in November of 2022 for a four year term, receiving 46% of the votes and becoming the City's next Mayor. In December of 2022, he heard a rumor that Cristina Templet did not live in the City of Millersville when she ran for City Commissioner, which is illegal. T.C.A. § 2-2-122 states that a person's residence is the "place in which the person's habitation is fixed, and to which, whenever the person is absent, the person has a definite intention to return[.]" The property claimed as a Millersville residence by Templet was 7711 Ruby Lane in Millersville. Templet had used this address to illegally register to vote in 2018, and she had also used the address on her "Candidate Nominating Petition" filed on August 14, 2020. In fact, there was no habitation on the Templet's Millersville property at all until February-March of 2021. Thus, it was clear that Templet had illegally

registered to vote under T.C.A. § 2-19-107, and made false entries on official registration

and election documents under T.C.A. § 2-19-109, both of which are Class D felonies.

35. On November 16, 2021, Cristina Templet voted to approve a land purchase agreement with the City of Millersville selling a property to StaPro Investments, LLC, a company owned by Templet's husband in which she had an undisclosed, personal financial interest, in violation of Section 2-187 and 2-189 of the Millersville Code of ordinances, T.C.A. § 6-54-107, T.C.A. § 12-4-101, and the official misconduct statute, T.C.A. § 39-16-402. Templet did not even submit a "Personal Interest Disclosure Form" disclosing her interests in the dozen or so shell companies she and her husband owned until September 21, 2023.

36. The Templets then took action to conceal their involvement in various projects in the City, including Winston Templet using fictitious names like "Jones Property Town Homes" or having former City Manager Scott Avery list only the tax and parcel numbers in City meeting agendas instead of listing the address and the owner/developer information.

37. After Mayor Long removed Winston Templet from the Planning Commission due to a conflict of interest with him voting to approve projects where he and his wife held an undisclosed, material interest, the Templets retaliated by forming another shell company they named "FU Tommy Long, LLC," spray-painting the name on a dumpster and moving it around town until they eventually parked it next to Mayor Long's home.

   a. See https://www.wsmv.com/2023/09/06/husband-political-rival-millersville-mayor-tommy-long-registers-company-with-state-named-fu-tommy-long-llc/ (Sept. 6, 2023).

   b. Winston Templet discussing the vendetta on one of his many YouTube Videos:



38. Before January 2024, the City faced longstanding problems, including an alleged quid pro quo scheme with Solaren Risk Management—a security firm owned by Jack Byrd III. Uncertified officers received Police Commission Cards, allowing them to direct traffic and work lucrative downtown Nashville security gigs, despite lacking the required Tennessee POST certification. Media outlets ran multiple stories alleging unlicensed guards and impersonation of police officers.

   a. https://www.tennessean.com/story/news/2017/08/10/nashville-metro-council-candidate-runs-office-while-fighting-extortion-charges-giles-county/548537001/ (Aug. 10, 2017);
   b. https://www.wsmv.com/2023/05/04/security-company-insiders-imposter-police-officers-all-worked-same-business/ (May 3, 2023);
   c. https://www.newschannel5.com/news/newschannel-5-investigates/security-company-vows-to-make-changes-following-allegations-of-hiring-unlicensed-guards (May 26, 2023);
   d. https://www.wsmv.com/2024/07/02/state-issues-62-violations-against-company-accused-allowing-imposter-cops-nashville-streets/ (July 2, 2024);
   e. https://tennesseeconservativenews.com/davidson-county-sheriffs-office-investigating-fake-cops-in-nashville/ (Sept. 23, 2024);
   f. https://www.newschannel5.com/news/newschannel-5-investigates/sheriff-suspends-four-deputies-for-wearing-misleading-police-patch-while-working-off-duty-private-security (Oct. 11, 2024);

39. Former Chief Dustin Carr was often in the news, with allegations of an illegal quid pro quo for the sale or barter of police commission cards for up to $5,000 a piece. At least one

eyewitness claimed in an online podcast to have seen that Carr had a drawer that was filled with bundles of cash that vastly exceeded his police chief salary. Carr abruptly resigned on December 12, 2022 shortly before photos he had taken of himself brandishing his penis at City Hall while in his police uniform emerged online.

    a. https://www.wsmv.com/2023/07/07/recorded-phone-call-former-police-chief-raises-questions-quid-pro-quo-commission-card/ (July 7, 2023);

    b. https://www.newschannel5.com/news/newschannel-5-investigates/millersville-police-chief-named-in-bullying-lawsuit-resigns (Dec. 12, 2022).

    c. https://mainstreetmediatn.com/articles/news-robertsoncountyconnection/millersville-police-chief-abruptly-resigns-before-emergence-of-indecent-photograph-2/ (Dec. 27, 2022).

40. Throughout 2023, the City of Millersville faced ongoing issues. Former Assistant Police Chief Glenn Alred—lacking a current P.O.S.T. certification—served full-time when he could only lawfully be employed as a "part-time reserve officer," violating P.O.S.T. rules and subjecting the City to potential criminal sanctions. He and Interim Police Chief Melvin Brown resigned in July 2023, sparking additional media coverage of their actions:

    a. https://www.newschannel5.com/news/newschannel-5-investigates/millersville-cop-under-investigation-amid-questions-about-his-state-certification (Mar 9, 2023);

    b. https://www.wsmv.com/2023/09/26/internal-investigation-former-assistant-chief-violated-deadly-force-restriction-policy/ (Sept. 25, 2023).

    c. https://www.newschannel5.com/news/newschannel-5-investigates/state-investigators-confirm-timesheet-issues-for-now-former-millersville-assistant-police-chief (Aug. 18, 2023).

41. In November 2023, then–City Manager Scott Avery hired Robert "Uno" Richman from Texas as Millersville's new police chief, despite Richman's lack of a college degree and a controversial record as Associate Commissioner for Child Protective Investigations in Texas, which included allegations (reported by the Texas Tribune) of mishandling sex

trafficking and abuse reports at a foster care facility resulting in the Governor of Texas demanding that Richman step down from office.

    a. https://www.texastribune.org/2022/08/12/texas-child-abuse-agency-rich-richman/ (Aug. 12, 2022).

42. In exchange for hiring Richman, Richman placed Scott Avery on the Millersville "Reserve Officer" list despite having the required P.O.S.T. certification and mandatory training hours, thus enabling Avery to work the lucrative security contracts for Jack Byrd and Solaren Risk Management in Downtown Nashville.

43. Around January 26, 2024, Interim City Manager Tina Tobin terminated Richman after he presented a roster listing former City Manager Scott Avery as a "reserve officer." Records online also revealed that Richman faced harassment and criminal trespass charges in Texas for conduct presumed to have occurred before he had relocated to Tennessee:



| | OTHER EVENTS AND HEARINGS | | |
|---|---|---|---|
| 03/13/2024 | Magistration Documents | | |
| 03/13/2024 | Complaint & Information (Open Case) | | |
| 03/13/2024 | Order for Summons (Judicial Officer: Brown, Elaine ) | | |
| 03/13/2024 | Summons | | |
| | Richman, Robert J | Returned Unserved | 03/20/2024 |
| | | Returned | 03/20/2024 |
| 03/20/2024 | Summons Return | | |
| 04/24/2024 | Arraignment (9:00 AM) (Judicial Officer: Johnson, Chris) | | |
| | NO ARREST / NO WARRANT | | |
| | Result: Failure To Appear | | |
| 05/22/2024 | Order for Summons (Judicial Officer: Brown, Elaine ) | | |
| 05/22/2024 | Summons | | |
| | Richman, Robert J | Returned Unserved | 05/28/2024 |
| | | Returned | 05/28/2024 |
| 05/28/2024 | Summons Return | | |
| 07/03/2024 | Arraignment (9:00 AM) (Judicial Officer: Johnson, Chris) | | |
| | NO ARREST / NO WARRANT | | |

44. Before the January–February 2024 personnel changes in Millersville, the City had only one detective with under a year of experience, and he had been "*Giglio*-impaired"[1] by the Robertson County DA for lying about involvement in a traffic stop of a meth trafficker, Savannah Hill. A *Giglio*-impaired officer is when prosecutors refuse to call a witness due to documented untruthfulness, often leading to case dismissals. Former Assistant Chief Glen Alred—friend and business associate of former Millersville Police Chief Dustin Carr—was also *Giglio*-impaired by the same DA for lying about his role in that same traffic stop. A copy of the letter is attached hereto as **Exhibit A.**

***Plaintiffs Begin Working for a New Administration Under Chief Bryan Morris.***

45. In February 2024, Interim City Manager Tina Tobin hired Bryan Morris as Millersville's new Chief of Police. Morris, a former chief in a neighboring town with a college degree

---

[1] See *Giglio v. U.S.,* 405 U.S. 150 (1972), a case in which the prosecution failed to disclose a promise of immunity to a state's witness. In Tennessee law enforcement circles, a "*Giglio*-impairment" refers to a prosecutor's duty to provide exculpatory evidence that impeaches the testimony and credibility of the police officer, and is part of the *Brady v. Maryland,* 373 U.S. 83 (1963) line of cases. If the exculpatory evidence is that the officer had lied to prosecutors, for example, it could result in a refusal to prosecute the officer's cases. In that regard, a *Giglio*-impairment amounts to a "scarlet letter" for law enforcement officers.

and private-sector business management experience, discovered the prior administration had overstated its full-time officer count. He immediately hired certified, experienced officers to resolve the City's longstanding problems with uncertified officers. Chief Morris also ended the City's controversial reserve/auxiliary officer program, prioritizing policing within the City of Millersville, instead of using Millersville's police resources to enrich security companies in Downtown Nashville.

46. Before the 2024 leadership shift, a local trailer park saw an alarming rate of one to two dead bodies appearing weekly from what appeared to be drug overdoses, earning it the grim nickname "the body park" among Millersville officials. Prior administrations had either ignored the problem or failed to competently address it. Under the leadership and experience of Chief Morris, however, dead bodies suddenly stopped surfacing in Millersville almost overnight.

47. Det. Michael Candler began working at the City of Millersville in the Spring of 2024. He was recruited by Chief Morris to work undercover narcotics investigations in Millersville, which has been plagued by illegal narcotics trafficking, human trafficking, and unusually high overdose deaths over the past several years. When Det. Candler arrived in Millersville, he brought with him 20 years of security and police experience. During that time, he had been involved in a multitude of police roles, from K9 officer to patrol officer, from S.W.A.T. team member to advanced investigation, and he would now be Millersville's first undercover detective. His training and experience includes, among other things, tactical S.W.A.T. team training, advanced drug and narcotics investigations, advanced narcotics training including human trafficking training, K9 and drug interdiction operations, and Open-Source Intelligence Training conducted by the FBI. He has private

security contractor experience, training as a maritime security specialist, and has attended and graduated from the elite executive protection school, Executive Security International ("ESI"), in Grand Junction, Colorado. His security assignments have included being an OpFor (Opposition Force) or "red-team" tactician, tasked with engaging in simulated guerilla warfare training operations against members of various branches of the United States Special Forces, including Navy SEALs, as well as foreign components of U.S. allies such as the British SAS, the purpose of which was to train them for combat operations overseas.

48. Capt. Todd Dorris has over 31 years of experience in law enforcement with over 20 years of that experience as a P.O.S.T. certified police officer. In March of 2024, he was recruited by Millersville Police Chief Bryan Morris as a detective, and he has since been promoted to Captain. Capt. Dorris has prior training in child abuse investigations, recognition of characteristics of child sex abuses, and tactical firearms training. Prior to being recruited to work at Millersville, he had been with the Greenbriar Police Department for 14 years, where he had also been promoted to the rank of Captain. He has prior experience in K9 handling, and was a K9 patrol officer with the Montgomery County Sheriff's Office, where he had been employed previously for 9 years.

***Assistant Chief Shawn Taylor's Creation of a Joint Task Force to Combat Corruption.***

49. Det. Candler and Capt. Dorris worked directly under Assistant Chief Shawn Taylor and Chief Bryan Morris. Asst. Chief Taylor's background included prior work and experience that enabled him to assist with the overhaul and modernization of the MPD. Asst. Chief Taylor began using his knowledge, skills, and training to help the department gain access to advanced investigative tools. With regard to the investigations occurring within the

City, Taylor was involved in the research and gathering of intelligence from databases and law enforcement database portals, which he provided to Det. Candler and Capt. Dorris, who were independently handling the investigative work for the cases that followed.

50. On February 28, 2024, Assistant Chief of Police Shawn Taylor emailed federal FinCEN representatives requesting assistance in obtaining access for the Millersville Police Department. FinCEN provided contact information for Tennessee representatives of the TBI. Assistant Chief Taylor subsequently emailed Brooklyn Nash and Aja Brechtel of the Tennessee Bureau of Investigation (TBI), stating that he had been brought in to Millersville to correct various issues, including uncovering financial issues within the city that required access to FinCEN data to develop. Taylor proposed a phone call to discuss his request and "put together a game plan." The call was scheduled for the following day.

51. On or around February 29, 2024, the TBI spoke with Taylor and provided him with re-dissemination guidelines and guidelines on the use of Suspicious Activity Reports (SARs) by law enforcement. These documents highlighted that SARs information could be used as a part of <u>any</u> criminal investigation, and should be treated as a "confidential informant" that the officer could use to locate other credible information. The documents stated that re-dissemination of SARs documents should typically only be to other officials, federal, state or local, but that the primary rule was that the primary rule is that the subject of FinCEN data should never be informed that a Suspicious Activity Report was filed against them by a financial institution.

52. Assistant Chief Taylor had identified numerous inconsistencies in the City of Millersville's files and paperwork, including missing documents and files pertaining to employee background checks and employment records.

53. On March 2, 2024, Assistant Chief Taylor requested a report of all background checks for queries made by Millersville between January 1, 2022, and January 26, 2024 from the Sumner County Emergency Communications Center (ECC). This request included information about pre-employment and employment-related queries, including the names and dates of requested background checks, as well as records of whether criminal findings were returned as part of these queries. The reports Taylor received further substantiated evidence that the City of Millersville had been conducting improper background checks of various individuals.

54. On March 6, 2024, Chief Bryan Morris and Assistant Chief Shawn Taylor met with officials and attorneys from the Tennessee Department of Commerce and Insurance (TDCI), the Tennessee P.O.S.T. Commission, and representatives of other state agencies to address several issues, including Millersville's prior practice of printing illegal police commission cards for uncertified officers, the lack of training records for almost all of the auxiliary/reserve officers from Millersville who had been working for Solaren Risk Management, and missing municipal files, including personnel files for former MPD officers.

55. On March 7, 2024, Assistant Chief Taylor followed up with TDCI and Regulatory Board officials via email, expressing gratitude for their assistance and offering to provide them with intelligence reports on some of the topics and individuals discussed during their meeting.

56. On March 7, 2024, Taylor requested additional criminal case numbers from the ECC, through the Computer-Aided Dispatch (CAD) system. Although TBI documents would later claim that Taylor had not filed incident reports or citizen complaints in CAD when

requesting criminal case numbers, nothing about the practice is unlawful. First, entering information into CAD is at each officer's discretion, and no law requires it to obtain a criminal case number. Criminal case numbers are also not required for a criminal investigation. The CAD system is used to track the status of units, record incident details, and to generally ensure that resources are dispatched quickly and accurately. Second, the MPD intentionally avoided placing details in CAD since that system can be accessed by officials and the public—potentially alerting suspects that they are under investigation. In Millersville, preserving operational security ("OPSEC") demanded that no such information be published in CAD.

57. On March 8, 2024, Asst. Chief Taylor emailed TBI Agent Katie Chestnut, identifying himself and stating that he and Chief Morris had recently been hired and that he had been tasked to fix the issues that had plagued the Millersville Police Department, including his discovery of numerous issues and security breaches uncovered while auditing the records and systems utilized by former members of the Millersville Police Department. Asst. Chief Taylor requested to schedule a time to speak with Agent Chestnut to speak about the issues that he and the MPD had identified. Agent Chestnut is the Support Supervisor for Criminal Justice Information Services (CJIS) and Tennessee Information Exchange System (TIES) for the TBI. CJIS is a division within the FBI responsible for managing and disseminating critical criminal justice information to federal, state, local, and international law enforcement agencies to ensure they have accurate and timely information necessary for effective policing, investigations, and maintaining public safety. CJIS allows for data management of from the National Crime Information Center (NCIC), and other databases and serves as the backbone of information sharing in the criminal

justice community. TIES is a secure, statewide network designed to facilitate seamless information sharing among law enforcement agencies within Tennessee and with federal entities. TIES tailors the CJIS databases to sharing at the statewide level, providing Tennessee law enforcement agencies with a platform for collaboration and efficient access to essential information.

58. On March 11, 2024, Assistant Commissioner Alex Martin of the Tennessee Division of Regulatory Boards emailed Asst. Chief Taylor, thanking him for the time that he and Chief Morris had taken out of their schedules to meet and brief Commissioner Martin and Chief Legal Counsel Jesse Gentry. Martin thanked Taylor for his willingness to share documents and other information that would aid them in their pursuit of a resolution of their cases, and stated that he and Gentry would be happy to come to Millersville to review any additional material. Commissioner Martin informed Taylor that he was looking forward to staying in touch.

59. On March 11, 2024, Assistant Chief Shawn Taylor of the City of Millersville Police Department emailed the Tennessee Integrated Criminal Justice Portal (ICJP) Administrator to report a potential misuse and security breach involving the Criminal Justice Portal (CJP) by former employees of the City of Millersville. Assistant Chief Taylor stated that he had received a report from a local District Attorney outlining an event where the Criminal Justice Portal was allegedly misused. Acting on this report, Assistant Chief Taylor requested the City of Millersville's Administrator of the Criminal Justice Portal to perform an offline search of individuals named in the District Attorney's letter, as well as other individuals of concern. The findings returned by the City's Administrator conflicted with the information provided by the District Attorney. Assistant Chief Taylor sought further

assistance and clarification from the ICJP Administrator and requested a phone conversation to discuss the matter, offering availability on Friday of that week.

60. On March 12, 2024, Asst. Chief Taylor contacted the ICJP administrator regarding alleged misuse of the portal by former Millersville employees. The administrator included his manager, Christine Estes, and Business Analyst Gina Brawley, and they scheduled a TEAMS call to discuss Taylor's concerns. Taylor informed the ICJP administrator that he wanted to investigate the matter to a conclusion and take action, if necessary.

61. On March 14, 2024, the ICJP administrator informed Taylor that the Millersville Police Department currently lacked proper authorization to access the Criminal Justice Portal due to previous issues with Millersville employing uncertified officers. During subsequent correspondence, the ICJP clarified procedures and provided relevant user agreements so that MPD could be .

62. On March 15, 2024, Assistant Chief Taylor met with various officials with the Tennessee Administrative Office of the Courts (AOC) to discuss his findings regarding portal misuse. He proposed forming a Task Force to address public corruption and shared investigative findings with the AOC.

63. On March 15, 2024, Taylor emailed Christine Estes at the AOC, stating:

Mrs. Estes,

I hope you are well. I am following up on the meeting we had by TEAMS on 03/15/2024. As stated in the meeting, We have opened a criminal investigation into several former Millersville employees, regarding possible misuse of Criminal Justice Portal as well as several other possible criminal acts. We are diligently auditing files, records, evidence and will begin conducting interviews in the near future. Your assistance in auditing and providing me the findings on the reports I have requested will be extremely helpful in identifying issues. I will provide you ALL the findings as we identify them.

Warm regards,
Shawn Taylor

Assistant Chief of Police

64. Between March 15 and March 19, 2024, Asst. Chief Taylor continued to coordinate with the AOC regarding their TNCRIM Audit Request, inquiring as to whether there were possible criminal infractions for unlawful access of the ICJ Portal by uncertified officers employed by the prior administration.

65. On March 20, 2024, TBI Intelligence Analyst Brooklyn Nash emailed Asst. Chief Taylor, to follow up and see if he had submitted a FinCen request, a response indicating that the TBI was eager to assist Taylor during the investigation. Taylor responded the following day, stating that he had not yet submitted the first FinCen request, but that he was working on one but making sure that it was on point when he sent it. He then indicated that he should have his first request submitted by Friday.

66. On March 26, 2024, Assistant Chief Taylor emailed the AOC with an update on the investigation previously discussed in a TEAMS meeting. He believed he had enough probable cause to seek a search warrant for one suspect and intended to continue investigating all involved until he was ready to request warrants for all. Taylor also noted that he was in contact with the Tennessee Department of Commerce and Insurance, which was conducting its own parallel investigation. He proposed forming a multi-agency task force—including the AOC—to combine gathered evidence and welcomed any input the AOC could offer.

67. On April 2, 2024, Charisse Bonwell from the AOC replied to Taylor's request for her agency to join his Task Force, confirming their willingness to assist. **She copied TBI's Joshua Schwartz and several other state officials on her response to Taylor, stating,**

**"We will assist you in any way that we can. Please let me know what you need in that endeavor."**

68. At no point during the creation of this Task Force did any state or federal official indicate that Taylor's actions were even remotely improper. Instead, emails demonstrate that they praised his competence, diligence, and adherence to protocol. Official records show Taylor was conducting investigations with assigned case numbers, uncovering extensive criminal activity in Millersville with ties extending across the United States.

69. On April 2, 2024, Millersville's former Chief of Police, Dustin Carr, was apprehended during a what appeared to be a theft sting operation in Goodlettsville. Authorities discovered over $100,000 in stolen goods in Carr's possession, while driving a Solaren Risk Management vehicle, and the report indicates that he was alleged to have been selling the stolen goods on Facebook. This incident originated in 2023 and documented in CAD as Case No. 23-35167. The report also references Case No. 24-12894, and states that Carr represented himself "as an officer." Despite the severity of these allegations, Carr was neither charged nor prosecuted for theft or impersonation. This lack of action and selective enforcement of the laws further raises doubts and concerns about the credibility and motives behind the allegations of "official misconduct" against Shawn Taylor for investigating criminal activity, as well as the allegations of "perjury" based on statements from the Defendants in the case at bar.

70. On April 3, 2024, Chief Bryan Morris forwarded Taylor an email from the Blue Lightning Operation Center (BLOC), an ICE division focused on combatting human trafficking and commercial sexual exploitation. It included a sample BLOC access request letter from federal HSI/ICE officials for other MPD officers to use, as Taylor already had BLOC

access since 2009 and served as an official HIDTA (High Intensity Drug Trafficking Area) Agent.

71. On April 4, 2024, Taylor updated the TDCI on his ongoing investigation into a former Millersville PD officer who had illegal used the Criminal Justice Portal to conduct background checks on individuals for personal reasons unrelated to anything concerning the City of Millersville. Taylor requested copies of the relevant files, and continued working with TDCI on these issues.

72. On April 4, 2024, Gen. Ray Whitley closed his investigation of Commissioner Cristina Templet, claiming that there was no evidence of criminal activity "that would warrant prosecution."

73. On April 5, 2024, sent additional information to TDCI about more individuals of interest to the joint investigation.

74. On April 23, 2024, Asst. Chief Taylor announced "Operation Clean Sweep," the initiative targeting corruption and misconduct. That evening, former Mayor Tim Lassiter was arrested on charges of criminal simulation for his involvement in document fraud completed in furtherance the unapproved build-out of the sleeping quarters for Millersville's Fire Hall, which was ironically not build according to Fire Code and which therefore could never be used for its intended purpose, costing taxpayers over $100,000 in wasted funds. The charges of tampering with governmental records and criminal simulation where based on allegations that Lassiter had issued himself building permits he was not authorized to grant. Despite commissioners warning him not to do so, the renovation project for the fire department was completed anyway. Lassiter was also

possibly involved in building out the city's almost unusable evidence room in a similar manner.

75. On April 24, 2024, Channel 5 News quoted Gen. Ray Whitley's frustration about not being consulted before the MPD arrested former mayor Lassiter on two counts of document fraud. Whitley claimed that he found the situation "very strange," and indicated that he was unsure of whether his office would prosecute the case, despite not having reviewed any of the evidence. Commissioner Cristina Templet, speaking outside the jail with Lassiter's family, called the arrest a personal vendetta by mayor Tommy Long. Templet said she believed Lassiter was an "amazing human being" who was somehow wrongly treated by the city. The story noted how Lassiter had stepped down as mayor in 2022, following a lawsuit by two former Millersville Police officers who claimed they were bullied out of their jobs and faced racial discrimination.

76. Between May 3-7, 2024, the TBI emailed Asst. Chief Taylor multiple positive results of SARs reports and Cash Transaction Reports (CTRs) of various individuals and corporations who were being investigated. These positive FinCEN results indicated that the flagged transactions were deemed suspicious by independent federal authorities, signaling potential money laundering and other financial crimes that warranted further scrutiny.

**May 17-19, 2024: The Millersville Undercover Pedophile Sting.**

77. From May 17-19, 2024, the City of Millersville Police Department conducted an undercover child solicitation sting with the assistance and guidance of Veterans for Child Rescue ("V4CR"), a non-profit organization comprised of military professionals, military veterans, former and current law enforcement officers, and child abuse and trafficking

survivors that, in addition to raising awareness about child trafficking, provides advice and live assistance to law enforcement agencies conducting pedophile stings across the United States. V4CR provided what amounted to live training to Millersville officers in how to prepare for and run an undercover pedophile sting, which differs from the more common types of undercover stings, such as narcotics and prostitution stings.

78. On May 16, 2024, in advance of the sting, all V4CR volunteers and the Millersville Police Officers participating in the Operation met at Assistant Chief of Police Shawn Taylor's house, where the law regarding exploitation of minors and the rules of the Operation were explained.

79. The primary law applicable to the sting is T.C.A. § 39-13-528, which sets forth the elements of the offense of solicitation of a minor:

(a) It is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet services, directly or through another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age, or **solicits a law enforcement officer posing as a minor, and whom the person making the solicitation reasonably believes to be less than eighteen (18) years of age**, to engage in conduct that, if completed, would constitute a violation by the soliciting adult of one (1) or more of the following offenses:
(1) Rape of a child, pursuant to § 39-13-522;
(2) Aggravated rape, pursuant to § 39-13-502;
(3) Rape, pursuant to § 39-13-503;
(4) Aggravated sexual battery, pursuant to § 39-13-504;
(5) Sexual battery by an authority figure, pursuant to § 39-13-527;
(6) Sexual battery, pursuant to § 39-13-505;
(7) Statutory rape, pursuant to § 39-13-506;
(8) Especially aggravated sexual exploitation of a minor, pursuant to § 39-17-1005;
(9) Sexual activity involving a minor, pursuant to § 39-13-529;
(10) Trafficking for commercial sex acts, pursuant to § 39-13-309;
(11) Patronizing prostitution, pursuant to § 39-13-514;
(12) Promoting prostitution, pursuant to § 39-13-515; or
(13) Aggravated sexual exploitation of a minor, pursuant to § 39-17-1004.

(emphasis added).

80. Thus, the statute prohibits soliciting a law enforcement officer posing as a minor if the suspect making the solicitation reasonably believes the person was less than eighteen years of age.

81. Before the sting began, Capt. Dorris met with Robertson County Assistant District Attorney Jason White, who insisted that police officers conduct the text messaging with suspects during the solicitation. Adult conversations with a minor, alone, are not illegal; however, soliciting sexual activity is. Under T.C.A. § 39-13-522, "rape of a child" involves unlawful sexual penetration when the victim is between 8 and 12 years old—so any solicitation of sexual activity with someone in that age range constitutes unlawful solicitation of a minor.

82. No Tennessee case specifically requires an officer to be the one "typing" text messages during a sting operation. Nevertheless, at the Robertson County DA's request, the Millersville Police Department instructed all V4CR volunteers that MPD Detectives were required to handle all solicitation-related texting.

83. Capt. Dorris and Asst. Chief Taylor instructed V4CR volunteers that only detectives could handle solicitation texts. V4CR Volunteer Tim Brown reiterated these instructions during the three-day event. Volunteers could initially "chat" with subjects to see how they reacted once the decoy profiles revealed they were 12 years of age. If conversations turned "raunchy" or veered into solicitation, volunteers were instructed to bring the phone to detectives to review and handle the solicitation.

84. Other instructions and rules were given to V4CR volunteers, including the rule that nobody was allowed to take any Ops Phone from the kitchen area of the VRBO, which is where Capt. Dorris and Det. Candler were seated next to V4CR's Tim Brown. It was abundantly

clear to every volunteer that all of the solicitations had to be handled by Millersville detectives and needed to take place on phones purchased by the Millersville Police Department.

85. Prior to the Operation, Gen. White stated that it was OK for the V4CR volunteers to assist setting up the phones used in the Operation, and had stated that the MPD officers needed to wait until V4CR got into Millersville to set up the decoy profiles. Although Kim Kelley would later complain during a podcast interview that "nothing had been set up" when she arrived in Millersville as part of her disparagement of Plaintiffs and the Millersville PD, this was because Gen. White wanted the profiles to be set up in Millersville when the V4CR volunteers were present, and not prior to their arrival.

86. On Thursday, May 16, 2024, all V4CR volunteers and MPD officers participating in the sting met at Assistant Chief Shawn Taylor's house to go through the details of the operation, including the following:

   a. The requirements of Tennessee law for prosecuting the unlawful solicitation of a law enforcement officer posing as a minor;

   b. The district attorney's preference that the MPD officers do the actual texting or messaging with the suspects during the part of any conversation that involved the actual solicitation or solicitations from the suspects;

   c. No personal cell phones could be used for any part of the Operation or any solicitation;

   d. The V4CR volunteers were not to handle any solicitation because it could not be prosecuted;

e. V4CR volunteers who were monitoring one of the Ops Phones were to bring could only filter through profiles that had reached out to the decoy profile, and they were only permitted to "chat" with subjects for the limited purpose of gauging whether they were still interested in chatting after the decoy profile indicated that their real age was under 13;

f. There was to be no recording or photographing of the Operation or participants with any cell phones, most notably because Det. Michael Candler was hired to be the City's undercover narcotics officer;

87. All volunteers, including Defendant Kim Kelley, were briefed on Tennessee's solicitation law and told that only Millersville detectives could handle actual solicitations. In the event that a suspect spontaneously solicited a volunteer while they were "chatting," the phone was to be handed to a detective so they could attempt seek a second or third provable solicitation. All volunteers were aware that any solicitations not handled by a law enforcement officer would not be presented for prosecution.

88. Kim Kelley knew that Det. Candler was an undercover narcotics detective who was not to be photographed and who had taken measures to ensure that his identity would not be revealed in any picture or video. When Det. Michael Candler first introduced himself to Kim Kelley, he stated that he was the narcotics detective, and that he had been hired to work undercover narcotics operations in the City. Furthermore, one of the first rules communicated to Defendant Kim Kelley and the other volunteers was that no photos or videos of the Operation were to be taken by any of the Volunteers and most especially Det. Candler because his identity could not be disclosed. Candler also wore plain clothes and drove an unmarked, undercover vehicle.

89. On Thursday, May 16, 2024, the Millersville Police Department purchased six (6) generic Android smart phones from Walmart to be used in the Operation, referred to as the "Ops Phones." Det. Candler unboxed each phone that evening to complete the initial activation of each phone by connecting the cell phone to the carrier's network. As he unboxed each phone, he numbered each phone and box with a black permanent marker, writing the phone number on the box, and placing each box in a separate evidence bag that followed each phone. That evening, he charged the phones at the Police Department.

90. A VRBO in Millersville was rented from May 17 to May 20, 2024, and used as the "Chatter house" for detectives and volunteers. Before the operation, Det. Dorris consulted DA Jason White, who confirmed volunteers could help set up phones but that only detectives could handle solicitation. Volunteers ("chatters") screened messages to weed out innocuous chats, but once a conversation turned to solicitation, detectives were required to take over to ensure legal compliance.

91. On the Morning of Friday, May 17, 2024, with the assistance of V4CR volunteer Tim Brown, Capt. Dorris and Det. Candler set up the social media accounts and decoy profiles on the phones used during the Operation. Each decoy profile had a data sheet that accompanied the Ops Phone, setting forth the fictitious names and other "personal" information used for the decoy accounts.

92. As part of the training provided by V4CR during the Operation, Tim Brown assisted the detectives with organizing and setting up each decoy profile, while explaining how he generates the names, which AI programs he uses for modifying pictures, and his methodology for setting up profiles on the App they would be using during the sting, which was called MocoSpace.

93. Detectives Dorris and Candler, with Tim Brown's help, created the MocoSpace profile on Ops Phone #3 that attracted an individual with the username, "honeylover1034," later identified as Henry Dean Jordan of Nashville.

94. Det. Dorris selected the AI-altered decoy photo from a batch of several options provided by V4CR volunteers. Tim Brown had generated the photos from AI using real photos that Kim Kelley and Aspen Sawyer had taken inside the VRBO. These interior photos served as the base or starting point for the AI program to alter and make them appear to be 12 year old girls. None of the volunteers ever suggested that Dorris use the specific image that he selected for Ops Phone #3. Similar AI-altered photos of Kim Kelley and Aspen Sawyer were sent to Det. Candler.

95. Once the decoy profile photos were uploaded to the MocoSpace profiles on the morning of Friday May 17, 2024, the profiles started receiving dozens of immediate views and communications from men, and some women. Videos taken that morning show Det. Candler and Capt. Dorris both texting and messaging various subjects and suspects.

96. Detectives Dorris and Candler were stationed primarily in the kitchen of the Chatter House—its central hub—handling texts and messages on their Ops Phones. Tim Brown sat beside them to monitor the volunteers, who began filtering chats or "chatting" with subjects to anticipate which were likely to become suspects, with the expectation that phones would be handed off to one of the detectives if the conversation was turning toward a solicitation.

97. During the Operation, Tim Brown had to repeat the rules several times to Kim Kelley, who seemed to be having difficulty following the rules. Nobody was to take the Ops Phones outside of the room. Nobody was to be texting on personal phones while the Operation was taking place. Chatters could sift through conversations with subjects to see which of

them were still interested in communicating after the decoy profile revealed they were actually underage.   In fact, Defendant Kelley did not have difficulty following the rules, but instead intended to violate the rules as part of her and Phil Drake's plan to sabotage the MPD sting and exploit the subsequent coverage to promote themselves and their businesses.

***Defendant Kim Kelley's Disruptions, False Alarms, and False Claim That Suspect "Got Away."***

98. Assistant Chief Shawn Taylor and Chief Bryan Morris were both part of the "takedown team," stationed at a location separate from the Chatter House. Around 5:00 p.m. on Friday, May 17, 2024, Taylor was in an unmarked vehicle near the interstate conducting surveillance, searching for the suspects that Kim Kelley claimed were coming.

99. While Taylor and others were conducting surveillance in unmarked vehicles, Kim Kelley periodically shouted to Detective Candler, "I got one coming in!" and insisted the "suspects" were "15 minutes away." Each time, Detective Candler relayed this information to the takedown team via radio, forcing the rest of the team to prepare for interception and scan for the suspects. When Detective Candler asked Kelley if there had been a solicitation, Kelley said no.  It did not make sense for individuals to be arriving if there had been no solicitation, and Kelley was aware that solicitations had to be handled by the Detectives. Concerned by these discrepancies, Candler went over to see what Kelley was doing on her phone but he did not observe any conversations with individuals claiming to be en route to the Chatter House.  At some point during the operation, Kim Kelley's bizarre behavior caused Det. Candler to question Kim Kelley's motives, and he told Tim Brown that he believed Kim Kelley was secretly recording them.

100.    Kelley's continued misinformation not only created a chaotic atmosphere at the Chatter House but also led Assistant Chief Taylor to temporarily call off the operation that evening. Although the MPD did not realize at that time that Kim Kelley had conspired with Defendant Phil Drake to sabotage the undercover sting, her duplicity became apparent when she told news outlets about detectives letting a suspect "get away," even though none of those "suspects" actually existed.  Stated differently, she "cried wolf" and falsely reported that suspects were approaching, so that she and Phil Drake could later mock the MPD by claiming these imaginary suspects "got away."

101.    Drake later made the implausible claim that MPD officers could not locate the arrested suspect, Henry Dean Jordan, but he was able to "ping" the suspect's cell phone and located him "within 3 seconds." These dubious assertions underscore Kelley and Drake's consistent dishonesty and their willingness to disseminate any information, regardless of its credibility, to advance the Defendants' agenda. If Kelley and Drake were communicating in real-time and Drake genuinely possessed the ability to "ping" a suspect's cell phone, why did they not "ping" the locations of all the suspects Kelley falsely reported as arriving "in 15 minutes"? Furthermore, if their "pinging" capability were authentic, why would Kelley and Drake knowingly allow these suspects to escape justice? Their reckless and unfounded claims not only undermine their credibility but also highlight their deliberate efforts to mislead the public and obstruct legitimate law enforcement operations.

102.    In subsequent media interviews, Defendants Kim Kelley and Phil Drake falsely claimed that a suspect escaped because an MPD vehicle lacked a siren on the vehicle. Both Kelley and Drake used this pretext to disparage Plaintiffs and make the MPD appear incompetent.  Drake and Kelley had apparently rehearsed the same story, as both of them

mocked the purported lack of a siren and stated that officers should have hung their heads out the window and "made siren sounds with their mouths." While the Defendants' statements were intended to impugn the reputations of the Plaintiffs and their department, they nonetheless revealed Drake and Kelley's profound ignorance of basic police procedure—blue lights are used to stop vehicles, while sirens merely alert surrounding motorists that an emergency vehicle is approaching.

***Suspect Henry Dean Jordan Solicits the Decoy Profile Operated by Capt. Dorris.***

103.    A few hours later, suspect Henry Dean Jordan (profile "honeylover1034") contacted the decoy profile on Ops Phone #3, and officers noted that other MocoSpace users were claiming to have knowledge that Jordan was a child predator, which comments are visible in one of the photographs taken by the detectives:



104.     These visible comments from others accuse Henry Dean Jordan of engaging in at

least two or more prior acts of child rape, and therefore Jordan meets the definition of a

"serial child rapist" under well-established DOJ, FBI, law enforcement and criminology

principles and definitions, Phil Williams and the NewsChannel 5 Defendants falsely stated

that this lawsuit claims "without evidence" that Jordan was a "serial child rapist."  Even

Defendant Kim Kelley stated during her multiple interviews online that Jordan was a

dangerous child predator whom she believed had raped multiple children in the past.

Shockingly, in the face of this evidence, Phil Williams and the NewsChannel 5 Defendants

went so far as to defend Jordan's innocence, claiming that .

105.     The January 15, 2025 article, written by Williams in furtherance of his ongoing smear campaign, was titled, "Millersville detectives, facing TBI investigation, take aim at whistleblower in federal lawsuit – Whistleblower Kim Kelley responds, "My verifiable evidence speaks for itself, and I remain steadfast in my commitment to justice, transparency and protecting children from exploitation."[2]  Although Plaintiffs requested copies of Kim Kelley's "verifiable evidence" on or about May 14, 2025, Kim Kelley has failed and refused to provide *any* of it.

106.     Taken in context with the rest of the broadcast, Phil Williams' statement that "Prosecutors also dropped charges against Jordan, who the lawsuit claims — without evidence — was a 'serial child rapist,'" followed by the editorial comment, "NewsChannel 5 has not found any such history," amounts to an overt attempt to not only defend, but advocate for a child predator who, according to Williams' own source Kim Kelley, had most certainly harmed children before—a characterization Williams willfully ignored in furtherance of his fake news campaign and the conspiracy to unlawfully interfere with the Plaintiffs' employment.

107.     Kim Kelley claims she "identified" Jordan's profile.  In fact, Tim Brown and Michael Candler first saw the profile and comments, and this was the reason why Candler snapped the above picture and then handed the phone to Capt. Dorris.   It was reasonable to believe that Jordan was likely to solicit the decoy profile and Capt. Dorris retained possession of that phone, Ops Phone #3.  Thereafter, Tim Brown observed Dorris typing

---

[2] A copy of the article is available at the following hyperlink: https://www.newschannel5.com/news/newschannel-5-investigates/qanon-comes-to-main-street/millersville-detectives-facing-tbi-investigation-take-aim-at-whistleblower-in-federal-lawsuit

messages to Jordan in both the MocoSpace App, and the subsequent text messages with Jordan where the solicitations occurred.

108.    Capt. Dorris and Det. Candler continued working with Ops Phone #3 and other Ops Phones, periodically placing the phone down on the table.  Shortly after the solicitations were obtained from Jordan, Defendant Kim Kelley grabbed Ops Phone #3 and attempted to walk to another room with it.  Det. Candler yelled for Kelley to come back and set the phone down.  Shortly thereafter, Kim Kelley made a second attempt to take Ops Phone #3 away from the detectives to another location.  Although the Plaintiffs thought it was strange that Kelley kept trying to walk away with the phone, they were unaware at the time that Kelley was trying to actively sabotage the sting.  Upon information and belief, her intent was to take contemporaneous photographs of Capt. Dorris's text thread with Henry Dean Jordan on her personal phone to fabricate evidence to support her false that she had handled the solicitation with Jordan.

109.    During Capt. Dorris's communications, Henry Dean Jordan was informed that the individual he believed he was speaking to was a child about to turn thirteen (13) years old. Despite this, Mr. Jordan made explicit statements regarding his intentions to engage in various unlawful sexual acts, and coordinated plans to travel by bicycle to a designated meeting location in Millersville at the Bethel Road Shell Station near I-65 North Exit 104.

110.    After Jordan failed to arrive at the Shell Station at the agreed upon time that evening, MPD officers located and detained Mr. Jordan pedaling his bicycle up the shoulder of I-65 North near mile marker 103. Jordan was taken to the Millersville Police Department, and Capt. Dorris left the Chatter House to handle the paperwork.

111.     Although Jordan was never questioned by MPD detectives, he told Capt. Dorris, "I never touched that girl" while he was being processed at the Millersville Police Department. Capt. Dorris then prepared documentation regarding the incident, and Jordan was subsequently transferred to the Robertson County Jail and taken before a judicial commissioner around 2:25 am on May 18, 2024, where his arrest warrant was signed.

112.     That same evening, Henry Dean Jordan voluntarily spoke to a documentary film crew that accompanied the V4CR volunteers, where Jordan voluntarily confessed to the crime of soliciting a minor. Contrary to the false statements later made by Kim Kelley that this was improper or would "jeopardize" the prosecution, it is well-established under Tennessee law that statements voluntarily made by a suspect to a third-party that is not a law enforcement officer are generally admissible against the defendant at trial. See, e.g., *State v. Sanders,* 452 S.W.3d 300 (Tenn. 2014); *State v. March,* 395 S.W.3d 738 (Tenn. Crim. App. 2011).

113.     At the end of each day, all of the Ops Phones were gathered and secured. After the evidence from Ops Phone #3 was downloaded, the phone was brought back to the Chatter House. Upon information and belief, Ops Phone #3 was returned to the Chatter House on Sunday, May 19, 2024. It is possible that Kim Kelley had access to Ops Phone #3 at this point. Plaintiffs do not know what purported "evidence" she has that she texted Henry Dean Jordan and handled the solicitation. None of the videos or recordings that are publicly available online show her actually texting Henry Dean Jordan. None of those videos have time stamps or dates. All of the videos are edited, isolated clips that cut off conversations mid-way, raising serious questions about what they actually show.

***Kim Kelley Demands $35,000 from Craig Sawyer to "Purchase Trafficked Children."***

114.     On the evening of Saturday, May 18, 2024, Kim Kelley openly demanded that Craig Sawyer, CEO of V4CR, provide her with $35,000 to purchase trafficked children as a means of "rescuing" them from traffickers.  Det. Candler overheard Kelley's demand for payment, but was unaware at the time that Kim Kelley and Phil Drake were soliciting payments to purchase trafficked children from child traffickers as part of their business model to "combat" child trafficking.   At some point prior to the Millersville Operation, Kim Kelley and Phil Drake developed the opinion that intercepting pedophiles as part of a child solicitation/child exploitation sting was somehow not an effective way to prevent pedophiles from victimizing children, or that intercepting pedophiles on the "demand side" of child trafficking was not as effective as direct action against child traffickers on the "supply side" of an illegal child trafficking ring.   Regardless of whatever distinction Kelley and Drake had conjured in their minds, Sawyer refused to pay the $35,000 and Kim Kelley became upset.  She stormed outside the rental house, once again taking an Ops Phone with her that required Det. Candler and another V4CR Volunteer to go outside and retrieve the phone from her.

***Kim Kelley Remains in Nashville After the Pedophile Sting Ends.***

115.     Kim Kelley had the means and motive to fabricate evidence, and on the evening of May 19, 2024, she was given the opportunity to do so.  V4CR had rented a VRBO for the Millersville Operation from Friday May 17, 2024 to Monday, May 20, 2024.  When the pedophile sting ended on the evening of May 19, 2024, Kim Kelley stayed by herself overnight at the VRBO.  Thus, she had an entire evening to herself inside the VRBO to record videos of herself and fabricate evidence that made it appear she was openly chatting with suspects on one of the Millersville Op Phones during the sting.

116.     Shawn Taylor returned on Monday, May 20, 2024 to retrieve some radios that had been left inside the rental. When he arrived, there were two vehicles on the property, the sedan that Kim Kelley was driving and a four-door truck. When Taylor entered the house, he announced his presence and saw Kim Kelley hurry to her bedroom and shut the door. Upon information and belief, Defendant Kelly was hiding Defendant Drake in her bedroom at the VRBO.

117.     After the Millersville Operation had concluded, Kim Kelley stated that she was staying in Nashville for a few extra days. Upon information and belief, during this time she met with additional co-conspirators in the days that followed to further prepare and orchestrate the smear campaign used to damage the Plaintiffs.

***Phil Williams Begins Politically-Motivated Attack Campaign Against Shawn Taylor and Other Millersville Officials.***

118.     On May 18, 2024, local reporter Phil Williams of Channel 5 released a teaser video about a story he would be running about Asst. Chief Taylor on Monday, May 20, 2024. The purpose of the article was to discredit Taylor over statements made during various podcast 18 months to over two years before he became Assistant Chief in Millersville. Williams claimed that Taylor was a "QAnon conspiracy theorist" and "had appeared on podcasts associated with the widely discredited QAnon conspiracy theories." The article intentionally omits the dates of these podcast videos, ostensibly to create the illusion that the content on the podcast was recent and that it was therefore a matter of public concern. Phil Williams falsely claimed that he *personally uncovered* Shawn Taylor as part of his earlier investigation of a former Franklin, Tennessee official named Gabrielle Hanson, when in fact Taylor had met both Phil Williams and Channel 5 reporter Levi Ismail in

March of 2023, during which time Taylor provided both with a binder of documents and a USB drive containing even more files, including copies of the very LexisNexis "background reports" that Phil Williams would later falsely claim that Taylor had generated illegally. Williams also falsely claimed that he had "discovered" these background reports when watching one of Shawn Taylor's podcasts, which is false and yet another one of Phil Williams' attempts to mask his real sources through parallel constructs.

119. Levi Ismail sent the following text to Shawn Taylor about the meeting as follows:



120. After their January 2023 meeting, Shawn Taylor periodically provided additional information to Levi Ismail and NewsChannel 5 as a source of information and for assistance with various intelligence and investigatory tasks.

121. In addition to being provided the actual LexisNexis reports that Phil Williams would later use against Shawn Taylor, Ismail and NewsChannel 5 also specifically knew that Shawn Taylor had access to LexisNexis because Ismail had specifically requested that Shawn Taylor run these types of reports on other individuals on February 3, 2023 at 7:06 pm:



122.     Once Shawn Taylor became Assistant Chief of Police in Millersville, however, Defendants Phil Williams and Levi Ismail betrayed Taylor's trust, turning him from a source to a scapegoat.   They exploited every scrap of confidential information that Taylor had provided to them in January of 2023, and used Taylor's appointment as Assistant Chief of Police to manufacture a fake "public crisis" where none existed, thereby exploiting a source for his own partisan purposes and as overt acts in furtherance of his illegal objectives and those of the other Defendants.   In so doing, Williams and the Channel 5 Media Defendants forfeited any claim that they were ever reporting on a legitimate controversy. Their conduct was a calculated smear campaign aimed squarely at undermining Shawn Taylor, and then through false and defamatory claims against Plaintiffs Michael Candler and Todd Dorris.

123.     The May 20, 2024 article also quoted only part of what Taylor said in one of the dated podcasts to make it appear that he was currently investigating and accessing the financial data for U.S. Senator Marsha Blackburn via law enforcement databases, which Phil Williams knew was false.  In fact, the video was from years prior to Taylor becoming Assistant Police Chief and he was referring to publicly-available bank records filed as part of Blackburn's campaign disclosures.  Without any evidence, Phil Williams speculated that

Taylor must have been abusing a law enforcement database because Taylor had called Williams by a different last name.

124. On May 22, 2024, Williams ran another story about Millersville Commissioner Templet and Gregory demanding an inquisition into the hiring of Shawn Taylor. Millersville Commissioners have no authority to either conduct an inquisition during a City Meeting and have no authority to make or influence any hiring decisions, which authority is solely that of the City Manager under Millersville's charter. Williams speculated again that Taylor used a government database to investigate Williams. However, it is easy for law enforcement agencies to conduct an audit of a police officer's queries made in government databases, and there has never been any evidence that Taylor queried Phil Williams. Phil Williams is nowhere mentioned in any of the available information from the TBI, such as their search warrants, which do not mention Phil Williams at all. Despite Williams' lack of evidence, he continued running attack pieces against Taylor and other Millersville officials every other day, and even published different stories twice a day as part of an unprecedented campaign.

***The TBI Operation Plan Claims Investigation Was Requested on May 22, 2024.***

125. According to a TBI Operation Plan found at Shawn Taylor's house after the "raid" had concluded, on May 22, 2024, District Attorney Ray Whitley requested that the TBI conduct an investigation into allegations against Shawn Taylor for "improper use of law enforcement intelligence data, falsifying government records, and official misconduct."

126. Ray Whitley, however, was quoted in a July 29, 2024 NewsChannel 5 article as saying that *the TBI* had brought him evidence, not the other way around:

"There is information that the TBI brought to me, and as a result of that, I asked for the investigation," Whitley said. "It's an ongoing investigation, and I really don't want to comment on it until we find out what's going on."

127.     Discovery will be needed to confirm whether the investigation was triggered by the allegations from the Phil Williams stories, but Plaintiffs aver that the contemporaneous proximity of Phil Williams' first story and the sudden involvement of the TBI is proof that Phil Williams not only has a source inside the TBI that was already working on a pretext to investigate Shawn Taylor for unlawful and retaliatory reasons.

128.     The TBI Operation Plan shockingly claimed that Taylor was alleged to have been improperly utilizing government databases, when in fact he was the one that had created the very Task Force that was investigating improper utilization of the ICJ portal and other actions from former Millersville officers.  Moreover, Taylor's Task Force had been formed with the knowledge and inclusion of multiple TBI officials and the actual Administrator of the Integrated Criminal Justice Portal.  The Operation Plan states, "It is believed [Taylor] has improperly utilized law enforcement intelligence data to include the State of Tennessee Integrated Criminal Justice Portal, Financial Crimes Enforcement Network, and the National Crime Information Center."

129.     The allegation that Taylor "improperly utilized" FinCEN data is difficult to understand or believe.  Taylor accessed this data through the proper channels by requesting it via the TBI's web portal and justifying its use for legitimate criminal investigations. In Tennessee, the TBI acts as an intermediary to FinCEN, ensuring that only authorized officers with valid reasons are provided FinCEN information. Therefore, it's not possible

for Taylor improperly accessed FinCEN data when it was the TBI that accessed it and provided it to him after the proper procedures were followed. The suggestion of official misconduct is as questionable as if a bank allowed a customer to withdraw money from their own account, and then turned around and accused the customer of robbing the bank.

130.    By statute, municipal police officers have extremely broad authority to investigate and prevent any crimes. Under T.C.A. § 6-21-602, municipal police are authorized to protect residents from *all* criminal acts, and to prevent the commission of crime, and violations of law and of the city ordinances. Thus, it is risible to claim that a police officer investigating suspected criminal activity should be investigated for official misconduct and "exceeding his authority" when he was both doing what the law requires of municipal police, and he possessed documents that the TBI had approved and provided. In light of these facts, the proffered reasons for initiating the investigation was a pretext for an unlawful and retaliatory motive.

***Millersville's Request for a Prosecutor Pro Tem and Investigative Grand Jury is Declined.***

131.    In an effort to ensure that the Millersville investigations remained unbiased, Taylor had also proposed notifying the Tennessee Attorney General to request a prosecutor *pro tem* and convene an investigative grand jury. Taylor had briefed the Attorney General and Reporter on several occasions with regard to the criminal activity he was investigating, and an official request had been sent by the City of Millersville in mid-April, 2024. However, on May 23, 2024, after the negative press, the Attorney General "respectfully declined" to do so, claiming that he was constrained by statute requiring the local district attorney's consent to appoint a prosecutor *pro tem*, which the Attorney General believed was unlikely to occur.

132.     Not coincidentally, a prosecutor *pro tem* and an investigative grand jury were convened as part of a different TBI investigation occurring in Chattanooga based on allegations identical to those against Millersville Commissioner Cristina Templet. According to the TBI press release:

> At the request of District Attorney General Pro Tem D. Michael Dunavant, TBI agents began investigating the residency of Celeste Murphy (DOB [REDACTED]) in April. Dunavant was appointed by the Court to serve as District Attorney General Pro Tem upon the recusal of 11th Judicial District Attorney General Coty Wamp. During the investigation, agents determined Murphy knowingly entered false information on several government documents related to establishing residency in Chattanooga, though swearing to their truth in signing the documents.
>
> On Tuesday, the Hamilton County Grand Jury returned a 17-count indictment, charging Murphy with one count of Illegal Voter Registration, one count of False Entries on Official Registration or Election Documents, three counts of False Entries in Governmental Records, three counts of Forgery, three counts of Perjury, and six counts of Official Misconduct. This morning, Murphy surrendered to agents at the Hamilton County Jail, where authorities booked her and subsequently released her after Murphy posted an aggregate $19,000 bond.

***Capt. Todd Dorris Testifies at The Preliminary Hearing on May 28, 2024.***

133.     On the morning of May 28, 2024, Capt. Todd Dorris testified at the preliminary hearing in State of Tennessee v. Henry Dean Jordan.  Jordan was the only suspect arrested during the sting. Assistant DA Jason White did not prepare Capt. Dorris in advance of his testimony, but Dorris brought copies of some pictures of the text messages where he was posing as a minor and Jordan had made the solicitation.

134.     Assistant DA Jason White directed the examination of Capt. Dorris.  He testified that he was an investigator at the Millersville PD, and that they had started an investigation into internet crimes against children.  He testified that the investigations began with them setting up the phones they had purchased from Walmart, and that they had created some accounts and a profile on MocoSpace, where Capt. Dorris had to set the decoy profile age

to 18 at the time, because that was the minimum allowable age on the App. Capt. Dorris testified that he had been doing the typing in the App.

135.     Capt. Dorris testified that after they received hits on the app, they would try to move over to straight text messaging from phone to phone, to get off the app so they could tell the individuals that they were 12 years old.   Capt. Dorris was then asked about the contact from the phone number belonging to Henry Dean Jordan.  Dorris testified that they researched the phone number through some databases to determine the name associated with it, and the name Henry Jordan came back.

136.     Capt. Dorris testified that they were communicating via text from that point on, which started out with basic communication, and then letting Jordan know that he was only 12 years old, turning 13 next week.  Jordan then began making explicit comments in the text messages and solicited oral sex from the decoy profile whom he believed was a 12 year old girl that was actually Capt. Dorris.

137.     Capt. Dorris testified that arrangements were made for Jordan to come to a Shell Station in Millersville, and that Jordan stated he would be traveling there via a bicycle.

138.     Capt. Dorris testified that it was taking a very long time for Jordan to arrive, so officers were sent out to locate Jordan on the interstate, and they located him on the interstate coming up the ridge by mile marker 104, confirmed his identity, and brought him into custody.

139.     Capt. Dorris testified that he served the warrants on Jordan, and informed him of the charges, at which point Jordan stated, "I never touched that girl."  At that point, Dorris informed Jordan that he was the one posing as the underage girl that Jordan had been soliciting.  Jordan did not deny sending the text messages to the decoy profile.

140.     Gen. White then asked Capt. Dorris to go through the pictures of the text message chain that he had with Mr. Jordan, and Capt. Dorris read through the parts of the text message chain that he started, and various parts of the text thread that he had typed out and sent to Jordan.  Gen. White then confirmed the part of the text messages where Jordan had solicited oral sex, and the seven pages of text thread was made "State's Exhibit 1."

141.     On cross-examination by Jordan's defense attorney, Capt. Dorris testified that the operation started on May 17, 2024 around 3:00pm and went until about 3:00 in the morning.  Capt. Dorris testified that Det. Candler was also responding to the text messages with Jordan, and that he had assistance from Veterans for Child Rescue.   Capt. Dorris testified that V4CR chatters provided him with advice during his texts with Jordan, including how to talk like a 12-year-old, and that they were with him, in person, while the text messages were being sent.

142.     Capt. Dorris testified that Jordan was not the only individual contacted during the sting.  He was asked, generally, about how the MocoSpace App worked, and Capt. Dorris testified that it was a social app like Facebook Messenger, and was not a dating app.

143.     Capt. Dorris testified about how users had to set up an account stating they were 18 years old, otherwise they would be immediately kicked out of the app.  Capt. Dorris stated that Mocospace monitored the profile and the messages.  He testified that he had, at some point, identified himself as underage in the app, and that they had used different account names for each profile.

144.     Capt. Dorris testified that they had used AI to generate the photo for the profile used on the decoy profile.  He testified that he had chosen the AI photo, and that it was not suggested by V4CR.  Capt. Dorris was never asked if more than one AI photo had been

generated. Nor was Dorris asked any questions about the process of how the AI programs generated the profile pictures, which involved uploading photos of Kim Kelley and Aspen Sawyer (or any other female) into the AI program where the photo was altered by the algorithm to appear as though the subjects were 12 years old.

145.     Capt. Dorris, who had been handed back a copy of the text messages with Henry Dean Jordan, was asked if V4CR had sent any of the messages, and he truthfully testified that they had not. He testified that he did not send any additional pictures through the Mocospace App.

146.     Capt. Dorris testified that he was not sure whether he or Henry Dean Jordan had provided their phone numbers through the Mocospace App, but that Jordan would have been the first to send a text message. Dorris testified that there some pictures were sent via text message, but that he did not recall whether Jordan had sent pictures to the decoy phone. Dorris testified that he saw the profile picture of the individuals on the other side of the message.

147.     Capt. Dorris testified that Jordan had indicated he was in Nashville, and that most of the communications with him would have likely occurred in Davidson County, but that he did not take part in the arrest on the Interstate, which could have been in Sumner or Robertson County.

148.     Capt. Dorris testified that there was no way to know who was truly communicating on the other side of the Mocospace app, and that, thereafter, some communications happened by text message, but that, aside from their investigation, there was no way to tell who was sending the text messages on the other end.

149.     Capt. Dorris was asked if there was any video in real time of him communicating through the Mocospace App, and he said there was no video involving Henry Dean Jordan. He was then asked questions about who might have been on the arresting team, whether he knew if Jordan was mirandized or asked any questions, and some other questions about who secured Jordan's phone and logged it into evidence.

150.     On re-direct, Gen. White asked Dorris more details about V4CR's advisory role and the type of advice that V4CR had given, and he testified that they had given advice on what to look for, how to set up the profile, what questions to ask, and how to answer in order to sound like a 12-year old.

151.     Capt. Dorris still had State's Exhibit One in his hands at this point in his testimony, which consisted of seven pages of his text messages with Jordan. Dorris was asked if he and Candler had done "all the typing and the all the data entry," and Capt. Dorris replied, Yes, sir." In making this statement, Dorris was not stating that he and Candler handled every one of the six Ops Phones. He was still testifying solely about the conversations with Henry Dean Jordan and the Exhibit that was in his hands. The crinkling of paper from Capt. Dorris's hands grasping Exhibit One can actually be heard on the audio recording of the preliminary hearing. Although it is easy to manipulate a narrative with a short, edited clip of testimony taken out of context, the full, unedited recording demonstrates that Dorris was testifying about his text messages with Henry Dean Jordan during the solicitation, and those present in the courtroom knew that Dorris was testifying about those messages because he was holding them in his hands while speaking.

152.     Capt. Dorris was then asked to clarify whether he started conversations by reaching out to individuals or waited for them to question him, and Dorris testified that he waited

until they questioned him. Dorris acknowledged that he waited for Jordan to make first contact with the decoy profile, and that they did not "target" anybody. Dorris acknowledged that the address for the decoy profile was in Robertson County, which meant that Jordan had solicited sexual acts with a minor that were going to occur in Robertson County.

153.     Capt. Dorris concluded his testimony by confirming that he never tried to question Henry Dean Jordan when he was in police custody, and that Jordan made the statement ("I never touched that girl") after Dorris informed him about the charges.

***After Kim Kelley Questioned by V4CR, She Uploads Video of Herself Claiming She Texted Suspect, and Locks V4CR Out of Their Social Media Accounts.***

154.     Craig Sawyer was notified that Kim Kelley and Phil Drake had attempted to bribe one of the V4CR members to commit corporate espionage against V4CR. After learning about this subterfuge, Sawyer invited Kim Kelley to participate in a Zoom call with him and some other managers. The call took place at 10:00 am PST on the morning of May 28, 2024 and lasted approximately two hours.

155.     During the call, Mr. Sawyer asked Ms. Kelley, "Kim, we want to understand from your perspective, why are you investigating V4CR?" Sawyer stated that they were a non-profit and their records were open. He informed her that her business partner, Phil Drake, is a criminal and Sawyer questioned why she and Drake were working together to try and disrupt the important work that V4CR was doing under the guise of some "investigation."

156.     During the Zoom call, Kim Kelley was acting in a bizarre manner and was hyper-focused on minute distinctions in order to avoid answering questions. For example, if she was asked about harmful statements she had made on Thursday, she would immediately

accuse the person of lying, saying the statements happened on Wednesday and that the person was therefore a "liar."

157.     During the Zoom Call on the morning of May 28, 2024, Kim Kelley acted in a bizarre manner, and began hyper-focusing on trivial details and disputing definitions of words instead of providing direct answers about her actions related to the corporate espionage that she and Phil Drake were attempting against V4CR. An example of the type of quibbling would be responding to an accusation that she had made harmful statements on Thursday, to which she would counter with the accusation that the person was lying because the statement was made on a Wednesday, while dodging the call of the question as to *why* she had made the statements. At other times, she would quibble with the definition of a word when asked a question, responding with non-answers such as, "well, that depends on how you define _____." Her deliberate evasion and emphasis on minutiae prevented a clear understanding of her involvement and actions with Phil Drake, but at that point she knew that her and Drake's "investigation" had been exposed.

158.     Kim Kelley had been handling the social media for V4CR and had access to all of their social media accounts. Shortly after the Zoom Call, Kim Kelley uploaded a video of herself to V4CR's YouTube channel, claiming that she was the one who had texted the suspect that was arrested during the Millersville sting. In the video Kim Kelley made of herself, she suspiciously emphasizes with unnecessary details that she alone had done all the texting and chatting with suspect Henry Dean Jordan. She suspiciously emphasized that law enforcement essentially had nothing to do with the sting, except for arresting the suspect.

159.     Kim Kelley's disinformation tactics were aimed at derailing the Millersville pedophile sting and manipulating public perception.  She falsely emphasized her unilateral role in texting with the suspect, despite multiple witnesses contradicting her claims.  Kim Kelley was fully aware that only law enforcement was authorized to handle solicitations with suspects under Tennessee law, and the video she took of herself and uploaded was designed to make a public video containing information that she knew would not only obstruct the Millersville sting, but would also contradict any truthful testimony from Capt. Dorris that he had handled the messages involving Henry Dean Jordan's solicitations.

160.     After uploading the video to V4CR's YouTube channel, Kim Kelley locked V4CR out of their social media accounts and changed the 2-factor authorization to a phone number controlled by her, making it impossible for V4CR to either take down the misleading information, access their accounts, or recover them.   Because they lacked access to the account, Kim Kelley's video remained on V4CR's YouTube account.  Kelley then provided the link to the video of herself to local reporter Phil Williams as "evidence" that she had done all the texting with Henry Dean Jordan, which conveniently contradicted the testimony that Det. Dorris had given earlier that morning.

161.     On the evening of May 28, 2024, Craig Sawyer emailed Kim Kelley, stating:

Hi Kim,

After a 2-hour discussion with you, trying to gain understanding of why you have been working with a known criminal and facilitating his bizarre attempt to "investigate" our org, even though our books are open public record, we were unable to get that honesty, or sincerity.

Instead of addressing our observations of your words and actions, you accused us of making accusations and fought us on every minute aspect of your behavior, even when we have video evidence of your behavior. Even with your painful betrayal, we were inclined to try to reach you and get you to see you've been led into a very precarious situation with many red flags on the legal front.

One day, you will see we were telling you the truth and were trying to save you from whatever you're headed into. But at the end of the day, you've chosen your own behavior. That is your prerogative. We each must choose our path. You have chosen yours, which is now obviously hostile to ours. We have an important org to run and a difficult mission to conduct.

Due to your refusal to address our concerns, You are no longer trusted by our team. Your contract services here will no longer be needed, even though we all genuinely celebrated your contributions while you were here.

We do ask that you cooperate with our people as we make some adjustments to our online services for turnover, in good faith.

We will have nothing negative to say about you and genuinely wish you well. In addition, we will continue to aggressively defend our org & mission from defamation by all comers where needed.

Go be well. I pray that you continue to grow, learn, heal and thrive.

Craig "Sawman" Sawyer
Founder, Veterans For Child Rescue

162.    On the morning of Wednesday, May 29, 2024, Kim Kelley responded to Sawyer and denied the accusations made against her, asserting that she had dedicated two hours during the Zoom call to addressing the concerns and false allegations, even though she never presented any evidence to support her claims. Kelley maintained that her contract could be terminated with a 30-day written notice and outlined options for either continuing her team's work until June 28, 2024, or halting all activities, including publishing content and managing orders, with final payment due the week following the termination date. She stated she would help "streamline an easy turnover process" of and that this would take place over the course of the next 30 days. However, Kelley's denials were later proven false through her own subsequent interviews and statements from Phil Drake, who confirmed that Kelley was deliberately sabotaging the Millersville sting operation under the guise of conducting an unsanctioned "investigation" of their competitor, V4CR. As Drake stated

in his interview with Heartland Journal Podcast, Kim Kelley went in to "take those bastards out."

163.         Additionally, Kelley was found to be untruthful regarding the 30-day cancellation clause in the V4CR contract; when requested to provide a signed copy of the contract containing this clause, she failed to produce it within the email chain, further discrediting her claims and demonstrating intentional fabrication of evidence to mislead and manipulate the situation. She nonetheless asked if V4CR had any reason to not fulfill their side of the agreement, despite not producing a signed copy of it.

164.         On May 30, 2024, Craig Sawyer wrote to Kim Kelley, characterizing her hostile actions to lock V4CR out of their social media accounts and withhold their property as "attempted extortion":

"Hi Kim,

Under normal circumstances, no, there would be no reason we would ever withhold any compensation. However, under a hostile attack from an outside entity attempting to hold our property hostage, or to actively bring harm to our mission for children, we reserve the right to handle the situation as our legal team advises. Since I trust you're not attempting to hold our property hostage in such an attempted extortion scenario, I trust that's not even an issue we need to further discuss.

So, as you turn over our property (social media accounts) in good faith, as agreed, we will all be free to continue the separation process amicably.

**Craig "Sawman" Sawyer**
**Founder, Veterans For Child Rescue"**

165.         Despite the fact that Sawyer never acknowledged the validity of the 30-day clause, Kim Kelley disingenuously replied to him, stating that she was going to still demand final payment 30 days out:

"1. Ok, great. Since there's no hostile attack or attempt to hold your property hostage on my end 😄 I'm going to confirm that you're agreeing to honor the termination process and the final payment will be due the week after June 28.
If any of that is incorrect, please clarify in your next email.

2. My expense invoice was approved and processed by Forrest :D thank you!

3. Following up on this important question, since I have still not received a response:
**Would you like Grow Online to continue our regular work until June 28th, or would you like us to halt further work and go ahead and send the final invoice, and complete a smooth turnover process?**
Please advise so we have a clear, written agreement on our next steps to wrap up this contract.

THANKS

Kim Kelley"

166.     In fact, no expense invoice had been approved by V4CR, and Kim Kelley charged several thousand dollars to a V4CR credit card without permission.   Moreover, V4CR remained locked out of their social media accounts for many months and, upon information and belief, have still not recovered access to several of them as of the time of filing this lawsuit.

*Plaintiffs' Investigations Reveal a Nexus of Corruption, Voter Fraud, Mortgage Fraud, and Money Laundering.*

167.      Det. Candler continued working on other investigations after the pedophile sting. As part of these investigations, he submitted numerous Open Records Requests to Sumner County Government.

168.     In June of 2024, Det. Candler submitted a Public Records Act request for numerous individuals including several individuals who were Commissioners at the time.   The purpose of the request was to obtain records that Candler already knew existed, but that had been produced as part of a complaint in a different administrative proceeding.   Thus, Candler was merely trying to authenticate documents he already had in his possession.

Some of the records included emails and requests for other documents from the Sumner County Election Commission.

169.     On June 12, 2024, Det. Candler attended a training conducted by the FBI about open-source intelligence.  During breaks in the training, Candler discussed the issues that were occurring in Millersville, and the FBI agents stated they believed there was clear evidence of public corruption and that they would send an analyst down to discuss the case with him.

170.     On June 18, 2024, Det. Candler emailed the FBI to connect with an agent in Nashville, and ultimately set up a meeting with them on June 25, 2024.

***Det. Candler Attempts to Obtain a Judicial Subpoena for Public Records.***

171.     Concerned that his Public Records requests might be arbitrarily denied or that he might be provided incomplete information, on June 18, 2024, Det. Candler dropped off an application for a judicial subpoena to Judge Joe Thompson's judicial assistant. She emailed him back stating that she needed additional information.  Det. Candler responded, and sent the Judicial Subpoena via email.

172.     On June 20, 2024, Detective Candler returned to Sumner County Circuit Court, and met Judge Joe Thompson again. Instead of meeting Judge Thompson in chambers, the Sheriffs' deputy directed Candler to the courtroom, stating that Judge Thompson was waiting on him in the courtroom.

173.     Upon entering the courtroom, Judge Thompson initiated the official recording of the session by pressing the record button, signaling the start of the proceedings. He addressed Detective Candler directly, stating for him to come up, and that his subpoena needed a "clear and concise nexus."  Candler responded by specifying his request for

emails and other public records. Judge Thompson reviewed the subpoena, highlighting specific sections and making annotations directly on the document.

174.    As the discussion progressed, Judge Thompson identified the individuals listed in the subpoena, stating, "I know these people. They are on the Sumner County Election Commission. And these three are lawyers." He claimed that the records would be protected by "attorney-client privilege," asserting, "You know these are lawyers. This is protected by attorney-client privilege." Detective Candler clarified, "No sir, I'm not requesting that information; these are public records."

175.    The courtroom tension heightened when Judge Thompson inquired about Candler's sources, asking, "Who is your confidential source? Who is the complainant?" Candler referenced a Bureau of Ethics Complaint filed by a Millersville resident against a Commissioner. In response to further probing from the Court, Candler stated that Shawn Taylor had provided him with some information for him to either use or discard. Of course, Shawn Taylor's role as Asst. Chief of Police was to assist the detectives with any technical research and computerized intelligence gathering for anything that might be relevant or related to the cases being investigated by the City's detectives, but Taylor was otherwise uninvolved and let the detectives conduct their investigations how they saw fit.

176.    Judge Thompson expressed concern over the direction of the investigation, stating, "Your bosses are putting you in a predicament. You shouldn't be investigating this. It should be handled by a third party" In response, Candler stated that he had reached out to a third-party—the FBI. However, Judge Thompson stated that the FBI "did not have jurisdiction."

177.     Judge Thompson dismissed the legitimacy of the subpoena. The judge reiterated his belief, without evidence, that Candler had been put in a predicament by his superiors and concluded the session by denying the subpoena. Notably, instead of returning the subpoena, Judge Thompson retained it, made additional annotations, and informed Candler, "You're not allowed to talk about this."

178.     Subsequent actions raised serious concerns about Judge Thompson's impartiality. Detective Candler wrote a statement to document what occurred on the same day, but was later seized by the TBI on September 4, 2024, along with all three copies of the statement and the laptop upon which it was typed. Additionally, the City of Millersville's request for the hearing's recording has been denied, pending further proceedings. Analysis of the TBI's Operation Plan "notes," inadvertently left behind after search warrants signed by Judge Thompson were executed, revealed references to "attempted subpoenas" as part of alleged "official misconduct"—claims that appear unfounded.

179.     Further suspicions arose when it was discovered that Judge Thompson retained the "attempted subpoena" and provided it, along with the hearing's recording, to the TBI. This action suggests a breach of judicial neutrality, especially considering Judge Thompson's role in authorizing search warrants for both Millersville City Hall and Shawn Taylor's residence. The confluence of these actions by Judge Thompson raises questions about the validity of the search warrants because a Judge that acts as an investigator that provides evidence to the prosecution cannot be considered a "neutral and detached magistrate" under well-established Fourth Amendment Jurisprudence. These actions further cast doubt on the integrity of the legal proceedings and the motivations behind the TBI's subsequent actions in Millersville.

180.     On June 25, 2024, Det. Candler and Det. Dorris met with FBI special agents, bringing binders with evidence of their criminal investigations. They discussed the cases, but did not hear back from the FBI before the TBI "raid" took place. The TBI seized all of the folders that Detectives Candler and Dorris had taken to the FBI.

181.     On July 12, 2024, Det. Candler obtained a search warrant for Henry Dean Jordan's phone. During the search of the phone photographs were taken of the suspect's ID/Handle from the main phone log. Candler confirmed that the ID, WhatsApp, and MocoSpace messages all matched the items Id/handles/and apps as show on the law enforcement phone on 05/17/24 during the communication and arrest of the suspect. Detective Candler matched the messages and phone logs from Henry Dean Jordan's phone to the phone used by law enforcement on the night of 05/17/24. The logs showed matches on MocoSpace, Phone Logs and text messages. All electronic and documents from the phone were saved to a thumb drive for evidence and placed in the Millersville Evidence section by Det. Candler for storage and safe keeping.

***Defendants Phil Williams, NewsChannel 5, Levi Ismail and News Affiliates Begin Publishing False and Defamatory Stories About Plaintiffs Todd Dorris and Michael Candler and Falsely Associating them with Known Hate Groups.***

182.     Although Defendants Phil Williams and the NewsChannel 5 Defendants had been publishing false and defamatory stories about Millersville's Assistant Chief Shawn Taylor, Bryan Morris, and other Millersville officials since the Spring of 2024, these Defendants turned their sights toward Plaintiffs Todd Dorris and Michael Candler on July 15, 2025,

when they published an article titled: " 'Disturbing' recordings from inside child-predator sting shows police, MAGA operatives ignoring laws."[3]

183.    The "secret recordings" were taken by Kim Kelley during the May 17-19, 2024 child predator sting and provided to Phil Williams/NewsChannel 5 at some point thereafter.

184.    Phil Williams and the NewsChannel 5 Defendants published the July 15, 2024 article within their series called "Hate Comes to Main Street," despite the Defendants' actual knowledge that neither Todd Dorris, Michael Candler, Shawn Taylor, Bryan Morris, or any other Millersville official in the 2024 administration had any affiliation with the KKK, Neo-Nazis, or any hate group.   Phil Williams and the NewsChannel 5 Defendants had no evidence whatsoever of any such affiliation, yet they intentionally posted and reposted the article and numerous other stories of and concerning Plaintiffs under both the "Hate Comes to Main Street" series and then again in the "Confronting Hate" series.  The Defendants' false attribution of the Plaintiffs as having membership in a hate group and/or racist group is defamatory because it holds the Plaintiffs up to public hatred, contempt, or ridicule, and likewise imputes negative attributes and criminal behavior to them.

185.    The "*Hate Comes to Mainstreet*" series purported to reveal an "investigative discovery" that hate-based extremists had infiltrated Millersville's police department and City Hall. Throughout the broadcasts Williams repeatedly identified, associated, and unmistakably implied that Plaintiffs Michael Candler and Todd Dorris were "extremists" who had "brought hate to Millersville" and corrupted city resources for their own gain.

---

[3] The July 15, 2024 article was published at:   https://www.newschannel5.com/news/newschannel-5-investigates/franklin-politics/disturbing-recordings-from-inside-child-predator-sting-shows-police-maga-operatives-ignoring-laws

Each of those statements and implications was false, defamatory per se, and published to a statewide audience and republished by Scripps media to nationwide audiences.

186.      Critically, Phil Williams engages in a deceptive framing technique of claiming that Millersville was "controlled by a three-member majority backed by the far-right group Sumner County Constitutional Republicans." This was, in fact false, as neither Tommy Long, Milton Dorris, or Alisa Huling were members of SCCR. Phil Williams and the NewsChannel 5 Defendants clearly targeted Todd Dorris and Michael Candler because of their belief that Dorris and Candler were "MAGA extremists," or that they were affiliated with the SCCR, which Williams and NewsChannel 5 repeatedly branded, without any evidence, as a "far-right extremist group."

187.      Although Candler and Dorris were targeted based on the belief that they held certain political views, neither Candler nor Dorris were actually members of the SCCR.

188.      The headline of the July 15, 2024 article is factually false and defamatory, as Plaintiffs not only did not "ignore laws," they had specifically researched the law and had even obtained an opinion from the Robertson County DA about exactly what he wanted them to do. Everyone involved in the Millersville predator sting had been briefed on the law and was aware that Millersville detectives were to handle the actual solicitations with any suspects, and that volunteers could only filter through the messages on their phones and, if the conversation was steering toward a potential solicitation with a suspect (i.e., the chat was becoming sexually explicit after the decoy profiles stated they were underage), any phones that were being monitored by volunteers had to immediately be handed over to the detectives so that one or more solicitations, as defined by Tennessee law, could be obtained.

a. Prior to the child predator sting, Capt. Todd Dorris had confirmed with Robertson County District Attorney Robert Nash how he wanted the evidence to be obtained. Detectives/law enforcement had to handle the actual communications involving the solicitations with suspects.

b. Volunteers were allowed to monitor phones and handle any preliminary "chatting" with persons who interacted with the decoy profiles to weed out potential suspects who might solicit a minor from persons who were not interested in interacting with the decoy profile after they had been lead to believe that it was an underage girl.

c. Upon information and belief, Kim Kelley recorded these briefings about law enforcement handling the solicitations and provided them to Phil Williams and the NewsChannel 5 Defendants. Therefore Phil Williams and the NewsChannel 5 Defendants had actual knowledge that their statements and false implications that V4CR volunteers had handled the solicitations and that prosecutors had stated that "the sting would only be legal if sworn law enforcement officers were the ones doing the work."

189. Both Kim Kelley and Phil Williams had no evidence of, and therefore knew, that any claims that Todd Dorris and Michael Candler were "MAGA operatives" were false, as Dorris and Candler never made any "MAGA" political statements, had been involved in any "MAGA" political podcasts. Kelley and Williams knew that Dorris and Candler were merely at the predator sting to perform their duties as detectives and attend what was supposed to be a live-training operation in how to handle these stings taught by the experienced V4CR group and its volunteers.

190.     Phil Williams and the NewsChannel 5 Defendants never even mention that V4CR and the other volunteers were there to provide training and support to Plaintiffs and a few other members of the Millersville Police Department.  The omission by Phil Williams and the NewsChannel 5 Defendants of the crucial fact that V4CR and its volunteers were invited to Millersville to provide training and operational support to the Millersville Police Department creates a false and defamatory implication for several powerful reasons, especially when viewed in light of the broader narrative presented in the July 2024 broadcasts.

191.     By selectively showing a "team photo" of the sting operation (incorrectly referring to it as "Operation Clean Sweep" instead of "Operation Mongoose") and stating that none of the five officers pictured had experience running child sex stings, the report deliberately implies that the operation was irresponsibly organized and carried out by amateurs—and more dangerously, by ideologically motivated extremists. This false impression would have been immediately corrected by disclosing the true purpose of the V4CR team's presence: to train and advise law enforcement in an area where they acknowledged needing support and guidance.

192.     In reality, the operation was structured such that Candler and Dorris would handle the law enforcement aspects—including communications with suspects—while V4CR provided support on decoy profiles, operational logistics, and tactical guidance. Failing to mention this professional structure falsely suggests that Millersville officers improperly outsourced or abdicated their responsibilities to civilians and then testified falsely about it subsequently, which is categorically untrue.

193.    Williams compounds the defamatory implication by mocking the V4CR team in the photo for being Republicans or "prayer warriors," and associating them with fringe ideologies like QAnon. Yet, without acknowledging that V4CR was brought in specifically for its training experience, this criticism is misleading and malicious. It implies that Millersville PD deliberately aligned itself with a political agenda when in fact it was participating *in a law enforcement training initiative*, not a political campaign. By omitting this fact, the broadcast fabricates a narrative of political extremism and lawlessness that is unsupported by the truth.

194.    Journalistic ethics require reporters not to present facts in a manner that knowingly leads to false inferences. Here, the failure to mention the training purpose of V4CR—while simultaneously portraying Plaintiffs as untrained and the volunteers as right-wing zealots—weaponizes the omission to create a defamatory caricature: that Det. Candler and Det. Dorris were participating in the child-predator sting not in furtherance of their actual job duties, but as part of a rogue, ideologically driven group of MAGA conspiracy theorists operating outside the law. This portrayal was not only false—it was constructed through the strategic omission of material facts that Williams and the NewsChannel 5 Defendants either knew or should have known.

195.    Kim Kelley would later admit that they V4CR had asked her to go to Nashville to train the MPD on a different podcast. Thus, the information was either known to Phil Williams and the NewsChannel 5 Defendants or was knowingly or recklessly disregarded by them.

196.    The July 15, 2024 article also has a tagline or sub-heading that stated, "Recordings show police discussing luring predator suspect to a jurisdiction where he may not leave the

jail alive." This sub-heading is also factually false and defamatory, as no police officer ever discussed luring any suspect to a jurisdiction where he would "not leave the jail alive." This false statement and false impression was fabricated by Phil Williams and the NewsChannel 5 Defendants in conjunction with the selective presentation of isolated clips of a video recording from Defendants Kim Kelley and Phil Drake. Phil Williams and the NewsChannel 5 Defendants have never presented the full recording which shows the conversation and events leading up to Det. Candler speaking with Kim Kelley and Aspen Sawyer that morning during the sting.

197.     At some point in January of 2025, Phil Williams and the NewsChannel 5 Defendants posted a longer clip of the Kim Kelley/Michael Candler video they claim is "evidence" of Candler "discussing luring a predator suspect to a jurisdiction where he may not leave the jail alive." However, this longer clip of the edited "secret recording" only proves the falsity of the NewsChannel 5 Defendants' allegations. First, Kim Kelley or Phil Williams edited the video to mid-conversation, when the unedited video would show that *Kim Kelley* was the one who had initiated the conversation with Michael Candler about the Henry Dean Jordan arrest. Another volunteer for V4CR, Aspen Sawyer, is heard in this video talking with Candler and Kim Kelley.

198.     Kim Kelley, the NewsChannel 5 Defendants and Phil Williams knowingly published false and defamatory implications concerning Plaintiff Michael Candler in the July 15, 2024 article titled "Secret recordings from inside child predator sting show police ignoring laws," falsely claiming that Candler "boasted that the suspect was being taken to a jail where it was likely that he might not come out alive," thereby implying that Plaintiff Candler conspired to bring a suspect to a jurisdiction to be murdered or harmed in custody.

199.     In truth, as shown by the full, unedited audio recordings in which eyewitness Aspen Sawyer can be heard, Plaintiff Candler's statements were not a threat or boast, but a reference to the fact that defendant Henry Dean Jordan would likely be held without bond, prosecuted for his solicitation in this case, have his DNA uploaded to the national database, have his phone searched where evidence of other child victims would be apparent and in which he would be charged, and that Jordan would face a lengthy prison sentence due to the severity of his charges.  In the full recording, Det. Candler can clearly be saying the suspect was unlikely to get any bond or any parole.

200.     In fact, it was Kim Kelley, not Michael Candler, who said Jordan would be going to jail with people that Jordan "may not survive with" and that she is the one "who would like that."

201.     In fact, it was Phil Williams, not Michael Candler, who said that Henry Dean Jordan would be taken to a jurisdiction where he would not come out alive.

202.     Williams and the NewsChannel 5 Defendants, through their agent/employee Nick Leonardo, then begged the TBI to come in and investigate what was meant by these statements even though they were not made by Det. Candler and the full recordings show that Candler is talking about prosecuting Jordan for crimes that would keep him behind bars for up to two decades or more.

203.     Candler never stated or implied that Henry Dean Jordan would be harmed or killed in jail, nor did he participate in or suggest any plan to "lure" Jordan to a specific jurisdiction to cause such harm.   Jordan responded to a decoy profile and travelled to Millersville.  He was never "lured" by anyone.  Defendants took Candler's statements out of context to create

the false and outrageous implication that he planned or condoned vigilante justice or extrajudicial violence.

204.    Plaintiff Michael Candler's comment that suspect Henry Dean Jordan "might come up missing in the jail" has been deliberately mischaracterized by Defendants to falsely suggest that he was advocating or predicting the suspect's murder while in custody. However, the full context of the statement—as well as Candler's immediate clarification— makes clear that this was not a reference to violence or death.

205.    Candler's remark was followed without pause by:

    a.    "That's a Robertson County thing that we've given up. Robertson, Murray, Hickman, Monroe and Giles. You're not coming out of the jail."

206.    This clarification shifts the meaning from any suggestion of harm to a well-understood local colloquialism—that certain Tennessee counties have strict pretrial detention and sentencing practices. In this context, Candler was plainly referencing the likelihood that Jordan, given the serious nature of the child exploitation charges, would be held without bond, denied pretrial release, and potentially incarcerated long-term or for life due to the legal consequences of his crimes.

207.    Importantly, the statement is not made in isolation. In preceding and surrounding discussion, Candler and others—including Aspen Sawyer—were discussing how Jordan had ridden a bicycle from Nashville to Millersville, how his DNA would now be in CODIS (the national database), and how additional victims could come forward as a result of his arrest. The overarching tone was one of legal certainty, not violent intent.

208.    Moreover, Candler did not initiate nor endorse Kelley's comment "Yeah I agree I would like that," and instead immediately continued with a general commentary about jail

outcomes in specific counties, not about this specific suspect, and certainly not about orchestrating any harm.

209. The implication by Defendants that Candler was advocating extrajudicial punishment or death is reckless, defamatory, and flatly contradicted by the context of the conversation, the surrounding facts, and the consistent statements of eyewitnesses who were present for the sting operation and recordings, including Aspen Sawyer.

210. In sum, Candler's statement was a colloquial expression regarding pretrial detention and the seriousness of the charges, not a reference to any harm befalling the suspect in a jail or prison operated by an entirely different agency unrelated to the City of Millersville. Any contrary interpretation is false, misleading, and defamatory.

211. According to Aspen Sawyer, the AI-generated image used in the "Angel" profile was derived from Kelley's photo, but Kelley was not involved in the texting or solicitation of Jordan. Rather, it was Detectives Candler and Dorris who handled all communication with Jordan, and Sawyer herself performed the voice on a call made by Jordan to confirm the identity of "Angel."

212. The joke that Jordan had been "coming for you, Angel," referenced by Aspen Sawyer in the secret recording, was a light-hearted acknowledgment of the fact that the AI image used to lure Jordan was based on Kelley's likeness—not that Kelley had any operative role, had personally communicated with Jordan prior to the solicitation, or had handled the solicitation with Jordan.

213. Despite this, NewsChannel 5 falsely characterized the video as showing Candler and Kelley "discussing Kelley's role as the decoy in that case," when the full context

reveals that both Candler and Sawyer were simply joking with Kelley about her AI-modified likeness being used, not attributing operational responsibility to her.

214.     Defendants published these false statements with actual malice or reckless disregard for the truth, as Sawyer, who was present and participated in the operation, directly refuted Kelley's claims and confirmed that Candler never made threats or exaggerated statements about Jordan's safety or jurisdictional manipulation.

215.     Moreover, there is no evidence that Candler or any officer involved "lured" Jordan to a specific jurisdiction. Jordan responded to a decoy profile and voluntarily rode his bicycle to Millersville. The assertion that officers manipulated jurisdiction for harm is a fabrication by Defendants.

216.     Defendants' publication also omitted Sawyer's statements and other exculpatory context that was known or easily accessible to them, thereby reinforcing the narrative that Candler was reckless or dangerous when the facts demonstrate the opposite.

217.     These publications interfered with the Plaintiffs' business relationships and at-will employment, caused Plaintiffs reputational harm, professional setbacks, emotional distress, and contributed to the constructive discharge of Todd Dorris, who was removed from his police duties and forced out after the defamatory stories aired.

218.     Defendants Phil Williams and WTVF/NewsChannel 5 breached the core tenets of ethical journalism by deliberately excluding exculpatory and materially mitigating facts from their reporting on the Millersville child-predator sting, including statements made by the City of Millersville and Police Chief Bryan Morris at a public meeting-statements which Williams and his crew filmed but never aired.

219.     These excluded facts included clarifying responses that:

a. Assistant Chief Shawn Taylor was not involved in the operational communications at the Chatter House;

b. Anticipatory search warrants were not used, and in fact are lawful under decades of Tennessee jurisprudence;

c. All suspect communications that crossed into criminal solicitation were conducted by law enforcement officers, whose "fingers were on the keyboards" during the solicitation, in full compliance with the direction of the Robertson County DA's instructions and Tennessee law, including T.C.A. § 39-13-528;

d. Statements about the suspect not leaving jail were clearly understood by all participants to reference lack of bond, not death threats or physical harm;

e. No information obtained from search warrants was shared with private parties, and the supposed "data sharing" claimed by a V4CR volunteer never occurred, and there is no recording or any other evidence that Det. Candler or Det. Dorris ever agreed to do so; and

f. Henry Dean Jordan was never even questioned by Det. Candler or the Millersville Police Department because they did not need to interrogate him, and he certainly never "refused to be questioned" whereupon he was "turned over" to a private group for questioning.

220.     Despite having access to these facts – and in many cases, recordings of them – the Defendants chose instead to publish a sensationalized and defamatory narrative that misrepresented the Plaintiffs as political extremists and rogue police officers who had entrapped and "lured" an unsuspecting "victim" into a jurisdiction where he would be killed in jail.

221.     This calculated omission of truth was defamation by implication and also constituted violations of the SPJ Code of Ethics, which requires journalists to:

   a. Take responsibility for the accuracy of their work. Verify information before releasing it" and "Provide context. Take special care not to misrepresent or oversimplify in promoting, previewing or summarizing a story";

   b. Never deliberately distort facts or context, including visual information";

   c. Disclose unavoidable conflicts of interest" and "expose unethical conduct in journalism, including within their organizations."

222.     In further breach of the Code, Defendants failed to disclose that attorney Nick Leonardo, presented as an objective legal analyst, was in fact the former personal attorney of disgraced Police Chief Dustin Carr, who was central to the "Imposter Police" scandal in 2022-2023 and who had abruptly resigned after releasing a lewd photograph of himself holding his genitals while in uniform at Millersville City Hall.  Leonardo and attorneys from Neal & Harwell, who also represent Phil Williams and WTVF, attempted to secure a monetary settlement for Carr from the City of Millersville related to this misconduct. These facts and this obvious conflict of interest were never disclosed in any NewsChannel 5 broadcast or article.  In the article, Leonardo also attributes the prior misdeeds taking place under his client Dustin Carr's administration to Plaintiffs.  Phil Williams asks him, "From what you've heard in these recordings is this a police department that's out of control?" Leonardo responds, "It sounds to me like it's a police department that never had control. This is jeopardizing the safety of the citizens of the City of Millersville and something needs to be done."  Curiously, the TBI never appears to have actually investigated Leonardo's client Dustin Carr for his role in printing illegal Police Commission cards

pursuant to an obvious kick-back scheme with security firm Solaren Risk Management. Nor does it appear that they have investigated any of the officers involved in the "Imposter Police" police commission card scandal such as Glen Alred, Jack Byrd, former Fire Chief Brandon Head, Commissioner David Gregory.

223.    Leonardo and his principle/employer NewsChannel 5 had an undisclosed interest and underlying motive to attack the 2024 Administration that had put a stop to "Imposter Police" Commission Card scandal. Leonardo's personal and professional bias rendered him an interested party, not an impartial analyst. Yet his inflammatory quote, "This is the most disturbing video I've ever been asked to comment on," was broadcast by Williams without caveat or disclosure of Leonardo's ongoing conflict, thus deceiving the public and compounding the defamatory harm.

224.    Further exacerbating the appearance of a coordinated effort to malign the Plaintiffs and discredit the sting, WTVF published stories featuring TBI Agent James Scarbro, who is best friends with Dustin Carr and who appeared on-site during the September 4, 2024 TBI raid orchestrated at Williams' prompting. Scarbro had also previously "investigated" the shooting of Shawn Taylor's home-a case that NewsChannel 5 continues to report as "ongoing" with no evidence of progress or arrest.

225.    By failing to disclose these overlapping personal, legal, and political relationships between Leonardo, Carr, TBI Agent Scarbro, and the news production team at WTVF and its counsel at Neal & Harwell,  the Defendants presented the illusion of neutral journalism while instead coordinating and fabricating a politically motivated character assassination.

226.    The omissions and editorial decisions described above were not innocent mistakes but intentional fabrications of context, designed to damage Plaintiffs' reputations and

further Defendants' false narrative that the Millersville Police Department was a lawless, conspiracy-driven agency.

227.    These actions meet the standard for actual malice under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), as Defendants either knew the statements were false or acted with reckless disregard for their truth or falsity.    However, because the Defendants fabricated the very "public controversy" they claimed to be reporting upon, they cannot claim any privilege based on reporting on a matter of public concern.

228.    Defendants' breaches of the SPJ Code of Ethics, including their failure to "provide context," "verify information," "disclose conflicts of interest," and "avoid deliberate distortion," are not just ethical failures-they are central evidence of knowing falsity and defamatory intent.

229.    The NewsChannel 5 Defendants then continued begging the TBI to investigate the Millersville Police Department on the video broadcast between anchors Rhori Johnston, Amy Watson, and Phil Williams.    This is known as a "scripted anchor handoff," or a "choreographed commentary segment," which functions as editorial framing disguised as neutral reporting.

230.    Employees of the NewsChannel 5 Defendants Rhori Johnston, Amy Watson, and Phil Williams engaged in a coordinated editorial exchange masquerading as objective reporting, in which the anchors acted as on-air surrogates to reinforce and echo Williams' unsubstantiated conclusions. In this scripted segment:

  a.    Anchor Rhori Johnston echoes inflammatory language and frames the operation as lawless: "you know, Nick Leonardo referenced this but you have some sick,

dangerous people, real predators, who most people would agree need to be behind bars," "but that won't happen if you're not following the law";

 b. Phil Williams agrees and states, "yeah, if you want to enforce the law you have to follow the law;"

 c. Anchor Amy Watson states, "It really is that simple," and then calls for state intervention, stating, "we'll be watching to see if anybody who can do that takes action"-a clear signal urging the TBI or other law enforcement to intervene;

 d. Phil Williams responds, "Absolutely," endorsing the anchor's editorial commentary as if it were objective truth.

231. These choreographed exchanges serve not as neutral journalism but as editorial propaganda, in which the Defendants, who have been in close communication with agents working for the TBI already, collectively beg state agencies to take action against Plaintiffs based on their own distorted reporting.

232. Such conduct violates the Society of Professional Journalists' (SPJ) Code of Ethics, which requires reporters to "distinguish news from advocacy and commentary" and to "never deliberately distort facts or context." The scripted nature of the exchange falsely imbues Williams' disputed claims with the aura of institutional credibility, while hiding the editorial motives and conflicts of interest that underlie the coverage.

233. The first page of the July 15, 2024 article contains a video with a thumbnail of a picture taken by Shawn Taylor inside his garage and posted to his friends on his personal Facebook account on April 25, 2024 and involved a meeting that had nothing to do with discussing the child predator sting. Stated beneath the thumbnail was the statement: "What happens when you give people with bizarre conspiracy theories a gun and a badge? Secret

recordings from inside the troubled Millersville Police Department provide a sobering answer." This label, which was repeated in the body of the article again, was intended by the NewsChannel 5 defendants to falsely attribute beliefs in "conspiracy theories" and involvement in the Millersville child predator sting to the individuals pictured in the photo, even though the NewsChannel 5 Defendants had other photos, including the "Team Mongoose" photo showing that the none of the people in that photo other than Shawn Taylor were in the "Team Mongoose" photo. Moreover, the photo was posted to Shawn Taylor's personal page and did not "tag" or reveal the name or identities of anybody involved in that meeting.

234.     In the video broadcast, the NewsChannel 5 anchor Rhori Johnston, reading a script prepared by Phil Williams and the NewsChannel 5 Defendants, amplifies the false claims in the long-form article, stating, "What happens when you give a gun and a badge *to people that believe in <u>and share</u> bizarre conspiracy theories*?" Thus, the NewsChannel 5 Defendants expressly and falsely attribute, without any evidence, that Plaintiffs Todd Dorris and Michael Candler were somehow affiliated with the political podcasts/ videos that Shawn Taylor had appeared on 18 months to more than two years before Taylor became a Millersville police officer.

235.     In the broadcast, Phil Williams falsely states, "But this Millersville operation appears to have been flawed from the very beginning." To achieve this false impression, Phil Williams and Kim Kelley omit the dates of recorded calls and only present isolated clips of the recordings taken by Kelley.

236.     The July 15, 2022 article contains the additional false and defamatory statement that "in their zeal to make some big cases, Millersville's conspiracy-minded cops may have

crossed the line of what's legal." This statement, echoed by Amy Watson in the video broadcast, expressly attributes to Plaintiffs Todd Dorris and Michael Candler false accusations that they are "conspiracy-minded cops" that have broken the law.

237.     Phil Williams and Levi Ismail re-posted the story to Twitter and other social media platforms.

238.     According to his LinkedIn profile, Phil Williams' is a member of the Society of Professional Journalists, which has an established Code of Ethics for journalists, a copy of which is attached hereto as **Exhibit B**.

239.     Phil Williams violated the SPJ Code of Ethics in numerous ways. By attaching the "hate group" labels to Michael Candler and Todd Dorris without any factual support, even though all public records show that Candler and Dorris are veteran officers without any ties to extremist convictions, Phil Williams not only knowingly published false and defamatory information about Plaintiffs, he also violated numerous provisions of the SPJ Code of Ethics.

240.     Phil Williams and the NewsChannel 5 Defendants subsequently attempted to rebrand the July 15, 2024 article and others within the Millersville episodes in a sub-series titled "QAnon Comes to Main Street." This rebranding, done after the fact, is equally false and defamatory of Plaintiffs, as Phil Williams and the NewsChannel 5 Defendants had absolutely no evidence that Michael Candler or Todd Dorris had ever endorsed QAnon.

241.     Despite having no evidence whatsoever, the NewsChannel 5 Defendants knowingly and falsely attributed to Plaintiffs an extremist ideology, including by characterizing them as "MAGA Operatives," "QAnon Conspiracy theorists," and as members of the "Sumner County Constitutional Republicans," which the NewsChannel 5 Defendants brand an

"extremist group" without any evidence whatsoever of any ties to any extremist ideology or affiliation with any hate group.

242.    The July 15, 2024 article was "updated" on July 16, 2024, and then was re-posted by Phil Williams and the NewsChannel 5 defendants with a link under each and every attack piece involving Millersville up through at least January of 2025.

243.    In addition, articles about Plaintiffs also were found nestled as "Related Stories" to each and every one of the Phil Williams/NewsChannel 5 stories on Neo-Nazis, KKK members, and other stories dealing with actual hate groups. Each one of these articles that was reposted by these Defendants with the intent to reach new audiences.

***Defamatory Article Published July 22, 2024 – "Did Millersville detective commit perjury about child-predator investigation?  Here's the evidence."***

244.    On July 19, 2024, Phil Williams posted another teaser on Twitter, stating "Did a Millersville, TN police officer commit PERJURY with his testimony about a child-predator sting?  The explosive new story – with evidence – airs Monday on @NC5 at 6!"

245.    The article was published on July 22, 2024,[4] and Phil Williams claimed that Detective Dorris had committed perjury, and on July 23, 2024, the TBI informed Williams that they were opening an investigation based of the purported perjury.

246.    All of the "evidence" posted in the Channel 5 came from short clips of the alleged secret recordings taken by Kim Kelley, which Defendant Phil Drake claims to have provided to Phil Williams.  Either Kim Kelley or the Channel 5 Media Defendants selectively edited those recordings to fabricate the allegation that Det. Doris committed "perjury" about the pedophile sting.  Phil Williams and the NewsChannel 5 Defendants did

---

[4] The article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/did-millersville-detective-commit-perjury-about-child-predator-investigation-heres-the-evidence

a voiceover and have edited a recording of Todd Dorris specifically to create the false impression that he was instructing Kim Kelley to handle the solicitations with suspects.

247.    The article sensationalizes Williams' unsubstantiated claim that Detective Todd Dorris "lied under oath." No court has found Dorris's testimony false; Kelley's heavily edited snippets—supplemented by Phil Williams' own voice-overs covering up at least half of what Det. Dorris was saying—do not demonstrate perjury, and the article omits that Dorris's sworn statements align with the official protocols approved by Taylor and the DA's office, which were briefed to Kim Kelley and all other volunteers. Upon information and belief, Kim Kelley provided the recording of the briefing to the Channel 5 Media Defendants, which conclusively proves that Taylor gave clear and accurate statements regarding what the DA requested.

248.    Phil Williams and the NewsChannel 5 Defendants even went so far as to falsify some of the purported "evidence" in their July 22, 2024 article and video broadcast.

249.    Defendants Phil Williams and NewsChannel 5 falsely asserted that their proof did not merely rely on Kim Kelley's word, but that the "secret recordings" from inside the sting operation confirmed that Kelley was the individual texting with the child predator suspect, Henry Dean Jordan. In a deliberate act of "evidence laundering," Williams and the NewsChannel 5 Defendants – after claiming they had evidence via the secret recordings – then immediately aired a stock video of a woman's hand typing on a smartphone, implying to viewers that the footage depicted Kelley herself engaging in the solicitation communications with Henry Dean Jordan, when in fact she has absolutely no video actually showing her texting with Jordan:

 By: Phil Williams



NEWSCHANNEL 5 | INVESTIGATES

01:14 / 08:24 CTIVE COMMIT PERJURY?

In an explosive new development that could bring new trouble for the already-troubled Millersville Police Department, a key player in a child-predator sting says the lead detective on that operation lied under oath.

 By: Phil Williams



NEWSCHANNEL 5 | INVESTIGATES

01:20 / 08:24 CTIVE COMMIT PERJURY?

250.     Despite the deliberate selection and utilization of videos of text messaging being done with a woman's hand and long fingernails, at no point did the Defendants identify this footage as stock video or provide any disclaimer that it was not authentic documentation of the sting.

251.     This false visual representation is a classic example of Phil Williams' "evidence laundering" technique, whereby he creates the illusion of corroboration or documentary proof by presenting editorial conjecture or staged visual materials as if they were factual or contemporaneous evidence. The use of a stock image of a woman's hand to bolster the fabricated narrative that Kelley—not law enforcement—was operating the decoy phone is a calculated act of visual deception, one that misleads the viewing public and falsely portrays the operation as being conducted in violation of state law.

252.     This false depiction directly and defamatorily implicates Plaintiff Detective Todd Dorris. The underlying legal accusation—that Dorris committed perjury when he testified that law enforcement officers operated the decoy profiles—rests entirely on the false premise that Kelley sent the messages. By falsely asserting that there was corroborating video evidence of Kelley doing so, and presenting staged visuals to deceive viewers into believing the existence of such evidence, Defendants published a materially false narrative that accuses Detective Dorris of a felony and professional misconduct. This is defamation per se under Tennessee law, as it directly impugns his integrity, honesty, and fitness to serve as a law enforcement officer.

253.     The Defendants acted with actual malice or, at minimum, reckless disregard for the truth, as they knew or should have known that the video footage was not authentic, that no such footage of Kelley texting Jordan existed, and that multiple eyewitnesses—including

V4CR volunteer Aspen Sawyer—have confirmed that the detectives, not Kelley, conducted the incriminating communications with Jordan. The inclusion of stock video without disclosure was not accidental; it was part of a deliberate pattern of misrepresentation, used to fabricate evidence that never existed in order to falsely accuse Detective Dorris of perjury and misconduct.

254.	Of the 8 minutes and 20 seconds of the video broadcast associated with the July 22, 2024 Channel 5 Article there was only one minute and twenty seconds of video that actually showed Kim Kelley's "secret recordings" of the Millersville undercover sting, none of which actually showed Kim Kelley texting or messaging suspect Henry Dean Jordan.  The article and broadcast quote Kelley at length, and it therefore appears that the gravamen of the purported "evidence" of perjury is, once again, Kim Kelley's words backed up with little more than fabricated evidence, selective editing, and visual disinformation.

255.	Phil Williams played one part of Det. Dorris's testimony where he was asked who was entering information into the "App" – referring to the MocoSpace App – he testified, "I was."   Critically, the solicitations that were actually obtained were done via text message, not in the MocoSpace App.   Det. Dorris's testimony clearly explains that the reason they switched to text messaging was because MocoSpace had a filter that precluded underage people from using it, so the decoys could only disclose that they were 13 years old via text message.   Phil Williams omits the entire context of this testimony.

256.	Because Phil Williams lacked any evidence that Todd Dorris testified to "doing all the work," he resorted to one of his favorite tactics used to mischaracterize evidence:  using voiceover to tell his audience what the evidence shows without actually showing it.  Using

this voiceover technique, Williams falsely claims that the recordings showed that Dorris testified under oath that V4CR volunteers only provided advice during the entire sting and that Dorris testified that he and Det. Candler "did all the work" – referring to Dorris and Candler handled all of the communications with every individual on every phone for the entire sting operation. Williams' statements are a gross mischaracterization specifically designed to fabricate the false narrative that Dorris committed perjury.

257.    Three of the seconds-long video clips were sweeping panorama shots taken by Kelley of various people inside Shawn Taylor's barn, where the initial briefing took place on or about May 16, 2024. These shots obviously do not support Kelley or Williams' claims, but instead only serve to identify the persons who were present at the sting.

258.    There was one seven second video clip of Kim Kelley asking Todd Dorris, "I need to know what you'll need, so I can work up to that." Dorris responds to Kim Kelley with, "You know, as much as you can," but the audio of his full response is cut off. What can be heard is that Dorris states, "You know, as much as you can, *but the DA said that*…" – and at that point, Phil Williams' voiceover drowns out the rest of what Det. Dorris was saying, which was that "the DA said that" law enforcement had to do the typing for all of the actual *solicitations*. Det. Dorris repeated his instruction numerous times during the Millersville sting, which Defendants Kelley, Drake, Williams and the other NewsChannel 5 Media Defendants knew but failed to show in the clips that were published by Phil Williams and NewsChannel 5. "Chatting" and screening out potential suspects before a solicitation occurs is different from handling the solicitation, which Kim Kelley and Phil Williams knew but intentionally misrepresented.

259.     Although Kim Kelley and Phil Williams claim this video is proof of her "doing all
the work" in order to fabricate a contradiction with Det. Dorris's testimony, everybody
present knew that she was actually referring to what he needed her to do to "work up to the
solicitation," which was part of the assistance the V4CR volunteers were allowed to
provide, by filtering through suspects and to determine whether people had no interest in
communicating with the decoy profile when they revealed that their age was 12 to 13 years
old.

260.     Another four second clip of the "secret recordings" shows Kim Kelley's hand on
the grey phone, ostensibly to suggest she was typing something in a message. A subsequent
eight second clip shows a recording of what appears to be the same grey phone, but the
bottom of that phone appears to lack the text from a removable sticker that was left on the
back of the Ops Phones as follows:



261.    Two angles of the bottom of the grey phone used by Kelley in her "secret recording" do not appear to have the above text, which should still be visible through at least part of the bottom of the phone:



No white letters are visible in the space toward the bottom of this phone.



No white letters are visible in the space toward the bottom of this phone

262.     The video showed another eight second clip with a grey phone in Kim Kelley's hand, where she is heard on recording claiming that a suspect got away because a vehicle "had no siren."



263. Remarkably, the phone shown in the video appears a lighter shade of grey and does not appear to have any of the Ops Phones numbers written on the back, which should be located in the open space near where the "2" and the "1" are written on Ops Phone #2 and #1, as seen in the image below:



264.     Ops Phone #3 was used for the Henry Dean Jordan solicitation, so the phone should

have a "3" in the location where the "1" and "2" are located on the above phones.

***The Defendants Release and Publish Video of Michael Candler to Reveal His Identity.***

265.     There was a seven second clip that showed Det. Michael Candler talking to Kim

Kelley about Henry Dean Jordan pedaling his bicycle up I-65.  The video clip of Candler

serves no real purpose but to reveal Candler's identity, as his statement about Jordan

pedaling up the side of I-65 had no value and provided nothing relevant to any of the claims

that Det. Dorris had purportedly "perjured" himself.

266.     Defendant Phil Williams and the NewsChannel 5 Defendants were specifically

aware that Candler was an undercover officer and that his likeness, name, and employment

as a Millersville Police Officer could not be released.   Yet, Williams and the NewsChannel

5 Defendants were eager to do so with the specific goal of tortiously interfering with his

employment and rendering him unable to perform his duties as an undercover officer.

267.    The reason that Phil Williams and the NewsChannel 5 Defendants targeted Candler and Dorris was because of their belief that Candler and Dorris held certain political beliefs and political affiliations, including that they were "MAGA extremists," "MAGA operatives," or members of the "SCCR" which Williams and the NewsChannel 5 Defendants had branded as "far right extremists" without any evidence to support the claim at all.

268.    Thus, none of the video clips provided by Kelley and Drake to Channel 5 during that broadcast actual show Kim Kelley texting Henry Dean Jordan.   In fact, it was Kelley and Williams' fabrication of evidence and their false and defamatory communications that provided the basis for the false claim that Detectives Candler and Dorris were "ignoring the law" and that Dorris had "committed perjury."

***The Defendants Intentional Sabotage of the Millersville Pedophile Sting in Furtherance of Their Racketeering Influenced Corrupt Organization.***

269.    Unbeknownst to V4CR or the City of Millersville, Defendant Kim Kelley had been sent into Millersville as an "undercover" agent provocateur and saboteur at the direction of Defendant Phillip Drake.  Two days prior to the Millersville child predator sting, Phil Williams had contacted Shawn Taylor and left a message, falsely claiming he was investigating Taylor's "conspiracy theories" after Williams had uncovered that Taylor had done some investigative work for Gabrielle Hanson.   Taylor knew that Williams' claims were false, as Taylor had previously met with Levi Ismail and Phil Williams and provided evidence of public corruption and campaign finance fraud to Ismail and Williams nine months prior.    During the briefing of the V4CR volunteers and officers prior to

commencing the Millersville child predator sting, Shawn Taylor warned the volunteers and Kim Kelley that Phil Williams had called him.

270.    Upon information and belief, Kim Kelley and Phil Williams discussed interfering with the Millersville sting before the operation began.

***Defendants Defamatory July 23 2024 Publication – "TBI opens investigation of Millersville child-predator sting amid questions of possible perjury."***

271.    In the July 23, 2024 article,[5] Williams next reported that the Tennessee Bureau of Investigation ("TBI") had opened a criminal probe "following questions raised by NewsChannel 5" about the sting, stressing yet again that the operation was "brought into Millersville by the department's conspiracy-minded assistant police chief Shawn Taylor." Having intentionally edited the "secret recordings" and published them to fabricate evidence that Capt. Dorris had committed perjury, the Channel 5 Media Defendants expressly took credit for their intended and accomplished their defamation and their goal of coaxing the TBI into investigating the child predator sting, which they had been begging for during the commentary at the end of their televised broadcasts.

272.    The article repeats the false and defamatory statements that "Millersville Detective Todd Dorris testified that he and another officer did all the work. He claimed the nonprofit was only there to provide advice. But Kim Kelley… provided secret recordings showing that she and other colleagues were the ones posing as the minor." This statement falsely accuses Detective Dorris of perjury under oath, when in fact, multiple sources—including volunteers like Aspen Sawyer—have confirmed that law enforcement officers, not Kelley,

---

[5] The July 23, 2024 article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/franklin-politics/tbi-opens-investigation-of-millersville-child-predator-sting-amid-questions-of-possible-perjury

sent the texts constituting criminal solicitation. This is defamation *per se*, as it directly accuses Dorris of committing a felony and impugns his integrity as an officer.

273.    The article repeatedly references Assistant Chief Shawn Taylor's conspiracy theories and podcast appearances, and then immediately transitions into discussions of the sting operation and Dorris' alleged misconduct. This structure falsely implies that Dorris and Candler share Taylor's political views or conducted the sting based on QAnon-style conspiracies, even though neither Dorris nor Candler had any prior affiliation with V4CR before the operation and explicitly testified to following prosecutorial guidance. The Defendants therefore created a false light impression that damaged the Plaintiffs' professional reputations.

274.    The article omits the City's official response read aloud at a public meeting-which Williams and his crew recorded-that confirmed:

   a.    Officers' "fingers were on the keyboards" during solicitation communications.

   b.    Anticipatory search warrants were never used.

   c.    No suspect was turned over to private citizens for questioning.

275.    This omission violates the SPJ Code of Ethics and distorts the truth to frame Dorris and Candler as rogue and lawless officers.

276.    The article's placement of Dorris' photograph under the section titled "What happens when you give people with bizarre conspiracy theories a gun and a badge?" implies that Dorris is among such people and believes in "conspiracy theories," despite zero evidence that he ever engaged in or endorsed such conduct. This is defamation by juxtaposition, also constitutes false light invasion of privacy.

277.     The phrase, "Our investigation discovered [the recordings] do not match the detective's sworn testimony in the case", presents Kim Kelley's unverified and edited secret recordings as conclusive evidence, even though they were never authenticated and are contradicted by other eyewitnesses. This mischaracterization supports an inference of actual malice, as it proves Williams and NewsChannel 5 knowingly published false or misleading information.

278.     The article notes that "District Attorney General Robert Nash has asked the Tennessee Bureau of Investigation to look into… possible perjury by the lead detective"— a request that NewsChannel 5 provoked and promoted through its own manipulative reporting, which constitutes intentional interference with employment and reputational harm, compounded by the fact that the accusations rest on knowingly false narratives.

279.     In sum, Defendants Phil Williams and NewsChannel 5 July 23, 2024 article falsely and maliciously accused Plaintiff Detective Todd Dorris of committing perjury by selectively quoting edited recordings and falsely implying that civilian volunteers—not law enforcement—carried out the criminal solicitation of a child predator. Defendants presented unverified claims from a disgruntled volunteer as conclusive evidence, excluded exculpatory official statements, and falsely portrayed Dorris and fellow officer Michael Candler as political extremists operating under rogue ideology. These calculated misrepresentations were published with actual malice or reckless disregard for the truth, constituting defamation per se and false light, and causing severe reputational, emotional, and professional harm.

280.     Finally, the article, like all others, reposts hyperlinks to earlier defamatory articles, creating a new false public narrative and spreads it to new audiences. Williams uses

anchored hyperlinks, lengthy and biased descriptions, and repeated headlines to recirculate the Channel 5 Media Defendants' defamatory publications, compounding the reputational harm and prolonging public outrage based on knowingly false and selectively presented information.

***The Defendants July 29 2024 Defamatory Publication – "TBI expands investigation … looking into misuse of government data."***

281.     The July 29, 2024 article[6] contains additional false accusations of criminal misconduct of and concerning Plaintiffs, including the following:

"An exclusive NewsChannel 5 investigation revealed that members of a nonprofit group, Veterans for Child Rescue, posed online as a 12-year-old girl for the sting — despite a state law that requires sworn law enforcement officers to do the posing. Then, in a preliminary hearing in Robertson County… Millersville detective Todd Dorris testified under oath that he and another detective were the ones doing the online work."

282.     The July 29, 2024 article fabricates a legal conflict regarding law enforcement officers posing as minors that does not exist: namely that they have to handle every single communication with suspects when in fact the law only requires that law enforcement officers posing as minors handle the *solicitations*.  By falsely stating legal requirements that do not exist, Defendants intentionally implied that Dorris and Candler took part in an illegal child predator sting, which is defamation per se that imputes criminal conduct and professional misconduct to Det. Candler and Det. Dorris.

283.     The article refers to the "embattled Millersville Police Department," then refers to "secret recordings" that allegedly show officers "crossed the line of what's legal." This creates a sweeping implication that Candler and Dorris were participants in misconduct,

---

[6] The July 29, 2024 article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/franklin-politics/tbi-expands-investigation-of-millersville-police-looking-into-misuse-of-government-data

when in fact there is no evidence they did anything other than follow operational protocols discussed with the DA's office.

284. In the July 29, 2024 article, Defendants Phil Williams and WTVF/NewsChannel 5 published a story falsely accusing Plaintiff Detective Todd Dorris of committing perjury by suggesting that he lied under oath regarding who conducted the online communications in a child predator sting. The article falsely states that Tennessee law "requires sworn law enforcement officers to do the posing," and juxtaposes this with Dorris' sworn testimony, thereby accusing him of criminal misconduct. In addition, by referring to the police department as "embattled," implying illegal surveillance of political opponents, and using language such as "what happens when you give people with bizarre conspiracy theories a gun and a badge?" in connection with the operation, Defendants falsely portray Plaintiffs Dorris and Candler as ideologically driven, dishonest, and unfit for law enforcement. These false statements and misleading implications constitute defamation *per se*, and were made with actual malice or reckless disregard for the truth, causing reputational, professional, and emotional harm to the Plaintiffs.

285. Finally, this article, like all others, reposts hyperlinks to earlier defamatory articles, creating a new false public narrative and spreads it to new audiences. Williams uses anchored hyperlinks, lengthy and biased descriptions, and repeated headlines to recirculate the Channel 5 Media Defendants' defamatory publications, compounding the reputational harm and prolonging public outrage based on knowingly false and selectively presented information.

*The Defendants August 5 2024 Defamatory Article – "The stories that Millersville conspiracy cop tells about himself, his employment history, his threats."*

286.    In the August 5, 2024 article titled "The Stories That Millersville Conspiracy Cop Tells About Himself,"[7] Defendants Phil Williams and NewsChannel 5 again reinforced their broader defamatory campaign against the Millersville Police Department and its officers, including Plaintiffs Todd Dorris and Michael Candler. While not named directly, Plaintiffs were falsely implicated by association through repeated reference to an ongoing TBI investigation, without any distinction that neither Candler nor Dorris is the subject of that inquiry. The article's opening line—"With the Millersville Police Department now the focus of a TBI investigation…"—deliberately cast suspicion over all department personnel, building upon prior reports accusing Plaintiffs of perjury and misconduct. This publication, in context with the series of defamatory broadcasts and online articles, constitutes defamation by implication, as it falsely portrays Plaintiffs as dishonest, unfit for public service, and complicit in ideological extremism or official corruption.

*The Defendants' August 12 2024 Defamatory Publication – "TBI limits Millersville's access to sensitive law-enforcement data, chief says in podcast interview."*

287.    In this August 12, 2024 publication,[8] Williams and the Channel 5 Media Defendants shift fire to Chief Bryan Morris, dubbing him a "conspiracy chief" and ridiculing him as someone whose claims require belief in "time travel" regarding a claim that Channel 5 has posted Shawn Taylor's address before Taylor's house was shot up – the

---

[7] The August 5, 2024 article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/franklin-politics/the-stories-that-millersville-conspiracy-cop-tells-about-himself-his-employment-history-his-threats

[8] The August 12, 2024 article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/franklin-politics/tbi-limits-millersvilles-access-to-sensitive-law-enforcement-data-chief-says-in-podcast-interview

same morning of the Covenant School Shooting.  This was in fact true, as Taylor's address had been posted in the comments section of an article and Channel 5 delayed taking down for a considerable amount of time.  The article says the chief "appeared to express support for the bogus 'Pizzagate' hoax" which was false, and asserts that "Millersville doesn't just have a conspiracy cop, they've also apparently got a conspiracy chief." These statements falsely portray Chief Morris as delusional, dishonest, and professionally incompetent—directly impugning his integrity and fitness to serve.

288.     The August 12, 2024 article also publishes the following accusation of false testimony and criminal conduct by Todd Dorris:

  a.   *"Secret recordings obtained by NewsChannel 5 Investigates from that sting show it was volunteers who were posing online as a 12-year-old girl — not police, as required by law. But when one case went to court, the lead detective testified that Millersville police did all the texting."*

  b.   *"In fact, the secret recordings show there were conversations about having the detectives pose for videos, as if they were the ones doing the texting."*

289.     The article then implies a deception or cover-up by Candler and Dorris through "posing for videos" to make it appear as if police sent the messages. These are not just critical statements—they are accusations of criminal misconduct, and thus qualify as defamation per se under Tennessee law.

290.     The article presents statements from Chief Morris that he has video proving the detectives did the texting, and it quotes him as saying:  *"We actually have video of them doing the texting and sending the messages… I welcome anybody to come look at it."*

291.     Phil Williams immediately rebuts this with: *"In fact, the secret recordings show there were conversations about having the detectives pose for videos…"*

292.     This framing is defamatory by implication. It falsely suggests that any video of Dorris or Candler performing law enforcement duties was staged after the fact to support a false narrative, thereby attacking their honesty, competence, and integrity as sworn law enforcement officers. This implication is both misleading and factually contradicted by eyewitness testimony and physical evidence showing officers did, in fact, conduct the communications.

293.     While the article primarily targets Chief Morris and Assistant Chief Taylor, it once again refers to Millersville officers as "conspiracy-minded cops [who] may have crossed the line of what's legal." In context, and combined with images and allegations tied to Dorris and Candler, this is a continuation of defamatory branding of the department and the officers as ideologically motivated extremists acting outside the law. Given that Candler and Dorris were the only detectives named and referenced in connection with the sting, this broad characterization clearly refers to them.

294.     In sum, the August 12, 2024 article titled "TBI Limits Millersville's Access to Sensitive Law Enforcement Data," Defendants Phil Williams and NewsChannel 5 falsely and maliciously implied that Plaintiffs Detective Todd Dorris and Detective Michael Candler engaged in criminal misconduct during a child-predator sting operation. The article falsely claims that "volunteers" conducted all online communications and that "secret recordings" contradict Dorris' sworn testimony. These statements accuse Dorris of perjury—a felony—and further imply that both detectives staged video footage to falsely portray themselves as having conducted the communications. These claims are false, are

contradicted by eyewitnesses and physical evidence, and were published with actual malice or reckless disregard for the truth. Additionally, the article's misstatement of state law and its references to "conspiracy-minded cops" further smear the Plaintiffs' reputations and expose them to public contempt and professional harm.

295.     This article, like all others, reposts hyperlinks to earlier defamatory articles, creating a new false public narrative and spreads it to new audiences.

**August 26, 2024 – "QANON COMES TO MAIN STREET: Millersville cops team up with so-called pedophile hunter who blames 'satanic cult masquerading as Jews'"**

296.     The headline of the August 26, 2024 Article[9] falsely implies that Candler and Dorris—as part of "Millersville cops"—knowingly collaborated with or endorsed the views of Craig Sawyer, including his antisemitic conspiracy theories. This implication is categorically false, as Plaintiffs never met or worked with Sawyer prior to the sting and had no knowledge of his political or religious views. Sawyer's past statements are being falsely imputed to Plaintiffs through the phrase "team up," despite the operation being structured for law enforcement to handle legal matters, not for ideological alignment with volunteers. The article falsely claims that Millersville officers, including Taylor and Morris are "conspiracy theorists" that "carry guns and badges, using their police powers to explore notions" completely divorced from reality.

297.     The article also casts Plaintiffs Candler and Dorris in a false light with the following ideological smearing: "After years of voicing some bizarre conspiracy theories, Taylor

[9] The August 26, 2024 article is published at: https://www.newschannel5.com/news/newschannel-5-investigates/franklin-politics/millersville-cops-team-up-with-so-called-pedophile-hunter-who-blames-satanic-cult-masquerading-as-jews

decided back in May to gather a group of like-minded MAGA activists to run a child sex-predator sting."

298.     Though not named, this statement falsely lumps all law enforcement officers involved in the sting—including Candler and Dorris—into a political and conspiratorial narrative. The use of the words "MAGA activists" and "like-minded" implies that Dorris and Candler shared those beliefs and violated their duties as objective, neutral law enforcement officers which is false and defamatory.

299.     The article heavily relies on the statements of Kim Kelley, who has repeatedly been shown to provide misleading or false information, yet her statements are presented as authoritative:

    a.   "In the almost four years that I worked with Veterans for Child Rescue, I'm not aware that they ever actually combated child trafficking — now, therein lies my actual concern."

300.     By presenting Kelley's skepticism as fact, and linking her to the Millersville sting, the article implies that Dorris and Candler participated in a deceptive, performative operation that falsely claimed to protect children. In fact, they conducted a child predator sting and arrested one particularly nasty child predator, with the potential of dozens of other warrants or judicial subpoenas on other suspects.   The Defendants' article damages Plaintiffs' reputations as professional officers committed to lawful conduct.

301.     This article continues to push the idea that Millersville's sting operation—which was conducted operationally by Dorris and Candler—was done in furtherance of a political or conspiratorial agenda, rather than lawful enforcement. Combined with previous articles

that falsely accuse Dorris of perjury, this narrative builds a false public image of Plaintiffs being engaged in systemic dishonesty and misconduct.

302.     This article, like all others, reposts hyperlinks to earlier defamatory articles, creating a new false public narrative and spreads it to new audiences.

***The TBI Conducts Suspicious Show of Force in Millersville to Forcibly Seize The Evidence That The MPD Had Voluntarily Offered.***

303.     On August 20, 2024, Assistant DA Jason White called Det. Dorris and stated that they were not going to prosecute the case against Henry Dean Jordan for solicitation of a minor "at this time."  Gen. White told Det. Dorris to "keep the evidence on Henry Dean Jordan in the event we decide to prosecute again."

304.     On August 23, 2024, Asst. Chief Taylor asked Capt. Dorris to email Sumner County DA Ray Whitley to see if he would be willing to come to Millersville and review the evidence that the detectives had been accumulating in the larger "white-collar type of case" they had been working, and he even offered to buy Whitley and Assistant DA Thomas Dean lunch for taking their time:

"General Whitley,

I need your help.  I was wondering if you would be able to come to the Millersville PD to look at a case I am working.  It is a white-collar type of case that leads into the possibility of official misconduct, money laundering and fraud, so I put ADA Dean on the email as well.  I have multiple binders, things drawn out on a white board and items posted on the wall.  I believe I have enough for prosecution or at least to present to the Grand Jury, but I am not 100% sure.

With your knowledge and experience in these matters being greater than mine, plus it would be your office prosecuting, I was hoping you could take some time and come see if I am in the ballpark.

It shouldn't take too long, and if we do it around lunch time, we would feed you for taking the time.  I know you have a very busy schedule.

Captain Todd Dorris
Millersville Police Department

305.    On August 23, 2024, Assistant DA Thomas Dean responded to Capt. Dorris as follows:

"Capt. Dorris,

Thanks for reaching out.  Sorry to be responding late - it's been a busy day.  We will get back with you.

Have a good weekend.

Thomas Dean

306.    The district attorney, who has the statutory authority in Tennessee to initiate and supervise TBI investigations in their county, was explicitly invited by the Millersville Police Department to review the evidence they had been accumulating, which included an offer to buy the DA lunch to facilitate this collaboration. Instead of accepting the offer and cooperating transparently, the DA opted to have the TBI conduct a highly publicized raid twelve days later, forcibly taking the very files the MPD had prepared and intended to voluntarily provide. This orchestrated show of force was a coordinated publicity stunt, evidenced by the Channel 5 camera crew's presence in the immediate wake of the TBI's arrival. The sealed search warrants imply that Channel 5 had prior contact with the TBI, as they were not publicly available on any Circuit Court Docket.

307.    The raids took place at 10:00 AM on September 4, 2024, with the TBI executing two search warrants at Millersville City Hall and one at Assistant Chief Taylor's residence. Defendant Levi Ismail was also present and filming with a news crew at Taylor's residence

contemporaneously with the execution of the TBI raid, and at least an hour before any other news crew could arrive.

308.    Two warrants were issued in Sumner County, and one says "Sumner County" but was apparently signed by a Robertson County Judge.   The search warrant on Asst. Chief Shawn Taylor's house says "Robertson County" but was signed by Sumner County Judge Joe Thompson.   The Official Misconduct search warrant was also signed by Judge Joe Thompson, and targeted Asst. Chief Shawn Taylor.

309.    Although TBI Agent James Scarbro was not officially listed as the "Agent in Charge" of the purported investigations or officially designated as a lead agent during the search warrants, he was present and when Chief Bryan Morris and Asst. Chief Taylor began asking questions of the TBI Agents on the scene, they were directed to speak with Agent Scarbro.   Scarbro cryptically told them in words or substance, "there's a reason I am not listed as the agent in charge on these cases."   It was nonetheless apparent that Scarbro, who can be seen in the far right of the following NewsChannel 5 picture, was actually running the raid and even appears to be giving instructions to other agents:



James Garbee/WTVF
TBI agents load up boxes of evidence seized from the Millersville Police Department on Sept. 4, 2024.

310.     TBI Agent James Scarbro was also involved in the "investigation" of Dustin Carr following accusations that Carr had engaged in domestic violence.  In another lawsuit, *Black et al. v. Millersville et al.*, 3:21-cv-00704 (M.D. Tenn. 2021), former Millersville Police Officer Josh Barnes alleged in Paragraphs 44 and 45 of his Complaint that after he sent images of Aubrey Carr's injuries to the DA, he received a call from District Attorney Jason White, who informed Barnes that James Scarbro of the TBI would be in touch with him.     Within an hour of his conversation, Dustin Carr was aware that he was being investigated by the TBI.   Based on the timing of the leak of this knowledge, it is reasonable to infer that Scarbro leaked the information to Carr directly.   In addition, eyewitnesses have overheard Dustin Carr talking or texting with Scarbro constantly, and specifically overheard Carr talking to Scarbro about the issues with the domestic violence allegations involving Aubrey Carr.  Despite photographic evidence, Dustin Carr was protected and never charged.

311.    The Aggravated Perjury and Official Oppression search warrant targeted Det. Todd Dorris regarding Dorris's actions and testimony during the child-predator sting. The signature of the judge is difficult to read, but appears to belong to William R. "Bill" Goodman from the 19th judicial district in Robertson County. The allegations of perjury and the search warrant were based entirely on the false allegations from Kim Kelley, Phil Drake, Phil Williams, and the NewsChannel 5 Defendants, who falsely claimed that Capt. Todd Dorris had committed perjury and even edited at least one "secret recording" provided by Kelley/Drake to make it appear that Dorris was instructing Kelley to handle the solicitation with suspect Henry Dean Jordan. In fact, the unedited recording shows that Capt. Dorris was specifically stating that volunteers could handle preliminary "work up" of screening through messages, but that the detectives needed to handle the actual solicitations with suspects.

312.    The search warrants were obtained and signed on September 3, 2024, with the search warrant for Shawn Taylor's home and Millersville City Hall being signed by Judge Joe Thompson, despite the fact that he had acted as a witness or investigator when he provided evidence of the "attempted subpoenas" and the recording of Det. Michael Candler to the TBI, who have admitted that they possess the recording and considered it as part of their investigation.

313.    Video at City Hall taken by witnesses present on the morning of September 4, 2024 shows that the TBI brought their press spokesperson on the raid at City Hall, and she is seen leading Channel 5 in the parking lot to take video of files being taken out of vehicles. Several witnesses saw the Channel 5 News vehicle enter the City Hall property very shortly after the TBI pulled up and blocked both of the Millersville staff parking lots, thus

constituting a "custodial" stop by making it impossible for any officers or employees to leave. Given the fact that the Search Warrants were filed "under seal" and could not be obtained publicly, it was obvious that somebody within the TBI or the Sumner County Circuit Court had tipped off Channel 5 and warned them the search warrants had been signed the day before and the "TBI raid" would be taking place the following morning. In light of the fact that the Millersville PD had been working to get the TBI involved in a Task Force and to also provide evidence directly to Gen. Ray Whitley, who can request when the TBI is involved in investigations in Sumner County, the "raid" objectively appeared to be both a publicity stunt and an intimidation tactic.

314. The following photograph of Channel 5 camera man Brian Staples, seen wearing a blue shirt, with the TBI's Senior Public Information Officer, Susan Niland, seen in the right of the following photo appears to be taking pictures or video of Channel 5 peering into vehicles and filming evidence as it is being collected from vehicles that are actively being searched, although it is not clear who Susan Niland was taking these pictures or video of Channel 5 for, since she never posted them to the TBI social media page:



315. Plaintiffs aver that the above photograph is proof of the coordination and collusion between the TBI and NewsChannel 5 and their concerted actions against the Plaintiffs and other officials in Millersville.

316. Video from Channel 5's broadcast shows that they were allowed to actually look inside the trunks of vehicles for closeups of the items that were being seized, while they were being seized. None of the other news agencies that showed up an hour later were given such preferential treatment:



ERSVILLE POLICE DEPARTMENT
S HOME OF "CONSPIRACY COP" SHAWN TAYLOR

317.    The TBI's decision to involve a media liaison and facilitate the presence of Channel

5 News during the execution of the search warrants is highly irregular.  Moreover, she did

not actually post anything to social media on behalf of the TBI, raising questions over what

she did other than to escort and directly assist NewsChannel 5's camera crew.

Traditionally, law enforcement agencies conduct search warrant operations discreetly to

preserve the integrity of investigations and protect the rights of individuals involved.

Turning a search into a public spectacle, however, can lead to significant legal

consequences, including the suppression of evidence, civil liability, disciplinary actions

against law enforcement, and jeopardizing the prosecution's case.

318.    According to a copy of the TBI's Operation Plan that had been left behind at Shawn

Taylor's home:

"On May 22, 2024, Gen. Ray Whitley requested the TBI conduct an investigation[10] into
allegations against Shawn Taylor for improper use of law enforcement intelligence data,

---

[10] Ray Whitley's public statements contradict the TBI's claim that Whitley initiated the investigation.  Whitley claimed
in a Phil Williams story that the TBI had brought him evidence and that, as a result of that, he requested the
investigation, not the other way around.  Upon information and belief, Agent James Scarbro was involved.

falsifying government records, and official misconduct. Taylor is the current Assistant Chief of the Millerville [sic] Police Department (MPD). Taylor has been known to request case numbers in order to initiate criminal investigations without claims or incident reports being previously filed. It is believed he has improperly utilized law enforcement intelligence data to include the State of Tennessee Integrated Criminal Justice Portal, Financial Crimes Enforcement Network, and the National Crime Information Center. Several interviews have been conducted and information gathered about the initiation of such investigations and the possible motives involved.

The mission will be to execute a search warrant on Taylor's residence in an effort to locate documents and digital evidence to support the allegations of official misconduct. This mission will include a physical search of [Taylor's residence located at REDACTED].

A search warrant for the Millersville Police Department will be executed simultaneously to the search warrant execution for Taylor's residence."

319.    Thus, it appears that Taylor's residence was the primary target. The TBI, and its agent James Scarbro, was aware that Taylor had a sophisticated computer system that contained confidential client files from when he worked as a law enforcement consultant and OSINT researcher for private law firms. Thus, whatever the TBI seized from Taylor's computer, it is all protected under attorney-client privilege.

320.    The TBI was specifically aware of this computer because Taylor had previously filed a complaint against a TBI agent who was investigating the shooting of Taylor's house in the early morning hours of March 27, 2023, the same day as the Covenant School Shooting. The complaint alleged that the Agent had gone into the secured barn next to Taylor's house where the computer system in question was located, even though Taylor had told the TBI that nobody was to go in there unattended because of the highly confidential files located in the area. Shawn Taylor's house had been shot multiple times with a firearm chambered in 9mm while he and his family were asleep. In fact, the TBI had to stop investigating the shooting of Taylor's house to go to the Covenant School after Audrey Hale opened fire on students and teachers. One of Hale's weapons was also a

9mm. The same TBI agent who was the subject of Taylor's complaint also participated in the execution of the search warrants at Millersville City Hall on September 4, 2024.

321. The documents left behind by the TBI include handwritten notes bearing the title, "Briefing 9/3/2024" reveal the following information:

"NA-82A-312 – Official Misconduct – Rielly
NA-26A-17 – Perjury – McGowan

Bryan Morris – Chief
Shawn Taylor – Asst. Chief
Todd Dorris – Capt/Detective
Michael Candler – Detective

FINCIN Reports – City Commissioners
Portal, Criminal History's, Attempted Subpoenas

Dorris – Agg. Perjury – Prelim – Child Predator Sting
Veterans for Child Rescue" – Group who helped on sting – several days
Henry Jordan – one arrest

Millersville PD
Shawn Taylor – Residence
[ADDRESS REDACTED]
TCA – 39-17-402 – Official Misconduct
[…]"

322. Although the TBI claims it was searching for evidence related to queries that Taylor ran through "State of Tennessee Integrated Criminal Justice Portal, Financial Crimes Enforcement Network, and the National Crime Information Center," this information is actually run by the TBI and could be easily found by them without the need for a search warrant. For example, the TBI knew that Taylor had already obtained information from the Integrated Criminal Justice Portal because they were copied on the email from the Administrator of the ICJ Portal who had included them in the Task Force Taylor was creating. A simple "offline audit" of Taylor's username would show everything he ever

ran.    Moreover, there's no question that the TBI knew exactly what Taylor had received from FinCEN, since they were the ones who provided the information to Taylor.

323.      In fact, the TBI has the authority and capability to conduct offline audits of access to the National Crime Information Center.    According to Tennessee regulations, specifically Tenn. Comp. R. & Regs. 1395-1-1-.03, the TBI maintains the Control Terminal Agency (CTA) for the state, which is approved by the FBI/NCIC for control of the Tennessee Information Enforcement System (TIES) network. This network allows full access to make entries into NCIC and TCIC files, indicating that the TBI is the main contact for such access, which casts further doubt on the need for the TBI to seek a search warrant.

324.      Thus, it appears there was no reason at all for the TBI search Taylor's residence or City Hall for the documents they could find via an offline audit.    That means that the only remaining search warrant for Det. Dorris's alleged "perjury" was based entirely on the false allegations and fabricated evidence that Defendants Kelley, Drake their Affiliated Organizations had provided to Defendants Phil Williams, Levi Ismail, and the NewsChannel 5 Defendants, who in turn edited the evidence and selectively presented to create the Defendants' false narrative.

**The Defendants September 4, 2024 Defamatory Publication – "TBI agents raid Millersville Police Department, home of town's 'conspiracy cop'"**

325.      The September 4, 2024 article titled *"TBI agents raid Millersville Police Department, home of 'conspiracy cop,' as probe intensifies"*[11] by Phil Williams and Levi Ismail contains several false and defamatory implications of and concerning Detectives

---

[11] The article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/franklin-politics/tbi-agents-raid-millersville-police-department-as-criminal-probe-of-troubled-agency-intensifies

Todd Dorris and Michael Candler, despite not naming Candler and referring to Dorris only briefly.

326.     The article states, "The TBI is also investigating possible perjury of a Millersville detective, stemming from his testimony in what appears to have been a botched child predator sting."   This statement clearly refers to Detective Todd Dorris, as previously confirmed by earlier articles by Phil Williams. By asserting that the sting was "botched," and linking that to "possible perjury," the article falsely implies that Dorris committed a felony, namely perjury under oath-a serious charge that damages his professional and personal reputation. This is defamation per se, as it accuses Dorris of a crime involving dishonesty.

327.     Importantly, the article:

   a.   Fails to mention that Dorris' testimony is corroborated by other witnesses.

   b.   Presents the perjury allegation as if it is established, rather than speculative or politically motivated.

   c.   Leaves out exculpatory facts, including the City's public response and the lawful structure of the sting.

328.     The article claims that, "Photos provided to NewsChannel 5 Investigates show agents combing through an unmarked police vehicle as Chief Bryan Morris and Detective Todd Dorris stood off to the side."   The article does not show the actual photo of Todd Dorris, but creates the false implication that Dorris himself was being searched or that he had been pulled over and his vehicle was being actively searched as a suspect, which was false.

329.    The Defendants' placement of this accusation next to statements about the "criminal investigation" and "botched sting" falsely implies his direct involvement in wrongdoing and is a textbook example of false light via misleading context that would be highly offensive to a reasonable person.

330.    The article repeatedly refers to the Millersville Police Department as "embattled," "troubled," and under "criminal investigation," while referencing a "botched child predator sting." This framing is part of a longstanding campaign to smear the department and its officers, including Candler and Dorris, through repeated association with conspiracy theorists and vague innuendo of criminality-without any direct evidence or clarification that neither Dorris nor Candler is accused of misconduct.

331.    Nowhere in the article does Williams disclose:

a.    That no charges have been filed against Dorris.

b.    That Dorris' actions were conducted with guidance from the Robertson County District Attorney.

c.    That Candler and Dorris were the actual officers conducting the solicitations, with video evidence and witness corroboration confirming this.

d.    That the TBI has been collaborating closely with Phil Williams, raising questions about the independence and neutrality of both investigations.

e.    That Nick Leonardo had represented Dustin Carr and was not offering a neutral and unbiased commentary about the sting being illegal, which was nonetheless based on known and obvious misstatements of the law.

332.    These omissions are material, and their exclusion supports a claim of actual malice or reckless disregard for the truth.

***The Defendants September 16, 2024 Defamatory Publication – "When QAnon Comes to Main Street: Investigating the Millersville Police Department and its 'conspiracy cop'"***

333.　　　　The September 16, 2024 article titled "When QAnon Comes to Main Street: Investigating the Millersville Police Department and its 'conspiracy cop'"[12] by Phil Williams contains multiple false and defamatory statements and implications of and concerning Detectives Michael Candler and Todd Dorris, especially through:

　　　a.　Guilt-by-association with extremism and criminality

　　　b.　Accusations of perjury

　　　c.　Repetition of false narratives without correction

334.　　　　In addition, the article contains direct accusation of perjury by Det. Dorris:

　　　a.　*"Still, our NewsChannel 5 investigation discovered that when the one arrest from the case went to court, lead detective Todd Dorris testified under oath that he and another Millersville detective had done all the work."*

　　　b.　*"'It does not represent the truth of what really happened during that operation,' Kelley told NewsChannel 5 after listening to audio of Dorris' testimony."*

　　　c.　*"Taylor and Sawyer decided that members of Veterans for Child Rescue would do the posing—as long as officers were in the room."*

　　　d.　*"Despite those admonitions, **the detectives** claimed otherwise under oath."*

335.　　　　This segment explicitly states that Detective Todd Dorris *and now claimed that Det. Candler* committed perjury during sworn testimony—a felony criminal offense. It cites a known partisan source, Kim Kelley, whose own credibility is under dispute, without presenting any part of the exculpatory statements from the City of Millersville. This is

---

[12] This article appears to have been removed from the www.newschannel5.com website, but a copy is included with this Amended Complaint as **Exhibit C.**

defamation per se, as it accuses Plaintiffs of a serious crime involving dishonesty and undermines their integrity and fitness for duty.

336.     The article also casts Plaintiffs Todd Dorris and Michael Candler in a false light with the following statements:

    a.   *"Four months into our NewsChannel 5 investigation of the Millersville Police Department, there is now a TBI investigation—and QAnon-aligned elements of the far right are outraged."*

    b.   *"Here, conspiracy theorists carry guns and badges, using their police powers to explore notions that are sometimes completely divorced from reality."*

337.     These comments falsely imply that all Millersville police officers—including Candler and Dorris—are ideologically aligned with QAnon, are delusional, and are abusing police power. This is an intentional broad-brushing, especially when the piece elsewhere accuses "Millersville police" of carrying out a "botched sting." This constitutes defamation by implication and false light invasion of privacy.

338.     The article states: *"One prong of the ongoing TBI investigation focuses on the potential misuse of sensitive law enforcement data by Millersville police to investigate their political enemies, while the other focuses on what appears to have been a botched child-predator sting and possible perjury by the lead detective in that case."*

339.     The repeated use of "botched" implies gross negligence, incompetence, or wrongdoing, and the mention of a "lead detective" in the same breath implies that Dorris and now, Det. Candler, were directly responsible because the same article claims that "detectives" (plural) made contradictory statements under oath. This repetition of conclusory language reinforces a defamatory narrative despite factual contradictions.

340.     The September 16, 2024 Article was also published by www.newsbreak.com,[13] a digital news aggregation platform founded in 20215 and owned by Particle Media, Inc. backed by IDG Capital, a China-linked venture capital firm.  By reposting the false and defamatory allegations of Phil Williams, www.newsbreak.com and Particle Media, Inc. d/b/a NewsBreak is liable for false and defamatory statements of Williams.

***The Defendants' Defamatory Publication on October 7, 2024 - titled "Election denier says his group gained access to U.S. banking data"***

341.     While the October 7, 2024 article titled *"Election denier says his group gained access to U.S. banking data"*, by Defendants Phil Williams and NewsChannel 5 does not name Plaintiffs Todd Dorris or Michael Candler, it continues the Defendants' long-running smear campaign against the Millersville Police Department and its officers. By publishing allegations that the department was misused to access FinCEN financial data and framing all officers as part of a broader conspiracy-minded faction working with "election deniers" and "pedophile hunters," the article falsely implies that Dorris and Candler were complicit in illegal surveillance or ideological misconduct. In the context of prior defamatory stories where Plaintiffs were explicitly accused of perjury and dishonesty, this article reinforces those false narratives and contributes to ongoing reputational damage.

***The Defendants Defamatory October 22, 2024 Publication Titled "GOP Lawmakers threaten 'political fallout' for TBI's Millersville investigation."***

342.     The October 22, 2024 article titled "GOP lawmakers threaten 'political fallout' for TBI's Millersville investigation"[14] by Phil Williams contains renewed defamatory

---

[13] A copy of the September 16, 2024 NewsBreak article is published at:  https://www.newsbreak.com/newschannel-5-wtvf-563677/3597743969870-investigating-the-millersville-police-department-and-its-conspiracy-cop
[14] This article is published at:  https://www.newschannel5.com/news/newschannel-5-investigates/qanon-comes-to-main-street/two-key-gop-lawmakers-threaten-political-fallout-if-tbi-continues-investigation-of-millersville-police

implications of and concerning Detective Todd Dorris, with indirect spillover effects concerning Detective Michael Candler, even though Candler is not named directly.

343.     The circumstances surrounding Phil Williams' "discovery" of this letter from Bud Hulsey also proves that the TBI had actually tipped him off about the letter he had received which proves that Phil Williams was receiving information from one or more individuals at the TBI.  In the article, Phil Williams that the "letter was obtained by NewsChannel 5 from the TBI through a public records request following some recent claims by Taylor that he had the support of state lawmakers."   Yet, Phil Williams did not send his Public Records Act request to the Tennessee legislature *to the TBI,* which means that he already knew from somebody at the TBI had informed him about the letter.

344.     This collusion between the TBI and Phil Williams is further validated by the timeline of these communications.  Rep. Hulsey's letter was sent by Hulsey to TBI Director David Rausch on or about Friday, October 11, 2024.  On October 15, 2024 Director Rausch responded to Rep. Hulsey's letter, and Phil Williams sent out his Public Records Act request on October 16, 2024.

345.     The article once again contains the false allegations of perjury by "a Millersville detective," which could reasonably be construed to include Det. Candler due to the Defendants' prior false accusations that  it was "detectives" (plural) who committed perjury:

    a.  "NewsChannel 5 Investigates also revealed details about a botched child predator sting in which it appears that a Millersville detective may have committed perjury."

346.     This is a repetition of a known false accusation that also directly concerns Plaintiff Todd Dorris, who was previously alleged to have testified about the operation. By

publishing this claim again—with no new evidence and in the face of exculpatory facts—Defendants demonstrate actual malice or reckless disregard for the truth.

347.    Labeling the sting "botched" implies gross incompetence or illegality, directly harming the reputations of the detectives who led the operation—primarily Dorris and Candler. This framing is used repeatedly throughout the NewsChannel 5 series and continues here with no balance, even though the suspect was arrested and charged with solicitation, Todd Dorris testified truthfully about his role, and the unedited videos and recordings provided to the NewsChannel 5 Defendants prove that Todd Dorris never perjured himself.

348.    Although this article focuses more heavily on Shawn Taylor and his interactions with political figures, it continues to tie the broader Millersville Police Department—including Dorris and Candler—into a narrative of ideological extremism and lawlessness. This is particularly dangerous given that earlier articles used images of Dorris and Candler in "team photos" while smearing the group as MAGA operatives or conspiracy theorists.

349.    In the public mind, this article extends the cloud of criminality and political corruption over all participants in the sting, including Plaintiffs Dorris and Candler.

***Phil Williams Publishes Dustin Darnall and Jesse Powell's Defamatory Letter of October 24, 2024***

350.    On October 24, 2024, before they were even Millersville Commissioners and were just "Candidates for Millersville Commission," Defendants Dustin Darnall and Jesse Powell signed a letter to Speaker Cameron Sexton attacking Rep. Bud Hulsey for his letter to TBI Director David Rausch.   Jesse Powell's name is misspelled as "Powel," raising questions over whether he actually authored the letter.

351.     The October 24, 2024 letter was, in fact, a coordinated ploy between Darnall, Powell, and Phil Williams, who most certainly was sent a draft of the letter in advance of it being signed and who had input into its words.  The October 24, 2024 letter does nothing more than parrot and puff up the false narrative against Todd Dorris that had been pandered by Phil Williams and the NewsChannel 5 Defendants, stating in relevant part, the following:

It is evident that Reps. Hulsey and Fritts have bene speaking directly with Shawn Taylor and have fallen for his deception. The letter authored by Reps. Hulsey and Fritts is filled with frequent inaccuracies, some of which we will address below.

First, Hulsey and Fritts stated "this investigation appears to have been triggered by intentionally misleading stores from one media outlet" when, in fact, this investigation appears to have been triggered when a Millersville Detective allegedly committed perjury after a botched child predator sting from May. In that botched sting, Millersville Police

disregarded guidance from a District Attorney that, to abide by TN law, only law enforcement officers must be the operators the electronic devices in the sting when communicating with the targets. There is video evidence that this guidance was not accepted and those other than law enforcement officers were operating the electronic devices during this sting. An arrest was made and when this person had a hearing, a Millersville Detective stated under oath that only Millersville Officers operated the electronic devices.

This set of facts lead to District Attorney Nash (19th Judicial District) asking the TBI to investigate. It appears something was found during that investigation, and the investigation expanded to include a request from District Attorney Whitley (18th Judicial District). We are attaching a screenshot from a WSMV report that shows the first pages of the TBI search warrants served on the Millersville Police Department in September. You can see that the TBI is investigating Aggravated Perjury (TCA 36-16-703) and Official Oppression (TCS 39-16-403) in one search warrant and Official Misconduct (TCA 39-16-402) in the other search warrant. We do not believe the search warrant served on Assistant Taylor's residence has been released.

> Second, it is unclear how House Representatives can make any determination that a TBI investigation lacks a clear legal basis. There is concern from many in our community that Millersville Police have been conducting politically motivated investigations into those they consider to be their political rivals. It seems reasonable to conclude that the TBI is investigating this perceived Official Misconduct. In the search warrant for Official Misconduct, the TBI was authorized to collect information about a lengthy list of individuals. If you scrutinize this list, you will see it contains many political rivals of the current Millersville administration.

352.     Defendants Darnall and Powell's letter falsely accuses Det. Dorris of committing perjury after a botched child predator sting, during which time he disregarded guidance from the District Attorney that "only law enforcement officers must be the operators the [sic] electronic devices in the sting when communicating with the targets." This is not only an intentional mischaracterization of the law, it is also an intentional mischaracterization of the very guidance that the DA Jason White provided to Det. Todd Dorris.

353.     Defendants Darnall and Powell falsely state that there was video evidence that the DA's guidance was not accepted and that "persons other than law enforcement" were operating the electronic devices, yet Detective Dorris stated under oath that "only Millersville Officers operated the electronic devices." This is, once again, an intentional misstatement of the law and gross mischaracterization of Det. Dorris's testimony.

354.     Defendants Darnall and Powell then make the risibly false claim that "[i]t appears something was found during that investigation, and the investigation expanded to include a request from District Attorney Whitley (18th Judicial District)." Defendants Darnall and Powell knowingly and intentionally made these false statements to impugn Det. Dorris's character.

355.     The Darnall/Powell letter was published by Phil Williams to his Facebook page on

October 24, 2024 with the following caption:



356.     The letter concludes:

As candidates for the Millersville Commission, we welcome the TBI to investigate
Millersville. We have a long history of issues. The TBI investigation needs to continue until it
is concluded and come what may.

We look forward to your consideration of this issue.

Sincerely,


*Dustin Darnall*


Dustin Darnall
Candidate for Millersville Commission


*Jesse Powel*


Jesse Powel
Candidate for Millersville Commission

357.     Both Darnall and Powell had previously been on a "citizen's board" to hire Chief

Rob Richman and openly stated that they wanted him back.  This remained their goal at all

times following their narrow win in the November 2024 election.

358.     After Capt. Dorris became the interim Police Chief following the resignation of

Bryan Morris in January of 2025, interim Chief Stephen Hale was selected.  At the direction

of Darnall and Powell, Hale immediately removed Capt. Dorris from all of his police duties

and plans were made to bring back Rob Richman, including making him a Captain at

Millersville until he could resume his position as Chief.

*Millersville's Knowing and Intentional Violations of its Insurance Agreements.*

359.     The move to make room for Rob Richman and bring him back was another

shockingly defiant act by Darnall and Powell, who were fully aware that the City of

Millersville could lose its insurance by bringing him back, as this move was a specific

violation of the Specific Person or Entity Exclusions mandated by Greenwich insurance

excluding coverage for any acts, errors, or omissions of Rob Richman and a host of other

former officials:

In consideration of the premium charged, it is hereby agreed that:

I.     The following exclusion is added to Policy Section **D. EXCLUSIONS**:

Actual or alleged acts, errors or omissions of the following persons:

Former City Manager Scott Avery; Former city Police Chief Robert Richman; Former city Fire Chief Brandon Head; Former city Attorney Jack Freedle; Holly Murphy, fomer city recorder; Vanessa Johnson, previous city recorder assistant

II.     The following is added to the Policy Section **E. DEFINITIONS**, Item 13:

**Insured** shall not include:

Former City Manager Scott Avery; Former city Police Chief Robert Richman; Former city Fire Chief Brandon Head; Former city Attorney Jack Freedle; Holly Murphy, fomer city recorder; Vanessa Johnson, previous city recorder assistant

360.     Despite the express exclusion for acts and omissions attributed to former city recorder Holly Murphy, both Darnall and Powell, in connection with the interim City Manager, were also knowingly allowing Murphy to remotely access the city files to continue working as some sort of "1099 worker" allowing her to manipulate the City's budget and adjust line items for the City's financial condition from February of 2025 onward. The interim City Manager, either Michael Gorham, Michael Housewrite, or both, have continued to allow Murphy to work and one or both of them have openly claimed that allow her to work as a "1099 worker" would allow the City to retain its insurance and bypass the exclusions established by Greenwich.

361.     Darnall and Powell had also worked extensively in connection with former City Attorney Jack Freedle to not only coordinate their defamatory publication against Det. Dorris in their Letter to Cameron Sexton, but also to harass the 2024 administration with dozens of public records act requests. Darnall openly received documents directly from Jack Freedle, and filed complaints about City officials tied to the misinformation from Phil Williams based on information from Jack Freedle.

362.     Darnall and Powell were overheard at City Hall stating that they wanted to hire back Jack Freedle, which was also restated by interim City Manager Mike Gorham. Their ultimate goal to bring back Freedle failed after Gorham discovered that Greenwich had refused to insure any acts or omissions by Jack Freedle. The City went so far as to hold a meeting to discuss obtaining "outside counsel," which was actually just a thinly-veiled

attempt to surreptitiously hire Jack Freedle and his firm as a reward for his malfeasance and assistance to Darnall and Powell throughout 2024.

***The Defendants' December 9, 2024 Publication titled "Shawn Taylor resigns from Millersville Police Department amid criminal probe"***

363. The December 9, 2024 article titled *"Shawn Taylor resigns from Millersville Police Department amid criminal probe"[15]* by Phil Williams does not explicitly name or directly accuse Detectives Michael Candler or Todd Dorris. However, it continues to support and reinforce a false and defamatory narrative of department-wide criminality and ideological extremism, which implicates Candler and Dorris by association.

364. The article continues with additional defamatory accusations of and concerning Det. Candler and Det. Dorris, stating: "The TBI investigation focuses on the possible misuse of sensitive law enforcement data in investigating Taylor's political enemies, as well as questions about possible perjury in a child predator sting that Taylor orchestrated with private 'pedophile hunters.'"

365. Although the article attributes the sting mostly to Taylor, earlier articles by the same outlet have clearly stated that Detective Todd Dorris was the lead detective on the sting, and previously accused him of perjury. By repeating these allegations in summary form while failing to clarify that Dorris's sworn testimony was corroborated and never charged as perjury, the article reaffirms a false and defamatory accusation against him and constitutes defamation by implication and repetition.

---

[15] The December 9, 2024 Article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/qanon-comes-to-main-street/conspiracy-cop-shawn-taylor-resigns-from-millersville-police-department-amid-criminal-probe

***Phil Williams and The NewsChannel 5 Defendants' December 18, 2024 Quid Pro Quo Media Kickback***

366.    In furtherance of the retaliatory and defamatory campaign against Plaintiffs Todd Dorris and Michael Candler, Defendants Phil Williams and NewsChannel 5 provided repeated and favorable media coverage to Commissioners Dustin Darnall, Jesse Powell, and David Gregory, portraying them as reformers and heroes while painting the prior administration—and its officers—as ideologically dangerous and incompetent. The December 18, 2024 article, titled "Hints of drama, yet hope for future as new city commission takes reins," serves as a quid pro quo media kickback, reinforcing the conclusion that Defendants, including Defendant Cristina Templet, acted in coordinated fashion with elected officials to defame Plaintiffs, force their removal from public service, and consolidate political power through false narrative manipulation. This further supports Plaintiffs' claims under 42 U.S.C. § 1983, as well as Tennessee common law defamation, false light, and tortious interference.

***Phil Williams and the NewsChannel 5 Defendants Continued Campaign of Disinformation and Support of Kim Kelley and her Affiliated Organizations as Quid Pro Quo Media Kickback via January 14, 2025 Article.***

367.    The January 14, 2025 article titled *"Millersville Detectives Take Aim at Whistleblower in Federal Lawsuit"*[16] by Phil Williams, the article is riddled with intentional distortions, misquotations of the actual Complaint, and coordinated narrative manipulation, which constitute further acts in a concerted racketeering enterprise, a First

---

[16] The article was published at: https://www.newschannel5.com/news/newschannel-5-investigates/qanon-comes-to-main-street/millersville-detectives-facing-tbi-investigation-take-aim-at-whistleblower-in-federal-lawsuit

Amendment retaliation scheme under 42 U.S.C. § 1983, and continued tortious interference with Plaintiffs' at-will employment.

368.    The January 14, 2025 article contains deliberate misquotation from the original Complaint, reinforcement of known falsehoods, and a smear campaign framing of the lawsuit in at least the following ways:

a.  Williams characterizes the "coordinated publicity stung" between NewsChannel 5 and the TBI as "strange" or "baseless" without quoting or linking to the actual evidence provided.

b.  Williams does not provide a copy of the lawsuit for viewers to see, which is a standard practice.  Williams does not provide a copy of the lawsuit to continue to launder evidence and intentionally skew the false narrative he and the other Defendants created.

c.  While completely ignoring the bulk and core assertions in the Complaint, Williams focuses his article on two sentences regarding 9mm bullets to distort the context of the lawsuit and falsely suggest the Complaint is unserious or conspiratorial.

d.  Williams again promotes the narrative that Dorris committed perjury, despite clear exculpatory language in the Complaint stating that detectives took over communications when they became criminal in nature and characterizing this as some sort of "new allegation" from the Detectives, when in fact their story never changed.  Williams language suggests that their story is a false, post-hoc justification, when in fact their story and Det. Dorris's testimony has never changed on this point.

e. Williams selectively cites statements from Kim Kelley that have already been discredited by multiple eyewitnesses and video and audio evidence.

f. Williams falsely states that the "videos provided by Kelley corroborated her story," when those videos are edited, staged, and were shown to have occurred after the sting or at least at time when no other volunteers or officers are visible in the frame or can be heard in the background, thus strongly suggesting that they were taken after the sting was over, as the Complaint alleges.

g. Williams mischaracterizes the Complaint as an effort to attack a whistleblower, rather than what it is: a lawsuit seeking redress for defamation, constitutional violations, and coordinated retaliation.

h. Williams continues to refer to Plaintiffs as part of a "troubled department," reinforcing the defamatory campaign of guilt by association that he and the NewsChannel 5 defendants created.

369. This article is not a stand-alone hit piece-it is part of a pattern of predicate acts that show a criminal racketeering enterprise and constitutional conspiracy involving the following coordinated actors:

a. Phil Williams and NewsChannel 5, as propagandists and media manipulators;

b. Kim Kelley, as the operative providing knowingly false and altered evidence;

c. Commissioners Carla McCain, Dustin Darnall, Jesse Powell, and Cristina Templet, who used these broadcasts to justify removing Plaintiff Dorris from his law enforcement role;

d. Stephen Hale and the interim City Manager, whose retaliatory employment decisions were based on this false narrative.

370. The January 14 article:

    a. Reinforces the false political attribution that Plaintiffs were part of a conspiratorial, extremist movement;

    b. Distorts and weaponizes legal filings to further discredit them;

    c. Furthers the retaliation scheme by portraying Plaintiffs as aggressors and discrediting their access to the courts;

    d. Was published with actual malice, as Williams has knowledge of the facts alleged in the Complaint, including that Kelley fabricated footage and that law enforcement officers conducted the communications with suspects.

371. In an effort to defend against disclosing Det. Candler's likeness, name, and affiliation with the Millersville Police Department, Phil Williams falsely stated that a photo taken by Shawn Taylor on April 25, 2024:

    a. "shows Detective Candler posing during the planning meeting for the sting operation in Taylor's garage,"

    b. and that this photo was "posted by the Millersville Police Department."

372. In fact:

    a. The photo was not posted by the Millersville Police Department

    b. It was a private Facebook post by Shawn Taylor on April 26, 2024, shared only with his personal friends;

    c. Det. Candler was not identified or tagged, wore plain clothes and a cap pulled low over his face, and was not publicly recognizable as a police officer and was standing amidst multiple individuals who were not police officers;

d. The sting operation had not even been conceptualized at the time the photo was taken, and the meeting had nothing to do with the sting.

373. Despite repeatedly referring to her so-called "verifiable evidence" in public statements and broadcasts—including direct quotes featured in Phil Williams' January 14, 2025 article—Defendant Kim Kelley has refused for months to produce the unedited source material or supporting documentation for the claims she has made against Plaintiffs Todd Dorris and Michael Candler. Plaintiffs have specifically requested this evidence, yet Kelley has failed to provide even the most basic corroboration of her allegations. Instead, Kelley has attempted to divert attention from her evidentiary deficiencies by focusing obsessively on unrelated topics such as Veterans for Child Rescue (V4CR) and bizarre, irrelevant conspiracies concerning "the Moonies."

374. Kelley's failure to turn over the alleged "verifiable evidence" she so publicly touts—while simultaneously launching salacious and career-destroying accusations—demonstrates that no such evidence exists, or that she knows its full context would discredit her narrative. Rather than comply with reasonable disclosure requests, Kelley has engaged in a pattern of delay, distraction, and deception, including repeated attempts to use her political and media allies to amplify her claims without scrutiny.

375. Furthermore, Kelley has communicated through an attorney who strategically refuses to confirm whether he actually represents her, a tactic seemingly designed to shield her from accountability while still engaging in quasi-legal posturing. During this period, Kelley and/or this proxy attorney have improperly copied Phil Williams on confidential and privileged communications, a breach of ethical and professional norms that

demonstrates a coordinated relationship between a purported source and a journalist who has abandoned objectivity.

376. Phil Williams has knowingly excluded all of these material facts from his ongoing coverage of the case, including Kelley's refusal to produce evidence, her irrelevant diversions, and her entanglement in privileged correspondence. Instead, Williams has published misleading and one-sided reports that portray Kelley as a whistleblower, thereby participating in a quid pro quo media kickback scheme wherein he promotes her public image in exchange for access to weaponized "leaks."

377. This conduct by Kelley and Williams constitutes additional evidence of the malicious intent, actual malice, and reckless disregard for the truth that underlies Plaintiffs' claims of defamation, false light, tortious interference, and constitutional violations. It further supports Plaintiffs' claims that the media narrative was never rooted in fact, but in orchestrated retaliation and character assassination carried out by political actors and media surrogates acting in concert.

378. In sum, the January 14, 2025 article published by Defendants Phil Williams and NewsChannel 5 and titled *"Millersville Detectives Take Aim at Whistleblower in Federal Lawsuit"* falsely and maliciously mischaracterized the factual allegations contained in Plaintiffs' federal Complaint, deliberately misquoted portions of the filing, and reinforced discredited narratives about the Plaintiffs, all while promoting Defendant Kim Kelley as a heroic "whistleblower" despite her proven role in fabricating and altering evidence. This article constitutes a further act in a coordinated racketeering enterprise under RICO and is part of the continuing violation of Plaintiffs' First Amendment rights under 42 U.S.C. § 1983 by publicly retaliating against them for perceived political affiliations. By presenting

knowingly false claims as fact and falsely accusing Plaintiff Dorris of perjury, the Defendants once again defamed Plaintiffs, cast them in a false light, and materially contributed to the ongoing tortious interference with their at-will public employment. The false and misleading statements were made with actual malice and are part of a broader campaign to suppress Plaintiffs' constitutional rights, discredit their law enforcement work, and force their removal from public service.

***The Defendants' Shared Goals of Interfering with the Millersville Child Predator Sting and Plaintiffs Employment.***

379.     Defendants Kelley and Drake nonetheless had the shared goal of disrupting the Millersville undercover sting operation to, in their words, simultaneously "take out" their perceived competitor, V4CR, and the members of the Millersville Police Department working with them.    Phil Williams and the NewsChannel 5 Defendants were willing participants in this shared goal, although their motive was also to cause harm to Plaintiffs based on their perceived political beliefs and political affiliation.  The NewsChannel 5 Defendants engaged in multiple overt acts in furtherance of this shared goal of disrupting the undercover sting, destroying the Plaintiffs careers, via their repeated posts and reposts of the false and defamatory articles about Plaintiffs, and their simultaneous favorable support of Kelley, which she then used to increase her business reputation and profits.  Kim Kelley acknowledged her ongoing relationship with Phil Williams and the NewsChannel 5 Defendants' by tagging them in multiple social media posts, and has even copied Williams on privileged communications involving this lawsuit.

380.     The Defendants and their co-conspirators, by fabricating evidence and coordinating a smear campaign, attacked and disparaged the Plaintiffs with false and negative statements

for the purpose of advancing their own unlawful agendas and promoting their unlawful racketeering enterprise. The Defendants' campaign also caused the unlawful release of Det. Candler's identity, thereby rendering it impossible for him to work as an undercover narcotics officer, and tortiously interfering with his employment.

381.     As set forth herein, Defendant Kim Kelley has been engaged in various racketeering enterprises with Defendant Phillip Drake, including through her companies Defendants Digital Defenders United, Inc. and Grow Online, LLC, and their purported "non-profit" corporation, Uniting America Incorporated.

382.     Kim Kelley is an admitted former member of a "sex cult." Kelley was interviewed in Episode 236 of the Heartland Journal Podcast on August 5, 2024,[17] and she emphasized that she was "raised by gaslighters and narcissists."[18] Kim Kelley's admission that she was raised by narcissists and "gaslighters" demonstrates her familiarity with their manipulative tactics and further demonstrates that she understands, and has the propensity to utilize, gaslighting and narcissistic strategies—such as distorting facts, sowing confusion, and controlling narratives—to gather and selectively edit evidence for blackmail, to fabricate false evidence, and to orchestrate smear campaigns—which is exactly what she did as part of her and Drake's campaign to "destroy" Capt. Dorris, Det. Candler, and others.

---

[17] See, e.g., https://rumble.com/v59v3gd-heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24.html; https://podcasts.apple.com/us/podcast/heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24/id1650288595?i=1000664415208

[18] "Gaslighting" originates from the 1938 stage play *Gas Light,* later adopted into the 1944 film, in which a husband systematically manipulates his wife's environment, most notably by dimming the gas lamps, to make her question her own perceptions and sanity. As used herein, a "gaslighter" is someone who employs psychological manipulation and deception to make another person doubt their own reality or sanity, while a "narcissist" is an individual who displays extreme self-centeredness, lacks empathy, and exploits others for personal gain.

383.     V4CR attempted to disrupt child trafficking operations by posing as minors in states where that is allowed, and assisting law enforcement with posing as minors in states like Tennessee.   V4CR's goal was to catch and arrest pedophiles who sought to have sex with persons they believed were minor children.   Kim Kelley apparently disagreed with the manner in which V4CR was operating, stating that she "had concerns about the lack of effectiveness on the "combatting" side of their operations," as she stated in an online post on July 3, 2024.   She claimed that she had been terminated after raising concerns about V4CR's affiliation with something she referred to as "the Moonies cult."

384.     According to statements published online, including in podcasts and videos streamed over the Internet and elsewhere in the channels and streams of interstate commerce, Defendant Kelley and Defendant Drake had been planning to "investigate" and eliminate V4CR for some time and that they had planned to sabotage Millersville for nearly a month in advance during a timeline that overlaps with Phil Williams' pretextual "investigation" of Shawn Taylor and Plaintiffs Dorris and Candler.   What Defendants Drake and Kelley refer to as an "investigation" was actually just corporate espionage and unfair trade practices, both of which are illegal under state and federal law.   Phil Williams' "investigation" was just a pretext to not only burn a source but to attack Plaintiffs for their perceived political beliefs.

385.     Kim Kelley was interviewed in Episode 236 of the Heartland Journal Podcast on August 5, 2024,[19] and provided the following statement to host Steve Abramowicz, who read the disclaimer at the beginning of the podcast:

---

[19] See, e.g., https://rumble.com/v59v3gd-heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24.html;  https://podcasts.apple.com/us/podcast/heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24/id1650288595?i=1000664415208

*All recordings of V4CR in the Millersville's Police Department conducted by Kim Kelly were authorized by Uniting America Incorporated, Phil Drake. Uniting America Incorporated led the entire investigation with Kim Kelly serving solely as an employee of Uniting America Incorporated.*

386.    Kim Kelley 's above disclaimer, published by the Heartland Journal about her working for Phil Drake and Uniting America Incorporated as part of an "investigation," contradicts her own statements in the podcast. For example, one of her pretexts or justifications for making recordings was that she had a "gut instinct that they were trying to either frame me or just do some shady things that I had been observing and calling attention to." Thus, according to Kim Kelley, she needed to have evidence just in case "they," at some future point, tried to "frame her" for some unknown act. Kim Kelley does not identify the exact origin of her paranoia or explain who "they" are and what she was going to be "framed" for, which is evidence that her statements are actually a pretext for a different and unlawful motive. At another point during her interview, she claims that she released her recordings because she saw that "people" were "trying to gaslight and deceive her" and had put her at "significant risk," but she offers no more details other than to say that when she got to Millersville, the phones had not been set up.

387.    Thus, it is reasonable to infer, and Plaintiffs therefore aver, that Kelley's pretexts should not be believed, and that the real reason Kim Kelley and Drake leaked recordings of Plaintiffs Candler and Dorris to the NewsChannel 5 Defendants, which they edited and even amplified the falsity with stock video footage, was because these Defendants had actually conspired to interfere with the Millersville sting before it took place.

388.    V4CR attempted to disrupt child trafficking operations by posing as minors in states where that is allowed, and by assisting law enforcement with posing as minors in states like Tennessee. V4CR's goal was to catch and arrest pedophiles who sought to have sex

with persons they believed were minor children.  Kim Kelley apparently disagreed with the manner in which V4CR was operating, stating that she "had concerns about the lack of effectiveness on the "combatting" side of their operations," as she stated in an online post on July 3, 2024.  Her actions, however, are difficult to follow.  Although her justifications for her interference change every time she discusses them, she claimed at one point that she had been terminated after raising concerns about V4CR's affiliation with something she referred to as "the Moonies cult," a topic in which she has a bizarre and ongoing fascination.  She also claimed that she had given V4CR "many opportunities to do what's right" and that they "made their decisions."  These purported "justifications" do not explain why she wanted to specifically target and attack Det. Candler and Det. Dorris.

389.     Kim Kelley has a remarkable talent for weaving a web of vague terminology and evasive rhetoric, making it difficult to discern her true intentions or accusations. She frequently relies on pronouns like "they" and "them," deliberately obscuring who she is referring to and what specific issues she is addressing. This penchant for ambiguity allows her to construct straw men, deploy red herrings, and engage in circular logic, effectively derailing meaningful conversations and evading responsibility for anything she does. Much like her boyfriend Phil Drake, the self-proclaimed creator of the QAnon conspiracy, Kelley thrives on misdirection and confusion and their collaborative efforts resemble a modern-day QAnon playbook.

390.     For instance, Kim Kelley fixates on attacking V4CR by alleging vague "ties" to "The Moonies Cult," conveniently ignoring that the current members of the Unification Church have rebranded and distanced themselves from the old practices.  Information available online shows that the Moonie children who currently operate the church have no

ties to the old practices of their parents, revealing that Kelley's attack is based on information that is both outdated and irrelevant. Her strategy of targeting irrelevant or exaggerated threats supports her false narrative while diverting attention from the real issues at hand.

391.    Additionally, Kelley's grandiose claims that she provided V4CR with "many opportunities to do what's right" and that they "made their decisions" are nothing more than circular statements designed to evade accountability. Her love for vague assertions and misleading statements is no surprise, given her association with Drake, whose own conspiratorial antics mirror the cryptic and unfocused tactics Kelley employs.

392.    Regardless of her shifting and ambiguous statements, it is clear that Kim Kelley openly promoted Uniting America Inc. and solicited donations from viewers as part of her and Phil Drake's smear campaign.  For example, she provided the following statement on behalf of Uniting America Inc. to be used in the description of Episode 236:

"Joining us is Kim Kelley spokesperson for Uniting America Inc. a frontline movement actively assisting the homeless, advocating for social justice, and combating child trafficking in the USA. But we can't do it alone. We need your help to address these critical issues, make lasting impact, and make a world of difference in our communities. Kim requested she be given an opportunity to share her side of the story as it relates to our Millersville episode with Police Chief Bryan Morris so we did so and here it is. To find out more go tohttps://unitingamericainc.org/"

393.    Defendant Kelley made another incredible claim that at some time before she talked to Phil Williams, she had been accused of "obstructing justice" purportedly by making phone calls to some unidentified person to have them "rip up" the warrants.  Kelley then makes another incredible claim that, only when some unidentified person "framed" her for the warrants not going through at Millersville, that she decided to do an interview with Phil Williams.  Although she claimed that she was going to force "the truth to come out," no

part of the Phil Williams interview discusses the purported conspiracy to "frame" Kim Kelley.

394.     In the Heartland Journal Podcast, Kim Kelley states that there were four "chatters," but she fails to disclose that there were six phones.   She also claims to have been the one who identified suspect Henry Dean Jordan, claiming that the detective was with her and she showed him the phone.  She stated that the "chatters" were the ones "posing as minors," but fails to include the full truth, which is that chatters were only allowed to filter through communications to ascertain whether the subjects were still interested in talking to the underage profile or not.  She failed to state that none of the Volunteers were authorized to handle the solicitations from the suspects.

395.     In another isolated clip provided by Kelley to Channel 5, she played a clip of Asst. Chief Taylor stating that the detectives needed to be in the room with the chatters at all times, without playing the rest of the recording and without clarifying that this rule was independent of the rule regarding law enforcement officers handling the solicitation.  These are two separate rules, and Kim Kelley combined partial playback manipulation of a different rule to fabricate evidence that when she got to Millersville that "the Rules had changed."  In fact, the rules at the Millersville Op never changed, and none of the publicly available videos taken by Kim Kelley prove otherwise, except by selective editing and partial playback manipulation.  One rule was that the detectives had to always be present with the chatters.  The next rule was that the detectives had to handle the solicitation because that is what Tennessee law required.  Rule #1 and Rule #2 make sense because a detective needed to be present so that if a solicitation was about to happen, the phone could be handed to them immediately.   Another rule was that volunteer chatters could only

handle preliminary communications with suspects to "work up" through preliminary chit chat to see if the conversation was going to steer toward a solicitation that needed to be handled by the detectives.

396.    In another one of the edited video clips Kim Kelley provided to Phil Williams, she asks Det. Dorris how much "work up" he needed for her to handle, and he states, "Well, as much as you can." Kim Kelley then falsely characterized this isolated clip of the recording as evidence that she was handling all the solicitations and that the Plaintiffs were never involved in any communication with any suspect at all. In fact, the "work up" was nothing more than Det. Dorris telling her the pre-existing rule, which was that they could "chat" with subjects but that the Robertson County DA was absolutely clear that detectives had to handle the solicitation with the suspect.

397.    According to Phillip Drake in an August, 19 2024 interview on episode 240 of the Heartland Journal Podcast, he and Kim Kelley had conspired to sabotage the Millersville/V4CR sting and had agreed in advance that she would travel to Millersville with the express goal "to take those bastards down," referring to both V4CR and the Millersville Police Department. Defendant Kelley and Defendant Drake intended to sabotage the Millersville pedophile sting and then exploit the subsequent media coverage generated from the fallout to accomplish this goal.

398.    In one of the "secret recordings" made by Kim Kelley and sent to Phil Williams, Kim Kelley speaks with Asst. Chief Taylor, who correctly informs her that under Tennessee law, the detectives had to handle the solicitations and that the volunteers needed to tell the detectives what to type. Taylor then asks Kim Kelley, "When it comes to setting up the account, what's got to be done to set up the account?" After an awkward pause,

Kim Kelley offered the following shill or non-sequitur, "That's what I want to understand are the parameters. The parameters. That's what – I'm being counseled against this, not only against this being effective. But I'm being counseled against doing this." In the recording, a male voice is heard laughing. Upon information and belief, the laughter was from Phil Drake, who admitted in a subsequent podcast that he was listening to the phone call and that it was somehow funny that Taylor was asking Kelley for her advice on how to set up a profile on the phone, which Kelley was unable to answer.

399. Defendant Kim Kelley claimed in the recording that she was "being counseled against doing" the Op and was counseled against the "effectiveness" of a pedophile sting, which she would later state was, in her opinion, not the same as investigating "child trafficking." Philosophical differences aside, the full recording shows only that Shawn Taylor informed Kim Kelley truthfully about the requirements of an undercover law enforcement officer handling the solicitation aspect of the conversation.

400. Prior to the Millersville undercover sting commencing on or about May 17, 2024, volunteers had been expressly warned by Millersville officials about the risk of media coverage and that the Op needed to be run with a heightened duty of care for that reason. Kim Kelley was also specifically aware that Phil Williams at Channel 5 News would be running stories on Shawn Taylor.

401. Kim Kelley had participated in only two (2) prior operations with V4CR over the prior year. Drake admitted during his Heartland Journal Podcast interview that he had seen Defendant Kelley online and had recruited and groomed her to work for him. Drake admitted during the Heartland Journal Podcast that he had targeted Kelley because she was already working with V4CR and had inside access to their operations, which would make

it easier for him to commit corporate espionage against them. Their relationship goes back at least a year, and the two have been romantically involved.

402. Drake stated in his interview that he was a "federal contractor" for 15 years, and that he did "horrendous things" to civilians as part of his work along the U.S. – Mexico border and as part of his purported "counter-corruption" job duties for one of several three letter agencies, including the FBI, OIG, and the CIA. Although Drake claims that he only uses the CIA for when he needs to kidnap (in his terms "rescue") children that are trafficked internationally. Violence is a routine part of Drake's racketeering enterprises. As Drake candidly stated to host Steve Abramowicz during Drake's interview on the Heartland Journal Podcast, when any individuals get in his way or his organization's way, "we take them out, too, as you well know."

403. In early 2024, Drake and Kelley had attempted to bribe and/or solicit a V4CR volunteer to commit corporate espionage against V4CR. Although the V4CR volunteer declined to commit corporate espionage, the Defendants' attempt to commit the offense and/or solicitation of another to commit the offense constitutes a violation of 18 U.S.C. § 1832, and is therefore a predicate racketeering offense for purposes of 18 U.S.C. § 1961 et seq.

***Phil Drake Publicly Claims To Have Created the "Q Anon" Conspiracy As Part of His Work as Contractor for CIA, FBI, and OIG.***

404. It is the peak of irony that Phil Williams baselessly branded Shawn Taylor and Plaintiffs Todd Dorris and Michael Candler as "QAnon conspiracy theorists," yet he relied on statements and evidence from Kim Kelley and her co-conspirator Phil Drake as his star witness and source of information. Although Phil Drake openly states in his online

podcasts that he was the one who provided Phil Williams with the "secret recordings," Phil Williams and the NewsChannel 5 Defendants falsely stated in their January 14, 2025 article that Drake "was not utilized as a source for NewsChannel 5's investigation." The NewsChannel 5 Defendants never mentioned that this lawsuit claims and proves that Phil Drake openly claimed in online videos to be the *actual* creator of QAnon, supposedly as part of his top-secret work as a "federal contractor" working for the FBI, CIA, OIG, and various other unidentified "three-letter agencies." By using an unreliable witness and her self-professed QAnon–founding accomplice to smear the Plaintiffs for doing their job, Phil Williams has actually advanced the very "Q conspiracy" narrative he purports to condemn.

405.    On January 2, 2024, Phil Drake uploaded a YouTube interview he did with Craig Sawyer, another favorite target of Phil Williams, during which time Drake made additional, shocking claims.  According to Drake, contractors were needed to be a "third party" that could accomplish illegal tasks that the agencies themselves could not carry out.   He claims that his job was to assist the "FBI, OIG, or CIA" by breaking into homes, documenting evidence, and then being treated as an "undercover informant," in order to somehow provide these agencies the stolen information so they could then obtain a search warrant to seize the evidence.

406.    During the podcast with Craig Sawyer, Drake claims that his "entire career doing this was [sic] revolved around violating the rights of the American people," and that he was "not going to sugarcoat it."  Drake claims that he received "orders" from the CIA. "You make the people in the community trust you," claimed Drake, "and then you manipulate situations so you can follow out your orders."

407.    Drake claims to have received direct orders from "the administration," to create "QAnon." He claims that he started working on "QAnon" in mid-2016. To accomplish the creation of "Q" - Drake claims that he and unidentified members of his team of "contractors" were provided an English translation of Adolf Hitler's "Mein Kampf" as part of the creation of "QAnon." According to Drake, his "QAnon" development was accomplished to target members of "the Christian faith."



408.    Drake claims that he and his team used "Cambridge Analytics" to create QAnon. He reiterated that his mission was to "target Christians" and "target their faith" to make sure that there was a "living savior" in office.

409.    Phillip Drake ran in the 2024 United States Presidential Race, first as a Democrat, and then as an independent candidate. In fact, his purported campaign was and is a front for illegal transmissions of money, money laundering, and racketeering enterprises owned and operated by Drake and Defendant Kelley, with over $200,000 being paid to Defendant Kim Kelley for "online marketing" services, when in fact the money was paid as part of

these Defendants' unlawful scheme to purchase, traffic, and conceal children on a farm owned and operated by the Defendants, in violation of dozens of federal laws.

*Phil Drake and Kim Kelley's "Child-Purchasing" and "Survivor Center" Fraud Scheme.*

410.      Phil Drake and Kim Kelley had a shared "vision" of an enterprise to purchase children being illegally trafficked in the United States and then conceal them from society at an undisclosed farm operating as a purported "survivor center." According to admissions by Drake during his interview on the Heartland Journal Podcast, to obtain these children, some of which are as young as ten (10) months old, he and his "team" will either use force to kidnap children from child traffickers, or he will "bribe government officials" involved in the illegal trafficking scheme, and then transport them to a compound owned and operated by him and Kim Kelley.

411.      Drake claims that he and Kim Kelley have built a "Survivor Center" to house the child trafficking victims he has rescued. His stated reason for having this compound of children is "because you can't trust the government to house the children."

412.      Of course, being on the "buy side" of a child trafficking scheme is just as illegal as being on the "buy side" of a drug trafficking scheme. As an analogy, if an individual wants to purchase a kilo of cocaine "to get it off the streets," they can still be arrested and charged for possession of the drugs as if they intended to use them personally. Similarly, whatever lofty intentions were shared by Drake and Kelley as part of their "child purchasing" scheme or "kidnapping trafficked children from the traffickers" scheme, their conduct is just as illegal as if they had kidnapped these child victims by prying them from their parents' arms.

413.      Phil Drake openly admitted during his interview with Craig Sawyer that the funds he used to fund both his presidential campaign and the purported "Survivor Center" came

from the illicit funds he made doing "horrible things" along the U.S. – Mexico border. Drake made the following statements approximately 1 hour and 24 minutes in the online interview with Mr. Sawyer:

*Listen, my motivations have completely changed. Like the nonprofit up to this point where we're doing the Survivor Center and all that stuff. It's been funded completely out of pocket. Now I'm running out of money, but it's been completely out of pocket. The campaign completely out of pocket because. Listen, I did a lot of horrible things to make that money, right? It wasn't good money, even though there's not much of it left. I knew I had to. I knew that I had to do something good with that money or dispose of it. So I'm doing good with that money. And I have a unique set of skills now. I can use those skills for the good instead of for the bad. And that's why we run operations. Me and my team, we just go in and we get the kids. You know, we do a lot of investigating of child sex cults. I know you know a great deal about that, Craig. Ugly.*

414.    Phil Drake has admitted that his 2024 Presidential Campaign was funded in whole or in part with the illicit funds he obtained as part of the Defendants' scheme of mass murder of migrants on the border, and their subsequent trafficking of the children that Drake separated from their parents.  Thus, all funds received by Drake, including all funds transferred to or from Drake and Kelley's shell corporation, Uniting Americas, Inc., which holds funds known to be derived from criminal offenses and holds said funds for purpose of tax evasion, and therefore constitutes an illegal "money transmitting business" in violation of 18 U.S.C. § 1960.   The Defendants, individually and in collaboration with Defendant Uniting America, Inc., participate in and solicit participation in a human trafficking payment network used to move funds in furtherance of human trafficking operations in violation of 18 U.S.C. § 1960.

**Defendant Phil Drake Admits Involvement In Interstate and Transnational Racketeering Scheme, Willfully Violating Rights of Americans, and Engaging in Acts of Terrorism.**

415.    On numerous occasions, Phil Drake has publicly boasted not only about openly bribing government officials and expressing his continued willingness to do so, but also

engaging in heinous acts of mass murder of migrant families along the U.S. Border with Mexico. Drake has claimed that he was working as a "federal contractor" for both the CIA and Mexican drug cartels, and that he would intercept immigrants travelling to the U.S. Border from Mexico. Drake claims that he, with the assistance of other "federal contractors," separated children from their parents and then engaged in the systematic murder of the parents of over 5,000 child immigrants. Drake has claimed on numerous times that he knows where "all the mass graves" of the murdered victims are located, and that it is somewhere along the U.S. border with Mexico in Texas.

416.     Drake has openly admitted to trafficking children as part of his purported campaign of mass murder and violence. Drake claims that after separating migrant children from their parents and killing their adult parents, he was given "satchels full of money" from the drug cartels and ordered to transport these illegal payments across the border and state lines to officials in Washington D.C. as part of the Defendants' unlawful racketeering enterprise. Drake claims that he had been involved in this enterprise "under the past four U.S. Presidents," indicating that his pattern of racketeering has gone back at least two decades.

417.     Phil Drake's admissions of separating children from their parents at the U.S. – Mexico Border, participating in the murder of those parents, and then smuggling satchels of money back into the United States to bribe officials—constitutes a clear "murder-for-hire" scheme that is unlawful under 18 U.S.C. § 1958, which prohibits using interstate or foreign commerce facilities for the intentional commission of murder in exchange for anything of pecuniary value. Drakes admissions also serve as a "predicate act" under the Racketeer Influenced and Corrupt Organizations Act, rendering anyone involved in the scheme jointly and severally liable for it. Specifically, 18 U.S.C. § 1958 identifies the use

of interstate commerce (through travel, mail, or other means) with the intent to commit murder-for-hire as a federal offense; under civil RICO, such conduct demonstrates a pattern of racketeering activity that gives rise to liability for those who knowingly participate in, conspire to commit, or benefit from the scheme.

418.     Defendant Drake's admissions of mass murder at the U.S.-Mexico border also constitute "international terrorism" in violation of 18 U.S.C. § 2331(1). First, his activities involved violent acts and serious threats to human life, which would be criminal under state or federal law if committed within the territorial jurisdiction of the United States. Second, these acts were inherently designed to intimidate or coerce a civilian population or government, satisfying 18 U.S.C. § 2331(1)(B). Finally, Drake's actions transcended national boundaries by allegedly occurring in Mexico and continuing into the United States, fulfilling the requirements of 18 U.S.C. § 2331(1)(C). Accordingly, Drake is guilty of international terrorism, and these offenses constitute separate predicate acts for purposes of the Plaintiffs' Civil RICO claims brought under 18 U.S.C. §§ 1961–1968.

419.     Drake's admissions also implicate 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering activity. Specifically, Section 1959 penalizes individuals who commit or conspire to commit murder, kidnapping, and other violent offenses either for something of pecuniary value from a racketeering enterprise or to maintain or increase their position in such an enterprise. Here, Drake admits to committing mass murder on the U.S.–Mexico border, and then kidnapped the children and smuggled funds into the United States to bribe public officials—conduct that is the epitome of violent crimes done in furtherance of a racketeering scheme. Consequently, Drake's actions violate 18 U.S.C. § 1959 and

constitute yet another multitude of predicate acts for purposes of Plaintiffs' Civil RICO claims under 18 U.S.C. §§ 1961–1968.

420.    Accepting Phil Drake's admissions as true, his direct involvement in the systematic murder of 5,000 to 10,000 civilians would also constitute crimes against humanity under international law and would rank him among such notorious persons as Serbian war criminal Ratko Mladić, who was criminally responsible for the July 1995 Srebrenica massacre in which over 7,000 Bosnians were systematically murdered.

421.    Phil Drake has told witnesses that he has videos on his cell phone showing him and his "team" stacking dead bodies into mass graves somewhere along the U.S. – Mexico border.  Discovery is needed to verify these claims.

422.    In Episode 240 of the Heartland Journal Podcast, Drake claimed that he and his Affiliated Organizations are responsible for the "rescue" of 1,384 children in the eight months from January 2024 and his interview in August of 2024.  Drake stated that he does not film his "rescues," because the child traffickers that he steals these children from view his actions as "stealing their product," which Drake claims justifies hiding these children from society on the purported farm owned and operated by him and Defendant Kelley.

423.    Under 18 U.S.C. § 1201, kidnapping is broadly defined as the unlawful abduction or confinement of a person, regardless of the perpetrator's claimed motive. In Defendant Drake and Kim Kelley's "business model," forcibly taking children from their parents or traffickers—without lawful authority—and holding them at a concealed location purportedly to "rescue" them still constitutes "abduction" and "holding" for an unlawful purpose. The statute does not require proof of a demand for ransom or reward; the phrase "or otherwise" covers <u>any</u> unlawful holding of a victim against their will or without proper

legal justification. Consequently, even if Drake and Kelley subjectively view their actions as noble or protective, the act of removing children from their rightful custodians and hiding them away at a "Survivor Center"—absent a valid legal order—constitutes kidnapping under federal law and also constitute at least 1,384 additional predicate acts occurring in 2024 for purposes of Plaintiffs' Civil RICO claims under 18 U.S.C. §§ 1961– 1968.

424.    Defendants Drake and Kim Kelley have knowingly used their Affiliated Organizations as unlicensed money transmitting businesses in violation of 18 U.S.C. § 1960 by funneling illicit proceeds from their murder/kidnapping/trafficking/fraud scheme into Drake's presidential campaign and then, in turn, transferring those funds to themselves under the guise of the expenditures being "campaign expenses." Further, they have misused their 501(c)(3) entities—Uniting America Inc. and Digital Defenders United—to facilitate these transactions without obtaining the required state licensing or federal registration as a money transmitting business under 31 U.S.C. § 5330. By operating without the appropriate license(s) and using instrumentalities of interstate commerce to move illicit funds, Defendants have violated 18 U.S.C. § 1960.

425.    In addition, Defendants Drake and Kelley have engaged in the unlawful laundering of monetary instruments in violation of 18 U.S.C. § 1956, as they knew the funds derived from their murder/kidnapping/trafficking operation were proceeds of unlawful activity, yet they conducted financial transactions with the intent to promote further illegal conduct and to evade reporting requirements. Specifically, by moving money from the presidential campaign and through nonprofit accounts to pay themselves, Defendants concealed or disguised the nature, source, ownership, and control of these criminal proceeds. This

conduct constitutes money laundering in violation of 18 U.S.C. § 1956(a)(1) and (a)(2), as the transactions involved interstate commerce, were designed in part to avoid taxation and required disclosures, and clearly promoted continued unlawful activity.

426.     Defendants Kelley also exploited their 501(c)(3) nonprofits—Uniting America Inc. and Digital Defenders United—as conduits for funneling illicit funds while claiming the protection of charitable status. This misrepresentation to federal and state authorities further underscores their intent to conceal the origins and beneficiaries of the money. As a result, these nonprofits acted as fronts for illegal financial transactions, intensifying Defendants' violations of both 18 U.S.C. § 1960 and 18 U.S.C. § 1956, and contributing to a broader pattern of racketeering activity under 18 U.S.C. §§ 1961–1968.

*Defendants Phil Drake and Kim Kelley's "Survivor Center" Is An Instrument of Fraud Racketeering.*

427.     Defendant Drake and Defendant Kelley, Co-founders of Uniting America Inc., created and utilized Uniting America Inc. to not only promote and facilitate their unlawful racketeering enterprise, but have also used the instrumentalities of interstate commerce to fraudulently obtain donations and funds to build a "Survivor Center" that does not actually exist.  At bottom, Drake and Kelley are scam artists who travel across interstate lines to perpetrate their many frauds.

428.     Although the Defendants took down their websites "UnitingAmericaInc.org" and "GrowOnline.Com" in December and August of 2024, respectively, the Defendants had utilized those websites to advance their racketeering activities and fraudulently obtain donations.

429.     To advance their racketeering activities, Defendants Drake and Kelley claimed to own 80,000 acres of property "in the Carolinas," where they had built their Survivor Center and were actively harboring "child trafficking survivors."   The following screenshot is from the Facebook page of Uniting America Inc.:



430.     The Defendants published the following information about their business plan and

the purported "Survivor Center" on their website "UnitingAmericaInc.Org":



## Join the Movement For Positive Action!

By contributing your time, resources, or donations, you directly impact the lives of those in need and contribute to the positive transformation of our society. Every small action contributes to lasting change.

Join the #UnitingAmerica Movement and become an agent of change. Together, we will take action, uplift our communities, and create a brighter future for all.

## A Sanctuary of Hope: Uniting America's Center for Child Trafficking Survivors

Imagine surviving the unimaginable, facing each day with the heavy burden of unfathomable mental and physical trauma.

Children trapped in the harrowing realm of trafficking require more than sympathy. Beyond rescue, they need a sanctuary where they can rediscover hope, heal from their trauma, and envision a future where they are free and empowered.

**Donate & Make A Difference**

431.    The scope of the Defendants' fraudulent scheme varies.  On Facebook, they claimed to own 80,000 acres "in the serene Carolinas," but on their website, they claimed to own "85 acres in the peaceful Carolinas":

> ## Our Vision: A Self-Sustainable Haven
>
> At Uniting America, we're rising to address this challenge. Over 85 acres in the peaceful Carolinas will soon be transformed into a beacon of hope and healing.
>
> Our Survivor Center and Safe Home Community promises:
> - **Safety & Security:** High-security measures, from on-site security teams to advanced tech, ensuring every child is truly safe.
>
> - **Healing & Therapy:** Spaces dedicated to trauma-informed care, led by specialists in various therapy and rehabilitation modalities.
> - **Reconnection with Nature:** Our community will thrive sustainably, complete with its farm, animals, and gardens, offering therapeutic engagements with nature, and solar panels ensuring green energy.
> - **Education & Growth:** Holistic growth opportunities, from education to skill-building, preparing them for brighter tomorrows.

432. According to videos on the Defendants' Facebook page, they have travelled to various places throughout the United States to promote their illicit business and seek donations from those they can scam into believing that the "Survivor Center" has been built. Through creative editing of videos and recordings, the Defendants have taken clips of videos from various places and edited them together to create the illusion that they own and operate a resort-like "Survivor Center" complete with what they refer to as a "regenerative farm," where purported child trafficking survivors live and work as part of some collective commune. Drake and Kelley have uploaded videos of themselves with various children, claiming that these children were currently being housed at their

"Survivor Center." It is not clear if these children are, in fact, trafficked children or if they are just more "props" that the Defendants have used to create the illusion that they are operating a legitimate business.

433.    In videos the Defendants have posted to their Facebook page "Uniting America Inc," Kim Kelley announces herself as the "co-founder" of Uniting America Inc. and claims that the Defendants own "100 acres" that houses their Survivor Center and their "regenerative farm" and they claim in these videos "right now, we have a regenerative farm and we have cabins that can house 15 to 17 children each." The Defendants show videos of children working on this "regenerative farm" and other videos of children playing with dogs, which the Defendants represent are trafficked children who have been rescued and are currently living at this compound.

434.    Defendants Drake and Kelley, and those acting in concert with them have admitted to harboring and conspiring to harbor children at their so-called "Survivor Center," which they claim is surrounded by armed guards. Drake has claimed that these children are then isolated and concealed from the public and lawful authorities until they will reach adulthood. Drake has stated his intent that these children remain under his control at the "Survivor Center," working on the "regenerative farm" that is attached or part of the same property. The Defendants' actions constitute the knowing recruitment, harboring, or obtaining of persons for labor or services under conditions that effectively prevent them from exercising their rights or seeking help from law enforcement—thus violating 18 U.S.C. § 1590. By removing any possibility of discovery by authorities, voluntary departure, or lawful guardianship, Drake and Kelley's plan violates the statutory

prohibitions against peonage, slavery, involuntary servitude, or forced labor and constitute independent predicate acts of racketeering activity under 18 U.S.C. §§ 1961–1968.

435.     Moreover, Defendant Drake and Kelley's scheme to house these children in a compound surrounded by armed guards and compel them to work at the "Survivor Center" inherently envisions him benefiting—financially or otherwise—from their unpaid or forced labor. Under 18 U.S.C. § 1593A, any individual who knowingly profits from a venture involving trafficking or forced labor, knowing or acting in reckless disregard of the venture's illegal nature, is subject to the same penalties as a direct participant. Here, Defendant Drake's continued public statements reveal an intent for him and the other Defendants and Defendant Organizations to profit from coerced labor, thereby demonstrating that he benefited (and plans to benefit) from his ongoing, criminal trafficking scheme.

436.     At bottom, Defendants Drake and Kelley are also simply utilizing their fraudulent enterprises to scam people into donations and receipt of money based on their misrepresentations.  For example, Drake uploaded a video on YouTube claiming it showed him building one of the "cabins" for trafficked children at the Defendants' Survivor Center:



437.     Although it is not clear where the staged videos of the two "tiny homes" being delivered were taken, Google Earth images show that both of these structures are now in the back yard of Phillip Drake's dilapidated residence in South Carolina, as shown at the end of the dirt driveway in the right side of the following photo:



438.     Defendants Drake and Kim Kelley also utilized their fraudulent racketeering enterprises to scam individuals into donating money for purported "disaster relief efforts." Drake and Kelley used the federally-declared Maui fire disaster in 2023 to divert donations to his and Defendant Kelley's illicit enterprises.   In furtherance of this scheme, Defendants Drake and Kelley uploaded videos to YouTube falsely claiming that they were sending in a "team" to assist with the disaster relief, which was false.

439.     The following is a screenshot of the Defendants' YouTube video:



440.     The Defendants also linked back to their website for Uniting America, Inc., thus

using the instrumentalities of interstate, in order to obtain fraudulently induced donations

provided to them for purposes of assisting with the disaster in Maui:

**UNITING AMERICA: STEPPING UP TO FILL IN THE GAPS**

In these unprecedented times, we're committed to locating the lost, supporting the survivors, defending residents' rights, and initiating community rebuilds.

**Our Recon Team**
Despite the risks, our dedicated team is heading to Maui in an effort to render aid, mitigate further losses, and champion the spirit of Aloha.

**Your Role in Their Resilience**
Your generosity can be the beacon of hope Maui desperately needs.

We guarantee:
💯 **Direct Impact**: Every penny of your donation directly fuels the Maui Disaster Relief effort.

🎥 **Transparent Updates** We promise raw, unfiltered updates from the heart of the action, revealing the truths some might wish to conceal.

Join hands with us. Together, let's empower Maui to rise from the ashes.

**Donate Now**

441.     The Defendants disaster relief fraud not only violates 18 U.S.C. § 1040, it also constitutes yet another predicate act for purposes of Civil RICO, 18 U.S.C. § 1961 et seq. Drake and Kelley have violated 18 U.S.C. § 1040 by knowingly making materially false and fraudulent statements concerning the solicitation and use of donations purportedly designated for "Maui disaster relief" efforts. Specifically, under § 1040(a)(2), they falsified representations by assuring donors that their contributions would be allocated to emergency relief initiatives related to the Maui disaster, which qualifies as a benefit authorized under a major disaster declaration pursuant to the Robert T. Stafford Disaster Relief and

Emergency Assistance Act (42 U.S.C. § 5170). Their deceptive actions involve interstate commerce, as the donations were solicited and transmitted across state lines, thereby meeting the circumstances described in § 1040(b)(1). By concealing the true intent and misuse of the donated funds, Drake and Kelley engaged in fraud connected to major disaster benefits, warranting prosecution and penalties as stipulated under. 18 U.S.C. § 1040.

442.  Defendants Drake and Kim Kelley, along with their respective business entities and co-conspirators, have willfully combined and conspired to commit multiple federal offenses, including—but not limited to—money laundering, illegal money transmitting, kidnapping, forced labor, and tax evasion. By funneling illicit proceeds through purported nonprofit entities, concealing children at Drake's so-called "Survivor Center," and moving funds in and out of Drake's presidential campaign, Defendants engaged in a series of overt acts designed to further their collective criminal objectives. In so doing, they intended not only to defraud the United States government but also to obstruct law enforcement operations in Millersville, all in violation of 18 U.S.C. § 371.

443.  As part of their conspiracy, Defendants intentionally interfered with the undercover pedophile sting conducted by the Millersville Police Department, disparaging Plaintiffs and their participation in the operation as part of their promotion of their own unlawful racketeering ventures, Uniting America Inc. and Digital Defenders United. This interference included disseminating false and misleading information, orchestrating public attacks on Plaintiffs and law enforcement personnel, and coordinating a media narrative aimed at discrediting the sting's legitimacy and the Plaintiffs actions during the sting. By undermining a legitimate law enforcement operation, Defendants sought to advance their

racketeering enterprise by promoting it as superior to the methods used during the V4CR/Millersville pedophile sting.

444.     The above-described conduct also constitutes predicate acts under the Racketeer Influenced and Corrupt Organizations Act. Defendants' repeated violations of federal statutes—ranging from money laundering (18 U.S.C. § 1956) to unlicensed money transmitting (18 U.S.C. § 1960) to the conspiracy offenses described in 18 U.S.C. § 371— demonstrate a pattern of racketeering activity. By coordinating efforts to interfere with an active pedophile sting and simultaneously diverting criminal proceeds into their personal coffers and nonprofit organizations, Defendants acted as a cohesive "enterprise," seeking both financial gain and insulation from law enforcement. Their unlawful conspiracy, carried out through multiple related criminal acts, thus falls squarely within Civil RICO's purview, and each Defendant is jointly and severally liable for the damages caused by this pattern of racketeering activity.

445.     During his August interview on the Heartland Journal Podcast, Drake claimed that he had travelled across state lines into Tennessee "the other day" to assist "a young lady who has been abused quite a bit," claiming that "law enforcement" would not do anything about it.  Whatever illicit act Drake accomplished during this August trip to Tennessee, it constitutes another predicate act of extending the Defendants' racketeering enterprises into Middle Tennessee.

446.     Drake claims, and Plaintiffs therefore aver, that Drake provided the "secret recordings" taken by his agent, employee, business partner, and co-conspirator Kim Kelley during the undercover pedophile sting in Millersville to two media outlets that he mentioned in his Heartland Journal Podcast interview.   Drake has admitted that he was the

first person to contact Phil Williams at Channel 5, whom Drake claimed was eager and willing to publish the stories about Capt. Dorris and Det. Candler.

447.     Drake, a multiple felon, has prior convictions and has pled guilty to many crimes of dishonesty.  According to public records, Drake has over three dozen criminal filings against him from South Carolina and Texas, including multiple infamous crimes of dishonesty:

    a.  Two charges in South Carolina for Cruelty to Animals dated August 27, 2013.

    b.  Convictions in South Carolina for felony fraud/theft charges for "Breach of Trust with Fraudulent Intent for over $2,000" on November 2, 2012;

    c.  A guilty plea to the felony charge in South Carolina for the fraud/theft crime of "Larceny/Failure to Return Rented Objects, Fraud, Misappropriation," on February 24, 2012;

    d.  A guilty plea to a 2011 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses under $2,000" ;

    e.  A guilty plea to a 2012 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses under $2,000" ;

    f.  A guilty plea to a 2012 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses Valued $10,000";

    g.  A guilty plea to a 2012 felony charge in South Carolina for theft crime of "Exploitation/Exploitation of a Vulnerable Adult," on February 24, 2012;

    h.  A pending felony charges from 2010 in South Carolina for Theft of Livestock valued at $5,000 or more

i. Indictments from 2009 for Breach of Trust with Fraudulent Intent, valued at $5,000 or more.

j. Five guilty verdicts in 2006 for writing fraudulent checks valued at $500 or less;

448.    In November of 2024, Defendant Drake was arrested by U.S. Marshalls and was held in the Hidalgo County jail in Texas and is currently on house arrest, pending trial for a half dozen felony charges of Theft of Cattle/Horses/Livestock and Theft of Property valued between $30,000 and $150,000.   Hidalgo Texas and Hidalgo County in the Rio Grande Valley sit directly on the U.S. – Mexico border, which is a geographic hotspot widely known to be a corridor frequently used in furtherance of cross-border smuggling and human trafficking.  Thus, Drake's allegations of kidnapping, trafficking and murder along the U.S. Border should be investigated by federal agents, as he had the means, motive and opportunity to have engaged in the heinous acts he has claimed to committing along the U.S.-Mexico border.

*The Defendants' Manipulation of Recordings Taken at the Millersville Pedophile Sting – May 17 to May 19, 2024*

449.    Although Plaintiffs currently lack critical evidence due Kim Kelley's refusal to provide any of the "secret recordings" to see whether they were taken before or after Henry Dean Jordan's arrest, there is available evidence that demonstrates that Kim Kelley fabricated evidence that she was texting Henry Dean Jordan as part of her and Drake's mission to sabotage the Millersville Police Department and V4CR.

450.     In anticipation of the Millersville sting, Kim Kelley claimed that Craig Sawyer at V4CR asked her to purchase five (5) "burner phones" in early May, 2024, and she claims that she began setting up profiles and texting pedophiles herself from a state outside of Tennessee.   Kelley claims that the purpose of this operation was to "get a head start on things" in Millersville prior to the Operation.   Thus, when Kim Kelley arrived in Millersville, she had at least six phones available to make it appear that she was handling solicitations with suspects when in fact she was not.

451.     Kim Kelley and Phil Drake falsely portrayed Asst. Chief Taylor as being the individual who requested this "head start," as part of their concerted effort to fabricate evidence that the Millersville pedophile sting was being conducted contrary to the requirements of Tennessee law.   In fact, shortly before the Millersville Operation, Kim Kelley called Taylor and stated that she had talked with "local law enforcement" or the "TBI" and they had advised that she was not allowed to conduct the operation in the manner that V4CR had requested her to do, i.e., by handling solicitations.   Taylor confirmed that law enforcement officers had to be the ones posing as minors during the solicitation, and he informed her that the MPD was going to conduct the Op in the manner requested by the Robertson County DA.

452.     After the sting had concluded on the evening of Sunday, May 19, 2024, a film crew of V4CR volunteers filmed Kim Kelley showing Millersville Officers Tiffany VanSciver and Matt Singleton several phones she claims she had been using to pose as a minor as part of an impromptu "on camera interview."

453.     In the video, Kim Kelley states to Officer Singleton and Officer VanSciver that she had been receiving texts and messages from various "perps" or "pervs" over the past three

days, but hands them her personal iPhone, which is pink in color and has a wallet attached to it, as seen in the following picture:



454.     Kim Kelley's pink iPhone contained several videos of another phone that somewhat resemble the Androids used by Millersville officers, but there are distinctions.  Although Kim Kelley claims that the videos and evidence on her iPhone was from working "full-time over the past three days," the videos all appear to have been filmed on the morning of Friday, May 17, 2024, around the time that the Millersville detectives were still setting up the decoy profiles on each of the six Ops Phones.  Thus, it appears that Defendant Kelley was providing false information to Singleton and VanSciver, most likely to fabricate

evidence that she had been texting with suspects entirely on her own throughout the duration of the Op.

455.     The entire MocoSpace Chats in the iPhone video are visible in the high-definition V4CR video of Kim Kelley's iPhone, but none of those chats showed any conversations with Henry Dean Jordan.  An excerpt of the multiple screens shows that the profile names can be seen in the V4CR video:



456.     All of the chat history seen in the video on Kim Kelley's phone actually shows videos taken only on the morning of Friday, May 17, 2024, shortly after or during the time when the phones profiles were being set up.     However, Kim Kelley told Officers

VanSciver and Singleton that the videos on her pink iPhone represented "the entire inbox" of what she had accumulated on her phone over the past three days.

457.     Defendant Drake claimed to have provided the secret recordings made by Kim Kelley to Phil Williams at News Channel 5.  Although Kim Kelley and the NewsChannel 5 Defendants falsely represented that the video showed her chatting with Henry Dean Jordan, nothing shown in the video clip identified the person whom Kim Kelley was texting or messaging.

458.     Defendant Drake admitted in his Heartland Journal Podcast interview that he was constantly texting Kim Kelley during the sting.  Based on Drake's admissions, it is reasonable to assume, and Plaintiffs therefore aver that the "secret recordings" taken by Kim Kelley are actually of her texting Phil Drake, who was admittedly participating in the efforts to sabotage and obstruct the Millersville pedophile sting.

459.     Although it is not possible to determine who Kim Kelley was texting in the short excerpt of the staged "secret videos" that Kim Kelley provided to Channel 5, it does not appear to have involved any of the Millersville Ops Phones.

460.     Kim Kelley handed the phone to Officer Singleton and Officer VanSciver, and explained that she had used the same AI-augmented photo of herself to make herself look like a child under the age of 12.  This particular photo shows the AI generated photo of Kelley outdoors, whereas the profile pictures used during the sting were all taken indoors. This same AI-augmented photo was one of several that Kim Kelley sent in a batch of potential decoy profile photos to Det. Candler, which included some interior photos as well. Thus, the circumstances demonstrate that it would be remarkably easy for Kim Kelley to fabricate evidence that she was texting the suspects, as any pictures or video of the profile

she set up prior to the Millersville sting on one of the "burner phones" she admitted to purchasing would closely-resemble any profile made by Det. Dorris or Det. Candler. Plaintiffs therefore aver that some or all of the evidence that Kim Kelley provided to a local reporter and the TBI was not only selectively edited, but also falsified by Kelley and Drake.

461.    In the May 19, 2024 V4CR video of Kelley interacting with Millersville officers, two additional phones are seen by Kim Kelley's feet, neither of which appears to be one of the Millersville Ops Phones. Based on Kelley's repeated claims that she had been asked by V4CR to purchase phones in advance of the sting, it is reasonable to assume and Plaintiffs therefore aver that one or more of the phones that Kelley displayed in her "secret recordings" were actually one of the five generic smart phones that purchased on her own in early May of 2024. Kim Kelley never submitted invoices for reimbursement for these five "burner" phones she purchased, and Plaintiffs therefore aver that, if they were in fact purchased by Kelley, it was for Kelley and Drake's own malicious purpose to fabricate evidence and intentionally sabotage the Millersville/V4CR sting.

462.    Kim Kelley and the other volunteers had been instructed on what Tennessee law requires for unlawful solicitation of a minor, and all volunteers were aware that only the Detectives could handle the solicitations, and that only the "Ops Phones" purchased by Detective Candler were to be used for solicitations. Thus, to the extent that Kim Kelley chatted or texted with suspect Henry Dean Jordan, it not only must have occurred on a separate profile she created on a different phone, but she knew it was against the express instructions provided by the Millersville Police Department, did not take place on a Millersville Op Phone, and most likely did not even take place during the Millersville Operation. Kim Kelley has admitted she began texting with suspects two weeks prior to

the Operation commencing and Henry Dean Jordan's profile indicates it has been active since October 22, 2017. Moreover, as alleged in more detail below, she was the last person staying at the Chatter House on May 20, 2024 to fabricate additional evidence.

463.     On May 28, 2024, Phil Williams released the Covenant School Shooting Story, falsely claiming that Shawn Taylor denied that the shooting had ever occurred. The Covenant School Shooting occurred on March 27, 2023, at 9:22 am. Shawn Taylor's house was also shot up earlier that same morning between 5:00 am and 5:20 am, and the TBI had been called out to investigate the shooting. TBI Agent James Scarbro arrived and was part of that investigation, which NewsChannel 5 acknowledged was "still pending" in at least one of its stories.

464.     Evidence showed that a 9mm weapon had been used in the shooting of Shawn Taylor's house. TBI agents had to leave Shawn Taylor's house to respond to the scene of the Covenant School Shooting. It was later revealed that the shooter, Audrey Hale, used a 9mm carbine as part of her arsenal at the Covenant School. In the story, Shawn Taylor was criticized over comments he made on a podcast in which he stated that the bodycam videos that had been released by MNPD looked like a "Training Op." Contrary to the media report, Taylor never once stated that the Covenant School shooting did not occur. Nor did Taylor deny that students and teachers were killed by Hale or that MNPD had shot Hale.

### Capt. Dorris is Constructively Discharged

465.     From February 1, 2025 through May 6, 2025, Plaintiff Todd Dorris served as the interim Chief of Police for the City of Millersville. On May 5, 2025, Defendant Stephen

Hale began his first day as the newly appointed Chief of Police. Merely two days later, on May 7, 2025, Plaintiff Dorris was abruptly removed from all law enforcement duties, and reassigned to a non-operational office position. The stated reason for this demotion was that Plaintiff Dorris was "under investigation by the TBI," a claim that was based entirely upon false and defamatory media reports orchestrated and disseminated by Defendants Phil Williams, Levi Ismail, and the NewsChannel 5 Defendants.

466.    Following his removal, Plaintiff Dorris was stripped of meaningful responsibilities, and instead assigned to menial, degrading tasks, including the so-called "audit" of "stinky-pinky" trash cans across the City—an assignment devoid of any legitimate law enforcement purpose. During this period, from May 7, 2025 to June 20, 2025, Dorris was subjected to daily harassment, including repeated inquiries from superiors and coworkers asking whether he had "found a new job yet," and statements that he "needed to resign."

467.    This course of conduct created working conditions that were so objectively intolerable that a reasonable person in Dorris's position would have felt compelled to resign. Indeed, on June 20, 2025, after weeks of persistent badgering, public humiliation, and the complete erosion of his professional role, Plaintiff Dorris involuntarily resigned from his employment. His resignation was the reasonably foreseeable consequence of the employer's actions, and was the direct result of a deliberate scheme to force him out by isolating, degrading, and demoting him under false pretenses.

468.    Under the legal standard for constructive discharge, including consideration of Dorris's removal from police duties, reassignment to menial labor, public stigmatization based on unfounded allegations, and repeated inquiries suggesting he resign, Plaintiff

Dorris was constructively discharged in violation of U.S. employment law and applicable state protections.

## CAUSES OF ACTION

## COUNT I: DEFAMATION – TENNESSEE LAW

### *Defamation by Kim Kelley and Phil Drake*

469.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

470.     At the time Defendants Phil Drake and Kim Kelley published false and defamatory statements of and concerning Plaintiffs to a media outlet, on podcasts, and across various media, there was no particular public controversy regarding Plaintiffs. The pedophile sting operation involved law-enforcement activity, not a matter of public concern about Plaintiffs individually.

471.     Defendant Kim Kelley, with the assistance and backing of Phil Drake and their Affiliated Organizations, published numerous false and defamatory statements concerning Plaintiffs' role in the Millersville pedophile sting.  Kelley falsely claimed that volunteers were allowed to solicit suspects without any law enforcement supervision—despite overwhelming evidence that Detectives Dorris and Candler were present, personally handling the core "solicitation" phases. Kelley also misrepresented Detective Dorris's preliminary-hearing testimony, despite knowledge that Dorris's testimony concerned a single suspect (Henry Dean Jordan) and that his testimony was with regard to only the text messages with Jordan that had been labelled as "Exhibit 1" during the preliminary hearing.

472.     Defendants Kelley and Drake were aware that the prosecutor and lawyer questioning Det. Dorris during the preliminary hearing had asked specific questions about

Henry Dean Jordan, as well as "general" questions about what had transpired during the sting, and they intentionally misrepresented Det. Dorris's answers via partial playback manipulation to create the illusion that Dorris had committed perjury.

473.     Defendants Kelley and Drake intentionally mischaracterized Det. Dorris as testifying that he and Candler "did everything" during the sting, which Dorris never stated during his testimony at the preliminary hearing.  In fact, Det. Dorris testified only about a single suspect and his testimony was with regard to a single exhibit consisting of the text messages Dorris had with suspect Henry Dean Jordan.  Det. Dorris testified truthfully that he had, in fact, sent messages to suspect Henry Dean Jordan in the MocoSpace App and in subsequent text messages with Jordan off the App.

474.     Defendants Kelley and Drake failed to disclose that Detective Dorris's sworn statements were limited to one defendant, and that he never testified to "doing all the work" with every suspect on every one of the six (6) chatter phones used during the sting.

475.     By creating "secret videos" that only showed Kelley typing on a phone and the back of that phone, Kelley and Drake created a false impression that Dorris's testimony was false, when in fact their "secret recordings" do not actually show her texting with Henry Dean Jordan.

476.     Defendant Kim Kelley falsely published statements that (1) Detective Dorris did not set up the decoy account, (2) did not choose the profile photo, (3) never communicated with Jordan on the App, and (4) "never" sent any text messages to Jordan.  Video evidence from the morning of May 17, 2024 shows both Plaintiffs using Ops Phones to communicate in the MocoSpace App and send text messages outside the App in real time.   Timestamped photos taken by Det. Candler of the texts with Henry Dean Jordan show Det. Candler's

hand holding the Ops phone and the photos are contemporaneous with the times Jordan exchanged the messages.

477.    Defendants Phil Drake and Kim Kelley falsely published statements to others, including to the TBI, that the videos of Det. Candler and Det. Dorris were "staged" to cover up that they had not done any texting during the sting.  However, the allegation is implausible because the videos were taken at the beginning of the sting, not at the end of the sting.  Thus, there was nothing to "cover up" at the time the videos were taken.  Moreover, the detectives were seen in the videos sending actual messages and receiving advice from volunteers on what to say, which demonstrates that they were not acting or pretending as part of some "staged" video.  The videos prove that Det. Dorris's testimony was true.  Moreover, the "secret recording" that Kim Kelley published to others and claimed was proof of "staging," was actually a video where she speaks off camera to a member of a documentary film crew that either V4CR or another volunteer had brought.  There were at least two different volunteers filming during the sting.  Because everyone had been instructed to not take any video or pictures of Det. Candler, these crews had to be careful where they set up their cameras to frame their shots.

478.    Defendants Kim Kelley and Phil Drake also fabricated or manipulated "evidence" that they provided to Phil Williams at Channel 5 and others to create the illusion that Kelley was involved in the messaging and texting with Henry Dean Jordan, when in fact none of the excerpts of the videos shown on the Channel 5 broadcasts actually show who Kim Kelley is texting.  At most, the excerpts just show the back of a phone that does not appear to be an Ops Phone.  Defendant Drake later admitted in Episode 240 of the Heartland Journal Podcast that he was texting Kim Kelley during the undercover sting.

479.     Defendant Drake and Defendant Kelley published false and defamatory statements of and concerning Plaintiffs that they "had been told by prosecutors that the sting would only be legal if sworn law enforcement officers were the ones doing all the work." In fact, the MPD and Plaintiffs were specifically informed, and they instructed Kim Kelley, that prosecutors required that the detectives handle *the solicitation*, which is exactly what Tennessee law requires.

480.     Moreover, the Defendants knew or should have known that Henry Dean Jordan was not only *never* questioned by the Plaintiffs, but also that he never declined to be questioned. The Defendants also knew that the Plaintiffs never "handed over" Jordan to a documentary crew. Yet, the Defendants falsely stated that after Jordan first "refused to be questioned" that the Plaintiffs then handed him over to a documentary film crew to be interrogated against his will. In fact, the Plaintiffs had Jordan's text messages, did not need to question him, and had no intention of questioning him. Jordan volunteered the statement, "I never touched that girl." Jordan then voluntarily engaged with a camera crew that had been brought in by V4CR or another volunteer. The Defendants' false allegations and intentional omissions of fact were calculated to paint Detectives Dorris and Candler as incompetent, unethical, and guilty of criminal misconduct.

481.     Defendants published additional statements about Plaintiffs to the media, in podcasts, on other social media platforms, and to numerous other persons, with knowledge or reckless disregard for the falsity of the statements, or at least with negligence in failing to verify the truth of those statements. Specifically the Defendants made additional false and defamatory statements of and concerning Plaintiffs:

a. That the Plaintiffs engaged in a scheme to intentionally circumvent Tennessee law during the undercover sting;

b. That the Plaintiff's intentionally violated the civil rights and constitutional rights of suspect Henry Dean Jordan;

c. That the Plaintiffs never actually conducted the solicitation with Henry Dean Jordan, among other misrepresentations;

d. That the Plaintiffs staged or fabricated evidence, operated "illegally," and sought to conceal their wrongdoing, all of which were false;

***Defamation by Phil Williams, Levi Ismail, the NewsChannel 5 Defendants and NewsBreak***

482.    In their July 23, 2024 article, Defendants Phil Williams and NewsChannel 5 falsely and maliciously accused Plaintiff Detective Todd Dorris of committing perjury by selectively quoting edited recordings and falsely implying that civilian volunteers—not law enforcement—carried out the criminal solicitation of a child predator. Defendants presented unverified claims from a disgruntled volunteer as conclusive evidence, excluded exculpatory eyewitness testimony and official statements, and falsely portrayed Dorris and fellow officer Michael Candler as political extremists operating under rogue ideology. These calculated misrepresentations were published with actual malice or reckless disregard for the truth, constituting defamation per se and false light, and causing severe reputational, emotional, and professional harm.

483.    On July 29, 2024, Defendants Phil Williams and WTVF/NewsChannel 5 published a story falsely accusing Plaintiff Detective Todd Dorris of committing perjury by suggesting that he lied under oath regarding who conducted the online communications in a child predator sting. The article falsely states that Tennessee law "requires sworn law

enforcement officers to do the posing," and juxtaposes this with Dorris' sworn testimony, thereby accusing him of criminal misconduct. In addition, by referring to the police department as "embattled," implying illegal surveillance of political opponents, and using language such as "what happens when you give people with bizarre conspiracy theories a gun and a badge?" in connection with the operation, Defendants falsely portray Plaintiffs Dorris and Candler as ideologically driven, dishonest, and unfit for law enforcement. These false statements and misleading implications constitute defamation per se, and were made with actual malice or reckless disregard for the truth, causing reputational, professional, and emotional harm to the Plaintiffs.

484.     In the August 5, 2024 article titled "The Stories That Millersville Conspiracy Cop Tells About Himself," Defendants Phil Williams and NewsChannel 5 again reinforced their broader defamatory campaign against the Millersville Police Department and its officers, including Plaintiffs Todd Dorris and Michael Candler. While not named directly, Plaintiffs were falsely implicated by association through repeated reference to an ongoing TBI investigation, without any distinction that neither Candler nor Dorris is the subject of that inquiry. The article's opening line—"With the Millersville Police Department now the focus of a TBI investigation…"—deliberately cast suspicion over all department personnel, building upon prior reports accusing Plaintiffs of perjury and misconduct. This publication, in context with the series of defamatory broadcasts and online articles, constitutes defamation by implication, as it falsely portrays Plaintiffs as dishonest, unfit for public service, and complicit in ideological extremism or official corruption.

485.     In the August 12, 2024 article titled "TBI Limits Millersville's Access to Sensitive Law Enforcement Data," Defendants Phil Williams and NewsChannel 5 falsely and

maliciously implied that Plaintiffs Detective Todd Dorris and Detective Michael Candler engaged in criminal misconduct during a child-predator sting operation. The article falsely claims that "volunteers" conducted all online communications and that "secret recordings" contradict Dorris' sworn testimony. These statements accuse Dorris of perjury—a felony— and further imply that both detectives staged video footage to falsely portray themselves as having conducted the communications. These claims are false, are contradicted by eyewitnesses and physical evidence, and were published with actual malice or reckless disregard for the truth. Additionally, the article's misstatement of state law and its references to "conspiracy-minded cops" further smear the Plaintiffs' reputations and expose them to public contempt and professional harm.

486.     In the August 26, 2024 article titled "Millersville cops team up with so-called pedophile hunter who blames 'satanic cult masquerading as Jews'", Defendants Phil Williams and WTVF/NewsChannel 5 engaged in a deliberate act of defamation by implication and false light invasion of privacy by falsely associating Plaintiffs Detectives Michael Candler and Todd Dorris with what Channel 5 characterized as antisemitic conspiracy theories and extremist political ideologies. The article falsely states or implies that Plaintiffs "teamed up" with Craig Sawyer, who they claim was a controversial figure and who was not personally present with the Detectives for the sting, and whose views were unknown to Plaintiffs. The article refers to participants in the sting as "like-minded MAGA activists," falsely portraying Plaintiffs as political operatives rather than law enforcement professionals. These statements and implications are materially false, made with actual malice, and part of a broader defamatory campaign designed to discredit Plaintiffs and destroy their professional reputations.

487.    In the September 4, 2024 article titled "TBI agents raid Millersville Police Department, home of 'conspiracy cop,'" Defendants Phil Williams and NewsChannel 5 again falsely and maliciously implicated Plaintiff Detective Todd Dorris in criminal misconduct by asserting that the TBI is "investigating possible perjury" stemming from his testimony in a "botched child predator sting." This statement, made without reference to exculpatory evidence or clarification of Dorris' lawful conduct, constitutes defamation per se, as it imputes to him the commission of a felony. The article further placed Dorris in a false light by pairing his image with ongoing references to criminality, misconduct, and department-wide corruption. These defamatory implications were made with actual malice or reckless disregard for the truth, as Defendants had access to countervailing evidence and intentionally omitted it from their reporting.

488.    In the September 16, 2024 article titled "When QAnon Comes to Main Street: Investigating the Millersville Police Department and its 'Conspiracy Cop'," Defendants Phil Williams and NewsChannel 5 published materially false and defamatory statements of and concerning Plaintiffs Detective Todd Dorris and Detective Michael Candler. The article falsely accused Plaintiff Dorris of committing perjury during a child-predator sting operation, misrepresented Tennessee law regarding decoy profiles, and falsely implied that both Plaintiffs were ideologically aligned with extremist movements like QAnon. These statements were published with actual malice or reckless disregard for the truth, particularly given Defendants' repeated failure to include exculpatory evidence, eyewitness accounts, or video footage confirming that law enforcement officers—not civilian volunteers—conducted the online communications that led to arrest. The article constitutes

defamation per se, false light invasion of privacy, and a continuation of a broader campaign to discredit and harm the professional reputations of the Plaintiffs.

489.     Defendant Particle Media, Inc. d/b/a NewsBreak is liable for defamation and false light invasion of privacy for republishing and amplifying the false and defamatory articles authored by Phil Williams, including the September 16, 2024 article originally published by NewsChannel 5, including but not limited to stories accusing Plaintiffs of perjury, lawlessness, and participation in ideologically motivated or unlawful sting operations. By distributing these articles to a nationwide audience through its digital platform—without conducting any independent investigation, or including context or rebuttal—NewsBreak acted with reckless disregard for the truth and materially contributed to the reputational and emotional harm suffered by Plaintiffs. As a digital publisher, NewsBreak is not merely a passive conduit, but an active participant in the republication and algorithmic promotion of harmful content, and is therefore liable under well-established principles of defamation law prohibiting the republication of defamatory material.

490.     On October 22, 2024, Defendants Phil Williams and NewsChannel 5 republished materially false and defamatory statements in an article titled "GOP lawmakers threaten 'political fallout' for TBI's Millersville investigation." In that article, Defendants again falsely stated that a Millersville detective "may have committed perjury" during a child-predator sting operation—an accusation previously directed at Plaintiff Detective Todd Dorris. This repetition of a knowingly false allegation constitutes defamation per se, accusing Dorris of a felony without basis. The article also falsely referred to the sting as "botched," a term previously used to portray both Dorris and Detective Michael Candler as incompetent or unlawful. By failing to acknowledge contradictory evidence and by

continuing to smear the entire Millersville Police Department with implications of extremism and misconduct, Defendants have again published defamatory falsehoods with actual malice or reckless disregard for the truth, causing further reputational harm to both Plaintiffs.

491. In the December 9, 2024 article titled "Shawn Taylor Resigns from Millersville Police Department amid Criminal Probe," Defendants Phil Williams and NewsChannel 5 falsely and maliciously reinforced prior defamatory narratives concerning Plaintiffs Detective Todd Dorris and Detective Michael Candler. Although not named directly, the article repeated allegations of perjury and misuse of law enforcement data related to a child predator sting previously attributed to Detective Dorris. By referencing the operation and the department's alleged misconduct without acknowledging exculpatory evidence or clarifying that Plaintiffs were not subjects of any criminal investigation, Defendants created a continuing false implication that Plaintiffs were involved in criminal conduct or official corruption. This constitutes defamation by implication and omission, and was published with actual malice or reckless disregard for the truth.

492. The Defendants' false and defamatory statements portray Plaintiffs as immoral or disrespectful individuals, and include falsely accusing Detective Dorris of the crimes of perjury and aggravating perjury and falsely accusing Detective Candler of willfully participating in an illegal sting, intentionally circumventing Tennessee law, and violating the civil rights of a suspect who was, in fact, a serial child rapist.

493. Defendants made these false and defamatory statements as part of a coordinated and planned smear campaign designed to undermine Plaintiffs' credibility, harm their

standing in law enforcement, and simultaneously bolster Defendants' own unlawful and fraudulent racketeering schemes.

494.     Defendants deliberately and extensively published their statements to the widest possible audience—through mainstream media, social media, and podcasts—ensuring maximum reputational harm.

495.     The Defendants' statements were false, and Defendants either knew they were false or acted with reckless disregard for the truth. At a minimum, Defendants failed to conduct a reasonable investigation into the truth of their claims despite having access to evidence including recordings of Det. Dorris's testimony, videos, and time-stamped communications, contradicting their allegations.

496.     As a direct and proximate result of Defendants' defamatory statements, Plaintiffs have suffered and continue to suffer harm to their reputations in the law enforcement community and among the public.  Plaintiffs have endured personal humiliation, mental anguish, and emotional distress.  Plaintiffs have been forced to expend time and resources defending against these false charges.  Plaintiffs have also lost promotion opportunities, professional relationships, and Det. Candler has experienced the loss of the ability to pursue his role as an undercover narcotics officer.

497.     Because the Defendants' false allegations were part of video broadcast, were posted on the internet, and published in social media posts, etc., the defamatory matter constitutes libel under Tennessee law.

498.     To the extent the Defendants communicated the false and defamatory statements identified herein to others either verbally or orally, the Defendants are liable for slander under Tennessee law.

## COUNT II: FALSE LIGHT – TENNESSEE LAW

### *False Light Invasion of Privacy by Kim Kelley and Phil Drake*

499.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

500.     The Defendants' statements and accusations were widely disseminated—via interviews, media reports, podcasts, and social media—and placed Plaintiffs before the public in a false light that would be highly offensive to a reasonable person.

501.     The Defendants' false statements included the accusations that Plaintiff Todd Dorris perjured himself in official court proceedings, and that Plaintiff Michael Candler willfully participated in a scheme to violate a suspect's rights and Tennessee law during the Millersville sting.  The additional false statements include allegations that Det. Dorris perjured himself in official court proceedings, and that both Plaintiffs violated a suspects rights and intentionally circumvented Tennessee law during the Millersville sting.

502.     The Defendants falsely accused the Detectives of staging or manipulating videos of themselves chatting and texting with suspects as part of a scheme to deceive the public, prosecutors, and the court.

503.     The Defendants falsely stated that the officers needed a "siren" to arrest a suspect and that a suspect got away because of the lack of siren, which was stated to impugn the Plaintiffs' reputations and professionalism.  Blue lights are used to stop a vehicle, but there never was an opportunity to stop a suspect because Kim Kelley was falsely telling officers that "suspects" were on the way or approaching Millersville in order to fabricate the Defendants' false narrative and impugn the professionalism of Plaintiffs and their department.

504.     Defendants had actual knowledge or acted with reckless disregard for the falsity of their statements, given that the Defendants possessed or had access to clear evidence of Plaintiffs' legitimate law enforcement actions.

505.     They intentionally omitted exculpatory facts, including the facts that Plaintiffs carefully followed Tennessee law regarding soliciting suspects and instructed Defendant Kim Kelley and all volunteers on the same.

506.     The accusations described herein inherently impugn Plaintiffs' moral character and integrity as law enforcement officers, causing severe offense, embarrassment, and emotional distress. By sensationalizing these falsehoods, Defendants inflicted significant reputational and emotional harm.

507.     As a direct result of Defendants' false light invasion of privacy, Plaintiffs have suffered mental anguish, humiliation, emotional distress, and tangible harm to their professional standing.

*False Light Invasion of Privacy by Phil Williams and the NewsChannel 5 Defendants.*

508.     Defendants Phil Williams, Levi Ismail, WTVF-TV (NewsChannel 5), and its parent company Scripps Media, Inc., repeatedly and deliberately publicized false and misleading representations of and concerning Plaintiffs Todd Dorris and Michael Candler that placed them in a false light before the public, in violation of Tennessee common law.

509.     Through an ongoing series of televised broadcasts, online articles, and social media promotions, Defendants portrayed Plaintiffs as dishonest, extremist, conspiratorial, and criminally complicit, including false implications that Plaintiff Dorris committed perjury during sworn testimony and that both Plaintiffs participated in or condoned a "botched" and ideologically driven child predator sting.

510.     Defendants published and republished these allegations with the intent to sensationalize and damage, or with reckless disregard for the truth, despite having access to credible exculpatory information, including official statements from Millersville officials, law enforcement logs, and audio/video recordings that contradicted the defamatory narrative.

511.     Defendants further used visual media, selective editing, and omission of critical facts to create a deliberately misleading impression of Plaintiffs' conduct and character, including the use of out-of-context soundbites, staged imagery, and anonymous narration to suggest criminal behavior, ideological extremism, or dereliction of duty.

512.     These false and misleading portrayals were highly offensive to a reasonable person and caused Plaintiffs to suffer public scorn, reputational damage, emotional distress, and damage to their professional standing as law enforcement officers.

513.     Defendants' actions constitute False Light Invasion of Privacy under Tennessee law.

514.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be determined at trial.

## COUNT III: DEFAMATION BY IMPLICATION OR INNUENDO – TENNESSEE LAW

### Defamation by Implication or Innuendo by Kim Kelley and Phil Drake

515.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

516.     The Defendants published statements that omitted facts and distorted critical facts, thereby implying false narratives about Plaintiffs, their conduct, and their motives. In

particular, the Defendants omitted and distorted facts to create the false impression that Detective Dorris committed perjury and implied that Detective Candler knowingly engaged in illegal civil rights abuses during the sting.

517. In addition, the Defendants provided partial or manipulated playbacks of recordings to create a defamatory impression that would not have had the same defamatory meaning if the evidence had been presented to audiences in full.

518. The Defendants deliberately withheld or obscured material facts to distort the truth and create a false impression, including but not limited to the following facts:

a. That Defendants Phil Drake and Kim Kelley expressly intended to sabotage the Millersville pedophile sting because of some philosophical difference the Defendants had with V4CR about the best ways to combat child trafficking;

b. That Defendants Phil Drake and Kim Kelley agreed that Kelley would go to Millersville with the express intent of "taking out" Millersville police officers and members of V4CR;

c. That Defendants Phil Drake and Kim Kelley intended their sabotage of the Millersville sting to generate media attention for their own purported child-rescue operation;

d. Defendants Phil Drake and Kim Kelley failed to disclose that volunteers had specifically been instructed on the MPD's internal protocols and state law requiring law enforcement officers to handle the "solicitation" portion of the communications with suspects;

e. That if Defendant Kelley did handle a solicitation with any suspect, it was an express violation of the rules that had been instructed to Kelley and other Volunteers by Asst. Chief Taylor, Capt. Dorris, and others;

f. That Kim Kelley was aware that if she did handle a solicitation, that the Plaintiffs would not prosecute the case;

g. That if Kim Kelley did provide a "secret recording" of the back of a cell phone and herself purporting to send text messages and handle a solicitation, that it did not actually involve messages with Henry Dean Jordan and was against the rules;

h. That Kim Kelley was aware that Tim Brown discovered Henry Dean Jordan's profile and saw the warnings from others regarding Jordan, and that Brown immediately took the phone to Capt. Dorris who then personally managed the solicitation;

i. That Defendants Phil Drake and Kim Kelley knew the legitimate process by which Plaintiffs participated in the sting, including the fact that all Volunteers and Kim Kelley had been instructed on the requirements needed for a prosecution for the unlawful solicitation of a minor;

j. Defendant Kelley's omission that that Asst. Chief Taylor and Capt. Dorris had both informed her and others that only sworn law enforcement officers could handle the core solicitation from suspects;

k. Defendant Kelly's failure to clarify that volunteers like herself were merely to act as "chatters" with potential suspects until the decoy profile confirmed they were underage and the suspects were aware that they were speaking to a minor, at which

point the phones were supposed to be handed over to the detectives to handle the solicitation;

l. Defendants Phil Drake and Kim Kelley knew that no Millersville police officer ever instructed Kim Kelley or any other Volunteer to handle a solicitation of any suspect but failed to disclose these facts;

519. To the extent that Defendants Phil Drake and Kim Kelley have additional secret recording, they concealed the actual videos, photos, and time-stamped text messages showing the Plaintiffs themselves texting suspects and closely supervising volunteers;

520. By omitting these critical pieces of context, Defendants created a highly misleading narrative—portraying Plaintiffs as careless, unethical law enforcers trying to entrap suspects or violate their rights. In reality, the sting was conducted under lawful protocols. Kelley's and Drake's deliberate concealment of facts that would have exonerated Plaintiffs is proof of their malicious intent and reckless disregard for the truth.

521. The Defendants published false implications by omitting critical facts of and concerning the Plaintiffs to the public at large, including mainstream media viewers, social media followers, and podcast audiences.

522. Because the omitted information, taken together, would have dispelled the false impression that Detectives Dorris and Candler acted illegally, dishonestly, or corruptly, the Defendants are liable for defamation by implication or innuendo.

523. By selectively releasing or distorting the evidence, Defendants manufactured innuendo that Plaintiffs were unlawfully circumventing Tennessee law and violating the rights of a suspect, thus impugning their professional ethics and lawfulness. In addition,

the Defendants' selective release and distortion of evidence created an innuendo that Plaintiff Dorris had committed perjury.

524.    As a direct and proximate cause of the Defendants' unlawful acts and omissions, Plaintiffs suffered reputational harm, emotional distress, and potential lost career opportunities as a direct and proximate result of the defamatory innuendo.

***Defamation by Implication or Innuendo by Phil Williams, Levi Ismail, and the NewsChannel 5 Defendants***

525.    Defendants Phil Williams, WTVF-TV (NewsChannel 5), and Scripps Media, Inc., through a series of broadcasts, online publications, and accompanying commentary, made and disseminated a number of false, misleading, and defamatory statements and implications of and concerning Plaintiffs Todd Dorris and Michael Candler.

526.    While some of the individual statements made by Defendants may have been technically or facially true, Defendants carefully selected, edited, omitted, and arranged these facts in a manner designed to create a defamatory impression—namely, that Plaintiffs were dishonest, incompetent, lawless, politically extreme, or guilty of criminal misconduct including perjury, civil rights violations, or abuse of authority in the course of a child predator sting operation.

527.    Defendants consistently juxtaposed references to "botched stings," QAnon-aligned conspiracies, and unlawful conduct with references to Plaintiffs—particularly Plaintiff Dorris as the "lead detective"—without disclosing material facts known to them that would have negated or softened those defamatory inferences.

528.    For example, Defendants falsely implied that Plaintiff Dorris lied under oath regarding his role in the sting, while omitting that his testimony was corroborated by

eyewitness declarations and supported by law enforcement records and recordings. Similarly, Defendants implied that Plaintiffs acted in furtherance of extremist ideologies or rogue operations, when in fact their conduct followed guidance from prosecutors and departmental leadership.

529. Defendants also employed visual and structural innuendo, including edited clips, selective screenshots, headlines, and voiceovers that framed Plaintiffs' conduct as conspiratorial or unlawful, thereby enhancing the defamatory impact without stating overt falsehoods.

530. Under Tennessee law, even where statements are not explicitly false, the defamatory meaning conveyed by implication or innuendo is actionable, particularly where the speaker intends or knows the implication will be drawn (see *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978)).

531. The defamatory implications and innuendo created by Defendants' reporting were not justified, privileged, or protected, and were made with actual malice or reckless disregard for the truth, as Defendants had access to the full context, including exculpatory facts, but intentionally excluded or distorted those facts.

532. As a direct and proximate result of Defendants' publication of false and defamatory implications, Plaintiffs suffered severe reputational harm, emotional distress, public humiliation, and damage to their professional standing in the law enforcement community.

533. Plaintiffs demand judgment against Defendants for compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS, AT-WILL EMPLOYMENT, AND PROSPECTIVE BUSINESS RELATIONSHIPS – TENNESSEE LAW

*Tortious Interference by Defendants Kim Kelley and Phil Drake.*

534.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

535.    Plaintiff Detective Candler had an existing business relationship with the City of Millersville and was employed at-will as an undercover narcotics officer, plus prospective relationships with state/federal task forces and specialized undercover programs.

536.    Plaintiff Detective Dorris also had an ongoing business relationship, was employed at-will with the City of Millersville, and had prospective advancement opportunities in law enforcement.

537.    Plaintiffs Todd Dorris and Michael Candler served in good standing, with no prior disciplinary history or formal complaints concerning the operation at issue.

538.    The Defendants knew of Plaintiffs' roles and future prospects because of prior discussions and direct interactions with Plaintiffs and their colleagues.

539.    Defendants Kim Kelley and Phil Drake employed improper means, including defamation, misrepresentations, dissemination of confidential information, and other unethical conduct to undermine Plaintiffs' employment and prospective opportunities, including releasing secret recordings of Detective Candler, disclosing his undercover status, and publicly shaming Plaintiffs.

540.    The Defendants acted with malice when they undertook these actions with the specific intent to cause harm to Plaintiffs' relationships or at least with reckless disregard,

knowing their conduct would result in the breach or termination of Plaintiffs' present or future business relationships.

541.     As a direct and proximate result of the Defendants' tortious interferences, Detective Candler can no longer serve effectively as an undercover narcotics officer and his opportunities for specialized drug enforcement and potential task force assignments have been lost.  In addition, both Plaintiffs have been deprived of valuable professional goodwill, ongoing investigations, and access to specialized training and access to drug enforcement funds for overtime, court appearances, equipment, and similar expenses paid out of the drug fund for drug enforcement activities. In addition, Plaintiffs have suffered emotional distress, reputational harm, and financial losses.

***Tortious Interference by Phil Williams and the NewsChannel 5 Defendants.***

542.     Defendants Phil Williams, Levi Ismail, and the NewsChannel 5 Defendants were fully aware of Plaintiffs' employment status and their role in conducting an undercover child predator sting operation in May 2024.

543.     Beginning in or around July 2024, Defendants launched a coordinated media campaign targeting Plaintiffs, with the improper motive of attacking and discrediting them due to their perceived political affiliation, ideological beliefs, and their involvement in a law enforcement operation that Defendants sought to politicize for ratings, narrative control, or institutional retaliation.

544.     Throughout a series of high-profile broadcasts, headlines, and online articles, Defendants falsely accused Plaintiff Dorris of perjury, implied that both Plaintiffs were part of an unlawful or ideologically motivated operation, and suggested that they were

aligned with "QAnon" or "MAGA extremists," despite having no evidence that either Plaintiff held or expressed any such views.

545.    Defendants employed improper means to accomplish their goal, including but not limited to:

    a.  Publishing defamatory falsehoods and half-truths, including accusations of criminal perjury, falsification of evidence, and abuse of law enforcement powers;

    b.  Engaging in "evidence laundering" through the use of edited secret recordings, stock video footage falsely implied to be real, and manipulative visual juxtapositions;

    c.  Knowingly violating the Society of Professional Journalists (SPJ) Code of Ethics, including, but not limited to, its mandates to:

        i.  "Take responsibility for the accuracy of their work,"

        ii.  "Provide context,"

        iii.  "Avoid stereotyping,"

        iv.  "Distinguish news from advocacy," and

        v.  "Avoid deliberate distortion."

546.    Defendants further failed to disclose material exculpatory facts in their possession- such as video evidence confirming Plaintiffs' roles, and statements from city officials- which would have rebutted the false narrative they promoted.

547.    As a direct result of Defendants' intentional conduct, Plaintiff Todd Dorris was removed from all law enforcement duties, reassigned to non-operational roles, subjected to hostility and internal scrutiny, and ultimately constructively discharged from the Millersville Police Department.

548. Plaintiff Michael Candler, likewise, suffered severe reputational damage, was falsely portrayed as an extremist or rogue officer, and faced public and professional fallout that damaged his standing in the law enforcement community.

549. Defendants acted knowingly and intentionally, and their improper motive-to retaliate against Plaintiffs for their perceived political identity, to discredit their law enforcement work, and to further a sensationalized anti-police narrative-was the primary driving force behind their campaign of attacks.

550. Defendants' conduct constitutes tortious interference with Plaintiffs' at-will employment, and was accomplished through defamation, intentional omission of facts, ethical violations, and deliberate manipulation of public perception.

551. As a direct and proximate result of this interference, Plaintiffs have suffered loss of employment, income, career advancement opportunities, emotional distress, reputational harm, and ongoing damage to their personal and professional lives.

## COUNT V: MISAPPROPRIATION OF LIKENESS – TENNESSEE LAW
## (T.C.A. § 47-25-1105 et seq.)

552. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

553. Under Tennessee law, Plaintiff Michael Candler has a property interest in his name, photograph, and likeness, including his status and identity as an undercover narcotics officer.

554. Defendants Kelley, Drake, Williams, Ismail, and the NewsChannel 5 Defendants knowingly used, published, and infringed upon Candler's likeness by taking and releasing secret recordings of him without his consent and in violation of the express rules and

prohibition against filming or recording Det. Candler because he was the City's undercover narcotics detective.   releasing secret recordings and images of him without consent.

555.    The Defendants knowingly used, published, and infringed upon Candler's likeness for their own commercial advantage, including fundraising, soliciting donations, or drawing publicity to their purported 501(c)(3) "child rescue" programs and Drake's presidential campaign.

556.    The Defendants publicized or used these secret recordings "as an item of commerce," for advertising and fundraising aimed at promoting their own businesses, in direct violation of T.C.A. § 47-25-1105.

557.    Defendants Phil Williams, WTVF-TV (NewsChannel 5), and Scripps Media, Inc. have unlawfully and without consent used, published, and commercially exploited the likeness and identity of Plaintiff Michael Candler in broadcasts, online video segments, and written articles concerning the May 2024 child-predator sting operation in Millersville, Tennessee.

558.    Defendants used these images, video frames, and other representations of Candler's likeness in connection with the promotion and monetization of their news content, including segments aired through NewsChannel 5's syndicated partners and digital distribution platforms, for the purpose of attracting viewers and generating advertising revenue.

559.    As a direct result of Defendants' unauthorized and defamatory use of Candler's likeness, Plaintiff has suffered significant harm to his personal and professional reputation, including public ridicule, loss of professional standing, and emotional distress. He is

entitled to actual damages, disgorgement of profits, punitive damages, and injunctive relief to prevent further exploitation under T.C.A. § 47-25-1106 and § 47-25-1107.

560.     Det. Candler suffered loss of privacy, reputational harm, and diminished capacity to maintain secrecy in future undercover operations.

561.     As a direct and proximate result of the Defendants' unlawful acts and omissions, the Defendants profited from such unauthorized use by attracting attention, donations, and intangible benefits.  Det. Candler is therefore entitled to recover actual damages plus any profits attributable to the Defendants unauthorized use of his likeness, including any and all donations and fees obtained by the Defendants during their smear campaign, along with other statutory remedies available under T.C.A. § 47-25-1106.

## COUNT VI: MISAPPROPRIATION OF A TRADE SECRET – TENNESSEE LAW
## (T.C.A. § 47-25-1701 et seq.)

562.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

563.     Under T.C.A. § 47-25-1702, Detective Candler's identity and likeness as an undercover narcotics officer constitute a "trade secret" because his identity and likeness derive independent economic value from not being generally known to the public or other criminals who can exploit it.

564.     As a covert operator in ongoing criminal investigations, the confidentiality of his identity and role is essential to his ability to safely and effectively perform specialized police functions, including decoy operations, solicitation intercepts, and predator apprehension.

565.     Det. Candler made reasonable efforts to maintain the secrecy of his identity and likeness, as is standard procedure for undercover law enforcement personnel.  Defendant Kim Kelley was aware that Det. Candler was the undercover narcotics officer for the City of Millersville, and he wore plain clothes and drove an unmarked, undercover vehicle. Defendant Kim Kelley and other volunteers were specifically instructed to not photograph or film anyone or anything during the sting operation, but most specifically Defendant Kelley and other volunteers were told that Det. Candler could not be filmed or photographed under any circumstances because he was an undercover narcotics officer. This is the reason why Det. Candler was not included in the group photo that said "Team Mongoose."

566.     Kelley subsequently provided these materials to Defendant Phil Williams and the NewsChannel 5 Defendants, who used them in a nationally broadcast and widely republished defamatory campaign against Candler and other law enforcement officers.

567.     Phil Williams and the NewsChannel 5 Defendants' use and disclosure of Candler's likeness, methods, and presence in an undercover operation constituted misappropriation under T.C.A. § 47-25-1702(2)(B), as it involved disclosure of a trade secret without consent by a person who knew or had reason to know that the knowledge was derived from someone who owed a duty to maintain its secrecy. Defendant Kelley had access to this information solely through her limited, temporary, and subordinate volunteer role during the sting—subject to operational constraints, including the expectation and understanding that officer identities and methods would remain confidential.

568.     The Defendants used improper means—unauthorized filming, misrepresentations, and unlawful disclosure—to obtain and publish Det. Candler's identity despite knowing it was protected and confidential information.

569.     The Defendants disclosed or used Det. Candler's trade-secret identity without consent, violating T.C.A. § 47-25-1702(2)(B). They knew or had reason to know this information was subject to confidentiality for law enforcement purposes.

570.     The unauthorized release of these trade secrets caused irreparable harm to Plaintiff Candler's ability to perform future undercover work and has exposed him to personal safety risks, destroyed his operational anonymity, and rendered his law enforcement skill set functionally obsolete in future decoy or covert roles.

571.     As a direct and proximate result of the Defendants' conduct, Det. Candler has suffered an immediate and irreversible loss of the undercover advantage, destroying the economic value of Candler's secret identity.   In addition, Detective Candler lost professional opportunities, including specialized undercover assignments, as well as the associated benefits of specialized and advanced training, overtime, additional pay for working with a drug task force, and access to specialized drug funds that can only be spent on the City's drug enforcement program.

572.     Det. Candler is entitled to damages for his actual losses, injunctive relief, exemplary/punitive damages, and attorney's fees because the Defendants' shared malicious intent in exposing Det. Candler's identity for personal gain, corporate profit, and to sabotage the Millersville sting.

## COUNT VII: CONSPIRACY – TENNESSEE LAW

573.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

574.     The Defendants formed a common design or agreement among themselves, including with Does 1-25, to commit unlawful acts, or to commit lawful acts by unlawful means, including but not limited to:

    a.  Defamation, false light, and disparagement of Plaintiffs;

    b.  Intentional interference with Plaintiffs' at-will employment, business relationships and prospective business relationship; and

    c.  Misappropriation of trade secrets and Det. Candler's likeness.

575.     The Defendants engaged in multiple overt acts in furtherance of their unlawful conspiracy, including coordinating a smear campaign, releasing secret recordings, and publishing and posting false accusations, which acts included engaging in overt acts with Does 1-25 and which acts directly caused injury to Plaintiffs.

576.     As a direct and proximate result of the Defendants' unlawful conspiracy, including the named Defendants conspiring with Does 1-25, Plaintiffs have been damaged in their reputations, prospective business and employment relationships, and have suffered economic loss, emotional harm, and the destruction of Candler's trade-secret identity.

## FEDERAL CLAIMS

## COUNT VIII: MISAPPROPRIATION OF TRADE SECRETS - (18 U.S.C. § 1832)

577.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

578.     Detective Candler's identity/likeness as an undercover narcotics officer was used in undercover law enforcement narcotics operations involving the investigation, detection, and interception of illegal drugs that, by definition, flow through the instrumentalities of interstate commerce.  Det. Candler's identity/likeness is used in law enforcement operations that are interstate by nature, giving his undercover identity/likeness economic value from not being generally known, which constitutes a "trade secret" under 18 U.S.C. § 1839(3).

579.     Det. Candler spent much time and resources creating his undercover identity, including obtaining a fictitious driver's license or "cover license" from the Tennessee Department of Safety and Homeland Security to shield his real identity during undercover operations.  Det. Candler obtained documentation to support his undercover status so the State could issue valid credentials under an alias.

580.     Det. Candler also drove an undercover vehicle with a license plate officially registered under a fictitious name, which Defendant Kim Kelley took video or photographs of and provided to the media, the TBI, and others, including the other named Defendants and Does 1-25.

581.     Phil Williams and the NewsChannel 5 Defendants were therefore fully aware of the fact that Candler's identity was confidential due to the covert operations he would be working as an undercover officer, which secrets constituted non-public, sensitive operational law enforcement information that derived independent economic and practical value from being kept secret and not generally known to the public or to persons who could exploit it for improper advantages, which elements meet the definition of "trade secrets" under 18 U.S.C. § 1839(3).

582.     The Defendants acted with intent to convert this trade secret to their own use or benefit, including through monetization through viewership, advertising revenue, political influence, donor money, and other economic reasons, and they knew or should have known their acts were acquired by improper means, including deceptive recording and breach of trust by a non-law-enforcement volunteer, and that the Defendants' use of this information in interstate commerce broadcast across state lines would injure Det. Candler, who is the rightful owner of his undercover identity.

583.     The Defendants, without authorization and contrary to express rules prohibiting the same, photographed, recorded, transmitted, and publicized Candler's identity, violating 18 U.S.C. § 1832(a)(1)–(3). The Defendants' knowledge of Candler's undercover status underscores their improper means and motives in obtaining and disclosing protected information to harm Candler while promoting their own illicit businesses for personal gain.

584.     The Defendants' theft and misappropriation has rendered Det. Candler's identity useless for future undercover investigations, depriving him of significant economic and law enforcement value, causing him irreparable harm, causing permanent compromise of operational security, and causing substantial reputational and professional harm. Det. Candler also seek any additional civil remedies (e.g., disgorgement, injunctive relief) available under federal law.

585.     As a direct and proximate result of the Defendants' theft and misappropriation of a trade secret, the Defendants are liable to Det. Candler for an award of compensatory damages, exemplary or punitive damages, attorneys fees, and all other relief permitted under 18 U.S.C. § 1836(b) and related federal statutes.

## COUNT IX – VIOLATIONS OF RACKETEERING INFLUENCED CORRUPT ORGANIZATION ACT (18 U.S.C. §§ 1961–1968)

586.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

587.     Defendants Kim Kelley and Phil Drake, along with their affiliated and co-owned business entities (including but not limited to Uniting America Inc., Grow Online, LLC, and Digital Defenders United), as well as various unnamed Doe Defendants (1–25), have formed an association-in-fact constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  This enterprise exists separate and apart from the predicate acts in which it engages and operates under a common purpose of raising illicit funds and public attention for Defendants' so-called "child rescue" activities, which included the alleged buying, kidnapping, or stealing of children from traffickers by force, as well as harboring them at a "Survivor Center" surrounded by armed guards and concealing them from society until they reached adulthood, and plans to coerce them into labor at the "Survivor Center." Defendants also use this enterprise to solicit and launder donations through their 501(c)(3) organizations and Defendant Drake's political campaign, diverting money to themselves and evading regulatory oversight and proper taxation.

588.     The Defendants are engaged in interstate commerce, and the Defendants' enterprise activities affect interstate commerce because:

    a.     Defendants used online platforms, interstate travel, and out-of-state bank accounts to solicit donations and fees, and to move money across interstate lines;

b. Defendants traveled or caused travel to Millersville, Tennessee, from other jurisdictions for the purpose of sabotaging a police sting and disparaging Tennessee-based law enforcement officers to promote their illicit businesses; and

c. Defendants engaged in promotion of their business, including solicitation and demands of funds for illegal "child buying," child trafficking, and forced-labor operations that necessarily involve crossing state or national borders.

589. Over the relevant period, Defendants have committed multiple predicate acts as defined under 18 U.S.C. § 1961(1), forming a continuous pattern of racketeering activity that poses a threat of continued criminal conduct. These predicate acts include, but are not limited to:

a. The Defendants' violations of 18 U.S.C. § 1590 by Trafficking for Forced Labor or Involuntary Servitude, via the Defendants' scheme to "rescue" or buy children, conceal them at a "Survivor Center," and use them for labor at the compound, which constitutes trafficking under federal law;

b. The Defendants' violations of 18 U.S.C. § 1593A by Benefitting Financially from Peonage or Slavery, including knowingly profiting from their kidnapping, concealment and forced labor scheme, including soliciting donations from the public under false pretenses;

c. The Defendants' violations of 18 U.S.C. § 1960 for operating an Unlicensed Money Transmitting Business, including moving funds derived from illegal activities (including murder, kidnapping, forced labor, bribery of public officials) through the Defendants' nonprofit accounts, business accounts, and Defendant Drake's

presidential campaign accounts without the requisite state or federal money-transmitting license;

d.  The Defendants' violations of 18 U.S.C. § 1956 (Money Laundering), including the Defendants knowingly conducting financial transactions with proceeds from specified unlawful activities—such as kidnapping, trafficking, murder-for-hire, or forced labor—intending to promote further illegal conduct and to evade tax laws and financial reporting laws;

e.  The Defendant Drake's violations of 18 U.S.C. § 1958, Murder-for-Hire, due to Drake's public admissions to engaging in the systematic murder of the parents of migrant children and other "heinous acts" along the U.S.–Mexico border and transporting money to bribe officials, as part of a murder-for-hire scheme involving interstate facilities and foreign travel;

f.  The Defendants' violations of 18 U.S.C. § 1201, for Kidnapping children from their parents or traffickers by use of force or deception, harboring them without lawful authority, concealing them from the public and authorities, and transporting them across state lines;

g.  The Defendants' Misappropriation of Trade Secrets under 18 U.S.C. § 1832 for wrongfully disclosing and using the protected identity or "likeness" of Plaintiff Detective Candler—an undercover officer—to advance their illicit enterprise, knowing that Candler's identity was kept secret for law enforcement operations;

h.  The Defendants' Defamation, False Light, and Related State-Law Torts as Predicate Acts that are an integral part of RICO through wire fraud, including the Defendants' employment of misrepresentations, false statements, and public smear

campaigns to obtain money or property in the form of donations or other funds to obtain a professional advantage.

590.    In furtherance of their enterprise, Defendants conspired to sabotage the Millersville Police Department's undercover pedophile sting in May 2024 and thereafter by traveling to Millersville, infiltrating and influencing volunteers and officers, fabricating evidence, and launching a widespread media campaign to defame Detective Dorris and Detective Candler. The Defendants intentionally published false claims about Plaintiffs, including that they planned on intentionally circumventing Tennessee law regarding the unlawful solicitation of a minor, as well as intentionally deceiving prosecutors and the court, and the false allegations manipulation of evidence to suggest that Plaintiff Dorris committed perjury. By disparaging Plaintiffs and the conduct of the sting, Defendants enhanced and intended to enhance their own public profiles, draw attention to their 501(c)(3) "child rescue" schemes, and thereafter solicited additional donations and monies that were then laundered or funneled into their personal accounts, business accounts, and Drake's presidential campaign.

591.    Throughout all RICO-related counts, Plaintiffs claim actual and compensatory damages for lost employment, out-of-pocket costs, diminished professional opportunities, trade secret misappropriation, and reputational harm, as well as treble damages under 18 U.S.C. § 1964(c), attorneys' fees, and other relief deemed just.

592.    Plaintiffs have suffered concrete financial loss and injury to their business or property interests as a direct and proximate result of Defendants' racketeering conduct.

593.    Plaintiffs' damages include, but are not limited to:

a. Loss of Employment/Professional Opportunities. Plaintiff Candler's loss of ability to continue working undercover, including as part of a Task Force, was destroyed once Defendants publicly disclosed his identity; Plaintiff Dorris has similarly endured reputational harm, jeopardizing career advancement.

b. Misappropriation of Trade Secrets. Det. Candler's identity/likeness, which is both a property right and property interest, has independent economic value in undercover narcotics operations but was disclosed, destroying its secrecy and utility, thereby diminishing its actual and potential value.

c. Reputational Harm and Out-of-Pocket Expenses. Both Plaintiffs have lost money, including legal expenses, elimination of overtime and specialized pay, forfeit of access to valuable training paid through drug-enforcement funds, and have endured diminished goodwill, damaging their professional standing in law enforcement.

594. The Plaintiffs have incurred losses to their property and tangible business interests recoverable under the RICO Act.

595. Defendants' ongoing criminal scheme—centered on discrediting a legitimate law enforcement operation to exploit media coverage as free advertising and to promote their businesses and solicit donations for financial gain—proximately caused Plaintiffs' injuries. But for Defendants' smear campaign, misappropriation of Candler's undercover identity, and interference with Plaintiffs' employment relationships, Plaintiffs would not have suffered the aforementioned losses.

596. At all times relevant to this action, Defendants Phil Williams, WTVF-TV, and Scripps Media, Inc. were active participants in an ongoing racketeering enterprise

operating in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.

597.     The "enterprise" consists of a coordinated group of individuals and entities, including:

   a.  Defendants Phil Williams, NewsChannel 5/WTVF, and Scripps Media, Inc.;

   b.  Government actors including Cristina Templet, Dustin Darnall, Jesse Powell, Carla McCain, David Gregory, and others within the City of Millersville;

   c.  Non-governmental actors such as Kim Kelley, whose unlawful conduct was enabled, promoted, and laundered through the media platform operated by Williams and WTVF.

598.     This enterprise engaged in a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), including:

   a.  Wire fraud (18 U.S.C. § 1343) by knowingly publishing and transmitting falsehoods across state lines through internet, broadcast, and syndication platforms;

   b.  Misappropriation and public dissemination of confidential law enforcement information and trade secrets, including undercover officer identities and operations, in violation of both Tennessee trade secrets laws and federal law (18 U.S.C. § 1832);

   c.  Witness tampering and obstruction by coordinating defamatory retaliation against Plaintiffs for exercising their constitutional rights to testify truthfully and file legal claims;

   d.  Defamation and false light, used to facilitate official retaliation and destroy Plaintiffs' public service careers;

599.     Tortious interference with at-will employment, implemented in furtherance of the broader scheme to control political power and suppress dissent within municipal government.

600.     The purpose of the enterprise was to:

   a.  Remove and discredit individuals perceived as political threats;

   b.  Retaliate against public servants who would not support the Templet-Darnall faction;

   c.  Elevate friendly actors into public positions (e.g., Stephen Hale, Rob Richman);

   d.  Generate revenue and ratings by manufacturing scandal and sensationalizing false narratives;

   e.  And maintain control over the flow of information by laundering false claims through the appearance of investigative journalism.

601.     Defendants Phil Williams and NewsChannel 5 were central to the execution of the scheme, using their media platform to:

   a.  Disseminate defamatory and knowingly false stories;

   b.  Coordinate with sources like Kim Kelley, even participating in the editing and strategic release of "secret recordings" known to be misleading or out of context;

   c.  Publish false claims accusing Plaintiff Dorris of perjury, while ignoring exculpatory facts and testimony;

   d.  Engage in "media kickbacks" to cooperating government officials, including repeatedly favorable coverage of Darnall, Powell, and McCain, in exchange for behind-the-scenes cooperation and leaks.

602.     These activities were conducted through the use of interstate wire transmissions, including publication on digital platforms, affiliate distribution networks, syndicated re-publication via NewsBreak, and coordinated messaging across broadcast and social media.

603.     The predicate acts described above occurred repeatedly between May 2024 and January 2025, and represent a pattern of racketeering activity as defined under 18 U.S.C. § 1961(5) – involving multiple acts over a substantial period with continuity and shared purpose.

604.     As a direct and proximate result of Defendants' racketeering conduct, Plaintiffs have suffered:

   a.   Constructive discharge and employment loss;

   b.   Irreparable reputational harm;

   c.   Emotional distress;

   d.   Lost career prospects;

   e.   Legal costs and security risks.

605.     The violations of 42 U.S.C. § 1983 committed by the Defendants—including the willful retaliation against Plaintiffs for protected First Amendment speech, the coercive constructive discharge of Plaintiff Dorris, and the politically motivated deprivation of employment and reputation—also constitute criminal predicate acts under the Racketeer Influenced and Corrupt Organizations Act (RICO). Specifically, these actions implicate violations of 18 U.S.C. § 242, which makes it a federal crime for any person acting under color of law to willfully deprive another of rights, privileges, or immunities secured by the Constitution or laws of the United States. Defendants Templet, Darnall, Powell, McCain, and Gregory, acting outside the scope of their authority but under color of state law,

deprived Plaintiff Dorris of his First Amendment rights by removing him from duty, harassing him, and coercing his resignation in retaliation for whistleblowing and protected speech. Similarly, Defendants Williams and Kelley conspired with these officials and used the color of journalistic authority to further the deprivation of constitutional rights by knowingly publishing falsehoods to justify state retaliation.

606.    Additionally, Defendants' actions violate 18 U.S.C. § 241, which criminalizes conspiracies to injure, oppress, threaten, or intimidate any person in the free exercise or enjoyment of rights secured by the Constitution or U.S. law. The Defendants conspired to destroy Plaintiffs' careers, reputations, and protected speech rights by coordinating a campaign of false political attribution, defamatory media broadcasts, manipulated "evidence," and the exertion of public and political pressure on the City to remove Plaintiffs from public service. These conspiratorial acts, driven by shared political motives and orchestrated across state lines through wire communications, constitute overt acts in furtherance of a racketeering enterprise and satisfy the definition of predicate criminal acts under 18 U.S.C. § 1961(1).

607.    Accordingly, these acts—though actionable as constitutional torts under § 1983—also provide the criminal predicate foundation for civil RICO liability under 18 U.S.C. § 1962(c), and further support the claim that all Defendants knowingly and willfully engaged in a RICO conspiracy in violation of 18 U.S.C. § 1962(d).

608.    As a direct and proximate result of the Defendants' unlawful racketeering enterprises, Plaintiffs are entitled to an award of compensatory damages for the harm to their business, property, and reputations, as well as treble damages under 18 U.S.C. § 1964(c).   Plaintiffs are also entitled to the costs of this suit, an award of reasonable

attorneys' fees, and all other relief authorized by RICO and deemed just and proper by this Court.

**COUNT X – CONSPIRACY IN VIOLATION OF RICO ACT (18 U.S.C. § 1962(d))**

609.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

610.     Defendants Kim Kelley, Phillip Drake, and their Affiliated Organizations, as well as Defendant Does 1-25 have agreed to participate in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity. They also agreed to carry out the unlawful scheme with the specific intent to harm Plaintiffs' business and property interests as part of advancing their illegal fundraising, money-laundering, child-harboring, and forced-labor operations.

611.     Defendants Phil Williams, WTVF-TV, and Scripps Media, Inc., along with Templet, Kelley, McCain, Darnall, and Powell, knowingly agreed and conspired to conduct and participate in the affairs of the enterprise described above, through a pattern of racketeering activity along with Kim Kelley, Philip Drake, and their Affiliated Organizations.

612.     Defendants took overt acts in furtherance of the conspiracy, including:

   a.   Coordination and spread of false media narratives;

   b.   Coercive employment decisions driven by media coverage;

   c.   Suppression of whistleblowers and retaliation against Plaintiffs for protected activities;

   d.   Public promotion of fabricated narratives while strategically omitting known facts.

613.     Plaintiffs seek all relief available under 18 U.S.C. § 1964, including:

   a.  Treble damages;

   b.  Attorneys' fees and litigation costs;

   c.  Equitable relief to bar further retaliation;

   d.  Punitive damages to deter similar racketeering activity in the future.

614.     Each Defendant knew of and voluntarily joined in the conspiracy's objectives—namely, sabotaging the Millersville pedophile sting, defaming Plaintiffs, and channeling the resulting notoriety and donations into Defendants' own coffers. Defendants acted in concert with each other and with unidentified Doe Defendants (1–25), each of whom knowingly engaged in at least two or more predicate acts, as alleged in Count IX and incorporated by reference.

615.     As a direct and proximate result of the Civil RICO conspiracy, Plaintiffs suffered injury to their business and property, including lost wages, loss of prospective employment, damage to professional goodwill, misappropriation of trade secrets, and other pecuniary losses described more fully above.

616.     Plaintiffs respectfully reserve the right to amend their pleadings to add such federal causes of action as may be warranted based on ongoing discovery and developments in this case.

## COUNT XI: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT RETALIATION BASED ON FALSE POLITICAL ATTRIBUTION.

**(Against Defendants Phil Williams, Levi Ismail, NewsChannel 5 Defendants, Dustin Darnall, Jesse Powell, David Gregory, and Carla McCain)**

617.     Plaintiffs re-allege and incorporate all preceding paragraphs as if fully set forth herein.

618.     At all times relevant to this Complaint, Plaintiff Todd Dorris was a public employee of the City of Millersville, serving in an at-will capacity as Captain, and later as Interim Chief of Police.

619.     Beginning in or around May 2024, Defendants Phil Williams, Levi Ismail, and the NewsChannel 5 Defendants published a series of sensationalized and defamatory news reports targeting Plaintiffs Todd Dorris and Michael Candler, falsely suggesting that they were "MAGA extremists," members of the so-called "SCCR" (an acronym never meaningfully explained), and ideologically aligned with QAnon-style conspiracy theories.

620.     These false attributions were repeatedly advanced in news segments, articles, and social media posts, despite the Defendants' actual knowledge that neither Plaintiff had ever made political statements or engaged in conduct suggesting such affiliation.

621.     Defendants Dustin Darnall, Jesse Powell, David Gregory, and Carla McCain, all elected officials of the City of Millersville, publicly echoed and amplified these false political characterizations. They adopted and relied upon the false reporting by Phil Williams and NewsChannel 5 as the foundation for official government action.

622.     Defendant Cristina Rosado a/k/a Cristina Templet, although no longer holding elected office after November, 2024, remains actively engaged in manipulating and influencing official decisions within the City of Millersville, including directives issued to the City Manager and senior officials. In April 2025, Defendant Templet accidentally left a voicemail for former Interim City Manager Tina Tobin, in which she unwittingly disclosed her ongoing involvement in municipal affairs and her improper behind-the-

scenes communications with the new administration. This voicemail confirms that Defendant Templet continues to act as a shadow power broker, despite no official authority, and is engaged in coordinated efforts with other Defendants to shape personnel decisions, retaliate against political adversaries, and interfere with the operation of the City in ways that violate lawful process and public transparency. Her actions, as evidenced by her own inadvertent disclosure, demonstrate a continuing pattern of undue influence and covert political manipulation.

623.     In coordination with the media narrative, these officials engaged in state action by:

   a.  Hiring Stephen Hale as Chief of Police;

   b.  Ordering Chief Hale and the interim City Manager to remove Plaintiff Dorris from police duties based on the TBI's investigation, which had been instigated and fueled by the defamatory and ideologically charged media campaign;

   c.  Reassigning Plaintiff Dorris to menial and humiliating tasks;

   d.  Pressuring Hale and the City Manager to repeatedly ask Dorris if he had "found a new job yet" and advising that he "needed to resign";

   e.  Facilitating a path for Rob Richman to be hired in his place—despite being warned that doing so might cause the City to lose its insurance coverage.

624.     These actions culminated in the constructive discharge of Plaintiff Dorris on June 20, 2025, a direct and foreseeable result of the sustained campaign of political retaliation and public vilification.

625.     The motivating factor behind Dorris's removal and forced resignation was the false political attribution made publicly and repeatedly by the Defendants, including Phil

Williams and NewsChannel 5, and endorsed and acted upon by the Millersville Commissioners.

626.     Under the legal standards set forth in *Marsilio v. Vigluicci*, 924 F. Supp. 2d 837, *Zappola v. Hennig*, 20 F. Supp. 2d 1150, and *Sowards v. Loudon County*, 203 F.3d 426, Plaintiffs Todd Dorris and Michael Candler each state a valid claim for violation of their constitutional rights under 42 U.S.C. § 1983 because:

    a.  Plaintiff Todd Dorris was subjected to a tangible adverse employment action, including his forced removal from police duties, reassignment to humiliating non-law enforcement tasks, and eventual constructive discharge on June 20, 2025. Plaintiff Candler suffered reputational damage, loss of assignment credibility, and exclusion from law enforcement roles due to public defamation and targeted political attacks;

    b.  These adverse actions were motivated by false political attributions, including public and internal claims that both Plaintiffs were "MAGA extremists" or affiliated with a fabricated group referred to as "SCCR," despite having never expressed or acted upon such political affiliations;

    c.  These actions by government officials and their media co-conspirators were taken in retaliation for Plaintiffs' constitutionally protected speech, beliefs, and associations, and therefore violated their rights to freedom of thought, belief, and political association under the First and Fourteenth Amendments.

627.     The conduct of Williams and the NewsChannel 5 Defendants is inextricably intertwined with state action, because:

a. Their reporting was directly cited by public officials as justification for adverse action;

b. Their false narratives were used as the factual basis for state employment decisions;

c. The intended and actual effect of the reporting was to cause governmental removal of Plaintiffs from public office based on political ideology;

d. And the government actors and media defendants operated in a joint effort to remove Plaintiffs from their posts by discrediting them based on perceived political views.

628. The constructive discharge of Plaintiff Dorris was not only foreseeable—it was the intended consequence of this joint effort. The removal was not based on performance or misconduct, but on the political animus fueled by knowingly false allegations.

629. Plaintiffs seek relief under 42 U.S.C. § 1983 for violation of their First Amendment rights, including compensatory damages, punitive damages against non-governmental defendants, and injunctive relief to bar further retaliation.

630. In the alternative, and in addition to the First Amendment political-affiliation claims above, Plaintiff Dorris asserts a claim against the Defendants Cristina Rosado/Templet, Carla McCain, Dustin Darnall, Jesse Powell, and David Gregory for violating the First Amendment rights of Plaintiff Todd Dorris for blowing the whistle on public corruption and speaking out on matters of public concern.

631. Plaintiff Todd Dorris, while off duty and acting in his capacity as a private citizen, while off duty and in another jurisdiction hours from Millersville, exercised his First Amendment rights by voluntarily reporting unlawful financial conduct to the City's financial auditors. In or around late April 2025, Dorris traveled several hours in a private

vehicle, using his own time and resources, to report illegal activity occurring within the City of Millersville that the McCain/Darnall/Powell/Gregory administration was trying to cover up with the active participation of Cristina Templet within the City of Millersville.

632.    Specifically, Dorris blew the whistle on former City Recorder Holly Murphy, whose conduct included:

  a.  Illegally transferring money from the police drug fund for unauthorized expenditures;

  b.  Participating in the unlawful expenditure of $90,000 in City funds to Tim Lassiter for a fire hall buildout project that had never been approved by the Board of Commissioners;

  c.  Continuing to work behind the scenes as a "contractor" for the City in violation of statutory and insurance regulations, including acting without a proper bond and jeopardizing the City's municipal insurance coverage.

633.    Shortly after this whistleblowing activity, individual Defendants Cristina Templet, Carla McCain, Dustin Darnall, and Jesse Powell-all acting in coordination with Interim City Manager Keith Gorham and newly appointed Police Chief Stephen Hale-retaliated against Plaintiff Dorris in direct response to his protected speech.

634.    Within days of his visit to the auditors, Plaintiff Dorris was:

  a.  Abruptly removed from all police duties;

  b.  Reassigned to the former finance director's office and stripped of any law enforcement role;

c.   Assigned to a menial, humiliating "audit" of the number of portable "stinky pinky" trash cans around the City, a task clearly designed to demean and pressure him into resignation;

d.   Subjected to daily comments and suggestions that he resign or find another job, creating an intolerable work environment.

635.   This campaign of retaliation was motivated in part by Dorris's exercise of protected First Amendment speech on a matter of public concern-namely, exposing public corruption, illegal spending, and regulatory noncompliance by a former City official who was actively meddling in City affairs and jeopardizing the City's insurance coverage for personal and political reasons unrelated to her non-existent office.  She was also operating without the mandatory bond required of municipal officers and without having taken the oath of office.  Defendants' actions were carried out under color of state law and had the foreseeable and intended consequence of constructively discharging Plaintiff from public employment in violation of his constitutional rights.

**COUNT XII:  MUNICIPAL LIABILITY UNDER *MONELL* – 42 U.S.C. § 1983**

636.   Defendant City of Millersville, through its elected officials, appointed administrators, and senior law enforcement personnel, is liable under 42 U.S.C. ¬ß 1983 for violating Plaintiffs' constitutional rights pursuant to the doctrine set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

637.   Between May 2024 and June 2025, the City of Millersville, acting through final policymakers including Commissioners Cristina Templet, Dustin Darnall, Jesse Powell, and Carla McCain, as well as appointed officials including Interim City Manager Keith Gorham and Chief of Police Stephen Hale, implemented and enforced an official policy,

practice, or custom of retaliating against perceived political dissidents within the City government-particularly targeting Plaintiffs Detective Todd Dorris and Detective Michael Candler.

638.     The City knowingly removed Plaintiff Dorris from his law enforcement role, stripped him of meaningful duties, subjected him to humiliating and degrading tasks, and ultimately forced his resignation, solely because of:

    a.  His perceived political affiliation (i.e., being a "MAGA extremist" or member of the so-called "SCCR");

    b.  His protected speech, testimony, and participation in an undercover operation;

    c.  And pressure arising from a coordinated and defamatory media campaign instigated by Phil Williams and NewsChannel 5.

639.     The City acted with deliberate indifference to Plaintiffs' constitutional rights and ratified the retaliatory conduct of its agents through:

    a.  Its failure to discipline or correct the misconduct;

    b.  The intentional hiring and use of department heads (Hale and Gorham) to carry out the political purge;

    c.  Its endorsement of policies and decisions that foreseeably violated the First and Fourteenth Amendments.

640.     Accordingly, the City of Millersville is liable under *Monell* for the constructive discharge, political retaliation, viewpoint discrimination, and deprivation of liberty and reputation inflicted upon Plaintiffs by City officials acting under color of law and pursuant to official policy or custom.

641.     As a direct and proximate result of the Defendants' misconduct, Plaintiffs are entitled to an award of compensatory damages, attorney's fees, and all other relief available under 42 U.S.C. § 1983.

642.     In the alternative and in addition to the above constitutional claims, Todd Dorris asserts the City of Millersville is liable for implementing or ratifying the unconstitutional retaliation for him having blown the whistle on a matter of public concern, in violation of his First Amendment Rights.

643.     The City of Millersville, acting through its final policymakers—including members of the Board of Commissioners and the City Manager's office—ratified and directly participated in the unconstitutional retaliation against Plaintiff Todd Dorris for exercising his First Amendment rights as a private citizen.

644.     The decision to strip Plaintiff Dorris of law enforcement authority, remove him from public safety functions, and assign him degrading tasks occurred immediately after the City became aware of his whistleblowing disclosures to the state auditors. These actions were undertaken with the approval, encouragement, or at the direction of City leadership, including Commissioners Templet, McCain, Darnall, Gregory, and Powell, who viewed Plaintiff's speech as a political threat to their power and control.

645.     The City, through its final policymakers, maintained a policy, practice, or custom of punishing dissenting speech by reassigning, isolating, or terminating public employees who exposed internal wrongdoing or opposed the dominant political faction. The City's failure to protect Plaintiff Dorris or investigate his retaliation claim—combined with its active role in the coercive environment that forced his resignation—renders it liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

646.     This policy of retaliation against constitutionally protected speech caused Plaintiff's constructive discharge, and deprived him of his rights under the First and Fourteenth Amendments, including the right to speak freely on matters of public concern without fear of professional reprisal or coordinated political punishment.

## DAMAGES

647.     Plaintiffs bring this suit for all damages recoverable under Tennessee and federal law.

648.     Plaintiffs seek an award of punitive damages against the Defendants, jointly and severally, for the Defendants intentional, reckless, malicious and fraudulent conduct in an amount sufficient to punish the Defendants wrongful conduct and to deter the Defendants and others from similar misconduct in the future.

649.     Plaintiffs have experienced and will continue to experience damages to their persons, business interests, and property interest, including, but not limited to the following:

   a. Lost wages,

   b. Out-of-pocket expenses,

   c. Damage to the professional reputations,

   d. Loss of career opportunities and future career opportunities

   e. Loss of case productivity effecting performance evaluations, promotions, and continued employment in specialized roles;

   f. Exclusion from professional circles;

   g. Inability to work in specialized roles;

   h. Loss of standing in the law enforcement community;

i.   Loss of professional standing and the economic value of professional standing;

j.   Loss of earnings potential in current and future employment;

k.   Loss of cases and investigative files, which is a unique form of intellectual and professional property in the field of law enforcement;

l.   Increased likelihood of early retirement or termination due to the false allegations and subsequent fallout, directly impacting the benefits accruing through continued employment, including benefits, accrued leave, and retirement contributions;

m.  Loss of professional equipment and resources, including access to investigative tools necessary for fulfilling their roles, further diminishing their property interests in their assigned work;

n.   Devaluation of professional credentials, which carry value in employment or consulting opportunities, due to the false allegations of the Defendants

o.   Damages for mental anguish and emotional distress;

p.   Damages for loss of goodwill and public trust;

q.   Damages for professional isolation leading to financial and career setbacks; and

r.   Increased legal and financial burdens, including legal costs for representation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray:

1.  That process issue, requiring the Defendants to answer in the time prescribed by law;

2.  That Plaintiffs be awarded a judgment and all damages recoverable under Tennessee law for the Defendants' defamation of Plaintiffs, including but not limited to actual damages for injury to reputation, mental anguish, and other relief the Court deems proper;

3. For equitable and injunctive relief prohibiting all Defendants from further publishing or disseminating defamatory materials, or otherwise retaliating against Plaintiffs for exercising constitutional rights, and for a takedown order requiring the removal of all false public statements;

4. That Plaintiffs be awarded a judgment and all damages, including actual and compensatory damages, for invasion of privacy, as well as any further relief the Court deems equitable and just;

5. That Plaintiffs be awarded a judgment and all damages recoverable under Tennessee law for the Defendants' defamation by implication or innuendo, including actual, compensatory, and other appropriate damages plus any additional relief the Court finds just and proper;

6. That this Court enter a judgment for misappropriation of Plaintiff Michael Candler's likeness for all applicable damages, including actual damages, disgorgement of profits, viewer revenue, ad revenue, and any "donations" or "awards" obtained by the Defendants, and any further relief available under T.C.A. § 47-25-1101 et seq.;

7. That Plaintiff Michael Candler be awarded a judgment all damages recoverable under Tennessee law for the Defendants' misappropriation of trade secrets, including but not limited to statutory damages, disgorgement of profits, actual damages, unjust enrichment, a reasonable royalty, exemplary damages, plus a reasonable attorneys' fees under T.C.A. § 47-25-1705;

8. That this Court enter judgment against Defendants, holding them jointly and severally liable for their roles in conspiring to conduct the RICO enterprise through a pattern of racketeering activity;

9. Treble damages, attorneys' fees, costs, and all other relief authorized by virtue of the Defendants' violations of the Racketeering Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961–1968, including both direct damages and conspiracy liability under 18 U.S.C. § 1962(c) and (d);

10. That this Court declare that the Defendants' conduct – including the publication of knowingly false and defamatory statements, retaliatory employment actions, participation in a coordinated smear campaign, and targeting of Plaintiffs for perceived political beliefs and for retaliating against Todd Dorris for speaking out on a matter of public concern – violated Plaintiffs rights under the First and Fourteenth Amendments to the United States Constitution and constitute unlawful acts under federal and state law.

11. That Plaintiffs be awarded a judgment from and against the Defendants for actual and compensatory damages in an amount in accordance with the proof at trial, but not less than ten million ($10,000,000) dollars for each Plaintiff.

12. That this Court enter an award of punitive damages against the Defendants in an amount sufficient to deter others from like conduct in the future, in an amount of ten million ($10,000,000) dollars for each Plaintiff, or a greater amount if proven at trial;

13. That this Court enter judgment against Defendants, jointly and severally, for damages (including treble damages), attorneys' fees, costs, and any such other relief as the Court deems fair and equitable;

14. For an award of attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988, 18 U.S.C. § 1964(c), T.C.A. § 47-25-1705,

15. That Plaintiffs be awarded their court costs and discretionary costs in this matter; and

16. For such other, general relief to which the Plaintiffs are entitled.

**Plaintiff demands a trial by jury for all issues so triable.**

Respectfully submitted,


 _/s/ Bryant Kroll_
Bryant Kroll (#33394)
The Law Office of Bryant Kroll
P.O. Box 219,
Pegram, TN 37143
Bryant@BryantKroll.com
Office: (615) 994-1837

*Attorney for Plaintiffs*